IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CONRAD SMITH, et. al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Case No. 21-2265 |
| | ) | |
| DONALD J. TRUMP, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

**DEFENDANTS DONALD J. TRUMP AND DONALD J. TRUMP FOR
PRESIDENT INC.'S MEMORANDUM IN SUPPORT OF THEIR
<u>MOTION TO DISMISS</u>**

Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
*Attorney for Donald J. Trump
and Donald J. Trump for
President, Inc.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. I

TABLE OF AUTHORITIES ....................................................... III

BACKGROUND 2

ARGUMENT     7

I.     The Constitution Forecloses All Of Plaintiffs' Claims Against President Trump. ............................................................................ 9

   a.    Absolute immunity bars Plaintiffs' claims against President Trump .... 9

   b.    The political question doctrine bars Plaintiffs' claims against President Trump. ........................................................................... 14

   c.    Res judicata and collateral estoppel foreclose Plaintiffs' claims .......... 16

      1.    All of Plaintiffs' claims arise from the same common nucleus of facts. ................................................................................ 17

      2.    Plaintiffs are in privity with Congress. ...................................... 18

      3.    The Senate's Impeachment trial is a final judgment on the merits issued by a court of competent jurisdiction. ..................... 20

      4.    Statutory construction of the Impeachment Judgment Clause shows that only an individual convicted is subject to follow-on litigation, and only for criminal offenses .................... 22

   d.    Well-established First Amendment jurisprudence bars Plaintiffs' claims based on President Trump's protected political speech. .................. 23

      1.    President Trump's speech was petitioning activity undertaken in his official capacity ...................................................................... 25

      2.    President Trump's speech does not meet the standard for incitement under Brandenburg v. Ohio. .......................... 26

      3.    Incitement is limited to true threats and a holding to the contrary would subject anti-riot laws to facial challenges. ............ 27

      4.    Plaintiffs' reading of § 1985 and argument for liability would result in such expansive liability to subject the statute to a facial challenge. ............................................................ 28

II.    This Court Lacks Personal Jurisdiction Over the Trump Campaign ........ 30

III.    Plaintiffs Have Failed to State a Claim. ...................................................32

   a.   Plaintiffs do not allege a violation of 42 U.S.C. § 1985(1). .........................33

   b.   Plaintiffs' claim under 42 U.S.C. § 1986 fails as it is contingent upon stating a claim under § 1985. ............................................................36

   c.   Plaintiffs' State law claims fail because their lawsuit is based on federal question jurisdiction, and their federal claims are insufficient. ......36

     1.   Bias-Related Crimes Act ...................................................37

       A.   Plaintiffs fail to plead that President Trump was generally aware of his role in an illegal activity or that he provided the "substantial assistance" necessary for aiding and abetting liability...................................38

       B.   Plaintiffs fail to plead that other Defendants had an agency relationship with President Trump. ......................39

       C.   Plaintiffs Fail to Plead Acts of Terrorism and Malicious Burning, Destruction, or Injury of Another's Property...................................................40

       D.   Rioting and Inciting to Riot ................................................41

     2.   Assault, Battery, and Negligence ................................................42

CONCLUSION ............................................................................................44

CERTIFICATE OF SERVICE.......................................................................45

# TABLE OF AUTHORITIES

## Cases

*Accord Gometz v. Culwell,*
   850 F.2d 461, 464 (7th Cir. 1988) ............................................................... 33

*Allen v. District of Columbia,*
   187 A.2d 888, 889 (D.C. 1963) ............................................................ 24, 25

*Allen v. McCurry,*
   449 U.S. 90, 94 (1980) ....................................................................... 17, 18

*Apotex, Inc. v. FDA,*
   393 F.3d 210, 217–18 (D.C. Cir. 2004) ...................................................... 17

*Ashcroft v. Free Speech Coal.,*
   535 U.S. 234, 253 (2002) ..................................................................... 5, 27

*Ashcroft v. Iqbal,*
   556 U.S. 662, 678 (2009) .......................................................................... 33

*Baker v. Carr,*
   369 U.S. 186, 217 (1962) .......................................................................... 15

*Bancoult v. McNamara,*
   445 F.3d 427, 432 (D.C. Cir. 2006) ...................................................... 15, 41

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544, 549 (2007) .......................................................................... 33

*Blassingame et al. v. Donald J. Trump,*
   Case No. 1-21-cv-00585 .......................................................................... 1, 8

*Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.,*
   402 U.S. 313, 323–24 (1971) ................................................................... 16

* *Brandenburg v. Ohio,*
   395 U.S. 444, 449 (1969) ................................................................. passim

*Calomiris v. Calomiris,*
   3 A.3d 1186, 1190 (D.C. 2010) ................................................................ 16

*Chaplinsky v. New Hampshire,*
   315 U.S. 568 (1942) ................................................................................. 24

*Cockrum v. Donald J. Trump for President, Inc.*,
   319 F. Supp. 3d 158, 174 (D.D.C. 2018) ............................................................ 30, 31

\* *Crawford-El v. Britton*,
   523 U.S. 574, 588 (1998) ........................................................................................ 12

*Crist v. Bretz*,
   437 U.S. 28, 40–41 (1978) ...................................................................................... 22

*Daimler AG v. Bauman*,
   571 U.S. 117, 127 (2014) ........................................................................................ 30

*Dalton v. U.S.*,
   71 Ct. Cl. 421, 425 (1931) ...................................................................................... 34

*Duarte v. Nolan*,
   190 F. Supp. 3d 8, 15 (D.D.C. 2016) ...................................................................... 30

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   472 U.S. 749, 758–59 (1985) .................................................................................. 24

*Feiner v. New York*,
   340 U.S. 315, 321 (1951) ........................................................................................ 25

*Franklin v. Massachusetts*,
   505 U.S. 788, 827 (1992) (Scalia, J., concurring) ................................................ 11

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477, 498 (2010) ........................................................................................ 34

*Griffin v. Breckenridge*,
   403 U.S. 88, 101 (1971) .......................................................................................... 29

*Halberstam v. Welch*,
   705 F.2d 472, 478 (D.C. Cir. 1983) ........................................................................ 38

\* *Harlow v. Fitzgerald*,
   457 U.S. 800, 807 (1982) .................................................................................. 11, 12

*Haynesworth v. D.H. Stevens Co.*,
   645 A.2d 1095, 1098 (D.C. 1994) .......................................................................... 42

*Herrion v. Children's Hosp. Nat'l Med. Ctr.*,
   448 F. App'x 71, 72 (D.C. Cir. 2011) ...................................................................... 16

iv

*Hollingsworth v. Perry*,
 570 U.S. 693, 713 (2013) ...................................................................... 39

*Imbler v. Pachtman*,
 424 U.S. 409, 423 (1976) ......................................................... 12, 13, 14

*Investors Research Corp. v. SEC*,
 628 F.2d 168, 178 (D.C. Cir. 1980) ...................................................... 38

*Japan Whaling Ass'n. v. Am. Cetacean Soc.*,
 478 U.S. 221, 230 (1986) ................................................................. 14, 15

*Jefferson Sch. of Soc. Sci. v. Subversive Activities Control Bd.*,
 331 F.2d 76, 83 (D.C. Cir. 1963) ........................................................... 18

*Kaiser Grp. Int'l, Inc. v. World Bank*,
 420 F. App'x 2, 5 (D.C. Cir. 2011) ........................................................ 39

*Lewis v. Drug Enf't Admin.*,
 777 F. Supp. 2d 151, 161 (D.D.C. 2011), *aff'd*, 2012 WL 1155698 (D.C. Cir. 2012)
 ............................................................................................................ 17

*Lewis v. News-Press & Gazette*,
 782 F. Supp. 1338, 1342 (W.D. Mo. 1992) ........................................... 35

*Maniaci v. Georgetown Univ.*,
 510 F. Supp. 2d 50, 64 (D.D.C. 2007) ................................................... 40

*McCord v. Bailey*,
 636 F.2d 606 (D.C. Cir. 1980) ............................................................... 33

*McFadden v. U.S.*,
 576 U.S. 186, 197 (2015) ....................................................................... 29

*McIntyre v. Fulwood*,
 892 F. Supp. 2d 209, 216 (D.D.C. 2012) .......................................... 17, 18

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
 466 U.S. 789, 816 (1984) ....................................................................... 24

*Mitchell v. Forsyth*,
 472 U.S. 511, 521 (1985) ....................................................................... 10

*Morse v. Frederick*,
 551 U.S. 393, 442 (2007) (Stevens, J., dissenting) ........................ 5, 27, 37

*Nixon v. Fitzgerald,*
   457 U.S. 731, 744 (1982) ................................................................. 10, 12

*Nixon v. United States,*
   506 U.S. 224, 229–30 (1993) ............................................................ 20, 21

*Nixon v. United States,*
   938 F.2d 239, 246 (1991) ....................................................................... 21

*Noto v. United States,*
   367 U.S. 290, 297 (1961) ......................................................................... 5

*Palsgraf v. Long Island Railroad Co.,*
   248 N.Y. 339, 341 (1928) ....................................................................... 43

*Pierson v. Ray,*
   386 U.S. 547, 554 (1967) ....................................................................... 10

