**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CONRAD SMITH, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 1:21-cv-2265-APM |
| | ) |
| DONALD J. TRUMP, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT DEREK KINNISON'S FIRST MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1) AND (b)(6)**

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Derek Kinnison*

## <u>TABLE OF CONTENTS</u>

Introduction ........................................................................................... 1

The Amended Complaint ........................................................................ 2

Argument ............................................................................................... 4

    I.       Standard for Rule 12(b)(1) and (6) motions to dismiss ............. 4

    II.     Counts I-III should be dismissed insofar as Plaintiff officers seek
          redress for the alleged injuries of nonparty members of Congress,
          "Congressional staff," President Biden and Vice President Harris ....... 5

    III.    Counts I and II fail to state claims under §§ 1985(1), 1986 ........... 9

          A.     "Officers of the United States" are Executive officers, not
               congressional employees.......................................... 9

          B.     D.C. is not a "State or Territory" under §§ 1985(1), 1986 ........... 11

          C.     Section 1985(3), not § 1985(1), prohibits conspiracies to interfere
               with the federal voting process................................... 13

          D.     Counts I and II allege no facts showing an actual agreement to
               commit the "conspiracy's" overt acts.............................. 15

          E.     The remaining D.C.-law Counts should be dismissed under 28
               U.S.C. § 1367(c) ................................................. 17

    IV.    Counts III, IV, V and VI fail to state claims ............................ 18

          A.     The BRCA Count fails to state a claim ............................ 18

           B.     The battery, assault and negligence Counts fail to state claims .... 20

    V.     Insofar as they depend on Kinnison's protected speech, expressive conduct,
          freedom of association, and right to petition the government, Counts I-VI
          must be dismissed ............................................... 22

          A.     Unlawful violence mixed with constitutionally protected
               assemblies ..................................................... 22

          B.     Membership in the Three Percenters group ....................... 24

VI.     If the Court does not dismiss Counts I-VI for the above reasons, it should
        dismiss or stay the case with respect to Kinnison under the first-to-file
        abstention doctrine............................................................................................ 26

Conclusion ................................................................................................................ 27

## <u>TABLE OF AUTHORITIES</u>

**CASES** **Page**

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) .................................... 5, 18

*Baker v. Carr*, 369 U.S. 186 (1962) .................................... 21-24

*Begay v. United States*, 553 U.S. 137 (2008) .................................... 26-27

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) .................................... passim

*Brown v. Louisiana*, 383 U.S. 131 (1966) .................................... 37

*Buckley v. Valeo*, 424 U.S. 1 (1976) .................................... 37

*Bush v. Gore*, 531 U.S. 98 (2000) .................................... 20, 22

*City of Houston v. Hill*, 482 U.S. 451 (1987) .................................... 38, 51

*Edwards v. District of Columbia*, 755 F.3d 886 (D.C. Cir. 2014) .................................... 36

*Hamling v. United States*, 418 U.S. 87 (1974) .................................... 14

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982) .................................... passim

*Hubbard v. United States*, 514 U.S. 695 (1995) .................................... 40-43

*Luther v. Borden*, 48 U.S. 1 (1849) .................................... 21

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) .................................... passim

*Snyder v. Phelps*, 562 U.S. 443 (2011) .................................... 37

*Texas v. Johnson*, 491 U.S. 397 (1989) .................................... 36

*Tinker v. Des Moines Ind. Comm. School Dist.*, 393 U.S. 397 (1989) .................................... 37

*Trump v. Mazars United States*, 940 F.3d 710 (D.C. Cir. 2019) .................................... 41

*United States v. Am. Trucking Ass'ns, Inc.* 310 U.S. 503 (1969) .................................... 56

*United States v. Bronstein*, 849 F.3d 1101 (D.C. Cir. 2017) .................................... 28

*United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) .................................... 55-56

*United States v. Bursey*, 2004 U.S. Dist. LEXIS 29661 (D.S.C. Sept. 13, 2004) .................................... 55-56

*United States v. Caputo*, 201 F. Supp. 3d 65 (D.D.C. 2016) ............................................... 38

*United States v. Dean*, 55 F.3d 640 (D.C. Cir. 1995) ..................................................... 40-43

*United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013) .............................................. 14-16

*United States v. Grace*, 461 U.S. 171 (1983) ................................................................... 37

*United States v. Granderson*, 511 U.S. 39 (1994) ....................................................... passim

*United States v. Kozminski*, 487 U.S. 931 (1988) ............................................................. 45

*United States v. Lanier*, 520 U.S. 259 (1997) ................................................................. 28

*United States v. Lopez*, 514 U.S. 549 (1995) .............................................................. passim

*United States v. Moore*, 613 F.2d 1029 (D.C. Cir. 1979) ................................................. 55

*United States v. Morrison*, 529 U.S. 598 (2000) ......................................................... passim

*United States v. Oakar*, 111 F.3d 146 (D.C. Cir. 1997) ............................................... 40-42

*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) ........................................ passim

*United States v. Rostenkowski*, 59 F.3d 1291 (D.C. Cir. 1995) ........................................ 21

*United States v. Rumley*, 345 U.S. 41 (1953) .................................................................. 20

*United States v. Santos*, 553 U.S. 507 (2008) ............................................................ passim

*United States v. Sutherland*, 921 F.3d 421 (4th Cir. 2019) ............................................. 18

*United States v. Wiltberger*, 18 U.S. 76 (1820) .............................................................. 45

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ................................................. 20, 22

*Virginia v. Hicks*, 539 U.S. 113 (2003) ........................................................................... 44

*Williams v. Fears*, 179 U.S. 270 (1900) .......................................................................... 52

*Yates v. United States*, 574 U.S. 528 (2015) ............................................................... 25-27

**STATUTES**

18 U.S.C. § 1752 ........................................................................................................... passim

18 U.S.C. § 3056 .................................................................................................... passim

18 U.S.C. § 1512(c)(2) ......................................................................................... passim

18 U.S.C. § 231(a)(3) ............................................................................................ passim

18 U.S.C. § 1503 .................................................................................................... passim

18 U.S.C. § 1505 .................................................................................................... passim

**RULES AND REGULATIONS**

Federal Rule of Criminal Procedure 7 ....................................................................... 14

Federal Rule of Criminal Procedure 12 ..................................................................... 14

31 Code of Federal Regulations Part 408 .................................................................. 10

**OTHER AUTHORITIES**

DOJ Resource Manual ......................................................................................... passim

Defendant Derek Kinnison, through his counsel, files this first motion to dismiss the Amended Complaint, pursuant to Rule 12(b)(1) and (b)(6) of the Federal Rules of Civil Procedure.