*Presley v. Commercial Moving & Rigging, Inc.,*
   25 A.3d 873, 888 (D.C. 2011) ................................................................ 42

*Rockwell v. Morris,*
   12 A.D.2d 272, 279 (N.Y. Sup. Ct. 1961) .............................................. 24

*Secretary of State of Md. v. Joseph H. Munson Co., Inc.,*
   467 U.S. 947, 958 (1984) ....................................................................... 28

*Sessions v. Dimaya,*
   138 S. Ct. 1204, 1212 (2018) ................................................................. 28

*Smalls v. United States,*
   471 F.3d 186, 192 (D.C. Cir. 2006) ....................................................... 16

*Snyder v. Phelps,*
   562 U.S. 443, 451–52 (2011) ................................................................. 24

*Stern v. U.S. Gypsum, Inc.,*
   547 F.2d 1329, 1337 (7th Cir. 1977) ..................................................... 35

*Sunshine Anthracite Coal Co. v. Adkins,*
   310 U.S. 381, 402–03 (1940) ................................................................. 19

*Tenney v. Brandhove,*
   341 U.S. 367, 376 (1951) ............................................................ 10, 12, 13

*Thomas v. Collins,*
  323 U.S. 516, 535 (1945) ........................................................... 5, 27, 37, 41

*Transamerica Leasing, Inc. v. La Republica de Venezuela,*
  200 F.3d 843, 849 (D.C. Cir. 2000) ............................................... 39

*Trump v. Vance,*
  140 S. Ct. 2412, 2426 (2020) ....................................................... 10, 19

*United States v. Miselis,*
  972 F.3d 518, 536 (4th Cir. 2020) ................................................. 27, 28

*United States v. Mouat,*
  124 U.S. 303, 307 (1888) .............................................................. 33

*United States v. Schwimmer,*
  279 U.S. 644, 654–55 (1929) (Holmes, J. dissenting) ................... 9

*Walden v. Fiore,*
  571 U.S. 277 (2014) ...................................................................... 31

*Wilson v. Fullwood,*
  772 F. Supp. 2d 246, 263 (D.D.C. 2011) ....................................... 18

*Youseff v. 3636 Corp.,*
  777 A.2d 787, 792 (D.C. 2001) ..................................................... 42

## Statutes

42 U.S.C § 1985(3) ............................................................................. 29, 36

42 U.S.C. § 1983 ................................................................................. 11

42 U.S.C. § 1985 ................................................................................. 28, 33, 36

42 U.S.C. § 1985(1) ............................................................................ 34, 35, 36

42 U.S.C. § 1986 ................................................................................. 36

## Other Authorities

1 Restatement (Third) of Agency § 1.01, cmt. f (Am. L. Inst. 2005) ........... 39

147 Cong. Rec. H35 (daily ed. Jan. 6, 2001) (statements of Reps. Waters and Lee) ... 3

151 Cong. Rec. H110 (daily ed. Jan. 6, 2005) (statement by Rep. Lee) ......................3

151 Cong. Rec. H110–11 (daily ed. Jan. 6, 2005) (statements by Reps. Nadler and Lee regarding alleged voting irregularities)..............................................3

163 Cong. Rec. H186–87, 189 (daily ed. Jan. 6, 2017) (statements of Reps. Jayapal, Lee, and Waters) ......................................................................................3

167 Cong. Rec. H165 (daily ed. Jan. 13, 2021) ...........................................17

3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833) ................................................................................10

*A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 258-60 (2000) .......................................................................20

Benjamin Cassady, *"You've Got Your Crook, I've Got Mine": Why the Disqualification Clause Doesn't (Always) Disqualify*, 32 QUINNIPIAC L. REV. 209, 279 (2014) ............................................................................................35

Brian Naylor, Read Trump's Jan. 6 Speech, A Key Part of Impeachment Trial, CNN (February 10, 2021), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial .........................................26

Domenico Montanaro, *Senate Acquits Trump in Impeachment Trial—Again*, NPR (Feb. 13, 2021), https://www.npr.org/sections/trump-impeachment-trial-live-updates/2021/02/13/967098840/senate-acquits-trump-in-impeachment-trial-again ..................................................................................................41

Kevin Foley, *Availability of Tolling in A Presidential Prosecution*, 168 U. PA. L. REV. 1789, 1799–800 (2020) ..............................................................................20

Mark Hosenball & Sarah N. Lynch, Exclusive: FBI finds scant evidence U.S. Capitol attack was coordinated, REUTERS (Aug. 20, 2021), https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/..............................................7

Sarah Ferris & Ally Mutnick, Democrat drops election contest in Iowa house race, POLITICO (Mar. 31, 2021), https://www.politico.com/news/2021/03/31/democrat-drops-election-contest-in-iowa-house-race-478736....................................3

Staff of S. Comm. on Homeland Sec. & Gov't Affs., 117th Cong. Rep. on Examining The U.S. Capitol Attack: A Review of the Security, Planning, And Response Failures on January 6 (Jun. 7, 2021) .......................................................7

Test Act of 1673, 25 Car. II, c. 2 (U.K.).........................................................................35

The Federalist No. 65, p. 442 (J. Cooke ed. 1961)........................................................21

The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)................................34

Webster's Third New International Dictionary 2168 (1971)........................................21

### <u>Constitutional Provisions</u>

* U.S. Const. art. I, § 2, cl. 5...........................................................................................18

* U.S. Const. art. I, § 2, cl. 6...........................................................................................21

* U.S. Const. art. I, § 3, cl. 6.....................................................................................18, 20

* U.S. Const. art. I, § 3, cl. 7.....................................................................................21, 22

* U.S. Const. art. I, § 4.....................................................................................................4

* U.S. Const. art. I, § 6, cl. 2...........................................................................................34

* U.S. Const. art. II, § 1, cl. 2.........................................................................................34

* U.S. Const. art. II, § 2, cl. 2.........................................................................................34

**\* Asterisks denotes authorities upon which Defendants principally rely.**

Plaintiffs' lawsuit suffers the same fatal deficiencies as a nearly identical one already pending in this Court against President Trump by fellow Capitol Police Officers.[1] Plaintiffs' Complaint relies upon cherry-picked statements intended to mischaracterize political speech to alleged unlawful conspiracy. Plaintiffs' Complaint is plagued with an inability to differentiate a speaker's words and intent from the interpretation of such speech by its hearers. And Plaintiffs simply ignore the absolute immunity provided by the Constitution to certain critical government officials — including U.S. Presidents from any and all political parties, even President Trump.

Indeed, Plaintiffs have an even weaker claim against President Trump than the *Blassingame* Plaintiffs. Unlike in *Blassingame*, this lawsuit was filed *after* multiple official government reports were issued finding scant evidence the January 6 Capitol protests were coordinated in any fashion.

When determining whether a presidential act is covered by absolute immunity, the Supreme Court has been clear: the appropriate question is only whether it is within the "outer perimeter" of the President's duties. In making this analysis, the Court has determined only the nature of the presidential act is subject to review; content-based determinations of motives underlying that act must be eschewed. Here, the result is simple: it is a normal activity of a President to speak to Americans in support of, or opposition to, congressional action. Courts are forbidden from inquiring into the motives behind such political speech and from setting regulations on the

---

[1] *See James Blassingame, et al. v. Donald J. Trump*, Case No. 1:21-cv-00858.

1

content of that speech. Consequently, the Constitution's absolute immunity doctrine protects President Trump from this lawsuit.

Plaintiffs should be commended for their years of service and dedication to serving as Capitol Police Officers. As President Trump has repeated many times, attacks against law enforcement officials are unacceptable. Yet here, Plaintiffs are seeking to expand the scope of liability for the violent actions of third parties to cover individuals whose words allegedly inspired their actions, which is in direct opposition to our nation's First Amendment jurisprudence. But liability rightfully lies only with those individuals who chose to engage in violence, and Plaintiffs have ample opportunity to obtain relief against the specific individuals actually responsible for their injuries.

## BACKGROUND

Donald J. Trump, the 45th President of the United States, is known for his patriotic and inspiring speeches that particularly resonate with those who feel forgotten by Washington D.C.'s political establishment. His speeches draw immense crowds throughout the country, but also bring scorn from political adversaries and most of the corporate news media. Following the 2020 election, President Trump (among numerous others) raised critical questions about the results of elections in several States. In the weeks and months after the election, the President and his supporters were engaged in litigation, recounts, and appeals.

Post-election challenges are common and are made by candidates of both political parties. For example, Ms. Rita Hart, a candidate for the U.S. House of Representatives from Iowa's 2nd Congressional District, contested the results of her

narrow loss for five months after the 2020 election.[2] Ms. Hart's petition for the U.S. House of Representatives to overturn the results of her district's election followed a fully certified election and a recount under Iowa State law. This is much different[1] than President Trump's election challenges, which took place while he and his team were litigating and challenging results that were not yet certified.