**Introduction**

The Complaint principally alleges that Kinnison and the other Defendants conspired to prevent, by force, intimidation and threats, members of Congress and the vice president from discharging their official duties on January 6 to count electoral certificates in the 2020 presidential election, in violation of the Ku Klux Klan Act, 42 U.S.C. § 1985(1).  Yet its 71 pages fail to allege facts showing an agreement between Kinnison and anyone else to that end. Plaintiffs scarcely clear a notice-pleading standard, still less the higher *Twombly/Iqbal* plausibility bar.  That is fatal to the claim.  The problems grow worse from there.

Plaintiffs are seven police officers.  As their counsel know, the officers lack standing to raise the civil rights claims of nonparty members of Congress and the vice president.  And yet redressing Plaintiffs' alleged injuries is of secondary importance in the Complaint.  For the officers are the vehicle by which their counsel aim to prove the more sensational claim, sounding more in politics than in tort law, that these Defendants in particular "caused" Congress's electoral certificate-counting delay—rather than the over 600 nonparty defendants criminally charged on that basis.

We know the Complaint moves the Plaintiff officers around the board with an eye on political pieces bigger than they and Kinnison, who are props in this case, because although all six Counts demand proof that these Defendants caused these officers' injuries, it does not allege any facts showing they did.  Buried in the middle of their Complaint Plaintiffs plead by-the-by that they do not know who caused the injuries they come around to alleging on page 62.  Compl.,

¶¶ 156-164.  Plaintiffs expect the Court not to notice that when the Complaint alleges that "Defendants" used "pepper spray, bear spray, fire extinguishers, and other pollutants" on Plaintiffs, it is obliquely alluding to unidentified "John Does 1-10"—whom the Complaint does not factually connect to the identified Defendants.  At bottom, Plaintiffs claim the identified Defendants "caused" their injuries in this sense: some unidentified protesters among the thousands present at the Capitol that day injured them; Defendants were present in D.C. the same day and audibly shared the same disagreeable politics; so, Defendants are liable.  This is not a cognizable theory of liability under any claim.  It is politics ill-concealed under a veneer of tort law.  The Complaint suffers from other flaws.  Its Ku Klux Klan Act counts fail to state claims under Supreme Court precedent; it is riddled with factual errors that a diligent review of the public record would have revealed; its liability theories conflict with basic First Amendment precedent.  The Complaint's claims against Kinnison should be dismissed.

**The Complaint**

Although Rule 11 bars attorneys from filing claims formulated without reasonable inquiry into the facts, Fed. R. Civ. P. 11(b), the Complaint bucks epistemological modesty from the outset. "The attack on the United States Capitol on January 6, 2021 (the 'Capitol Attack' or 'Attack')[1], was caused by Defendants." Compl., ¶ 2.  Its central allegations fall under these basic categories:

- **Conspiring to prevent electoral certification.**  The former president "and the other Defendants in this case conspired with each other and others to prevent Congress from

---

[1] Outside Plaintiffs' Complaint, to "attack," in the nonfigurative sense, is to "try to hurt or defeat using violence." ATTACK, Cambridge Online Dictionary, https://dictionary.cambridge.org/us/dictionary/english/attack.  Inside the pleading, "attack," used 181 times, lumps together acts of violence and acts of nonviolent protest, provided they occurred at the Capitol on January 6.  Thus, in Plaintiffs' private meaning, Protester X attacked the Capitol—as he stood holding up a political poster outside the building, where other people engaged in violence. The entire Complaint rests on this semantic fudge.

certifying the election results through the use of force, intimidation, and threats." Compl., ¶ 2;

- **Encouraging and inciting violence against law enforcement and Congress.** The former president "and the other Defendants propagated false claims of election fraud, encouraged the use of force, intimidation, and threats, and incited violence against members of Congress and the law enforcement officers whose job it was to protect them. Defendants' unlawful efforts culminated in the January 6 mass attack on the United States Capitol and the brutal, physical assault of hundreds of law enforcement officers. Many Defendants in this case planned, aided, and actively participated in that attack." Compl., ¶ 2; and,

- **Conspiring to assault law enforcement and members of Congress.** "Responding to TRUMP's calls, as TRUMP and other Defendants and co-conspirators intended, PROUD BOYS, OATH KEEPERS, and other Defendants planned and coordinated among themselves and with others to come to Washington, D.C., and violently attack the United States Capitol and the law enforcement officers defending it. Among other things, Defendants, including PROUD BOYS and OATH KEEPERS, raised money for, planned, and recruited co-conspirators to join in TRUMP's January 6 rally and, ultimately, to join in the Capitol Attack." Compl., ¶ 6.

Kinnison is referenced approximately 15 times in the Complaint. Compl., ¶¶ 99, 101, 130, 134, 170. None pleads any fact in support of the above conclusory assertions with respect to Kinnison, whom the federal government does not accuse of violence, attempted violence or planning to commit violence on January 6.

The Complaint first alleges that Kinnison "discussed plans to travel to Washington, D.C., on a Telegram chat" that was named "The California Patriots-Answer the Call Jan. 6." Compl., ¶ 101. Kinnison "said in the chat that he [and others] were bringing 'medical kits, radios, multiple cans of bear spray, knives, flags, plates[,] goggles, [and] helmets." *Id.*, ¶ 101. It alleges he later sent a text message saying, "Got the bandolier," and attached a photograph of him wearing the bandolier with ammunition. *Id.* It further alleges Kinnison was appointed "lead on Comms" in a chat called "DC Brigade." *Id.*, ¶ 103.