There is ample historical precedent for challenging the certification of electors. Democratic members of Congress challenged the certification of electors after the 2000, 2004, and 2016 elections. In 2000, Representatives Maxine Waters and Barbara Lee objected to counting Florida's electoral votes. *See* 147 Cong. Rec. H35 (daily ed. Jan. 6, 2001) (statements of Reps. Waters and Lee). In 2004, Representatives Barbara Lee and Jerrold Nadler objected to counting electoral votes from Ohio and voted to object to certification of Ohio's certified electors. See 151 Cong. Rec. H110 (daily ed. Jan. 6, 2005) (statement by Rep. Lee); 151 Cong. Rec. H110–11 (daily ed. Jan. 6, 2005) (statements by Reps. Nadler and Lee regarding alleged voting irregularities). And in 2016, Democratic representatives challenged nine States' electoral votes—more than Republicans challenged after the 2020 election. *See* 163 Cong. Rec. H186–87, 189 (daily ed. Jan. 6, 2017) (statements of Reps. Jayapal, Lee, and Waters).

Presidents are expected to take advantage of the bully pulpit. As our nation's chief executive, presidents routinely comment on election results and petition Congress to act (or refrain from acting) in various ways. After the 2020 election,

---

[2] 1 Sarah Ferris & Ally Mutnick, Democrat drops election contest in Iowa house race, POLITICO (Mar. 31, 2021), https://www.politico.com/news/2021/03/31/democrat-drops-election-contest-in-iowa-house-race-478736.

President Trump believed that there had been a failure to secure our nation's election procedures, and he made this sentiment known. As part of his constitutional duty to ensure that the laws be faithfully executed, President Trump tried to inspire Congress to postpone certifying election results until the various lawsuits challenging those results were concluded. Unlike Plaintiffs' characterization, the rally at the Ellipse was not an attempt to inspire a riot to interfere with Congress—it was a gathering of individuals who believed state executive branches had violated the Constitution by changing election procedures under assumed emergency powers when that power belongs only to state legislatures and who wanted Congress to understand the gravity of the violations and vote accordingly. *See* U.S. Const. art. I, § 4.

Plaintiffs allege that President Trump's speech, which expressed his strongly held belief in the insecurity of an election conducted through hastily implemented mail-in voting procedures, amounted to the dissemination of fraudulent claims about election integrity that were intended to incite others. *See* Compl. ¶¶ 48–50. Yet, as Plaintiffs should know, the content of speech is not something courts have authority to adjudicate. Moreover, it is not the effect on or subsequent actions of the listeners that is relevant to a court's inquiry. *See Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969).

Plaintiffs further allege that President Trump's statements and lawsuits challenging election results were intended to delegitimize the election and cause his followers to be angry and violently prevent anyone else assuming the presidential

office in the event he lost the election. Compl., ¶¶ 52, 62. To support this claim, Plaintiffs allege President Trump knew some of his supporters were advocating for violence. *Id.* at ¶ 56.

This imputation of knowledge and liability, however, is not in line with our nation's First Amendment jurisprudence—our legal standard has consistently required intent on the part of the speaker to incur liability. *See Morse v. Frederick,* 551 U.S. 393, 442–43 (2007) (Stevens, J., dissenting) (quoting *Thomas v. Collins,* 323 U.S. 516, 535 (1945)); *Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 253 (2002). Moreover, individuals need not disavow misinterpretations of their speech by others to shield themselves from liability, as Plaintiffs' argument seems to insinuate. *See Bradenburg v. Ohio,* 395 U.S. 444, 447-48 (1969) (drawing the distinction between third party actions subsequent his speech a proponent can and cannot be held responsible); *Noto v. United States,* 367 U.S. 290, 297 (1961) (pointing to the "distinction between the statement of an idea which may prompt its hearer to take unlawful action, and advocacy that such action be taken.") (internal citations omitted); Compl., ¶ 58.

Following Plaintiffs' theory of liability would drastically chill political speech because public officials and candidates for public office could be held legally accountable if their supporters misinterpret their passionate or fiery rhetoric and decide to carry out acts of violence or other illegal activity.

Falling into the same cherry-picking behavior as in *Blassingame,* Plaintiffs here allege President Trump intimidated and threatened state and local election

officials by merely retweeting a statement made by one of his many lawyers stating that those officials would "soon be going to jail." *Id.* at ¶ 67. Plaintiffs also try to paint the President's challenge to the election results as racist, even though state procedures were the target of the President's discontent and not individual cities or persons as Plaintiffs insinuate. *Id.* at ¶ 65.

Further, numerous allegations have no factual basis whatsoever, such as the claim that President Trump "openly threatened violence" by posting tweets "suggest[ing] his supporters would revolt and resort to violence if he lost the election." *Id.* at ¶ 68. The statements Plaintiffs use to support their allegation are President Trump saying this is "a very dangerous moment in our history" and people are "not going to stand having this Election stolen from them." *Id.*

Under no stretch of the imagination can those statements be characterized as *open threats of violence*. Because Plaintiffs' Complaint is based on a misunderstanding of the standard for liability for protected speech, especially that of a president when acting within the outer perimeter of his official duties, their claims involving President Trump must be dismissed, particularly as they fail to allege any factual basis for inferring any improper agreements between President Trump and anyone who chose to engage in unlawful rioting.

While President Trump is a vocal proponent of election integrity, he also is strongly committed to public safety and law and order. Indeed, the Senate Homeland Security and Governmental Affairs Committee released a staff report ("HSGA

Report") exonerating President Trump of involvement in the January 6 security failures.[3]

In pertinent parts, the HSGA Report found that President Trump had delegated the ability to use emergency powers, a lead federal agency had been designated to deal with the security concerns around the January 6 counting of electoral ballots, and President Trump personally asked if the security was ready on January 3.[4] These are not the actions of a co-conspirator attempting to undermine security, but rather the actions of a leader concerned with making sure security is properly in place.

Notwithstanding Plaintiffs' actually deficient allegations and insinuations of conspiracy, investigations by the Federal Bureau of Investigation ("FBI") and the Senate Homeland Security and Governmental Affairs Committee rebuffed Plaintiffs' contentions of wrongdoing by Trump Administration officials. "The FBI has found scant evidence the Jan. 6 attack on the U.S. Capitol was the result of an organized plot to overturn the presidential election result."[5]

## ARGUMENT

Despite the Senate Homeland Security and Governmental Affairs Committee Report finding President Trump made efforts to guarantee, not undermine, Capitol

---

[3] Staff of S. Comm. on Homeland Sec. & Gov't Affs., 117th Cong. Rep. on Examining The U.S. Capitol Attack: A Review of the Security, Planning, And Response Failures on January 6 (Jun. 7, 2021).

[4] *Id.* at 77.

[5] Mark Hosenball & Sarah N. Lynch, Exclusive: FBI finds scant evidence U.S. Capitol attack was coordinated, REUTERS (Aug. 20, 2021), https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/.

security; an FBI report of scant evidence of any coordinated action by the rioters, let alone with President Trump; and a Senate Impeachment Court finding President Trump did not incite any riot, Plaintiffs still attempt to bring a nearly identical lawsuit to one filed by their coworkers alleging President Trump is responsible for causing the riots of January 6. *See* Compl. ¶ 5; *Blassingame et al. v. Donald J. Trump*, Case No. 1-21-cv-00585. This lawsuit is doomed to fail for similar reasons and is even weaker because it comes after additional reports and findings of the Senate Committee and FBI that there is scant evidence of any coordination behind the January 6 riot.

Plaintiffs base their claims on out-of-context (and, indeed, sometimes provably false) political speech and expression made by the President before, during, and after the November 2020 election. This attempt to foist liability on the President for the actions of individuals who were allegedly inspired to act because of his political speech flies in the face of over a century of First Amendment jurisprudence that requires intent on the part of the speaker for liability to attach. A holding to the contrary would not only upset the Constitution's separation of powers balance, but also would irreparably harm our political system by creating an environment where candidates for public office who spoke in typical political hyperbole would be on the hook for tortious or criminal actions of individuals who claimed to be inspired by their rhetoric. Such a holding would be even more concerning for the Office of the President. As a visible and necessarily vocal public figure for our entire country, the President would be the target of endless litigation if it were allowed.

The functioning of our Republic depends upon protecting the free expression of political speech. "[I]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought that we hate." *United States v. Schwimmer*, 279 U.S. 644, 654–55 (1929) (Holmes, J. dissenting).

In addition to the legal reasons why Plaintiffs' case must be dismissed, there are serious and significant prudential concerns, namely the existence of a political question due to the judgment of the Senate Impeachment Court that acquitted the President of incitement charges on the same facts addressed in this Complaint. The Court should also decline to get involved in line drawing over what types of speech are acceptable in the political realm as such questions are not susceptible to judicially manageable standards and are necessarily reserved to the political branches. Even if the speech in question was not cloaked with the highest presumption of First Amendment protection, Plaintiffs' claims are precluded by the legal doctrines of absolute Presidential immunity, res judicata, and collateral estoppel.

## I. The Constitution Forecloses All Of Plaintiffs' Claims Against President Trump.

### a. Absolute immunity bars Plaintiffs' claims against President Trump

Presidents must be decisive. When making critically important decisions, often of historic proportions, it is imperative their discretion not be influenced, or their actions chilled, by a fear that their presidential actions will result in civil liability—ripening either during or after their presidential term. Consequently, courts have long held that presidents are covered by absolute immunity, which is grounded in the

principle of separation of powers and entrenched in precedent dating back to common law traditions. *See Mitchell v. Forsyth*, 472 U.S. 511, 521 (1985); *Nixon v. Fitzgerald*, 457 U.S. 731, 744 (1982); 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833) (reasoning that the President "must be deemed, in civil cases at least, to possess an official inviolability.").