3

The Complaint alleges that, on January 6, Kinnison, wearing a gas mask, entered the Upper West Terrace area outside the Capitol Building.  Compl., ¶ 123.  It alleges that he "breached police barricades on the United States Capitol grounds on January 6." *Id.*, ¶ 44.[2]

The Complaint alleges that the seven Plaintiff officers suffered injuries during the riot. Compl, ¶¶ 156-64.  However, it does not allege the identities of the alleged assailants, who are concededly unknown.  *Id.*  It alleges generally that the identified Defendants "caused Plaintiffs' injuries by causing the mass attack at the Capitol." *Id.*, ¶ 165.  Based on these allegations, the Complaint alleges that Kinnison conspired to interfere with civil rights, and failed to prevent a conspiracy to interfere with civil rights, in violation of the Ku Klux Klan Act, 42 U.S.C. § 1985(1), § 1986. Compl., ¶¶ 166-81 (Counts I and II).  It also alleges that Kinnison violated the D.C. Bias-Related Crimes Act (BRCA), D.C. Code § 22-3704(a). Compl., ¶ 182. Two of the predicate BRCA "offenses" Kinnison is said to have committed are a violation of the D.C. Anti-Terrorism Act of 2002 (ATA) and property destruction in violation of D.C. Code § 22-303. Kinnison is said to have violated the ATA by "commit[ing] and conspir[ing] to commit malicious destruction of property," which is a specified offense under the ATA.  *Id.*, ¶ 191 (Count III).  It finally alleges that Kinnison aided and abetted battery and assault (Count IV and V) and is negligently responsible for Plaintiffs' injuries (Count VI).

**Argument**

**I.      Standard for Rule 12(b)(1) and (6) motions to dismiss a complaint**

---

[2] As with many of Plaintiffs' allegations, this last one is demonstrably false.  The initial Complaint falsely alleged that Kinnison entered the Capitol.  The Amended Complaint "corrected" the falsity by alleging that Kinnison "breached police barricades." That is also false. The police barricades were down when Kinnison is said to have entered the area.

The Court evaluates Kinnison's motion to dismiss the Complaint pursuant to Rule 12(b)(6), under the standards announced in *Ashcroft v. Iqbal*, 555 U.S. 662, 679 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While the Court must accept as true all well-pleaded factual allegations and reasonable factual inferences drawn from them, a complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rather,

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief." *Id. at* 570.

*Iqbal*, 556 U.S. at 678.

A challenge to the standing of a party, when raised as a motion to dismiss, proceeds pursuant to Rule 12(b)(1). *Lipsman v. Sec'y of the Army*, 257 F. Supp. 2d 3, 6 (D.D.C. 2003). "Because subject-matter jurisdiction focuses on the Court's power to hear the plaintiff's claim . . . a court resolving a motion to dismiss under Rule 12(b)(1) must give the complaint's factual allegations closer scrutiny than required for a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim." *Id.* (citing *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001)).

**II.     Counts I-III should be dismissed insofar as Plaintiff officers seek redress for the alleged injuries of nonparty members of Congress, "Congressional staff," President Biden and Vice President Harris**

Plaintiffs, seven police officers, lack Article III standing to bring several of the claims underpinning Counts I-III, which purport to redress injuries suffered by nonparties who are not police officers.  Those Counts should be dismissed to the same extent.

The Constitution limits the Court's subject-matter jurisdiction to "Cases" and "Controversies" for which the plaintiff has standing to bring suit.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "The irreducible constitutional minimum of standing" has three elements: (1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable decision.  *Id.* at 560-61.  A party may successfully assert "third-party" standing, i.e., standing based on a nonparty's injury, only when (1) the plaintiff has suffered an injury-in-fact sufficient to give him a "concrete interest" in the proceeding; (2) the plaintiff "has a close relationship" to the third party; and (3) there is "some hindrance to the third party's ability to protect his [] own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010) ("[T]he burden is on the plaintiff to establish that he has third party standing, not on the defendant to rebut third party standing.").

Counts I and II allege violations of the Ku Klux Klan Act, 42 U.S.C. §§ 1985(1) (Count I), 1986 (Count II).  Section 1985(1) creates a private right of action against persons engaged in conspiracies

> to prevent by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

42 U.S.C. § 1985(1).

A plaintiff may recover resulting damages for a violation of § 1985(1),

if one or more persons engaged [in the conspiracy] do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby [the plaintiff] is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States . . .

42 U.S.C. § 1985(3).

Section 1986 provides,

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented. . .

42 U.S.C. § 1986.

Count I alleges that Kinnison violated § 1985(1) by (a) agreeing "with one or more persons to prevent, by force, intimidation, and threats (1) *members of Congress, Congressional staff* . . . from discharging their lawful duties as officers of the United States and holders of an office, trust, or place of confidence under the United States, or (2) *President Biden and Vice President Harris* from accepting or holding an office, trust, or place of confidence under the United States"; (b) agreeing with one or more persons "*to injure a member of Congress* . . . on account of their lawful discharge of their duties as officers of the United States, or to injure them while they were engaged in the lawful discharge thereof"; (c) agreeing with one or more persons to induce, by force, intimidation, and threats "*members of Congress, Congressional staff* . . . to leave a place, where their duties as officers were required to be performed."  Compl., ¶ 168 (emphasis added).

The Court should dismiss these theories of Ku Klux Klan Act liability since Plaintiffs— police officers—lack standing to bring them.  Civil rights injuries to members of Congress,

Congressional staff, President Biden and Vice President Harris are not the physical and emotional injuries Plaintiffs allege they have suffered.  Compl, ¶¶ 156-64.  Plaintiffs do not have "third-party" standing to sue on behalf of those nonparties because they have not shown they have a "close relationship" to those third parties and, in any case, there is no "hindrance to the third part[ies'] ability to protect [their] own interest[s]." *Powers*, 499 U.S. at 411; *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229-30 (11th Cir. 2000) ("Absent exceptional circumstances, a third party does not have standing to challenge injury to another party.").

The same problem bedevils Counts II and III.  Count II, alleging a § 1986 violation, simply rehashes the Count I allegations and conclusorily adds that Kinnison "had knowledge that the wrongs conspired to be done, as set out in Count I, were about to be committed, and neglected or refused to prevent or aid in preventing those wrongs."  Compl., ¶ 175.  Again, to the extent that Count I predicates Kinnison's § 1985(1) liability on injuries allegedly suffered by third parties, Count II must be dismissed to the same extent.  *Powers*, 499 U.S. at 411.

As to Count III, alleging a violation of the D.C. Bias-Related Crimes Act of 1989 (BRCA), Plaintiffs plainly lack standing.  The BRCA provides a civil cause of action for

> any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived . . . political affiliation of a victim of the subject designated act. . .

D.C. Code § 22-3704.

The Complaint explicitly alleges that "The intended victims of Defendants' [BRCA violations] were *Democratic members of Congress, some Republican members of Congress, and*

*Vice President Pence*, whom Defendants perceived to be endorsing Democrats Joe Biden and Kamala Harris by announcing the election results"— not Plaintiff police officers.  Compl., ¶ 188 (emphasis added).