Precluding civil litigation against the President is vital to ensuring a functioning Executive Branch—the absence of immunity would incentivize lawsuits that would make the President hesitant to exercise his discretion "even when the public interest required bold and unhesitating action." *Nixon*, 457 U.S. at 744–45. *See also Pierson v. Ray*, 386 U.S. 547, 554 (1967) (explaining that immunity serves the public interest in preserving the independence and decisiveness necessary of government officials). Even when a plaintiff alleges that a president's actions exceed his legal authority, the privilege *still* prohibits litigation. Otherwise, the rule would be swallowed whole by the exceptions; litigation would constantly test whether a particular "action was unlawful[] or was taken for a forbidden purpose." *Nixon*, 457 U.S. at 756.

The dominant concern motivating the Court's reasoning regarding immunity is the possibility of "distortion of the Executive's 'decision[-]making process 'with respect to official acts that would stem from 'worry as to the possibility of damages.'" *Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020). For this reason, the defense of immunity extends beyond traditional actions at common law to civil cases for monetary damages. *See Tenney v. Brandhove*, 341 U.S. 367, 376 (1951) (holding that

despite not explicitly providing the defense of immunity, 42 U.S.C. § 1983 does not abrogate the defense, which is "so well grounded in history and reason").

Presidential immunity also extends to suits seeking declaratory and injunctive relief. *See Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring) (explaining that the Court's reasoning in Nixon "appl[ies] with equal, if not greater, force to requests for declaratory or injunctive relief in official-capacity suits that challenge the President's performance of executive functions"). Claims attempting to hold the President civilly liable for a speech, rally, or petitioning activity would irreparably distort his decision-making process in a way that the Court recognizes is unacceptable and unconstitutional.

On the same day the Supreme Court decided that a president has absolute immunity, the Court drew a distinction between the persons entitled to such absolute immunity and those only entitled to a lesser form of immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). In *Harlow*, the Supreme Court distinguished between ordinary Executive Branch officials who would be entitled to qualified immunity from those who are entitled to the higher protection of absolute immunity. *Harlow*, 457 U.S. at 807 ("[O]ur cases make plain that qualified immunity represents the norm."). As the Supreme Court clearly explained, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 817–18.

The Court has also held that evidence of a defendant's subjective intent is irrelevant. *See Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("[The] defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated."). "[J]udgments surrounding discretionary action almost inevitably are influenced by the decisionmaker's experiences, values, and emotions" and allowing subjective intent would result in no clear standard for relevant evidence. *Harlow*, 457 U.S. at 816.

Here, President Trump was engaged in discretionary action pursuant to his constitutional duty to ensure that the laws were faithfully executed by petitioning Congress not to certify the electors from States with ongoing election challenges. As such, he is entitled to immunity because his speech did not violate any clearly established legal duties. Based on the logic of *Harlow*, the President is entitled to absolute immunity. The Court has continuously reaffirmed the purpose of executive and legislative immunities to allow officials to carry out their functions without fear of civil retribution for legitimate acts. *See Nixon*, 457 U.S. at 749, *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951) ("Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good."); *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976) (holding that absolute immunity existed for a federal prosecutor to prevent distraction from his public duties or improper consideration in the exercise of his independent judgment).

To hold that the President is in some actions protected by absolute immunity and in others protected by qualified immunity would unnecessarily burden the Office

of the President with different liabilities at different times. This would be inconsistent with the rationale for extending the immunity in the first place.

Further, such liability would be inapposite to the protection offered to legislators for the exact same reasons. In *Brandhove*, the Court held that the "privilege would be of little value if [a protected person] could be subjected to the cost and inconvenience and distraction of a trial upon the conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." *Brandhove*, 341 U.S. at 377. The Court determined that "Courts are not the place for such controversies[,]" but rather "self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses." *Id.* at 378.

In *Brandhove*, the Court limited its rationale to the facts before it, which were that the plaintiff alleged that a state legislator violated an individual's constitutional right by intimidating him into silence through an improper exercise of legislative power, calling him to testify. *Id.* at 371. The Court ultimately ruled they could not find the committee exceeded the bounds of the legislative power unless there is an "usurpation" of the executive or judicial powers that is "obvious." *Id.* at 378.

In *Imbler*, the Court held that a prosecutor could not be held liable for those against whom he brings charges but fails to convict. 424 U.S. 409, 423 (1976). The Court went on to pronounce that the office of public prosecutor is such that it must be administered with "courage and independence." *Id.* If such litigation were allowed, "[t]he apprehension of such consequences would tend towards great uneasiness and toward weakening the fearless and impartial policy which should characterize the

13

administration of this office." *Id.* at 424. These principles are easily extended to the present case.

Here, President Trump is an elected official entitled to absolute immunity. President Trump was engaged in the execution of his duties as President, which are constitutionally committed to his sole discretion. In this case, those duties involved using his bully pulpit to ensure the faithful execution of the laws of the United States and lobbying for proper legislative action to the same ends. The office of President, even more than the office of prosecutor, requires the ability to act boldly and fearlessly to carry out the duties of the office as the person vested with the entire authority of the Executive Branch.

A holding that Plaintiffs can bring a suit of this subjective nature would encourage political opponents to take their disputes out of the public square and halls of Congress and into courtrooms to punish a president for his disfavored speech. The President's absolute immunity forecloses the jurisdiction of this Court to do so.

**b.** **The political question doctrine bars Plaintiffs' claims against President Trump.**

Similar to absolute immunity is the practical consideration expressed in the political question doctrine. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n. v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). There are several instances when the doctrine makes a case non-justiciable, including when there is a "textually demonstrable constitutional

commitment of the issue to a coordinate political department" and when it is impossible to decide an issue without making "an initial policy determination of a kind clearly for nonjudicial discretion" or "without expressing lack of the respect due coordinate branches of government." *Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006) (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

Here, Plaintiffs seek declarations and damages against President Trump based on actions taken while he was acting in his official capacity as President of the United States. *See* Compl. at ¶ 70. Adjudication of such a claim based upon the words or actions of the President would improperly regulate the executive department. Moreover, adjudication of Plaintiffs' claims would require the Court to make a value determination about what is or is not proper for the President to say during a political speech when advocating for Congressional action. As previously discussed, such value determinations about the content of speech are not appropriate for the judiciary. The courts are not the branch constitutionally tasked with making "policy choices and value determinations," and they cannot serve to second-guess a president's judgments. *Japan Whaling*, 478 U.S. at 230.

The impeachment managers chosen by the House of Representatives had a full and fair opportunity to make their case at impeachment. They failed; President Trump was acquitted by the United States Senate sitting as an Impeachment Court. Its verdict was the final word on this matter. To hold otherwise would displace the Senate as the final arbiter on impeachment, showing a disrespect for a co-equal branch. As such, this Court should decline to adjudicate Plaintiffs' claims.

15

c.    Res judicata and collateral estoppel foreclose Plaintiffs'claims

Under the doctrine of res judicata, "a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction[2]." *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir. 2006) (citing *Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 323–24 (1971)).

Under D.C. law, which forms the basis for most of the Plaintiffs'claims, a court will consider "(1) whether the claim was adjudicated finally in the first action; (2) whether the present claim is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea is asserted was a party or in privity with a party in the prior case" to determine whether a claim is barred by res judicata. *Herrion v. Children's Hosp. Nat'l Med. Ctr.*, 448 F. App'x 71, 72 (D.C. Cir. 2011) (quoting *Calomiris v. Calomiris*, 3 A.3d 1186, 1190 (D.C. 2010)).

While these tests are formulated slightly differently, the core principles are that res judicata requires that claims be barred if they arise from the same common nucleus of facts, if the prior case resulted in a final judgment on the merits, and if the parties to the former litigation are the same or are privies of those parties. "[T]he parties to a suit and their privies are bound by a final judgment and may not relitigate any ground for relief which they already have had an opportunity to litigate even if they chose not to exploit that opportunity whether the initial judgment was erroneous or not." *Lewis v. Drug Enf't Admin.*, 777 F. Supp. 2d 151, 161 (D.D.C. 2011), *aff'd*,

2012 WL 1155698 (D.C. Cir. 2012). *See also Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."). A plaintiff alleging no new facts but simply a new legal theory "is precisely what is barred by res judicata." *McIntyre v. Fulwood*, 892 F. Supp. 2d 209, 216 (D.D.C. 2012) (quoting *Apotex, Inc. v. FDA*, 393 F.3d 210, 217–18 (D.C. Cir. 2004)).