The Complaint also explicitly alleges that Kinnison's alleged "prejudice based on the actual or perceived political affiliation" was directed at those "victims"—not at Plaintiff police officers.  *Id.*, ¶ 189.  Just as with Counts I and II, Count III must be dismissed because Plaintiff police officers lack third-party standing to vindicate the injuries of those nonparties.  Plaintiffs have not shown they have a "close relationship" with those third parties and, anyway, have not shown any "hindrance to the third part[ies'] ability to protect [their] own interest[s]." *Powers*, 499 U.S. at 411.

### III.    Counts I and II fail to state claims under §§ 1985(1), 1986

Counts I and II must be also dismissed because (1) "officers of the United States" in §§ 1985(1) and 1986 are Executive branch officers, whereas Plaintiffs are members of a congressional entity controlled by the U.S. Capitol Police Board, which does not belong to the Executive branch; (2) Washington, D.C., is neither a "State" nor a "Territory" under § 1985(1); (3) interference with federal voting rights is covered by § 1985(3), which Plaintiffs eschew in a transparent attempt to avoid its requirement that the defendant act with racial, invidiously discriminatory animus, an element not pleaded here, and (4) the Complaint fails to plead any facts showing an agreement between Kinnison and anyone else to violate § 1985(1), an essential element of that claim.  Because Counts I and II are the only counts creating original jurisdiction in this Court, the Court should dismiss the remaining pendant Counts under 28 U.S.C. § 1367(c).

### A.    "Officers of the United States" are Executive officers, not congressional employees

As shown above, Section 1985(1) prohibits conspiring to induce by force, intimidation, or threat "any officer of the United States" to leave the place where his duties as an officer are required to be performed or "to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties." § 1985(1).  Counts I and II are premised on the claim that Plaintiffs, U.S. Capitol Police officers, are "officers of the United States" under § 1985(1).  They are not.

Section 1985 was enacted as a part of the Civil Rights Act of 1871, as a means of effectuating the Fourteenth Amendment.  See, *e.g.*, *D.C. v. Carter*, 409 U.S. 418, 423 (1973).

The Fourteenth Amendment provides in pertinent part,

Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, *Representatives in Congress, the executive and judicial officers of a state, or the members of the legislature thereof*, is denied to any of the male inhabitants of such state, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state.

U.S. Const. amend. XIV, § 2 (emphasis added).

No person shall be a Senator or Representative in Congress, or elector of President and Vice President, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath, *as a member of Congress*, *or as an officer of the United States*, *or as a member of any state legislature, or as an executive or judicial officer of any state*, to support the Constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

U.S. Const. amend. XIV, § 3 (emphasis added).

As the italicized portions of the Fourteenth Amendment show, Congress enacted the enabling Civil Rights Act of 1871 consistent with the ordinary understanding that members of

Congress and legislative entities are not "officers of the United States." Rather, the term

"officer" is solely used in connection with "executive" or judicial" offices, not congressional

ones.

In *Hubbard v. United States*, 514 U.S. 695, 115 S. Ct. 1754 (1995), the Supreme Court

considered whether the statutory phrase "any department or agency of the United States"

included the judicial and legislative branches.   The Court held that unless a party makes a fairly

powerful showing otherwise based on the text of the statute at issue, the default presumption is

that those terms refer to Executive branch entities.  514 U.S. at 700.  The D.C. Circuit later held

that congressional entities are not "departments" or "agencies" "of the United States," since they

do not belong to the Executive branch.  *United States v. Oakar*, 111 F.3d 146, 151 (D.C. Cir.

1997); *United States v. Dean*, 44 F.3d 640, 658-59 (D.C. Cir. 1995).

The U.S. Capitol Police are not a part of the Executive branch. 5 U.S.C. § 101 (listing

Executive departments); 2 U.S.C. § 1970 (providing that Executive departments and agencies

may aid the USCP, which is therefore not the same thing).  Rather, the USCP are controlled and

managed by the U.S. Capitol Police Board.  United States Capitol Police, Capitol Police Board,

https://www.uscp.gov/the-department/oversight/capitol-police-board. The Capitol Police Board

is solely made up of congressional entities. *Id.*  As the Fourteenth Amendment itself

demonstrates, employees and members of Congress, such as the U.S. Capitol Police, are not

"officers of the United States." *Oakar*, 111 F.3d at 151; *Dean*, 44 F.3d at 658-59.

Because Counts I and II rest on the legally mistaken assumption that Plaintiffs, who are

not Executive officers, are yet still "officers of the United States," Compl., ¶¶ 167-68, 176, they

must be dismissed.

### B.     D.C. is not a "State or Territory" under § 1985(1)

Section 1985(1) creates a right of action against those who conspire to commit the acts covered in that statute—"in any State or Territory." § 1985(1).  The Complaint alleges that the overt acts on which Counts I and II rest were committed in Washington, D.C.  Compl., ¶¶ 6, 87, 88, 97, 107.  Because Washington, D.C., is not a "State" or "Territory," Counts I and II must be dismissed.

The issue is settled.  The Supreme Court in 1973 considered whether § 1983, a companion to § 1985 in the Civil Rights Act of 1871, applied against the District of Columbia. *Carter*, 409 U.S. at 423.  The question turned on whether D.C. was a "State" or "Territory." The answer was, and is, No.  The Court began by observing that "the commands of the Fourteenth Amendment are addressed only to the State or to those acting under color of its authority." *Id*. at 423.  "[T]he District of Columbia is not a 'State,'" it added, "within the meaning of the Fourteenth Amendment." *Id.* at 424 (citing *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)).  Nor could D.C. be analogized to a "Territory." *Id.* at 431.

The Court considered the purpose of the 1871 Act.  After the Civil War, some southern States were unwilling or unable to enforce their own laws against those violating the civil rights of others, at that time African-Americans terrorized by the Klan.  *Carter*, 409 U.S. at 426.  So, "Congress recognized the need for original federal court jurisdiction as a means to provide at least indirect federal control over the unconstitutional actions of state officials." *Id*. at 428.  By contrast,

> there was no need, however, to create federal court jurisdiction for the District of Columbia.  Even prior to 1871, the courts of the District possessed general jurisdiction over both federal and local matters. . . Thus, the jurisdictional aspects of § 1 of the 1871 Act were entirely superfluous with respect to the District.  Moreover, while Congress was unable to exert any direct control over the actions of state officials, it was authorized under Art. I, § 8, cl. 17 of the Constitution to exercise plenary power over the District of Columbia and its officers. . . And since the District is itself the seat of the National

Government, Congress was in a position to observe and, to a large extent, supervise the activities of local officials.