### 1.   *All of Plaintiffs' claims arise from the same common nucleus of facts.*

Plaintiffs' claims arise out of the same operative facts as the claims addressed in the Senate's impeachment trial. That trial did not result in a conviction—despite overwhelming political animus towards the President, the Senate acquitted the President of the incitement to insurrection charge. The articles of impeachment alleged that President Trump "willfully made statements that, in context, encouraged—and foreseeably resulted in—lawless action at the Capitol[.]" 167 Cong. Rec. H165 (daily ed. Jan. 13, 2021). These are the same charges that Plaintiffs bring now, alleging violations of laws that have substantially the same language. *See* Compl., ¶ 153 (alleging that President Trump was involved in a conspiracy to create a riot that would unlawfully injure members of Congress and Capitol Police Officers and prevent them from discharging their duties); ¶ 162 (alleging President Trump failed to prevent the riot because he had power to do so by not speaking out about election fraud and not pursuing lawsuits challenging election results); ¶ 181 (alleging that President Trump "incited or aided and abetted others to engage in a riot").

Res judicata applies not only to the actual claims brought, but also to any claims that could have been brought stemming from the same facts. *See Allen*, 449

U.S. at 94. The House of Representatives is tasked with "the sole power of impeachment." U.S. Const. art. I, § 2, cl. 5. It had the opportunity to craft any articles of impeachment and it chose to bring only one article for incitement to insurrection, alleging that the President's First Amendment protected speech on January 6, 2021, rose to the level of the types of "high crimes and misdemeanors" that warrant removal from office.

The Senate has "the sole Power to try all Impeachments" but what level of proof is required to convict is determined by each individual Senator. U.S. Const. art. I, § 3, cl. 6. Even under this lower standard of proof, and despite only needing a two-thirds vote to convict—a potentially lower bar than the President faces in this case—it failed to do so. The failure to bring additional claims does not permit parties or their privies to bring later litigation stemming from the same events; otherwise no judgment would ever truly be final.

### 2. *Plaintiffs are in privity with Congress.*

The Capitol Police is an agency under the legislative branch whose interests were adequately represented during the Senate's impeachment trial, which was predicated on the same nucleus of alleged facts that Plaintiffs bring here. A "privy" is one "so identified in interest with a party to former litigation that he represents precisely the same legal right in respect to the subject matter involved." *Jefferson Sch. of Soc. Sci. v. Subversive Activities Control Bd.*, 331 F.2d 76, 83 (D.C. Cir. 1963). "The government, its officers, and its agencies are regarded as being in privity for claim-preclusive purposes." *McIntyre*, 892 F. Supp. 2d at 215 (quoting *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 263 (D.D.C. 2011)). *See also Sunshine Anthracite Coal*

18

*Co. v. Adkins*, 310 U.S. 381, 402–03 (1940) ("There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government.").

In essence, the House of Representatives 'impeachment managers, serving in roles similar to prosecutors or plaintiffs, represented the interests of all the parties involved in the events that supported the article of impeachment brought against the President. Plaintiffs' claims are predicated on injuries they sustained from the actions of individuals at the Capitol, which the House blamed on President Trump. The Senate, tasked with hearing the evidence and passing a final judgment on the matter, did not find that President Trump's First Amendment protected speech rose to the level of incitement. The Senate, sitting as an Impeachment Court under an oath to the Constitution, issued a final judgment acquitting the President of the incitement to insurrection charge, thus precluding any parties or their privies who could have brought claims from relitigating the matter. Indeed, Plaintiffs could not have charged the President in a civil lawsuit for the claims they now attempt to bring because of absolute presidential immunity from claims for damages resulting from official acts. *See Vance*, 140 S. Ct. at 2426.

The House was the only party that could bring the claim and the Senate was the only court which could hear the claims. As such, the House was the relevant party bringing the suit and it adequately represented the interests of the Capitol Police, a legislative agency tasked with protecting Congress so that its members may carry out

their legislative duties. This relationship makes the Capitol Police privies of the House and bars their attempts to bring these particular claims against the President.

### 3.   The Senate's Impeachment trial is a final judgment on the merits issued by a court of competent jurisdiction.

Res judicata requires that a court of competent jurisdiction issue a final judgment on the merits for that decision to preclude future lawsuits stemming from the same facts. The Constitution, in Article I, § 3, cl. 6, specifically designates the Senate to sit as an Impeachment Court, which means that it qualifies as a court of competent jurisdiction, tasked with examining the articles presented by the House in the manner of a judge. *See Nixon v. United States*, 506 U.S. 224, 229–30 (1993) (analyzing the definition of "try" as used in the Constitution to reach the conclusion that the Framers did not intend to impose additional limitations on impeachment trial procedure beyond requiring that "Members must be under oath, a two-thirds vote is required to convict, and the Chief Justice presides when the President is tried").

Once the Senate has decided a case as an Impeachment Court, it is necessary to treat that decision with finality. *See* Kevin Foley, *Availability of Tolling in A Presidential Prosecution*, 168 U. PA. L. REV. 1789, 1799–800 (2020) (describing how the impeachment process is better suited for prosecuting the President for numerous factors among which is the finality of the lack of an appeal) (citing *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 258-60 (2000)); *Nixon*, 506 U.S. at 236 (discussing the necessity of the finality of the Senate's judgment after an impeachment because "opening the door of judicial review

to the procedures used by the Senate in trying impeachments would 'expose the political life of the country to months, or perhaps years, of chaos.'") (citing *Nixon v. United States*, 938 F.2d 239, 246 (1991)).

This is especially true because the Senate is the sole court that can pass judgment on impeachment. *See* U.S. Const. art. I, § 2, cl. 6. "The commonsense meaning of the word 'sole 'is that the Senate alone shall have authority to determine whether an individual should be acquitted or convicted." *Nixon*, 506 U.S. at 230–31. If the courts were permitted to review the processes and decisions of the Senate, this would compromise the Senate's ability to "'function[] . . . independently and without assistance or interference.'" *Id.* (citing Webster's Third New International Dictionary 2168 (1971)). The one exception to the finality of judgment of the Senate respects an individual impeached and convicted. "[T]he Framers recognized that most likely there would be two sets of proceedings for individuals who commit impeachable offenses—the impeachment trial and a separate criminal trial." *Nixon*, 506 U.S. at 234. "[T]he Constitution explicitly provides for two separate proceedings." *Id.* (citing U.S. Const. art. I, § 3, cl. 7). The Court explained that the separation of the two forums was a deliberate move by the Framers to "avoid raising the specter of bias and to ensure independent judgments." *Nixon*, 506 U.S. at 234 (citing The Federalist No. 65, p. 442 (J. Cooke ed. 1961)).

In this case, however, the Senate acquitted President Trump. That acquittal by the Senate is a final judgment on the merits and precludes this court from exercising jurisdiction.

**4.  Statutory construction of the Impeachment Judgment Clause shows that only an individual convicted is subject to follow-on litigation, and only for criminal offenses.**

The Impeachment Judgment Clause, U.S. Const. art. I, § 3, cl. 7, states that judgment "shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law." Two aspects of this clause stand out.

First, the only provision for follow-on liability is for a party convicted. The Framers could have written the party "tried" or the party "impeached," but the ultimate wording was limited to the party convicted. This alone should make clear that an individual impeached but not convicted shall not be subject to follow-on litigation.

Second, the clustering of post-conviction liability for "Indictment, Trial, Judgment and Punishment, according to Law" leads with "Indictment," which implies that an individual convicted is only potentially liable for follow on criminal charges brought by the government rather than a civil suit on the same issues. The Framers were familiar with the concept of res judicata and collateral estoppel. *See Crist v. Bretz*, 437 U.S. 28, 40–41 (1978) (describing that "the constitutional guarantee against double jeopardy was restricted to cases in which there had been a complete trial—culminating in acquittal or conviction . . . . This was consonant with the prevailing English practice regarding pleas in bar").

Recognition of the need to prevent repetitive suits is definitively expressed in the Constitution, which prohibits anyone from being "subject for the same offense to

be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Constitution then explicitly carves out an exception for this commonly understood prohibition against being subject to judgment more than once for the same claim only in cases where an individual is impeached and convicted. But an individual will not be subject to judgment in all cases—the Constitution again limits the liability to indictment, trial, judgment, and punishment.

Indictments are only issued for criminal offenses, not for civil lawsuits. The process of the impeachment trial is deemed a final judgment on the merits, but it will not prevent the individual convicted of a high crime or misdemeanor from facing judgment in a court of law for the crime in question. This makes sense because the Senate cannot bring a criminal charge against an individual impeached—only the executive branch can bring litigation to enforce the laws of the United States. Through being granted the power of impeachment, Congress was given an important check on the Executive and Judicial Branches, who could not have been trusted to prosecute and try themselves. Once removed from office, those individuals could then be properly tried in the courts of law. President Trump was not convicted on the impeachment charge brought against him. Because he is not a party convicted, he is not liable to be subject to further litigation on a matter already decided.

> ### d.   Well-established First Amendment jurisprudence bars Plaintiffs' claims based on President Trump's protected political speech.

An individual's rights to speak, assemble, and petition the government for redress of grievances are afforded the strongest presumption against infringement. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S.

789, 816 (1984) ("[P]olitical speech is entitled to the fullest possible measure of constitutional protection."). "[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985)).