*Carter*, 409 U.S. at 430.

In short, unlike the situation prevailing in certain States where African-Americans' rights were trampled on by the Klan with impunity, D.C. was and is "'the very heart—of the Union itself.'" *Carter*, 409 U.S. at 432 (quoting *O'Donoghue v. United States*, 289 U.S. 516, 537 (1933)). All of *Carter*'s analysis applies with equal force to § 1985(1).[3] There is no reason to doubt that the legislative purpose behind § 1983—creating a federal right of action against State officials who sat idly by as African-Americans' rights were infringed—is the same as the one that inspired § 1985(1), creating a federal right of action against the parties causing the infringement. As *Carter* held, the problem of the unenforceability of minority rights did not exist in the District of Columbia, where "the courts of the District possessed general jurisdiction over both federal and local matters." *Carter*, 409 U.S. at 430.[4] Accordingly, because D.C. is neither a "State" nor a "Territory," Counts I and II must be dismissed.

### C.  Section 1985(3), not § 1985(1), prohibits conspiracies to interfere with the federal voting process

---

[3] Significantly, although Congress amended § 1983 after *Carter* to explicitly include the District of Columbia, it did not so amend § 1985.

[4] In *Hobson v. Wilson*, 737 F.2d 1 (D.C. Cir. 1984), the court of appeals declined to extend *Carter* to § 1985(3) but did not address § 1985(1), pleaded here in Count I. As shown *infra*, Plaintiffs attempt to skirt the requirements of § 1985(3) by artificially recharacterizing their voting rights claim, covered by § 1985(3), as a § 1985(1) conspiracy. In addition, *Hobson*, decided in 1984, did not begin its statutory analysis with the plain meaning of the terms "State" and "Territory," which is the modern first step in a federal court's statutory analysis. *Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 22 (D.C. Cir. 2010) ("The Court must first begin with [the statute's] plain meaning, and if the statutory language is clear, the judicial inquiry normally ends there."). As *Carter* held, the plain meaning of "State" and "Territory" excludes D.C.

Section 1985(3) explicitly prohibits conspiracies to interfere with the federal voting process. 42 U.S.C. § 1985(3). Here, the entire Complaint is focused on Defendants' alleged "unlawful effort to use force, intimidation, and threats to prevent Congress from certifying the results of the 2020 Presidential election." Compl., ¶ 1. Why, then, do Plaintiffs plead Count I under the wrong subpart of § 1985? Because they are attempting to avoid the requirement under § 1985(3) that there must be racial, invidious discriminatory animus for the conspiracy. This Plaintiffs do not, and cannot, plead.

Section 1985(3) proscribes conspiracies,

to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy.

42 U.S.C. § 1985(3).

In interpreting § 1985(1), the Court must hew closely to the "'endlessly reiterated principle of statutory construction . . . that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage.'" *Independent Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000) (quoting *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995)). And "the canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. General Rev. Corp.*, 568 U.S. 371, 386 (2013).

If § 1985(1) encompasses conspiracies to interfere with the federal voting process, as Count I alleges, then the third subpart of the same statutory section is rendered superfluous. To avoid surplusage, the Court must construe § 1985(3) as covering conspiracies to interfere with

voting rights and § 1985(1) as covering non-overlapping civil rights violations.  *Marx*, 568 U.S. at 386.

That is particularly so here, where Plaintiffs are deliberately eschewing § 1985(3) so as to avoid its pleading requirements.  A § 1985(3) plaintiff must plead that racial, invidiously discriminatory animus lay behind the conspirators' actions.  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993).  The Supreme Court has never extended § 1985(3) beyond invidiously discriminatory intent "with something other than a racial basis." *Bush v. Butler*, 521 F. Supp. 2d 63, 69 (D.D.C. 2007) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)).

The Complaint pleads just the opposite.  Plaintiffs allege that Defendants' "conspiracy" was designed "to prevent Congress from certifying the election results . . . [based on] false claims of election fraud." Compl., ¶ 2.  The Complaint does not allege any facts showing that racial, invidiously discriminatory animus lay behind Kinnison's "conspiracy."[5]  Accordingly, Counts I and II should be dismissed.

### D.    Counts I and II must be dismissed, as the Complaint alleges no facts showing an actual agreement to commit the "conspiracy's" overt acts

Sections 1985(1) and 1986 prohibit conspiracies to commit the acts described in those sections.  An essential element of any civil conspiracy is "an agreement between two or more persons" to commit the prohibited activity.  *Findlay v. Citimortgage, Inc.*, 813 F. Supp. 2d 108, 122 (D.D.C. 2011).  Counts I and II must be dismissed as the Complaint does not allege any facts

---

[5] Possibly anticipating that the Court would not fail to notice this pleading gambit, Plaintiffs include in their Complaint a solitary, stock racism paragraph.  Compl., ¶ 4.  It does not allege that Kinnison was motivated by racial animus even conclusorily, much less with facts specific to him.  Nor does the Complaint plead how racial animus would account for the injuries of Plaintiffs who are not racial minorities.  *Id.*, ¶¶ 161, 163.

showing an agreement between Kinnison and any other Defendant to commit the acts prohibited by §§ 1985(1), 1986.

Of the 15 references to Kinnison in the Complaint only two are arguably relevant to the theory underpinning Counts I and II that he conspired with other Defendants to interfere with Congress's Electoral College certificate count and thereby somehow "caused" the injuries allegedly suffered by Plaintiffs at the hands of unknown protesters.  Neither reference pleads facts showing any agreement between Kinnison and another Defendant to violate § 1985(1).

First is the Complaint's allegation that Kinnison "discussed plans to travel to Washington, D.C. [on January 6] on a Telegram chat named 'The California Patriots-Answer the Call Jan. 6.'"  Compl., ¶ 99.  A different member of the chat described its purpose as "for able bodied individuals that are going to DC on Jan 6" who are "ready and willing to fight," and "to organize a group of fighters to have each other's backs and ensure that no one will trample on our rights." *Id.*  The allegation that Kinnison belonged to a messaging chat to discuss traveling to a political rally does not show an agreement to assault the Plaintiff officers or prevent them from fulfilling their office.  That is not changed by the allegation that another member of the chat said it was for "fighters." First, the Complaint does not allege Kinnison agreed with, or even read, that sentiment and, in any case, a vague reference to "fighters" does not plead a conspiracy to commit acts of violence against Plaintiffs.