The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder*, 562 U.S. at 452. That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Id.* Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Id.* "The primary question is whether the message conveyed . . . was of such a nature as to come within the ambit of the First Amendment Protection, or whether it must be placed in the categories of speech which the Supreme Court has held are not protected." *Allen v. District of Columbia*, 187 A.2d 888, 889 (D.C. 1963) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942)). For Plaintiffs' claims alleging conspiracy and aiding and abetting incitement to riot, the "[defendant's] conduct, and not the crowd's reaction to it, must be the starting point, for 'the measure of the speaker is not the conduct of his audience.'" *Allen*, 187 A.2d at 889 (quoting *Rockwell v. Morris*, 12 A.D.2d 272, 279 (N.Y. Sup. Ct. 1961)).

Therefore, the "[a]udience reaction, and the immediacy of the disorder, become significant elements of proof only after the speaker 'passes the bounds of argument

24

or persuasion and undertakes incitement to riot.'" *Allen*, 187 A.2d at 889 (citing *Feiner v. New York*, 340 U.S. 315, 321 (1951)). Here, President Trump's speech did not surpass any reasonable standard for the bounds of argument and persuasion commonly used by public officials and candidates for public office.

### 1. *President Trump's speech was petitioning activity undertaken in his official capacity.*

The speech President Trump gave on January 6, 2021, regarding the 2020 Presidential Election is certainly on matters of public concern. As President, it is his duty to ensure that the laws are faithfully executed and he had legitimate concerns about the integrity of the November election results. Allegations of election interference were more than welcome by politicians and the media in 2000, 2004, and 2016 when they were being voiced by Maxine Waters, Jerrold Nadler, Barbara Lee, Stacy Abrams, and Hillary Clinton.

In 2020, President Trump was decried for voicing concerns with the massive changes to state election procedures that brought uncertainty about their security. State legislatures are charged with setting the election process in every state, but the President has every right to question whether procedures were being followed and were secure. Indeed, dialogue between the political branches of government and the several states on such issues is at the core of federalism and the checks and balances that are the heart and soul of our Constitution's framework for more than two centuries. Questioning the propriety of the election was part of the President's duty to uphold and defend the Constitution. At the very least, his discussion of the matter while attempting to petition the government to redress his grievance was a matter of

public concern cloaked with the highest presumption of protection. It simply does not meet the standards described by the Supreme Court for when speech may be restricted without violating the First Amendment.

### 2. *President Trump's speech does not meet the standard for incitement under* Brandenburg v. Ohio.

At numerous points throughout the Complaint, Plaintiffs allege President Trump incited and provoked individuals to riot at the Capitol through weeks of voicing his concerns over the legitimacy of the elections (Compl., ¶¶ 2, 5, 53), filing lawsuits challenging those election results (Compl., ¶¶ 62, 64), and planning a rally to petition Congress to delay certifying the election (Compl., ¶¶ 81–83). From these allegations, they ascribe liability for the subsequent actions of individuals at the Capitol. President Trump's speech clearly expressed his desire for those who believed as he did to "peacefully and patriotically make [their voices] heard" at the Capitol where the election certification was going to take place.[6] At no point during the speech was there any advocacy for violence or unlawful activity.

Retrospectively assuming a speaker's intent based upon the actions of others is not a constitutionally acceptable method of pleading an unlawful incitement. *See Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969). And one cannot have negligent liability for incitement—intent on the part of the speaker is a required element of a plaintiff's claim. A holding that an individual can be liable for incitement based on

---

[6] Brian Naylor, Read Trump's Jan. 6 Speech, A Key Part of Impeachment Trial, CNN (February 10, 2021), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

26

how others interpreted his speech would blur "the distinction between advocacy and incitement." *Morse v. Frederick*, 551 U.S. 393, 442 (2007) (Stevens, J., dissenting). The Supreme Court rejected such an interpretation because this "would 'pu[t] the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.'" *Id.* at 442–43 (quoting *Thomas v. Collins*, 323 U.S. 516, 535 (1945)).

The right to protest was continually referred to in the media this past year as a central part of our functioning Republic—even when the protests that were being encouraged in cities throughout the country were clearly turning violent and putting Americans 'lives and property in jeopardy. A finding that President Trump's speech is not protected by the First Amendment would open the floodgates to liability for any individual if another person committed unlawful conduct and claimed to be under the influence of that individual's political speech, cluttering the dockets of federal courts and incentivizing using courts as a weapon against political opponents.

### 3. Incitement is limited to true threats and a holding to the contrary would subject anti-riot laws to facial challenges.

As the Supreme Court has recognized, the "mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). After all, "mere encouragement is quintessential protected advocacy" under the First Amendment. *United States v. Miselis*, 972 F.3d 518, 536 (4th Cir. 2020). Indeed, the Fourth Circuit has held that an Anti-Riot Act that "proscribes speech tending to 'encourage 'or 'promote 'a riot, as well as speech 'urging 'others to riot or 'involving 'mere advocacy of violence" was

overbroad under *Brandenburg* and swept up too much protected speech to be constitutional. *Miselis*, 972 F.3d at 540.

If the courts can conclude that urging others to riot or directly advocating for violence cannot incur liability under the First Amendment, the allegations that Plaintiffs have made here are surely insufficient. Otherwise, D.C.'s Anti-Riot statute would be subject to a facial challenge as sweeping in too much protected speech under the Supreme Court's analysis in *Brandenburg*, 395 U.S. at 447, which permits advocacy of the use of force except in limited circumstances where the speech both is intended to incite imminent lawless action and has a high likelihood of inciting imminent lawless action.

### 4. *Plaintiffs' reading of § 1985 and argument for liability would result in such expansive liability to subject the statute to a facial challenge.*

If Plaintiffs are allowed to bring this claim under § 1985, an unlawful conspiracy could be construed any time there is a standoff between the political branches that involves emotionally charged speech. This would make the statute subject to a facial challenge for being overbroad or void for vagueness. The overbreadth doctrine allows facial challenges to unbounded statutes to prevent the chilling of First Amendment speech. *See Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958 (1984). The void for vagueness doctrine ensures citizens are on notice of what a statute proscribes and guards against arbitrary or discriminatory enforcement. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

Should Plaintiffs' construction of § 1985 be adopted, it would lead to a boundless statute that would essentially hold politicians vicariously liable for the

actions of their supporters, substantially chilling critically important political speech. Moreover, the broad and vague prescriptions of the statute would encourage selective enforcement, inevitably based upon the political affiliations of the enforcer. Simply put, Plaintiffs' proposed interpretation of the statute provides no way to draw clear lines, requiring that they be struck down as facially invalid. But this historic statute need not be endangered.

A conspiracy under § 1985(1) should not be read so broad as to apply to all tortious interferences with the rights of others. *See Griffin v. Breckenridge*, 403 U.S. 88, 101 (1971) (discussing the legislative history of the statute, specifically as it applied to § 1985(3)). Indeed, a plain reading of the word "conspiracy" in the statute requires that the Court limit its application to specific agreements to interfere with the acceptance or performance of an officers' duties through an unlawful act. *See McFadden v. U.S.*, 576 U.S. 186, 197 (2015) (requiring that avoidance be used when courts must choose between competing plausible interpretations where one would lead to an unconstitutional result). Ergo, an agreement to engage in lawful political speech and assembly with others is no conspiracy at all; there must be an actual agreement to perform an overt act that extends beyond protected political speech. And as with any conspiracy allegation, proof of the actual agreement is key to surviving a motion to dismiss.

Plaintiffs here do not meet that required pleading standard. As President Trump's speech is protected under the First Amendment, and all of he claims against

29

him stem directly and solely from his political speech, this Court must dismiss the Plaintiffs' Complaint in its entirety.

## II.   This Court Lacks Personal Jurisdiction Over the Trump Campaign.

To establish general personal jurisdiction over a corporation, the corporation must either be incorporated in that state or maintain its principal place of business (e.g., be "essentially at home") in that state. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).

Other plaintiffs have brought Donald J. Trump for President Inc. ("the Campaign") into their lawsuits against President Trump in this Court before. This Court conclusively held that it lacked jurisdiction over the Campaign in a lawsuit based on election-related activities that incidentally required the corporation's presence in the district. "A corporation with a state of incorporation and principal place of business outside of the District cannot be regarded as 'at home 'in the District simply because its headquarters are nearby in Virginia and it conducts business activity in the District." *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 174 (D.D.C. 2018) (citing *Duarte v. Nolan*, 190 F. Supp. 3d 8, 15 (D.D.C. 2016)). "Plaintiffs seek to establish jurisdiction by citing events that happened outside the District, events that happened well before defendants allegedly joined the conspiracies, and events after the conspiracies achieved their objective . . . [none of which] focus on defendants 'contacts with the forum related to the specific claims raised in plaintiffs 'complaint." *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 175 (D.D.C. 2018).

"For this Court to exercise specific personal jurisdiction over defendants their 'suit-related conduct must create a substantial connection with 'the District. . . . Therefore, for purposes of asserting jurisdiction over [the Campaign], the Court must determine from the allegations in the complaint what suit-related conduct by defendants, in furtherance of the conspiracies, took place in D.C." *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 175 (D.D.C. 2018) (quoting *Walden v. Fiore*, 571 U.S. 277 (2014)).