Second is the Complaint's allegation that Kinnison "said in the chat that he [and others] were bringing 'medical kits, radios, multiple cans of bear spray, knives, flags, plates[,] goggles, [and] helmets.'" Compl., ¶ 101.  It alleges he later sent a text message saying, "Got the bandolier," and attached a photograph of him wearing the bandolier with ammunition. *Id.*  It further alleges Kinnison was appointed "lead on Comms" in a chat called "DC Brigade." *Id.*, ¶

16

103.  An allegation that Kinnison was bringing those objects and personal effects to D.C., where he would lead "communications," is not an allegation that he conspired to assault Plaintiffs or prevent them from fulfilling their office.

Twombly itself shows Plaintiffs' error.  There, the plaintiff class attempted to plead a price-fixing conspiracy under the Sherman Act by alleging parallel conduct without "any independent allegation of actual agreement" among the alleged conspirators.  550 U.S. at 564. The class contended that the court could reasonably infer agreement among the corporate defendants from their parallel conduct, as otherwise the defendants would not have succeeded in raising market price.  Id. at 566.  But the Court found it just as plausible that inflation was the result of group dynamics, companies "sitting tight, expecting their neighbors to do the same thing." Id. at 568.  Accordingly, the plaintiff class did not plausibly plead an illicit agreement.

Just so here.  Like the Twombly plaintiffs, Plaintiffs allege parallel conduct at the Capitol among dozens of Defendants.  But they do not make "any independent allegation of actual agreement" between Kinnison and any other Defendant to commit the acts in § 1985(1). Twombly, 550 U.S. at 564.  Just as in Twombly, the collective behavior of the Defendants cannot be explained as the necessary product of actual agreement.  As in Twombly, at least an equally plausible inference from parallel conduct is crowd psychology and group dynamics.  Id.  If there are plausible explanations for parallel conduct apart from actual illicit agreement, and the plaintiff has not factually alleged actual agreement, a civil conspiracy claim must be dismissed. Twombly, 550 U.S. at 564.  That is precisely the case here.

As to Count II, the Complaint pleads no facts whatsoever showing that Kinnison "had knowledge" that other unidentified individuals would commit acts in § 1985(1) on January 6; no facts that he "neglected or refused to prevent or aid in prevent those wrongs"; and no facts that

he "was in a position and had the power to prevent or aid in preventing the wrongs." Compl., ¶¶ 175-76.

Because Counts I and II do not allege that Kinnison actually agreed with any other Defendant to commit the acts prohibits in § 1985(1), they should be dismissed.

### E. The remaining D.C.-law Counts should be dismissed under 28 U.S.C. § 1367(c)

Counts I and II are the only counts that create original jurisdiction in this Court, as the Complaint acknowledges. Compl., ¶ 47. The remaining Counts are based on D.C. law claims. *Id.* Because Counts I and II should be dismissed, the remaining claims are not "so closely related to the federal claims as to form part of the same case or controversy." *Id.*[6]

It is therefore appropriate for the Court to decline to exercise supplemental jurisdiction over the D.C.-law Counts. 28 U.S.C. § 1367(c). Even if it chooses to exercise jurisdiction over the pendant claims, however, they should be dismissed for the following reasons.

## IV. Counts III, IV, V and VI fail to state claims

### A. The BRCA Count fails to state a claim

Count III alleges that Plaintiffs "incur[red] injury to [their] person or property as a result of an intentional act [of Kinnison's] that demonstrates [his] prejudice based on the actual or perceived . . . political affiliation of a victim of the subject designated act. . ." Compl., ¶ 183 (citing D.C. Code § 22-3704(a)). This claim fails for several reasons.

First, the Complaint pleads no facts showing how any of *Kinnison's* "intentional acts" affected any of the alleged victims: "Democratic members of Congress, some Republican

---

[6] The Complaint claims a punitive damages award for Counts I and II. Compl., p. 79. However, § 1985(1) and § 1986 only permit recovery of "damages occasioned by [the] injury or deprivation," § 1985(1), not punitive damages. Plaintiffs' punitive damages demand should be struck to the same extent.

members of Congress, and Vice President Pence." Compl., ¶ 188.  The Complaint does not plead

a fact showing how, why, or whether they were victims of any act by Kinnison specifically.  Nor

does the Complaint plead facts showing Kinnison's "prejudice" allegedly based on the "political

affiliation" of any of those "victims."

Second, the Complaint fails to plead facts satisfying the elements of the three D.C. Code

offenses allegedly predicating the BRCA Count:

**Act of terrorism.**  Plaintiffs allege that Kinnison committed an act of terrorism in

violation of D.C. Code § 22-3153(i) and (l) by virtue of committing and conspiring to commit

malicious property destruction exceeding $500,000.  Compl., ¶ 191.  But not a single reference to

Kinnison in the Complaint alleges that he conspired to, or did, destroy property on January 6.

Secondly, BRCA liability requires that the defendant commit a "designated act," which are

statutory defined.  D.C. Code § 22-3701(2).  All listed "designated acts" are criminal offenses.

By contrast, an "act of terrorism" under § 22-3153 is not an offense but a sentencing designation.

§ 22-3153.

**Property destruction.**  Plaintiffs allege Kinnison violated the BRCA by virtue of

engaging in property destruction, worth more than $1,000, in violation of D.C. Code § 22-303,

and attempting to engage in, aiding and abetting the commission of, and conspiring to do, the

same.  Compl., ¶ 184.  It pleads no facts showing how or when Kinnison aided and abetted

property destruction or that he conspired to destroy property.

**Rioting**.  Plaintiffs allege Kinnison violated the BRCA by virtue of rioting and

attempting to commit, conspiring to commit, and aiding and abetting the commission of the same

in violation of D.C. Code § 22-1322.  The Complaint fails to plead the elements of this offense.

A defendant may only be punished for "willfully" "engag[ing] in a riot" or "willfully" "incit[ing]

19

or urg[ing] other persons to engage in a riot." § 22-1322.  The adverb "willfully" in a criminal

statute means "with knowledge of illegality." *United States v. Quinn*, 401 F.Supp.2d 80, 101

(D.D.C. 2005).  The Complaint fails to allege that Kinnison undertook the alleged prohibited acts

in Count III with knowledge of their illegality.