Here, Plaintiffs fail to allege that any of the Campaign's speech or conduct in furtherance of the conspiracy took place in D.C. Plaintiffs' only allegations about the Campaign that could create a point of contact with D.C. are that it "filed and caused to be filed scores of baseless lawsuits in various state and federal courts", and "planned and organized the January 6 rally." Compl. ¶¶ 61, 79. Neither of these allegations, however, are alleged to be related to the ill-defined conspiracy to either take back the country or "halt[] the count of the electoral votes." *Id.* at. ¶ 112, 129. Filing a lawsuit cannot credibly be alleged to be an action in furtherance of a conspiracy, as even a baseless lawsuit such as Plaintiffs' has the right to be filed.

Plaintiffs also cannot establish specific jurisdiction over the Campaign. Plaintiffs have failed to allege any specific actions taken place by the Campaign or its agents within the District of Columbia that would subject the Campaign to the specific jurisdiction of this Court. Plaintiffs make conclusory allegations that the Campaign: (1) spread messages publicly, (2) filed lawsuits regarding the election, (3) and helped organize and fund the January 6 speech at the Ellipse. Compl., ¶¶ 52, 62,

65, 79, 106. Therefore, only the allegation about organizing and funding the speech potentially remains; however, Plaintiffs have failed to allege that any action involved in this alleged fundraising and planning took place from within the District. Further, alleging that the Campaign organized a rally does not allege that there was an agreement between the Campaign and other defendants for what conduct would happen at and after that rally. Given this lack of allegation that the Campaign has a substantial connection with D.C. related to the conspiracy, the Court does not have jurisdiction over it; the claims against it must be dismissed.

Plaintiffs provide no factual basis for their assertion that the Campaign helped organize or fund the speech at the Ellipse. Moreover, the First Amendment rights to the freedom of speech and the freedom to petition for redress of grievances would preclude this claim even if it were true (it is not). None of these allegations are remotely actionable, wrongful, or illegal as it is removed in time from the conduct at the Capitol by a span of hours.

Further, any general allegations that the other or third parties were agents of the Campaign are insufficient and conclusory with no factual support to survive a motion to dismiss. The Campaign's staff is a matter of public record. The Campaign was not involved in the January 6, 2021, speech at the Ellipse or the events afterward.

Accordingly, this Court should dismiss Plaintiffs' Amended Complaint against both the President and the Campaign for lack of personal jurisdiction.

## III.    Plaintiffs Have Failed to State a Claim.

To state a claim upon which relief may be granted, Plaintiffs are charged with pleading their Complaint so that it plausibly lays out a legally recognized case against

Defendants. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 549 (2007). While they need not include "detailed factual allegations," they must do more than state an unadorned "the-defendant-unlawfully-harmed-me" accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Iqbal*, 556 U.S. at 678; *Twombly,* 550 U.S. at 557. Moreover, Plaintiffs' conspiracy allegations must be pled with particularity. *See McCord v. Bailey*, 636 F.2d 606 (D.C. Cir. 1980). *Accord Gometz v. Culwell*, 850 F.2d 461, 464 (7th Cir. 1988).

### a.  Plaintiffs do not allege a violation of 42 U.S.C. § 1985(1).

Plaintiffs' claims against President Trump and the Campaign under § 1985 are contingent upon a finding that they conspired to interfere with the duties of a federal officer as described in § 1985(1). None of the individuals Plaintiffs allege in ¶ 153 (Members of Congress, Congressional staff, Capitol Police Officers, President Biden and Vice President Harris) were prevented by force, intimidation, or threats from discharging their duties or accepting or holding an office nor are they federal officers for purposes of § 1985(1).

An officer of the United States is one who "holds his place by virtue of an appointment by the president, or of one of the courts of justice or heads of departments authorized by law to make such an appointment." *United States v. Mouat*, 124 U.S. 303, 307 (1888). Additionally, as the Supreme Court explained in

2010, "[t]he people do not vote for the 'Officers of the United States.' U.S. Const. art. II, § 2, cl. 2. They instead look to the President to guide the 'assistants or deputies . . . subject to his superintendence. '"*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 498 (2010) (quoting, The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)). Furthermore, the Appointments Clause makes it clear that the President appoints the Officers of the United States. *See* U.S. Const. art. II, § 2, cl. 2.

The Constitution makes clear that members of Congress are not office holders "under . . . the United States." 42 U.S.C. § 1985(1). The Ineligibility Clause specifically states that "no person holding any Office under the United States, shall be a member of either House during his Continuance in Office." U.S. Const. art. I, § 6, cl. 2. Ergo, a member of Congress is not in an office under the United States, otherwise the Constitution would state that they could not hold more than one such office. In defining an office of the United States, the United States Court of Claims defined it as a "public station or employment established or authorized by Congress and conferred by appointment of the Government." *Dalton v. U.S.*, 71 Ct. Cl. 421, 425 (1931). Neither do members of Congress hold a position of trust or a place of confidence under the United States. The Constitution specifically delineates between senators, representatives, and those holding an office of trust or profit under the United States when it prohibits any of the above from serving as electors. U.S. Const. art. II, § 1, cl. 2.

34

In common law, an office of trust or profit referred exclusively to those in the employ in the executive, judiciary, or the church. *See* Benjamin Cassady, *"You've Got Your Crook, I've Got Mine": Why the Disqualification Clause Doesn't (Always) Disqualify*, 32 QUINNIPIAC L. REV. 209, 279 (2014). English statutes applied the term to offices conferred by the Crown, not by Parliament. *Id.* (citing Test Act of 1673, 25 Car. II, c. 2 (U.K.)). There are few examples of those who hold a place of confidence under the United States. A district court has applied that term to state court judges since they decide federal constitutional issues and are bound by federal law. *See Lewis v. News-Press & Gazette*, 782 F. Supp. 1338, 1342 (W.D. Mo. 1992). Other authority suggests all of the categories listed in Section 1 are limited to those who carry out and apply the law. *See Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1337 (7th Cir. 1977) (explaining the statutory history of § 1985(1) and concluding that the purpose of the legislation was to protect the "federal interest in the carrying out of federal functions").

Given the previously discussed limitation that officers of the United States are those who are appointed by the President, the fact that the Vice President is elected with the President prevents a finding that either the President or Vice President are officers. One thing is clear: the Congress that adopted the statute could very well have clearly made it applicable to the legislative branch and to the President and Vice President. But it did not. Indeed, if the statute did apply as broadly as the Plaintiffs allege, any time Congress and the President disagreed politically it could incur liability on either party in the courts of law if their bombastic rhetoric or

conduct could be perceived as a threat to the other. Plaintiffs do not have a cause of action under § 1985(3) because neither the members of Congress nor Vice President Pence qualify as individuals with whom interference of their duties gives rise to a cause of action under § 1985(1). As such, count one (and, therefore, count two) must be dismissed.

      **b.**    **Plaintiffs' claim under 42 U.S.C. § 1986 fails as it is contingent upon stating a claim under § 1985.**

Because Plaintiffs have failed to state a claim under § 1985, their § 1986 claim must necessarily fail as well. Furthermore, even if Plaintiffs had stated a claim under § 1985, this § 1986 claim would still fail. § 1986 requires that an individual with power to prevent or aid the alleged wrongdoings neglect or refuse to do so in order to incur liability. It is documented that President Trump took efforts to ensure that the Capitol was protected against attack, as evidenced by the HSGA report discussed above investigating the security failures on January 6.

      **c.**    **Plaintiffs 'State law claims fail because their lawsuit is based on federal question jurisdiction, and their federal claims are insufficient.**

Plaintiffs have brought three claims against President Trump based on alleged District of Columbia law violations in addition to claims of negligence. Each of these claims fails because Plaintiffs 'arguments are precluded by President Trump's absolute presidential immunity, the principles of res judicata, and President Trump's First Amendment rights to freedom of speech, petition for redress of grievances, and freedom of association. Even if the claims for assault, battery, negligence, and bias-related crimes were not precluded, Plaintiffs have failed to plead their *prima facie* case as required.

### 1.  *Bias-Related Crimes Act*

Plaintiffs allege President Trump is liable under the D.C. Bias-Related Crimes Act because the riots at the Capitol were politically motivated. *See* Compl. ¶¶ 168–72. Plaintiffs claim the Defendants' intended victims were those perceived to be, or supporting, Democrats. *Id.* at ¶ 174. The Complaint, however, shows there was no intent to harm Democrats—President Trump's speech encouraged the individuals at the rally to make their voices heard to Congress to express that they did not want the 2020 election certified because the voting procedures and counts were questionable. *Id.* at ¶ 108. Whether Plaintiffs disagree with such petitioning activity or not, individuals have a right to express those views. For them to attempt to assign liability for the violent actions of a minority of the individuals who heard this political speech misinterprets decades of First Amendment doctrine that does not allow liability for how others interpret your speech.

The Supreme Court conclusively rejected such a theory of liability because it "would 'pu[t] the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning.'" *Morse v. Frederick,* 551 U.S. 393, 442–43 (2007) (Stephens, J., dissenting) (quoting *Thomas v. Collins*, 323 U.S. 516, 535 (1945)).

Plaintiffs claim President Trump and the Campaign are vicariously liable under this D.C. statute because of the actions of the persons who actually infiltrated and damaged the United States Capitol on January 6. They argue President Trump and the Campaign are liable for three different violations, each of which fails for the

reasons stated throughout this brief as well as because Plaintiffs have failed to prove their theory either for aiding and abetting or existence of an agency relationship.