Third, Plaintiffs plead no facts showing that their injuries were incurred "as a result of"

Kinnison's alleged commission of the three predicate offenses.  D.C. Code § 22-3704(a).  To the

contrary, Plaintiffs explicitly plead that they do not know the identities of the people who

actually caused their injuries.   Compl., ¶¶ 156-164.  The Complaint alleges no facts showing

how Kinnison's alleged BRCA offenses somehow caused unknown assailants to injure Plaintiffs.

It merely states, "As a result of Defendants' bias-motivated crimes, Plaintiffs were injured while

defending the Capitol." Compl., ¶ 186.  Such "conclusory allegations of harm do not allege facts

that would support causation . . . sufficient to withstand a motion to dismiss." *Johnson v.*

*Sullivan*, 748 F.Supp.2d 1, 9 (D.D.C. 2010).

### B.      The battery, assault and negligence Counts fail to state claims

Counts IV and V concede that Plaintiffs have not identified the individuals who allegedly

committed assault and battery against them.  Compl., ¶¶ 200, 206.  The Complaint's conclusory

allegations that Kinnison "aided and abetted" the unknown assailants and "conspired" to cause

those offenses therefore fail.

At common law, a person is liable for aiding and abetting a crime "if (and only if) he (1)

takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the

offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014).  "An intent to

advance some different or lesser offense is not . . . sufficient: Instead, the intent must go to the

specific and entire crime charged." *Id.* at 76.  The Complaint does not come close to properly

alleging that Kinnison aided and abetted assault and battery of the Plaintiffs.  It does not even allege who injured the Plaintiffs, much less any "affirmative act" Kinnison allegedly took "in furtherance" of the assault or battery.  Compl., ¶¶ 201, 207.  Nor does the Complaint allege that Kinnison intended that any of his affirmative acts specifically facilitate an assault or battery on Plaintiffs.

As noted above, to plead common-law conspiracy, Plaintiffs must allege Kinnison entered into an agreement to commit an assault or battery on Plaintiffs.  *Citimortgage*, *Inc.*, 813 F. Supp. 2d at 122.  The Complaint fails to plead any facts showing that Kinnison agreed with anyone to commit assault or battery.

Count VI alleges that Kinnison owed a duty to act reasonably and conform to the standards of conduct set out in criminal statutes.  It further alleges that he breached that duty by allegedly violating three such statutes.   Compl., ¶¶ 213-218.  For each one, the Complaint fails to properly allege the elements of the offense:

**D.C. riot statute.**  The riot statute prohibits "willfully engag[ing] . . . [or] incit[ing] or urg[ing] others to engage in a riot" of five or more persons in the District of Columbia.  D.C. Code § 22-1322.  As explained above, the "willfully" element means "with knowledge of illegality." *Quinn*, 401 F.Supp.2d at 101.  The Complaint does not even conclusorily allege that Kinnison engaged in, or incited or urged others to engage in, a "riot" "willfully," much less facts substantiating that he undertook those acts with knowledge of their illegality.  Compl., ¶ 213.

**Violence on Capitol grounds**.  Two statutes prohibit "willfully and knowingly . . . engag[ing] in any act of physical violence" on U.S. Capitol grounds.  D.C. Code § 10-503.16(b)(6); 40 U.S.C. § 5104(e)(2)(F).  The Complaint does not allege facts showing that Kinnison committed any act of physical violence on January 6, nor does the federal government

accuse him of such conduct.  The Complaint conclusorily states that Kinnison "attacked the

police officers guarding the Capitol, including Plaintiffs." Compl., ¶ 215.  No facts are pleaded in

support of this reckless allegation.  The Court should inquire with Plaintiffs' counsel about their

certification that this allegation was "formed after an inquiry" concluding that it rests on

"evidentiary support or, if specifically so identified, will likely have evidentiary support after a

reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(2).

V.      **Insofar as they depend on Kinnison's protected speech, expressive conduct, freedom
        of association, and right to petition the government, Counts I-VI must be dismissed**

        Nearly every reference to Kinnison in the Complaint amounts to a demand that the Court

penalize the exercise of various First Amendment rights.  Compl., ¶¶ 99, 101, 130, 134, 170.

Even if Counts I-VI were properly pleaded, they should be dismissed to the extent the underlying

statutes and claims, as applied to Kinnison, conflict with his constitutional right.

        A.      **Unlawful violence mixed with constitutionally protected assemblies**

        Begin with Plaintiffs' claim that evidence of its Ku Klu Klan Act claim lies in Kinnison's

attendance at, and participation in, political rallies.  Compl., ¶¶ 99, 134.  Presumably, Plaintiffs,

represented as they are by the Lawyers' Committee for Civil Rights Under Law, would not

contest that such activities lie at the core of the First Amendment.  *Jeannette Rankin Brigade v.*

*Chief of Capitol Police*, 342 F. Supp. 575, 585 (D.D.C. 1972).  Perhaps Plaintiffs believe that if a

political rally sees outbreaks of violence, Kinnison's constitutionally protected activities at the

rally lose force in tandem.  They allege that, on January 6, although Kinnison himself committed

no acts of violence, others committed such acts, including against Plaintiffs.  Compl., ¶¶ 156-64.

According to Plaintiffs, then, Kinnison's presence at the Capitol with a group of protesters on

January 6 transformed from expressive conduct explicitly protected by this Court's precedent,

*see Jeannette Rankin Brigade*, 342 F. Supp. at 585 (finding unconstitutional U.S. Capitol

Police's refusal to allow 5,000 protesters on the steps of the Capitol in protest of the Vietnam War), to a violation of the Ku Klux Klan Act, because others committed acts of violence in the same place.

Plaintiffs' claim that assemblies mixed with violence lose constitutional protection has been unanimously rejected by the Supreme Court. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 889 (1982). The NAACP staged a boycott on white merchants in Mississippi. Many of the participants constitutionally picketed and boycotted stores. However, on a number of occasions, some boycotters used violence, firing shots into homes, throwing bricks through windows, slashing car tires, and threatening to assault boycott breakers. 458 U.S. at 904. The white merchants sued the NAACP under common law tort, ultimately securing joint and several liability judgments against all boycotters for the total economic damages—whether or not each member committed acts of violence. *Id.* at 895. The Mississippi Supreme Court rejected the nonviolent boycotters' reliance on the First Amendment, finding that the entire boycott was unlawful because, among other reasons, some of its members used violence. *Id.*