> A. *Plaintiffs fail to plead that President Trump was generally aware of his role in an illegal activity or that he provided the "substantial assistance" necessary for aiding and abetting liability.*

Under D.C. law, aiding and abetting has a similar standard to that of conspiracy, but even though courts and litigants commonly blur the lines, each has a unique standard. The D.C. Circuit has previously held that the "prime distinction" between the standards is that a conspiracy is about an "agreement to participate in a wrongful activity" while aiding and abetting is about "substantial assistance." *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983). This distinction and others are critical in determining liability when a specific charge is brought. "For example . . . liability may be based on a more attenuated relation with the principal violation in a conspiracy than in aiding and abetting." *Id.* at 485.

To state a claim for aiding and abetting, a plaintiff must show: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as party of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477 (citing *Investors Research Corp. v. SEC*, 628 F.2d 168, 178 (D.C. Cir. 1980)).

Plaintiffs allege President Trump aided and abetted the violent actors at the Capitol through his protected First Amendment speech as well as through "providing or soliciting funds, lodging, transportation, organization, equipment, or other goods or services to help the rioters travel" to the Rally at the Ellipse. Compl., ¶¶ 181–82.

38

Plaintiffs do allege that the violent rioters performed a wrongful act that caused Plaintiffs 'injuries. *Id.* at ¶ 157. They do not, and cannot, however, plausibly allege that President Trump was aware of his role in an illegal conspiracy at the time he spoke using his public platform and organized the Ellipse rally. And they cannot plausibly allege that President Trump provided substantial assistance to the individuals who engaged in violence at the Capitol.

> **B.   Plaintiffs fail to plead that other Defendants had an agency relationship with President Trump.**

"An agency relationship requires the existence of three elements: (1) the principal must manifest a desire for the agent to act on the principal's behalf; (2) the agent must consent to act on the principal's behalf; and (3) the principal must have the right to exercise control over the agent with respect to matters entrusted to the agent." *Kaiser Grp. Int'l, Inc. v. World Bank*, 420 F. App'x 2, 5 (D.C. Cir. 2011) (citing *Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849 (D.C. Cir. 2000)). "An essential element of agency is the principal's right to control the agent's actions." *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (citing 1 Restatement (Third) of Agency § 1.01, cmt. f (Am. L. Inst. 2005)).

The Restatement factors for agency liability do not apply to President Trump or the Campaign under these charges. Neither President Trump nor representatives of the Campaign were present during the alleged assaults and batteries, nor did they condone or ratify the conduct. In fact, President Trump multiple times asked for peace and calm (including after the riot, which Plaintiffs acknowledge in Compl. ¶ 137). Nor were President Trump or the Campaign temporally linked to the assaults. President

Trump specifically spoke to the individuals at the Ellipse, who did not arrive at the Capitol for hours after the speech, after President Trump had admonished them to be peaceful. This left plenty of time for the individuals to whom President Trump's speech was directed to cool off and consider their actions, even if his words had not explicitly admonished them to be peaceful.

Further, vicarious liability for assault or battery is usually claimed against employers whose employees committed the assault or battery while acting within the scope of their employment. *See, e.g., Maniaci v. Georgetown Univ.*, 510 F. Supp. 2d 50, 64 (D.D.C. 2007) (finding Plaintiffs adequately plead a theory of direct liability against employer University because University officials ratified employees 'conduct by directing and controlling their actions and then doing nothing to stop the tortious conduct). The individuals who attended the rally did not establish an agency relationship with President Trump or with the Campaign and were therefore not acting within the scope of an agency relationship.

### C. Plaintiffs Fail to Plead Acts of Terrorism and Malicious Burning, Destruction, or Injury of Another's Property.

In addition to being unable to prove aiding and abetting or an agency relationship, Plaintiffs also completely fail to allege facts to support their allegation for the existence of a conspiracy "to commit malicious destruction of property." Compl., ¶ 176. Indeed, there is no theory under which the Plaintiffs can impute liability to President Trump or the Campaign for the acts of others subject to this provision, as the only connection they allege is that President Trump's protected speech "sought to intimidate or coerce" Congress and the voting public with no

support for where destruction of property was ever considered. *Id.* at 177. It seems Plaintiffs are arguing that because property damage occurred, it must have been planned. Even if Plaintiffs had not so drastically failed to plead this allegation, the broad interpretation of the statute they seek would render it unconstitutionally overbroad and vague as it would sweep up entirely legal conduct aimed at petitioning Congressional action if destruction of property did result.

>       D.      *Rioting and Inciting to Riot*

For all of the reasons discussed throughout this brief, Plaintiffs' allegation for conspiracy to incite a riot and aiding and abetting a riot fail. It is improper to assign liability based on how others perceive one's speech. *See Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969); *Thomas v. Collins*, 323 U.S. 516, 535 (1945). There also are the issues of res judicata and collateral estoppel respecting the Senate Impeachment Court's finding of no fault for the President on the nearly identical charge of incitement to insurrection [7] and the political question that challenging such a judgment would inevitably raise. *See Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006).

Indeed, the Senate's judgment is further supported by the HSGA report and Reuters report, both finding that President Trump was not aware of any plan to riot and that there is scant evidence of any collaborative activity surrounding the January 6 riot. Plaintiffs attempt to assign liability because President Trump and the

---

[7] *See* Domenico Montanaro, *Senate Acquits Trump in Impeachment Trial—Again*, NPR (Feb. 13, 2021), https://www.npr.org/sections/trump-impeachment-trial-live-updates/2021/02/13/967098840/senate-acquits-trump-in-impeachment-trial-again.

Campaign "provid[ed] or solicit[ed] funds, lodging, transportation, organization, equipment, or other goods or services to help the rioters travel to Washington, D.C." (*see* Compl. ¶ 182) is too attenuated, because this alleged "aid" was provided to all of the peaceful individuals who attended the rally—the fact that some individuals who ended up rioting may have benefited from this does not amount to the substantial assistance that could impute liability.

### 2.   *Assault, Battery, and Negligence*

Plaintiffs attempt to allege that President Trump is liable for the tortious actions of battery, assault, and negligence on theories of aiding and abetting and agency. As discussed above, Plaintiffs have not met the standard for pleading conspiracy. They also fail to plead a case for either aiding and abetting or vicarious liability through agency.

The negligence standard in D.C. is familiar and well-established: no defendant is liable for negligence unless that defendant specifically owes the plaintiff some duty of care as a matter of law. *See Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1098 (D.C. 1994) (citing *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339 (1928); *Presley v. Commercial Moving & Rigging, Inc.*, 25 A.3d 873, 888 (D.C. 2011). Once such a legal duty is established, the plaintiff must also show a deviation from that duty, and a causal relationship between that deviation and the harm suffered by the plaintiff. *See Youseff v. 3636 Corp.*, 777 A.2d 787, 792 (D.C. 2001). Here, Plaintiffs can plead none of those elements, further dooming their negligence claims. Plaintiffs claim President Trump and the Campaign are liable under this cause of action because they broke criminal laws (they did not) solely through their speech and the actions of

others based on that speech. Plaintiffs 'claim is woefully insufficient, even at the pleading stage.

The statements Plaintiffs allege are insufficient to show negligence. Speakers at political rallies do not owe a duty of care to members of Congress or Capitol Police Officers not at the rally. By bringing their negligence claims, Plaintiffs advocate for another boundless rule with severe ramifications. Since the dawn of the Republic and before, politicians have expressed their passions in political speeches. The important First Amendment protections for those speeches have already been discussed in detail. But claiming political speech can give rise to negligence liability is also troubling.

In essence, Plaintiffs argue that speakers should be vicariously liable for the acts of the listeners. As a matter of law, political speakers do not owe a legally enforceable duty of care to their adversaries or others who might find themselves in the path of impassioned supporters. Like the infamous firework that harmed Ms. Palsgraf almost a century ago, the harm is simply too remote and unforeseeable to give rise to a duty of care. *See, e.g., Palsgraf,* 248 N.Y. at341, 354. 339. Whether political speech is negligent is a question for voters, not courts.

Plaintiffs cannot escape, even at the pleading stage, that the Trump Defendants acted responsibly. As previously discussed, President Trump simply called for peaceful and patriotic demonstrations. Should his statements be held negligent, then district courts will be very busy weighing the legal reasonableness of

43

statements from thousands of politicians. Aside from the obvious First Amendment pitfalls, such a rule would put the judiciary in an untenable position.

## CONCLUSION

For all of the reasons stated above, President Trump and Donald. J. Trump for President, Inc. respectfully request that this Court dismiss Plaintiffs 'Complaint in its entirely, with prejudice.

Dated: November 12, 2021                    Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
*Attorney for Donald J. Trump and Donald J. Trump for President, Inc.*

## CERTIFICATE OF SERVICE

I certify that on November 12, 2021, a copy of the foregoing was filed with the

Clerk of the Court using the Court's CM/ECF system, which will send a copy to all

counsel of record.


Dated: November 12, 2021                     /s/ Jesse R. Binnall
                                             Jesse R. Binnall
                                             *Attorney for Donald J. Trump*
                                             *and Donald J. Trump for*
                                             *President, Inc.*