The Supreme Court unanimously reversed the judgment. The Court framed the specific First Amendment issue this way: "The term 'concerted action' encompasses unlawful conspiracies and constitutionally protected assemblies. The 'looseness and pliability' of legal doctrine applicable to concerted action led Justice Jackson to note that certain joint activities have a 'chameleon-like' character." 458 U.S. at 888. The Mississippi Supreme Court erred, the *Claiborne Hardware* Court held, because while boycotters who committed or planned to commit violence lost First Amendment protection, members who picketed, who made "threats of vilification," and who even warned of "broken necks" did not lose constitutional protection with them. *Id.* at 927. The Mississippi Supreme Court was wrong to hold nonviolent members

23

accountable on the theory that the violent members' activities "contributed to" the boycott's

success. *Id.* at 921. Warning of "broken necks" to members of a group some of whom later

engaged in violence did not run afoul of the test in *Brandenburg v. Ohio*, 395 U.S. 444 (1969),

forbidding the proscription of advocacy of the use of force or of law violation except where such

advocacy is directed to inciting or producing imminent lawless action and is likely to incite or

produce such action. *Claiborne Hardware*, 458 U.S. at 928. Nor did the expression of such

violent language impose on the speaker a duty to "repudiate the acts of violence that occurred" in

order to preserve constitutional protection. *Id.* at 929. Liability could not be imposed on the

NAACP itself without a finding that it "authorized . . . or ratified [the] unlawful conduct" on

which liability was based. *Id.* at 931.

Held the Court: "[C]ivil or criminal disabilities may not be imposed on one who joins an

organization which has among its purposes the violent overthrow of the Government, unless the

individual joins knowing of the organization's illegal purposes and with the specific intention to

further those purposes." *Claiborne Hardware*, 458 U.S. at 932. And "the burden of

demonstrating that [violence] colored the entire collective [assembly] . . .is not satisfied by

evidence that violence occurred or even that violence contributed to the success of the [protest]."

*Id.* at 933.

The import of *Claiborne Hardware* here is clear. Plaintiffs' claim that Kinnison should

be held responsible for injuries they suffered in a protest turned riot. But they plead no facts

showing that Kinnison committed acts of violence against anyone, much less against them

specifically. They plead no facts showing that he intended to commit violent acts on January 6.

Their claim that Kinnison's expressive conduct and protected speech is still responsible for

others' acts of violence is barred by the First Amendment.

### B.      Membership in the Three Percenters group

Plaintiffs allege that membership itself in the Three Percenters, a political or fraternal organization, is evidence of a conspiracy to violate the Ku Klux Klan Act and an intent to commit the torts in Counts I to VI.  Compl., ¶¶ 42-45.  They allege the group and its members has among its purposes "extremis[m]" and "anti-government" ideology.  *Id.*, ¶ 42.  The Complaint alleges that Kinnison is a member.  Compl., ¶¶ 44.

Plaintiffs' attempts to impose disabilities on Kinnison by virtue of his membership in a political group are constitutionally retrograde. They are particularly bold when made by an organization holding itself out as a defender of liberties.  Such demands for associational suppression, once the preserve of cold warriors, had been rejected in federal courts for over 60 years.  In a looking-glass reversal of history, they have now been resurrected by public interest organizations that, waving the banner of civil rights, sue indigent criminal defendants for associating with groups in bad odor.

In 1961, the Supreme Court considered application of the Smith Act's clause prohibiting membership in organizations advocating the violent or forceful overthrow of the U.S. government, in particular the Communist Party.  *Scales v. United States*, 367 U.S. 203 (1961). The Court noted that a "blanket prohibition of association with a group having both legal and illegal aims" would present "a real danger that legitimate political expression or association would be impaired." *Id*. at 229.  To punish such association with such a group, there must be "clear proof that a defendant specifically intends to accomplish the aims of the organization by resort to violence." *Id.* (cleaned up).  In *Noto v. United States*, 367 U.S. 290 (1961), the Court emphasized that this intent must be judged "according to the strictest law," for

> otherwise there is a danger that one in sympathy with the legitimate aims of such an
> organization, but not specifically intending to accomplish them by resort to violence,

might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share.

*Id.* at 299-300.

In *Claiborne Hardware*, the Court put it succinctly: "Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence." 458 U.S. at 920.

Because Plaintiffs do not plead that Kinnison specifically intended to commit the acts of violence they allege other members of his group or the crowd committed, their attempts to hold him civilly responsible are barred under *Claiborne Hardware*, *Scales*, and *Noto*.

## VI.     If the Court does not dismiss Counts I-VI, it should dismiss or stay the case with respect to Kinnison under the first-to-file abstention doctrine

In *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), the Supreme Court set out the familiar test for when a federal court may exercise its discretion to deny jurisdiction over a case factually related to an already-filed state case.  With respect to related cases both pending in federal court, the Court held that "though no precise rule as evolved, the general principle is to avoid duplicative litigation." *Id*. at 817.  One factor that counsels against concurrent federal proceedings is "the disposition of property." *Id.* at 819.  In this Circuit it is well established that "[c]onsiderations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously." *Washington Metro Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980). The "first case to file" usually takes precedence.  *Id.*

Here, Plaintiff officers seek damages for their physical and emotional injuries suffered on January 6.  At the same time, the federal government is seeking recovery on the same injuries in hundreds of criminal assault cases.  If Plaintiffs' injuries were proximately caused by a crime of

violence, they would recover in the parallel criminal cases under the Mandatory Victims

Restitution Act, 18 U.S.C. § 3663A(a)(1), or else under § 3663.  Other injured law enforcement

officers who are not a party to this case will recover from the same finite pool of defendant

resources.  To the extent Plaintiffs recover for their injuries here, they are necessarily subtracting

from the funds available for restitution in the parallel criminal cases.  Considerations of the

orderly administration of justice dictate that the zero-sum disposition of these funds be

undertaken in a single court, where the matter was first filed, the criminal proceedings.  At the

very least, to avoid abstention here Plaintiffs should be required to show that the assailants who

caused their alleged injuries are not subject to a criminal claim for restitution.

**Conclusion**

For all of the foregoing reasons, Kinnison moves the Court to dismiss Counts I – VI.

Dated: December 23, 2021                    Respectfully submitted,

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Derek Kinnison*

**<u>Certificate of Service</u>**

I hereby certify that on the 23rd day of December 2021, I filed the foregoing motion with

the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF)

to the following CM/ECF user(s):

Edward G. Caspar
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005

202-662-8390
Email: ecaspar@lawyerscommittee.org

And I hereby certify that I have mailed the document by United States mail, first class

postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ Nicholas D. Smith
Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com