## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CONRAD SMITH, *et al.*

**Plaintiffs**,

v.

DONALD J. TRUMP, *"solely in his personal capacity"*

**Defendants.**

Civil Action No.  1:21-cv-02265-APM

<u>**DEFENDANT ZACHARY REHL'S MEMORANDUM OF LAW**</u>

<u>**IN SUPPORT OF HIS MOTION TO DISMISS THE AMENDED COMPLAINT**</u>

<u>**FOR FAILURE TO STATE A CLAIM UNDER**</u>

<u>**FEDERAL RULES OF CIVIL PROCEDURE RULES 12(b)(1) and 12(b)(6)**</u>

Comes now Defendant Zachary Rehl, and hereby moves to strike the Amended pursuant to Federal Rules of Civil Procedure Rule ("FRCP") Rule 12(b)(1) for lack of standing and Rule 12(b)(6) for failure to state a claim upon which relief may be granted.  Defendant Zachary Rehl respectfully submits this Memorandum of Law in support of said motions.

Jonathon A. Moseley, Esq.
5765-F Burke Centre Parkway #337
Burke, Virginia 22015
Telephone:  (703) 656-1230
Facsimile:  (703) 997-0937
E-mail:  Contact@JonMoseley.com

## **TABLE OF CONTENTS**

INTRODUCTION AND CONTEXT ................................................................... 3
SUMMARY AND STATEMENT OF FACTS RELEVANT TO MOTION....................... 4
GOVERNING LAW ON MOTION TO DISMISS ............................................... 8
GOVERNING LAW FOR INJUNCTIONS ......................................................... 10
ARGUMENT.................................................................................................. 11
    A)  This Lawsuit Is Not About Injuries To Plaintiffs  ............................. 11
    B)  42 U.S.C. § 1985 and 1986 Fail as a Matter of Law ........................ 12
    C)  Defendant Zachary Rehl is Not a State Actor ................................ 14
    D)  Private Conspiracies Inapplicable ................................................... 16
    E)  If 42 U.S.C. §1985 Claim Fails, a claim for 42 U.S.C. §1986 Fails  ............... 17
    F)  Amended Complaint Fails on Proximate Causation Requirements  ............... 18
    G)  Intervening Or Superseding Cause:  No Vicarious Liability Of Any
        Defendant To Any Other Defendant  ............................................. 19
    H)  Claims of Domestic Terrorism Not Applicable  ............................... 21
    I)  Failure to State a Claim under D.C. Bias-Related Crimes Act D.C. Code 22-
    3704(a) in Count III  ..................................................................... 23
    J)  D.C. Bias Related Claims Act by Rioting under D.C .Code § 22-1322 Bias-
    Related Crimes Act (BCRA)  .......................................................... 25
    K)  Plaintiffs Fail to Adequately Plead Battery Act Under Count IV   ............... 27
    L)  Conspiracy Claim Not Sustainable Including Under BCRA   ..................... 28
    M) Complaint Is Barred By Supreme Court's Incitement Standards ................... 30
    N) Lack of Standing  ........................................................................... 35
    O) Respondent Superior and Vicarious Liability  ............................... 35
    P)  Plaintiffs Lack Constitutional Standing to Seek Injunctive Relief ............... 36
    Q) Claim for Assault Not Sustainable ................................................. 35
    R)  Claim for Negligence Not Sustainable  ......................................... 41

CONCLUSION............................................................................................. 44

## I.        INTRODUCTION AND CONTEXT

In a bail hearing for ZACHARY REHL the U.S. District Court for the Eastern District of

Pennsylvania, the prosecution conceded in proper candor:

> **To be sure, the indictment does not allege that Mr. Rehl**
> **engaged directly in violence against officers or**
> **destruction of property * * * .**

*Assistant U.S. Attorney Luke M. Jones, Esq., Page 3, Transcript of Detention/Rule 5 Hearing*
*Before Honorable Richard A. Lloret, United States v. Zachary Rehl, Case No. 2:21-mj-526-1,*
*United States Magistrate Judge, U.S. District Court for the Eastern District of Pennsylvania,*
*March 26, 2021, filed publicly as ECF Docket # 9 in that Court.*

In parallel criminal cases, the U.S. Attorney's office has not cited to any evidence that

ZACHARY REHL ever encountered or interacted with any U.S. Capitol Police officer or any

other law enforcement officer either on January 6, 2021, or in events leading up to the

demonstrations on January 6, 2021.  Although it is probable that Zachary Rehl may have seen a

law enforcement officer or vice versa, no allegation or evidence has emerged that Rehl ever saw

a law enforcement officer on January 6, 2021, or vice versa.[1]

The Amended Complaint weaves an extended and complex conspiracy theory which at

its core seeks to sue those not responsible for the injuries to the Plaintiff police officers and not

to sue those who are actually responsible for assaulting them.  As such, the Amended Complaint

appears to be dismissive of the Plaintiffs in pursuit of ulterior motives that have little to nothing

to do with the interests of the Plaintiffs.

One of the core premises of the Amended Complaint is *"THE BIG LIE"* that 100%

peaceful and incident-free political rallies protected by the First Amendment to the U.S.

Constitution under many names, including "Stop the Steal," are indistinguishable from those few

---

[1]        The undersigned counsel was Zachary Rehl's criminal defense lawyer until he recently
switched to a government-funded court-appointed attorney for this criminal defense.

who battled with police and broke windows.

On the contrary, it has been reported that the FBI has concluded there was no coordinated plan to attack the Capitol.[2]  The Government has also known since May 2021, that all witnesses have agreed that there was no plan to attack the Capitol.  See FBI Interview form 302 of Oath Keeper Person 10, attached hereto as Exhibit 1.

The omnibus Amended Complaint combines so many different Defendants who did so many distinctly different things and so many unknown or unidentified people and so many different actions that the case is extremely difficult to analyze, understand, or respond to.

## II.    SUMMARY AND STATEMENT OF FACTS RELEVANT TO MOTION

ZACHARY REHL is the son and grandson of police officers.  In July 2020, REHL participated in the Back the Blue rally in support of police officers, at the Fraternal Order of Police lodge in Philadelphia.



However, ZACHARY REHL and most if not all of the other Defendants have nothing whatsoever to do with the left-wing conspiracy theories spread in the political world, which are

---

[2] Reuters, *Exclusive-FBI finds scant evidence U.S. Capitol attack was coordinated-sources* (Aug. 10, 2021).  https://www.reuters.com/article/us-usa-capitol-attack-exclusive-idCAKBN2FL10X

echoed here in the Amended Complaint.

Sadly and unfortunately, this Amended Complaint here explains that

> **1.  The eight Plaintiffs in this case are United States Capitol Police officers. Collectively, they have dedicated more than 170 years to their shared mission to protect Congress so that it can carry out its constitutional responsibilities safely and openly. * * * "**

Those members of the U.S. Capitol Police who were injured during violent confrontations with a few – very few – of the estimated 500,000 to 1 million people who came to the District of Columbia on January 6, 2021, deserve to be compensated, to the extent the legal system is capable of making them whole, for the injuries they sustained.  This includes not only these Plaintiffs but any of the other U.S. Capitol Police or Metropolitan Police Department who suffered injuries.  However, Defendant Zachary Rehl cannot even afford a criminal defense lawyer, and undersigned counsel will not be paid for many years for this civil work unless donations can be encouraged.

However, these Plaintiffs are not suing those who actually injured them, at least not in this suit, except as unknown John Does 1-10.   While this Amended Complaint must be dismissed, ZACHARY REHL wishes these officers good luck suing those who are actually responsible, which appears to be none of the Defendants sued herein.   All they need is access to the identification results of the massive video processing projects by the FBI and others, performed on behalf of their employer the U.S. Capitol Police and the Congress.

The Amended Complaint alleges in ¶ 125 that 300 Proud Boys assembled near the Capitol.  In fact, the total number of Proud Boys in Washington, D.C. on January 6, 2021, was around 50 total.  Yet a hysterical calls everyone a Proud Boy even if the person so accused has never met a Proud Boy.  Specifically, the Amended Complaint lacks credibility and plausibility in having no way of knowing who among the crowd was a member of the Proud Boys.

The Chair of the Proud Boys dissociated the organization from those who *as individuals* chose to attend events that day.  Enrique Tarrio told Proud Boys members not to wear any uniform, clothes or insignia ("colors") associated with the Proud Boys.  Thus, Tarrio clarified that anyone going to D.C. was going on their own, not as Proud Boys.  If there ever was a conspiracy, it was terminated by Tarrio's announcement, echoed by other Defendants here.

The allegations here and elsewhere are attenuated and several steps removed from direct, physical interactions with or injuries to the Plaintiffs or any other law enforcement officers.  The claims are several levels removed.  The Amended Complaint alleges only indirect influences by Defendants upon other people – that is, influence of the people who actually did brawl with the Plaintiffs and other law enforcement officers.

Neither Zachary Rehl nor (counsel believes) any of the Defendants here have ever been alleged to have injured, attacked, battered, brawled with or injured any law enforcement officers.  Rather, the claims are of attenuated influences upon those who actually did.  The claims must be analyzed as indirect through comments protected by the First Amendment.  The assumption is that human beings are not independent actors but their actions are dictated by commentary.

There are no direct interactions Zachary Rehl is alleged to have done.  Every allegation and every concept of liability is several steps removed on a plane of influencing others.

Plaintiffs allege that "Defendants' conspiratorial acts directly resulted in violence against the Capitol and the police officers who defended it, including Plaintiffs.  Several Defendants, as well as other attackers, assaulted police officers, broke through the outer police barricades surrounding on the Capitol grounds, and breached the Capitol Building itself." (Id. at ¶ 8)

And they allege that "Defendants assaulted and injured Plaintiffs and others, and caused millions of dollars of damage to the Capitol Building and grounds.

But  while seeking to pretend that a First Amendment rally is the cause of any injuries, the Plaintiffs let slip that the U.S. Park Police issued a permit for the completely peaceful rally that proceeded without incident at the Ellipse earlier in the day.  One had absolutely nothing to do with the other.

In ¶ 86, the Plaintiffs allege that Roger Stone raised funds "for the January 6 event" yet try to tie that to the violence of a very few at the U.S. Capitol 1.2 miles away or to the allegation that Zachary Rehl wore eye protection and other protective gear such as helmets, which may become apparent if one considers Plaintiffs allegations that Mr. Rehl came as security. ¶ 101.

There is some interest by the Plaintiffs and the political class in the outside world of funding, as if it takes money for a handful of hooligans to engage in the crimes of beating on police and breaking windows.  When counsel's late father, formerly a doctor, worked at the Emergency Room of a then (decades ago) redneck area of Florida, that was called Friday night at the ABC liquor store.  Dad invited his sons to witness the patients arriving one  New Year's Eve as an eye-opening experience.  How much money does it take for numbskulls to get in a brawl?

Setting up a 100% perfectly peaceful first-amendment-protected rally at and near the Ellipse with massive jumbotron television screens and banks of high-powered audio speakers (even though the audio speakers were out of synchronization, and interfered with each other, making the individual human speakers almost impossible to hear among the crowds of hundreds of thousands of people), did take some money.  Those who picked up some construction materials and tools from the erection of the scaffolding for the January 20 inauguration did not require any money to commit felonies attacking law enforcement officers using materials laying around the Capitol grounds and one or two (defective) riot shields wrestled from the Plaintiffs and the Plaintiffs' colleagues.  Fund-raising played no role in the 50-250 morons who attacked

the police.

In the Amended Complaint's ¶ 84, the Plaintiffs inadvertently admit and confess that the Ellipse rally held a permit from the U.S. Park Police.  Plaintiffs further admit that Defendant Rehl was there to provide security for Roger Stone.  ¶ 86.

## III.        GOVERNING LAW ON MOTIONS TO DISMISS

In deciding a FRCP Rule 12(b)(6) motion, a court "constru[es] the complaint liberally in the plaintiffs favor, accept[ing] as true all of the factual allegations contained in the complaint, with the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet v. Fame Jeans Inc.*, 525 F.3d 8, 13 (D.C. Cir. 2008) (internal quotations and citations omitted). However, a Rule 12(b)(6) motion to dismiss permits the defendant to test whether the complaint fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b) (6) (2008).  "The court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal, et al v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *see also Agomo v. Williams*, 2003 D.C. Super. LEXIS 31 (D.C. Super. Ct. 2003); *Alexis v. District of Columbia*, 44 F. Supp.2d 331, 336-37 (D.D.C. 1999).  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) ("a plaintiff's obligation [is] to provide the grounds of entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do").

Under either standard, however, Plaintiffs have failed to meet the requirements for preliminary injunctive relief and there is the obvious lack of irreparable injury, as well as the lack of any articulable claim under R.12(b)(6).

Dismissal is appropriate when a complaint, construed with all well-pleaded facts

viewed in the light most favorable to plaintiffs, *see In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 709 (N.D. Tex. 2008), fails "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   Given the many attenuated steps between events involving the Plaintiffs and the obscure, alleged actions against the Defendants, the totality of the allegations and claims are not credible or plausible under *Bell Atl. Corp. v. Twombly*.

It would be different if the Plaintiffs were suing those out-of-control people who directly, actually assaulted them.   But instead the Plaintiffs sue on assumptions about the Defendants remote and many steps removed from any injuries suffered by the Plaintiffs.

There are too many "hops" and too many open-ended "maybes," passive voice claims that somebody did something or somebody said something, which may or may not have been heard by any of the Defendants much less agreed to by any of the Defendants.

Similarly, *Ashcroft v. Iqbal*, 129 S.Ct 1937, 1949 (2009) requires that allegations must be more than just "consistent with" liability.  A plaintiff must allege facts that show that a defendant *actually* *is* liable, not that he could *possibly* be liable.  *Ashcroft v. Iqbal* teaches that if, after allegations are proven at trial, it is still uncertain if liability does attach, then the allegations are insufficient.  The *Iqbal* test is in effect that if the allegations from the Complaint – not adding other evidence not in the Complaint – would leave a fair, unbiased, careful jury unsure at the close of the trial if defendants are liable or not, then the Complaint as filed, at the opening of the lawsuit, is subject to a motion to dismiss for failure to state a claim under FRCP Rule 12(b)(6). If the allegations in the four corners of the Complaint were all proven at trial as pled, but the liability of the defendants would remain unclear without resort to additional facts, then the

Complaint fails to state a claim and is subject to dismissal.

Allegations in the passive voice, such as statements by unidentified people, and assumptions (such as that one person made a statement therefore others must have agreed with the statement, even though they might never have heard the statement made) fail to cross the line between possible liability to plausible liability.  Allegations that some of the Defendants attended a demonstration and *someone* – unidentified – initiated violence fails to satisfy *Twombly* or *Iqbal* to survive a Rule 12(b)(6) motion to dismiss.  Allegations that some unidentified person committed violence, or said something, or did something fail the *Twombly* and *Iqbal* standards.

## IV.        GOVERNING LAW FOR INJUNCTIONS

Plaintiffs are seeking declaratory judgment and one or more injunctions, which appear undefined, but derived from of 42 U.S.C. §§ 1985(1) and 1986.   To the extent any of these particular plaintiffs have a judicially cognizable claim for a declaratory action, at most it would be against the Senate and the House of Representatives. After all, it is Plaintiffs' employment relations to provide security for the House and the Senate.

"When considering a declaratory judgment action, a district court must engage in a three-step inquiry. The court must ask:

> (1) whether an actual controversy [of legal interests] exists between the parties in the case;
>
> (2) whether it has authority to grant declaratory relief;
>
> (3) whether to exercise its broad discretion to decide or dismiss a declaratory judgment action." F*rye v. Anadarko Petroleum Corp.*, 9553 F.3d 285, 293-94 (5th Cir. 2019) (internal citations and quotation marks omitted).
>
> With respect to the first inquiry, the Supreme Court has required that a dispute be "definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts."

*MedImmunte, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (internal quotation marks and alteration omitted).*

And the standard for Injunctive Relief includes, "[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)(*citing* 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d ed. 1995). "A plaintiff seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that the plaintiff is likely to suffer irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiffs favor; and (4) that an injunction is in the public interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992)).

## V.  ARGUMENT

### A)  This Lawsuit Is Not About Injuries To Plaintiffs

This lawsuit is plainly filed for an improper purpose to use these noble police officers as pawns in a partisan political power struggle to advance other people's agendas, goals, interests, and benefit.  The lawsuit is almost entirely about whether or not the 2020 Presidential election was stolen.

Political beliefs cannot be a basis for liability.   A main theme of the Plaintiffs' law firm's lawsuit is that the Defendants and others engaged in their Constitutionally-protected rights of free speech, but the Plaintiffs and others just don't like what the Defendants had to say.

Ultimately, 20 states – 40% of the Union – filed a lawsuit in the U.S. Supreme Court *Texas v. Pennsylvania*, 592 U.S. ___ (2020), because the 2020 presidential election violated the requirements of Article II, Section 2 of the U.S. Constitution, authorizing only State legislatures

to set the rules and procedures for Presidential (Electoral College) elections.

Forty (40) percent of the States of the Union agreed with these Defendants and disagreed with the Plaintiffs' left-wing law firm.  The Plaintiffs have as much right to disagree politically with these Defendants as these Defendants have the right to disagree with these Plaintiffs.

However, political disagreement – or even the frantic moral certitude of the Plaintiffs that they are right and others are wrong – cannot be the basis of liability in a civil lawsuit.

Suppressing the expression of political beliefs is not a legitimate purpose or goal of this lawsuit and the improper purpose calls for the dismissal of this case including as sanctions.  It does not matter how really, really strongly the Plaintiffs' counsel and others disagree politically with the Defendants.  This Court cannot tolerate the Plaintiffs suing over political disputes.

**B)**     **42 U.S.C. § 1985 and 1986 Fail as a Matter of Law**

Plaintiffs brought a claim under the first clause, which, as a preliminary matter is limited to constitutional violations by state actors.

> (1) Preventing officer from performing duties. If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, *any person from accepting or holding any office,* trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

42 USCS § 1985 (1)

In *Stern v. United States Gypsum, Inc.* the Court explained in relation to a cause of action based in past injuries that that, "Construction of § 1985(1) to apply a federal damage remedy to such facts would raise grave constitutional questions, because "laws which actually affect the

exercise of these vital [First Amendment] rights" need not do so directly and overtly to be adjudged constitutionally offensive. *Id. at* 134.

> "…Any injuries to Stern from appellants' alleged conspiracy resulted from the overt acts of communicating or causing to be communicated complaints about Stern's performance of his official duties to his IRS superiors. We have previously expressed our agreement with appellants that the evils addressed by the Forty-Second Congress in enacting the Act of April 20, 1871, were of a meaningfully different nature, and that there is no indication any member of that Congress ever contemplated the application of what is now § 1985(1) to such facts as Stern's complaint alleges…
>
> *Id*. at 1342.

The Court in *Stern* held, "Because the count of [Plaintiff]'s complaint drawn under § 1985(1) states no actionable federal claim and no other basis for federal jurisdiction exists, the order of the district court is reversed, and this case is remanded to the district court with direction to dismiss the complaint." 547 F.2d 1329, 1346, (7th Cir. 1977) (further citations omitted).

The Stern Court explained clause (1) of 42 U.S.C. §1985, and stated, that the First Amendment cannot be avoided[3]. 'The public criticism of governmental policy and those

---

[3] The Supreme Court has repeatedly extended First Amendment protection to statements that, in context, do not reasonably state or imply defamatory falsehoods in the requisite sense. In *Greenbelt*, 398 U.S. at 13-15, the Court concluded that use of the word "blackmail" to describe the plaintiff's hard-nosed negotiating tactics could not reasonably be understood to mean the plaintiff had committed a criminal offense…

> And in *Hustler Magazine*, 485 U.S. at 50, the Court held that an ad parody depicting the Rev. Jerry Falwell in an incestuous relationship with his mother could not support an emotional distress claim because the offending speech "could not reasonably have been interpreted as stating actual facts about the public figure involved." So instructed, this court held in *Weyrich*, 235 F.3d at 624-25, that a political magazine's statement that a conservative leader "began to suffer bouts of pessimism and paranoia" following his successful rise to power was not actionable because, in context, the description was merely "rhetorical sophistry, not a verifiably false attribution in fact of a 'debilitating mental condition'" as the plaintiff had contended.

responsible for government operations is at the very core of the constitutionally protected free speech area.' S*tern v. United States Gypsum, Inc.*, 547 F.2d 1329, 1342-1343, (1977) (*citing Rosenblatt v. Baer*, 383 U.S. 75, 85, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)).

### C)  **Defendant Zachary Rehl is Not a State Actor**

The Supreme Court in *Bray v. Alexandria Women's Health Clinic*, as in *Carpenters*[4], as in *Morrison*[5], repeatedly held that the federal tort actions against private individuals fail, *"[a]s we have consistently held 'The Fourteenth Amendment protects the individual against state action, not against wrongs done by individuals,*[6]*"* which was the holding in *Stern v. United States Gypsum*.

'Private actors cannot violate, and thus cannot conspire to violate, another person's First, Fourth, or Fourteenth Amendment rights.'[7]

> "It is a commonplace that rights under the Equal Protection Clause
> itself arise only where there has been involvement of the State or of
> one acting under the color of its authority. The Equal Protection
> Clause 'does not . . . add anything to the rights which one citizen has

---

*Farah v. Esquire Magazine*, 736 F.3d 528, 535-536, 407 U.S. App. D.C. 208, 215-216, (D.C. Cir. 2013).

[4] *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 831-832, 103 S. Ct. 3352, 3357-3358, 77 L. Ed. 2d 1049, 1056, (1983).

[5] *United States v. Morrison*, 529 U.S. 598, 620-621, 120 S. Ct. 1740, 1755-1756, 146 L. Ed. 2d 658, 678, (2000).

[6] *"As we have consistently held 'The Fourteenth Amendment protects the individual against state action, not against wrongs done by individuals.' Williams I, 341 U.S., at 92 (opinion of Douglas, J.)"* United States v. Price, 383 U.S. 787, 799 (1966).
*United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 831-832, 103 S. Ct. 3352, 3357-3358, 77 L. Ed. 2d 1049, 1056, (1983).

[7]  "Construction of § 1985(1) to apply a federal damage remedy to such facts would raise grave constitutional questions, because "laws which actually affect the exercise of these vital [First Amendment] rights" need not do so directly and overtly to be adjudged constitutionally offensive.  *United States Gypsum, Inc*., 547 F.2d at 1343 (*citing United Mine Workers, supra,* at 222; *Bates v. City of Little Rock*, 361 U.S. 516, 523, 4 L. Ed. 2d 480, 80 S. Ct. 412 (1960)).

under the Constitution against another.' <u>United States v. Cruikshank</u>,
92 U.S. 542, 554-555.

*Id.*

In addressing such conspiracies under 1985(3), the Supreme Court explained, "[t]he Court of Appeals accordingly erred in holding that § 1985(3) prohibits wholly private conspiracies to abridge the right of association guaranteed by the First Amendment. *United Bhd. of Carpenters & Joiners, Local 610, 463 U.S. 831-832.*

In *Bray*, the Supreme Court held that Fourth and Fourteenth Amendment rights cannot be privately impaired. And "[a]s JUSTICE BLACKMUN has cogently put it, the class "cannot be defined simply as the group of victims of the tortious action." 506 U.S. 263, 278 (1993). The *Bray* Court further held and explained the fundamental predicate to its holding, "[t]respassing upon private property is unlawful in all States, as is, in many States and localities, intentionally obstructing the entrance to private premises. These offenses may be prosecuted criminally under state law, and may also be the basis for state civil damages. They do not, however, give rise to a federal cause of action simply because their objective is to prevent the performance of abortions, any more than they do so (as we have held) when their objective is to stifle free speech." *Bray*, 506 U.S. at 286.

> "…Foremost among these limitations is the time-honored principle that the Fourteenth Amendment, by its very terms, prohibits only state action. The principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful."

*United States v. Morrison, 529 U.S. 598, 620-621, 120 S. Ct. 1740, 1755-1756, 146 L. Ed. 2d 658, 678, (2000) (citing Shelley v. Kraemer, 334 U.S. 1, 13, 92 L. Ed. 1161, 68 S. Ct. 836, and n. 12 (1948)).*

Similarly, the Supreme Court further upheld the unconstitutional infringement of intruding upon a state's criminal jurisdiction when it found that the federal act, *the Chemical*

*Weapons Convention Implementation Act* could not apply to a local crime.  *See Bond v. United States*, 572 U.S. 844, 134 S. Ct. 2077, 189 L. Ed. 2d 1, (2014) (emphasis added).

Nowhere in the Complaint does it suggest that Mr. Rehl, or anyone he is alleged to be "close to," are State Actors.  Further, the agreements alleged are not specific as to who agreed with who to do what exactly.  (ECF 1, ¶¶ 153-155).

And Plaintiffs suggestion that election integrity concerns were raised in cities with a higher percentage of Black residents compared to a city with a lower percentage is insufficient as a matter of law to support Plaintiff's claim of an invidious intention to discriminate. *See Chambers v. Omaha Girls Club*, 629 F. Supp. 925, 941–42 (D. Neb. 1986) ("[T]here is a requirement that there be a *mens rea* present, i.e., that the conspirators have a particular hatred of the protected group. . . . Evidence of adverse impact, if any, simply does not fulfill the mens rea requirement necessary to show irrational or invidious class discrimination.").

Furthermore, the fact that some individuals within the group may have protected characteristics, such as race, does not transform the group itself into a protected class. *See Jews for Jesus, Inc.* v. *Jewish Cmty. Relations  Council  of NY., Inc.,* 968 F.2d  286,292  (2d Cir. 1992)(a "racially diverse society ... cannot, by definition, constitute a racial class").  "The plaintiffs do not allege that the defendants were motivated by a class-based, invidiously discriminatory animus. … In the absence of pleading this essential element, the plaintiffs' allegations are insufficient to state a valid Section 1985 claim.   *Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 121, (D.D.C. 2012)(internal citations omitted).

### D)  **Private Conspiracies Inapplicable**

Under 42 U.S.C. § 1985, only the third clause (3) has been recognized as protecting the constitutional rights of "equal protection of the laws" and "equal privileges and immunities

under the laws" *against private conspiracies* in limited contexts. *Griffin v. Breckenridge*, 403 U.S. 88, 101-102, 91 S. Ct. 1790, 1798, 29 L. Ed. 2d 338, 348, (1971). 'But we observed that the section does not expressly refer to the Fourteenth Amendment and that "The broader scope of § 1985(3) became even more apparent when we [in Griffin] explained that the conspiracy at issue was actionable because it was aimed at depriving the plaintiffs of rights protected by the Thirteenth Amendment and the right to travel guaranteed by the Federal Constitution."' *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 832, 103 S. Ct. 3352, 3358, 77 L. Ed. 2d 1049, 1056-1057, 1983.

### E)    If 42 U.S.C. §1985 Claim Fails, a claim for 42 U.S.C. §1986 Fails

Plaintiffs claim generally that Defendants each "[knew] that the wrongs conspired to be done and mentioned in section 1985 are about to be committed, has the power to prevent or aid in preventing these wrongs, and yet neglects or refuses to help them."  (ECF 1, ¶ 158-166).

With regard to Zachary Rehl, however, as a private individual, there are no allegations that Rehl would have any ability to prevent or aid in preventing any wrongs.

First, the wrongs at issue are unclear but appear to be limited only to a small number of individuals brawling with police officers and damaging property, allegedly encouraged by the First Amendment comments of the Defendants here.

Even conclusory allegations without facts that Rehl could have prevented others still unknown to him today (except for two court cases where two people he had never known pled guilty) fail the requirements of plausibility and credibility of *Twombly* and *Iqbal.*

While perhaps other Defendants might have acted to prevent the "wrong" – which is still doubtful – Rehl clearly had no such power.

However, it is "[b]ecause [Plaintiff] does not have a valid § 1985 claim, he does not have a valid § 1986 claim.  This court has held that a valid § 1985 claim is a prerequisite to a § 1986 claim." *Von Drake v. St Paul Travelers Ins. Co.*, 353 Fed. Appx. 901, 905, (5th Cir. 2009) (citing *Bryan v. City of Madison*, 213 F.3d 267, 276 (5th Cir. 2000).

And there are no specific allegations showing Mr. Rehl failed to help when the allegations show he is not charged with any violence, and, in fact, went to the aid of other officers in the Capitol.

**F)**     **Amended Complaint Fails on Proximate Causation Requirements**

While the concept of proximate cause is somewhat amorphous, see Keeton 279, the common law is clear that certain intervening events — otherwise called "superseding causes" — are sufficient to sever the causal nexus and cut off all liability. See *Exxon Co., U. S. A. v. Sofec, Inc.*, 517 U. S. 830, 837 (1996) ("`The doctrine of superseding cause is ... applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable'" (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-166 (2d ed. 1994))); 57A Am. Jur. 2d, Negligence § 790, p. 701 (1989) ("The intervention, between the negligence of the defendant and the occurrence of an injury to the plaintiff, of a new, independent, and efficient cause, or of a superseding cause, of the injury renders the negligence of the defendant a remote cause of the injury, and he cannot be held liable, notwithstanding the existence of some connection between his negligence and the injury").

The mere existence of, or organizing, a demonstration does not establish proximate causation of some rogue attendees starting fights with police.

On September 17, 2021, a new Chief of the USCP, Thomas Manger, as one of the government entities bringing the complaint against these Defendants in this case, admitted and confessed among other things, at time stamp 00:18:10:

> **"In terms of how we engage, we handle multiple demonstrations at the Capitol and Supreme Court every day. Every day. Multiple demonstrations."**

"USCP News Conference on "Justice for J6" Rally" was recorded and broadcast live by C-SPAN, and is permanently recorded for viewing at:   **https://www.c-span.org/video/?514736-1/us-capitol-police-prepare-threats-violence-justice-j6-rally**

And again at time stamp 00:20:09 --

> **"We have multiple demonstrations every day."**

Therefore, the mere presence of demonstrators or the existence of a demonstrator cannot be a credible proximate cause.  Demonstrations at and around the U.S. Capitol – admits the then Chief of USCP – are routine and do not by themselves result in any violence or disruption.

In ¶ 131, the Amended Complaint alleges:  "The attackers closely followed and responded to TRUMP's speech and tweets before and during the Capitol Attack."  This also strains *Twombly* credibility, given that those demonstrating outdoors were not home watching television and with massive crowds cell phone service is usually overwhelmed and jammed.

**G)     Intervening Or Superseding Cause:  No Vicarious Liability Of Any Defendant To Any Other Defendant**

Moreover, the Plaintiffs fail to allege proximate causation by the other Defendants, where a few people having no relationship to any of these Defendants showed up and assaulted police and broke some windows at the U.S. Capitol.  The assumption that the relatively tiny reach of any comments by this Defendant proximately caused any one whom the Defendant does not know to show up and assault police is vulnerable to a break in causation.

The condescending and dehumanizing core premise of the lawsuit is that comments by Trump or others "caused" others to act as unthinking, mind-numbed drones without the capacity for individual decision making.  The Amended Complaint fails in alleging that any comments "caused" anyone to do anything.

For example, in ¶ 91, the Plaintiffs allege that some website by unidentified people **www.theDonald.win** posted things about the peaceful rally on January 6 at the Ellipse.  Yet, there is no proximate causation alleged between comments at a website with no alleged relationship to these Defendants and any injuries complained of by these Plaintiffs.

In ¶ 131, the Amended Complaint alleges:  "The attackers closely followed and responded to TRUMP's speech and tweets before and during the Capitol Attack."  This also strains *Twombly* credibility, given that those demonstrating outdoors were not home watching television and with massive crowds cell phone service is usually overwhelmed and jammed.

**H)      Claims of Domestic Terrorism Not Applicable.**

D.C. law provides that:

> "For the purposes of this chapter, the term: (1) "Act of terrorism" means an act or acts that constitute a specified offense *as defined in paragraph (8) of this section*":
> *(8)* "Specified offense" means:
> (A) Section 22-2101 (Murder in the first degree);
> (B) Section 22-2102 (Murder in the first degree — placing obstructions upon or displacement of railroads);
> (C) Section 22-2106 (Murder of law enforcement officer or public safety employee);
> (D) Section 22-2103 (Murder in the second degree);
> (E) Section 22-2105 (Manslaughter);
> (F) Section 22-2001 (Kidnapping and conspiracy to kidnap);
> (G) Section 22-401 (Assault with intent to kill only);
> (H) Section 22-406 (Mayhem or maliciously disfiguring);
> (I) Section 22-301 (Arson);
> (J) Section 22-303 (Malicious burning, destruction, or injury of another's property, if the property is valued at $500,000 or more); or

(K) An attempt or conspiracy to commit any of the offenses listed in subparagraphs (A) through (J) of this paragraph.

 and that are intended to:

(A) Intimidate or coerce a significant portion of the civilian population of:
(i) The District of Columbia; or
(ii) The United States; or
(B) Influence the policy or conduct of a unit of government by intimidation or coercion.
(2) "Biological agent" means any microorganism, virus, infectious substance, or biological product that may be engineered as a result of biotechnology, or any naturally occurring or bioengineered component of any such microorganism, virus, infectious substance, or biological product, capable of causing:
(A) Death, disease, or other biological malfunction in a human, an animal, a plant, or another living organism;
(B) Deterioration of food, water, equipment, supplies, or material of any kind; or
(C) Deleterious alteration of the environment.
(3) "Hoax weapon of mass destruction" means any device or object that by its design, construction, content, or characteristics, appears to be or to contain, or is represented to be or to contain a weapon of mass destruction, even if it is, in fact, an inoperative facsimile or imitation of a weapon of mass destruction, or contains no weapon of mass destruction.
(4) "Material support or resources" means:
(A) Expert services or assistance;
(B) Currency, financial securities or other monetary instruments, financial services, lodging, training, false documentation or identification, equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets; or
(C) A weapon of mass destruction.
(5) "Nuclear material" means material containing any:
(A) Plutonium;
(B) Uranium not in the form of ore or ore residue that contains the mixture of isotopes as occurring in nature;
(C) Enriched uranium, defined as uranium that contains the isotope 233 or 235 or both in such amount that the abundance ratio of the sum of those isotopes to the isotope 238 is greater than the ratio of the isotope 235 to the isotope 238 occurring in nature; or
(D) Uranium 233.
(6) "Provision of material support or resources for an act of terrorism" means the act of providing material support or resources to a person or an organization with the purpose or knowledge that the material

support or resources will be used, in whole or in part, to plan, prepare, or carry out an act of terrorism, or to flee after committing an act of terrorism.

(7) "Solicitation of material support or resources to commit an act of terrorism" means the act of raising, soliciting, or collecting material support or resources with the purpose or knowledge that such material support or resources will be used, in whole or in part, to plan, prepare, or carry out an act of terrorism, or to flee after committing an act of terrorism.

D.C. Code § 22-3152 (emphasis added).

There are no allegations that contemplate the relevant sections of this statute to include

specified criminal offenses, with separately defined specific intent, required in relation to the

conviction of said enumerated actions.


**I)      Failure to State a Claim under D.C. Bias-Related Crimes Act
          D.C. Code 22-3704(a) in Count III**

The laws of the District of Columbia provide that:

§ 22–3704. Civil action.

**(a)** Irrespective of any criminal prosecution or the result of a criminal prosecution, any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, homelessness, disability, matriculation, or political affiliation of a victim of the subject designated act shall have a civil cause of action in a court of competent jurisdiction for appropriate relief, which includes:

**(1)** An injunction;
**(2)** Actual or nominal damages for economic or non-economic loss, including damages for emotional distress;
**(3)** Punitive damages in an amount to be determined by a jury or a court sitting without a jury; or
**(4)** Reasonable attorneys' fees and costs.
**(b)** In a civil action pursuant to subsection (a) of this section, whether an intentional act has occurred that demonstrates an accused's prejudice based on the actual or perceived color, religion, national origin, sex, age, marital status, personal

appearance, sexual orientation, family responsibilities, homelessness, disability, matriculation, or political affiliation of a victim of the subject designated act shall be determined by reliable, probative, and substantial evidence.

**(c)** The parent of a minor shall be liable for any damages that a minor is required to pay under subsection (a) of this section, if any action or omission of the parent or legal guardian contributed to the actions of the minor.

The Plaintiffs here allege that the allegations of the conduct of the Defendants, if those allegations were true, come within the D.C. Hate-Crimes Act based upon the political affiliations of a victim.

In this case, however, there are no allegations as to what the political affiliations are of any of the Plaintiffs are.

There are no allegations that the Defendants knew the political affiliations of any of the Plaintiffs.

There are no allegations that the Plaintiffs were treated differently from anyone else based upon their political affiliations or out of any prejudice towards them based upon their political affiliations.

The Plaintiffs do not have standing to assert the Act on behalf of anyone else, but there are no allegations that would support the Act involving anyone else either.

Meanwhile, although the Plaintiffs do not base their claim upon race, the Amended Complaint does not allege any act based upon the race of any person. On the contrary, the Plaintiffs allege that some Plaintiffs are Black and some Plaintiffs are White, yet they allege all being treated exactly the same, regardless of their race.

Further, Plaintiffs have not pled a predicate "designated act" as required under the D.C. Hate Crimes Act. "Under the hate crime statute, Plaintiffs must be the victim of a "designated act" perpetrated by Defendants. D.C. Code § 22-3704(a). The D.C. Code defines "designated

act" broadly as "a criminal act, including arson, assault, burglary, injury to property, kidnapping, manslaughter, murder, rape, robbery, theft, or unlawful entry, and attempting, aiding, abetting, advising, inciting, conniving, or conspiring to commit arson, assault, burglary, injury to property, kidnapping, manslaughter, murder, rape, robbery, theft, or unlawful entry." D.C. Code § 22-3701(2)(*Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 56, D.D.C. 2019).

**J)** **D.C. Bias Related Claims Act by Rioting under D.C .Code § 22-1322 Bias-Related Crimes Act (BCRA)**

Again, under Count III, the Plaintiffs claim that "Defendants are liable under BRCA in three independent ways, each demonstrating their prejudice: Defendants (1) engaged in acts of terrorism in violation of the D.C. Anti-Terrorism Act of 2002, D.C. Code § 22-3153; (2) engaged in rioting or incited a riot, in violation of D.C. Code § 22-1322; or (3) engaged in destruction of property in violation of D.C. Code § 22-303."

To begin, there is actually nothing in the text of D.C. § 22–3704 which permits the Plaintiffs to transform a claim of rioting under D.C. Code § 22-1322 (which does not provide for a civil cause of action) into a Bias Related Claims Act civil action under D.C. Code § 22–3704.

In order for violating D.C. Code 22-1322 to be an "intentional act" for which a civil cause of action could be actionable under D.C. Code 22-3704, it would have to be an "intentional act" which is "based on the actual or perceived race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, homelessness, disability, matriculation, or political affiliation…."

Again, there are no allegations that the Defendants ever knew the "race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, homelessness, disability, matriculation, or political affiliation" of any of the Plaintiffs or of anyone else involved, or that the Defendants treated the

Plaintiffs or any other person differently based on those characteristics.  `Indeed, the Plaintiffs describe themselves as being of different races, yet allege to all being treated the same (if badly).

Moreover, there are no allegations that Zachary Rehl engaged in any rioting.

Moreover, there are no allegations that Zachary Rehl ever "willfully incite[d]  or urge[d] other persons to engage in a riot."  Once again, the difference between the expression of opinions under free speech and incitement is tightly and narrowly controlled by *Brandenburg v. Ohio*, 395 U.S. 444 (1969) and *National Association for the Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) and their progeny.   Inciting a riot is most definitely not a subjective evaluation in the eye of a plaintiff, but a tightly-limited and constrained term of art in the eyes of the U.S. Supreme Court.

There are no allegations in the Amended Complaint within the tight constraints of the U.S. Supreme Court that Zachary Rehl ever "willfully incite[d]  or urge[d] other persons to engage in a riot."

The fact that unfortunately a very small riot consisting of a very tiny minority of the demonstrators present in D.C. that day is not enough to conclude that anyone – much less Zachary Rehl – incited it.

For example, whereas other Defendants – whom Defendant Zachary Rehl believe to also be innocent and falsely smeared -- are alleged to have broadcast widespread announcements and invitations for supporters to come to lawfully, peacefully, and constitutionally demonstrate on January 5-6, 2021, Defendant Zachary Rehl is not alleged to have any followers to hear any of the misrepresented quotes allegedly made by him (with no citation as to when or where those snippets were made, the context in which they were made, etc.)  The allegations of the Amended Complaint at most suggest that some of the Defendants (i.e., the Oath Keeper Defendants) said

things *to each other* but do not allege that anyone other than the Defendants themselves actually heard or read anything that the Proud Boys said or wrote.

Further, Plaintiffs have not pled a predicate "designated act" as required under the D.C. Hate Crimes Act.  "Under the hate crime statute, Plaintiffs must be the victim of a "designated act" perpetrated by Defendants. D.C. Code § 22-3704(a).  The D.C. Code defines "designated act" broadly as "a criminal act, including arson, assault, burglary, injury to property, kidnapping, manslaughter, murder, rape, robbery, theft, or unlawful entry, and attempting, aiding, abetting, advising, inciting, conniving, or conspiring to commit arson, assault, burglary, injury to property, kidnapping, manslaughter, murder, rape, robbery, theft, or unlawful entry." D.C. Code § 22-3701(2)(*Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 56, D.D.C. 2019).

### K)      Plaintiffs Fail to Adequately Plead Battery Act Under Count IV

> "Battery is an intentional tort. 'Intent and negligence are regarded as mutually exclusive grounds for liability. As the saying goes, there is no such thing as a negligent battery.' 1 DOBBS, LAW OF TORTS § 26 at 51 (2001)."

*District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003) (citing to *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C.1997)).

"The defendants are correct that [Defendant's] presence at the shooting, without more, cannot render him liable for assault and battery." *Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 107, (D.D.C. 2011) (*citing Chen v. District of Columbia*, 808 F. Supp. 2d 252, (D.D.C. 2011) (granting summary judgment for defendant on assault and battery claim because "there is no evidence in the record before the Court that [the defendant] ever touched [the plaintiff] or caused her to be touched" nor that the defendant "ever attempted or threatened to harm [the plaintiff] physically"); *(Halberstam v. Welch*, 705 F.2d at 481).

> A defendant may be held liable for assault against another if "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent

> apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." A defendant may be held liable for battery if the above "requirements of (a) are met and (b) an offensive contact with the person of the other directly or indirectly results."

*Rude v. Adeboyeku, 552 F. Supp. 2d 32, 35, (D.D.C. 2008)(citing Rogers v. Loews L'Enfant Plaza Hotel, 526 F. Supp. 523, 529 (D.D.C. 1981) (quoting Restatement (Second) of Torts § 21 (1979)) (interpreting District of Columbia law)(quoting Restatement (Second) of Torts § 18 (1979)) (interpreting District of Columbia law).*

Plaintiffs have not adequately pled a claim for assault and battery against Mr. Rehl, as there is no allegation that Mr. Rehl ever touched any of the Plaintiffs or "ever attempted or threatened to harm any of the Plaintiffs.  (ECF 91 ¶¶184, 195.)  Instead the claims appear to be based on an agency relationship with the Proud Boys.  (ECF 1 ¶¶ 33 and 37.

Nevertheless, the facts Plaintiffs rely on are based in principles in negligence including "agency" and "vicarious liability" as the predicate action where Mr. Rehl is actually referenced. (See ECF 1, at par. 164-165).  The Complaint explicitly alleges that Defendants, as a group, "intended" to create victims of "Democratic members of Congress, some Republican members of Congress, and Vice President Pence, whom Defendants perceived to be endorsing Democrats Joe Biden and Kamala Harris by announcing the election results"— not Plaintiff police officers. (ECF 1 ¶ 173 (emphasis added)).

Plaintiffs also makes a claim for punitive damages, which in DC, are available based on intentional torts, but Plaintiffs have not plead anywhere close to the factual predicate necessary as to Mr. Rehl' alleged conduct for punitive damages.  (See ECF 1, generally). In the District of Columbia, '…Such malice is shown by commission of a tortious act "accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's right[s], or other circumstances tending to aggravate the injury."' *Flythe v. District of Columbia*, 2016 U.S. Dist. LEXIS 115033, *33 (*citing Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C.

1995). (*quoting Wash. Med. Ctr. v. Holle*, 573 A.2d 1269, 1284 (D.C. 1990)) (internal quotation mark omitted).  As such, the unfounded claim for punitive damages should also be dismissed for failure to state a claim.

### L)      Conspiracy Claim Not Sustainable Including Under BCRA

Further, the conspiracy claim fails because Plaintiffs' claims that Mr. Rehl "breached the Capitol on January 6" and that Defendants had a common goal are conclusory allegations, insufficient to withstand a motion to dismiss.  (ECF 1¶ 37).

To establish the existence of an agreement, the "plaintiff must set forth more than just conclusory allegations of [the] agreement." A plaintiff must set forth more than just conclusory allegations of an agreement to sustain a claim of conspiracy against a motion to dismiss. " *Graves v. United States*, 961 F. Supp. 314, 320 (D.D.C. 1997) (dismissing claim where plaintiff merely alleged that his former employer "colluded" with the Department of Education to keep him underemployed, without putting forth "any facts showing the existence or establishment of an agreement"); *see also Estate of Phillips v. District of Columbia*, 257 F. Supp.2d 69, 83 (D.D.C. 2003) (dismissing claim where plaintiffs failed to specify that defendants how the defendants "acted in concert"); *Davey v. Tomlinson*, 627 F. Supp. 1458, 1462 (E.D. Mich. 1986) (dismissing claim where plaintiff made no allegations of specific acts or the means by which defendants were alleged to have conspired, other than arguing "in conclusory fashion that defendants conspired to deprive him of his constitutional rights").  *Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004); see also *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 51-52, (D.D.C. 2019).

While Plaintiffs generally allege the existence of an agreement, they provide no facts to support its existence.   The Complaint explicitly alleges that "The intended victims of

Defendants' were Democratic members of Congress, some Republican members of Congress, and Vice President Pence, whom Defendants perceived to be endorsing Democrats Joe Biden and Kamala Harris by announcing the election results"— not Plaintiff police officers. Compl., ¶ 173(emphasis added).

### M)   Complaint Is Barred By Supreme Court's Incitement Standards

In effect, the Amended Complaint seeks every possible way of alleging incitement without actually using the word "incitement" so as to evade the U.S. Supreme Court's clear standards under Brandenburg

The vast majority of the Amended Complaint in its allegations and causes of action are barred by mis-construction of statutes in violation of *Brandenburg v. Ohio*, 395 U.S. 444 (1969) and *National Association for the Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) and their progeny.  The Amended Complaint tries to avoid using the words "incite" or "incitement" because the Plaintiffs know that their causes of action cannot survive constitutional scrutiny.  However, the main themes of the Amended Complaint are prohibited by *Brandenburg v. Ohio*, 395 U.S. 444 (1969):

> [One of the allegations complained of in *Brandenburg*]
>
> This is an organizers' meeting. We have had quite a few members here today which are -- we have hundreds, hundreds of members throughout the State of Ohio. I can quote from a newspaper clipping from the Columbus, Ohio, Dispatch, five weeks ago Sunday morning. The Klan has more members in the State of Ohio than does any other organization. We're not a revengent organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken.

We are marching on Congress July the Fourth, four hundred thousand strong. From there, we are dividing into two groups, one group to march on St. Augustine, Florida, the other group to march into Mississippi. Thank you.

* * *

But *Whitney* has been thoroughly discredited by later decisions. *See Dennis v. United States,* 341 U.S. 494, at 507 (1951). These later decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.[n2] As we said in *Noto v. United States,* 367 U.S. 290, 297-298 (1961),

the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence is not the same as preparing a group for violent action and steeling it to such action.

*See also Herndon v. Lowry,* 301 U.S. 242, 259-261 (1937); *Bond v. Floyd,* 385 U.S. 116, 134 (1966). A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control. *Cf. Yates v. United States,* 354 U.S. 298 (1957); *De Jonge v. Oregon,* 299 U.S. 353 (1937); *Stromberg v. California,* 283 U.S. 359 (1931). *See also United States v. Robel,* 389 U.S. 258 (1967); *Keyishian v. Board of Regents,* 385 U.S. 589 (1967); *Elfbrandt v. Russell,* 384 U.S. 11 (1966); *Aptheker v. Secretary of State,* 378 U.S. 500 (1964); *Baggett v. Bullitt,* 377 U.S. 360 (1964).

Measured by this test, Ohio's Criminal Syndicalism Act cannot be sustained. The Act punishes persons who "advocate or teach the duty, necessity, or propriety" of violence "as a means of accomplishing industrial or political reform"; or who publish or circulate or display any book or paper containing such advocacy; or who "justify" the commission of violent acts "with intent to exemplify, spread or advocate the propriety of the doctrines of criminal syndicalism"; or who "voluntarily assemble" with a group formed "to teach or advocate the doctrines of criminal

syndicalism." Neither the indictment nor the trial judge's instructions to the jury in any way refined the statute's bald definition of the crime in terms of mere advocacy not distinguished from incitement to imminent lawless action.**[n3]**

Accordingly, we are here confronted with a statute which, by its own words and as applied, purports to punish mere advocacy and to forbid, on pain of criminal punishment, assembly with others merely to advocate the described type of action.**[n4]** Such a statute falls within the condemnation of the First and Fourteenth Amendments. The contrary teaching of *Whitney v. California, supra,* cannot be supported, and that decision is therefore overruled.

*Reversed.*

*Brandenburg v. Ohio*, 395 U.S. 444, 447-449 (1969)

Therefore, the Plaintiffs cannot hold random Defendants responsible for the actions of others based upon political opinions expressed in public. Those who actually assaulted these officers are responsible. These Defendants are not.

Each of these elements of the boycott is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments.**43** The black citizens named as defendants in this action banded together and collectively expressed their dissatisfaction with a social structure that had denied them rights to equal treatment and respect. As we so recently acknowledged in *Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 294, 102 S.Ct. 434, 436, 70 L.Ed.2d 492, "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." We recognized that "by collective effort individuals can make their views known, when, individually, their voices would be faint or lost." *Ibid.* In emphasizing "the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues," *id.*, at 295, 102 S.Ct., at 437, we noted the words of Justice Harlan, writing for the Court in *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, **460**, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488:

"Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced

by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly."

THE CHIEF JUSTICE stated for the Court in *Citizens Against Rent Control* : "There are, of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them." 454 U.S., at 296, 102 S.Ct., at 437.

The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected. In *De Jonge v. Oregon*, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278, the Court unanimously held that an individual could not be penalized simply for assisting in the conduct of an otherwise lawful meeting held under the auspices of the Communist Party, an organization that advocated "criminal syndicalism." After reviewing the rights of citizens "to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances," *id.*, at 364, 57 S.Ct., at 259, Chief Justice Hughes, writing for the Court, stated:

"It follows from these considerations that, consistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime. The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score. The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects. If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge." *Id.*, at 365, 57 S.Ct., at 260.

Of course, the petitioners in this case did more than assemble peaceably and discuss among themselves their grievances

against governmental and business policy. Other elements of the boycott, however, also involved activities ordinarily safeguarded by the First Amendment. In *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, the Court held that peaceful picketing was entitled to constitutional protection, even though, in that case, the purpose of the picketing "was concededly to advise customers and prospective customers of the relationship existing between the employer and its employees and thereby to induce such customers not to patronize the employer." *Id.*, at 99, 60 S.Ct., at 742. Cf. *Chauffeurs v. Newell*, 356 U.S. 341, 78 S.Ct. 779, 2 L.Ed.2d 809. In *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697, we held that a peaceful march and demonstration was protected by the rights of free speech, free assembly, and freedom to petition for a redress of grievances.

Speech itself also was used to further the aims of the boycott. Nonparticipants repeatedly were urged to join the common cause, both through public address and through personal solicitation. These elements of the boycott involve speech in its most direct form. In addition, names of boycott violators were read aloud at meetings at the First Baptist Church and published in a local black newspaper. Petitioners admittedly sought to persuade others to join the boycott through social pressure and the "threat" of social ostracism. Speech does not lose its protected character, however, simply because it may embarrass others or coerce them into action. As Justice Rutledge, in describing the protection afforded by the First Amendment, explained:

"It extends to more than abstract discussion, unrelated to action. The First Amendment is a charter for government, not for an institution of learning. 'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *Thomas v. Collins*, 323 U.S. 516, 537, 65 S.Ct. 315, 325, 89 L.Ed. 430.

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982)

Again, the Amended Complaint is based on the idea that some unknown people assaulted

police and broke windows, and therefore everyone who peacefully demonstrated that day is

indistinguishable.

On September 9, 2021, the Chief Judge of the Northern District of Florida entered a preliminary injunction against enforcement of Florida Statute § 870.01(2), an "anti-riot" law enacted by the Florida legislature in 2021. *The Dream Defenders*, et al., *v. Ron DeSantis*, 21-cv-191, ECF No. 137 (N.D. Fla. Sept. 9, 2021), Exh. 1. The riot law was enjoined on account of its unconstitutional vagueness and overbreadth. Exh. 1, pp. 45-77.

> A person commits a riot if he or she willfully participates in a violent public disturbance involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct, resulting in:
> (a) Injury to another person;
> (b) Damage to property; or
> (c) Imminent danger of injury to another person or damage to property.
> § 870.01(2), Fla. Stat. (2021).

This of course is similar to the various counts alleged by these Plaintiffs against Defendant here.

Among other reasons for enjoining the Florida riot law, the Chief Judge found overbreadth in the fact that the legislation appeared to criminalize the defendant's protest activities even if he did not participate in the violent acts necessary to satisfy the definition of a "violent public disturbance." *Id. ¶¶* 75-76.

Likewise, the court found vagueness in the definition of "violent public disturbance," like the causes of action and factual allegations here.  Even if there were "a rowdy group of Proud Boys" present at an assembly, the court reasoned, it is statutorily vague whether that would somehow transform an entire assemblage into a "violent public disturbance."  Id., ¶. 53. Similarly, in *United States v. Kevin Phomma*, Opinion and Order, Case No. 3:20-cr-00465-JO, September 15, 2021, U.S. District Court for the District of Oregon.

**N)**     **Lack of Standing**

The Plaintiffs' political law firm, using these eight police officers for partisan goals, present this lawsuit as compensating for physical injuries to the Plaintiffs in the course of their duties by unidentified people who have no relationship to any of these Defendants.  Two people have been accused and pled guilty for attacking police officers, yet those are not sued in this lawsuit.

The Plaintiffs have no standing or representational position to sue on behalf of the public at large or Congress or what they perceive to be democracy.

**O)**     **Respondent Superior and Vicarious Liability**

Plaintiffs' do not allege "respondent superior" specifically, and the Amended Complaint fails to support "*agency in reverse,"-- that is,* actions of the Proud Boys Club as an organization do not legally bind Mr. Zachary Rehl as an individual.

Furthermore, the Plaintiffs do not allege that any of the Defendants are the employee of any other Defendant.  The Plaintiffs do sue the 2020 campaign committee of Donald Trump, but still do not allege that any of the specific Defendants were employees or independent contractors employed, hired, or engaged by the campaign committee.  The Amended Complaint recites that employees of the campaign did something unspecified, but does not allege that any of these Defendants had any such relationship with any other Defendant.

The Plaintiffs do not allege that any of the Defendants are independent contractors of any other Defendant.  Despite abuse of words like militia, the Plaintiffs do not allege that any Defendant owed any duty to join, remain in, or follow the orders or goals of any organization. These are volunteer organizations, not military units to which anyone owes any duty of following orders or remaining for any term of service.

The Defendants are and were volunteers acting on their own volition, and the Plaintiffs do not allege otherwise.

For example, the Plaintiffs' activist law firm alleges that Defendants acted at Trump's direction or command.  ¶¶ 76(c), 92, 93, 120, 121, 129.   However, none of the Defendants have any legal status or duty to follow anyone's direction in these matters.

### P)    Plaintiffs Lack Constitutional Standing to Seek Injunctive Relief

Even if Plaintiffs had standing under irreparable injury to pursue their claims (which they do not), or had sufficiently pled the irreparable injury required to support a preliminary injunction (which they have not), the Complaint fails because Plaintiffs plainly cannot demonstrate a "clear" or "substantial" likelihood of success on the merits of their claims for injunctive relief, and fail to claim of federal tort claim. Indeed, its claims are clearly deficient in all respects.

However, Plaintiffs do not allege any future impact to justify injunctive relief, which is fatal to Plaintiffs' standing to seek injunctive relief.[8] "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).  "[T]o satisfy Article Ill's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

---

[8] Plaintiffs apparently believe that they can sue for everyone in the Capitol, even in America who opposed what happened on January 6th - asserting third-party claims requires a "close relationship with the absent third parties" who must have standing in their own right. *Kowalski v. Tesmer,* 543 U.S. 125 (2004).

by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env 't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); (see also, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992)).

"[A] plaintiff has standing to sue for injunctive relief when there is a 'real or immediate threat' that the party will suffer an injury in the future." *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019) (citation omitted).  The court further explained that '[t]here must be some connection between the plaintiff and the defendant that "[]differentiate[s]" the plaintiff so that his injury is not "common to all members of the public."' *Id*. at 654-655 (*citing United States v. Richardson*, 418 U.S. 166, 177, 94 S. Ct. 2940, 41 L. Ed. 2d 678 (1974) (*quoting Ex parte Levitt*, 302 U.S. 633, 634, 58 S. Ct. 1, 82 L. Ed. 493 (1937)).

'A person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210, 210 L. Ed. 2d 568, 590-591, (2021) (*citing Clapper v. Amnesty Int'l USA, 568 U. S. 398,* at 414, n. 5, *133 S. Ct. 1138, 185 L. Ed. 2d 264*; *Los Angeles v. Lyons*, 461 U. S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983); *see also Gubala v. Time Warner Cable, Inc., 846 F. 3d 909, 912 (CA7 2017).* 'Even apart from that fundamental problem with their argument based on the risk of future harm, the plaintiffs did not factually establish a *sufficient risk of future harm* to support Article III standing.' *TransUnion LLC*, 141 S. Ct. at 2211-2212 (emphasis added).  The Court further set forth that, 'a plaintiff must "demonstrate standing separately for each form of relief sought." *Id*. (*citing Friends of the Earth*, 528 U. S. at 185.)(see also, *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("standing is not dispensed in gross,");

Further, Plaintiffs must demonstrate a "personal stake in the outcome" in order to "assure that concrete adverseness which sharpens the presentation of issues" necessary for the proper

resolution of constitutional questions.' *LA v. Lyons*, 461 U.S. 95, 101, 103. S. Ct. 1660, 1665, 75

L.Ed. 2nd 675, 684, (1983)(*citing Baker v. Carr*, 369 U.S. 186, 204 (1962)(emphasis added)).

The Plaintiffs herein have plead no constitutional questions, much less imminent harm

from future conduct.   (See ECF 1, generally). In addition, the standing doctrine also includes

prudential elements, including a general rule that those seeking to assert absent third parties'

rights to have their own Article III standing and a close relationship with the absent third parties.

*Kowalski v. Tesmer*, 543 U.S. 125, 128-30 (2004)9.

In *LA v. Lyons,* the Court further explained a precedential holding to explain how one

cannot rely on past injuries, *O'Shea v. Littleton*, 414 U.S. 488 (1974), in which the Court

addressed "a case brought by a class of plaintiffs claiming that they had been subjected to

discriminatory enforcement of the criminal law." *Id.* at 102 (*citing Id.*).

> Past wrongs were evidence bearing on "whether there is a real and
> immediate threat of repeated injury." But the prospect of future injury
> rested "on the likelihood that [plaintiffs] will again be arrested for and
> charged with violations of the criminal law and will again be
> subjected to bond proceedings, trial, or sentencing before petitioners."
> … We could not find a case or controversy in those circumstances:
> the threat to the plaintiffs was not "sufficiently real and immediate to
> show an existing controversy simply because they anticipate violating
> lawful criminal statutes and being tried for their offenses. . . .

*Lyons, 461 U . S . at 102-103 (internal citations omitted.)*

The Supreme Court has held that a plaintiff cannot allege irreparable harm by

asserting its constitutional rights were violated in the past.  *See Id.*  In *Lyons,* the Supreme

Court held that the plaintiff, who alleged that a police officer placed him in an illegal

---

[9] Rehl is alleged to have been acting as an agent of the Proud Boys, Mr. Rehl and the Proud Boys could not conspire together, as a matter of law. S*ee Legal Aid Society v. Ass'n of Legal Aid Attorneys*, 554 F. Supp. 758, 766–67 (S.D.N.Y. 1982) (*the actions of an agent are attributed to the principal, and so the agent and principal cannot form a conspiracy between "two or more persons"*).

chokehold in violation of his substantive due process rights under the Fourteenth Amendment, did not have standing to seek an injunction preventing police officers from using chokeholds in the future because he did not allege facts showing "any real or immediate threat" that he would be subjected to an illegal chokehold again and, thus, no likelihood of "irreparable injury." 461 U.S. at 111.

Plaintiffs' conclusory allegations of past harm fails as a matter of law.  Plaintiffs' allegations do not constitute a redressable injury in fact – nor a Constitutional deprivation.  These allegations also fail to satisfy the "causation" and "redressability" prongs of the Article III standing inquiry.  *See DaimlerChrysler Corp. v. Cuna*, 547 U.S. 332,346 (2006) ("[A] party seeking federal jurisdiction cannot rely on speculative inferences to connect his injury to the challenged actions of the defendant." (internal quotation marks and alterations omitted)).  *Bond v. United States*, 564 U.S. 211, 222-23 (2011)(One who seeks to initiate or continue proceedings in federal court must demonstrate, among other requirements, both standing to obtain the relief requested, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992), and, in addition, an "ongoing interest in the dispute" on the part of the opposing party that is sufficient to establish "concrete adverseness." *Camreta v. Greene*, 563 U.S. 692, 701, 131 S. Ct. 2020, 179 L. Ed. 2d 1118, 1125 (2011) (internal quotation marks omitted)).

Without a showing of irreparable harm, Plaintiffs' request for a preliminary injunction should  be denied as a matter of law.

**Q)**    **Claim for Assault Not Sustainable**

Plaintiffs allege the claim of assault under D.C. local ("State") law.  Of course, the term assault is often confused, understood by most lay persons as being a battery – an unwanted

touching often causing physical injury.  Criminal statutes prohibiting assault often add to the confusion, including prohibitions on physical touching causing injury.

The intentional tort of assault in D.C. means

> The United States District Court for the District of Columbia certified the cause to the Superior Court and, after the completion of discovery procedures, the action was dismissed — the court holding that, absent a showing of malice, willfulness or specific wrongful intent, appellee could not be held liable for the acts alleged.

> An essential element of the ancient tort of assault is the intentional putting another in apprehension of an immediate and harmful or offensive conduct. See Restatement (Second) of Torts §§ 21, 22 (1965). Accord, 6 Am.Jur. (Second) Assault and Battery §§ 4, 109 (1963); C.J.S. Assault and Battery § 10(a)(1) (1968). Absent any such allegation of apprehension, the complaint, insofar as it alleged an assault, was clearly deficient.

*Madden v. D.C. Transit System., Inc., 307 A.2d 756 (D.C. 1973)*

Here, the Plaintiffs allege that Defendants engaged in the exercise of free speech protected by the First Amendment aimed at how the U.S. Congress would carry out its duties in the January 6 Joint Session of Congress to resolve disputes about the elections in some States of Electors to the Electoral College, including alternate slates of Electors presented.

The Defendants' statements and actions were not directed at or addressed to the Plaintiffs or other law enforcement colleagues, but demanding that Congress do its job.

The Defendants' statements and actions did not create an "*immediate*" apprehension of harmful or offensive conduct.  Surely Zachary Rehl did not.  The Plaintiffs chronicle statements and actions by Plaintiffs (while turning a blind eye to the year of rioting by Antifa) spread over many months.

Did a small number of thugs battle with police?  Surely yes.  It is caught on video.  Did this violence by others – not these Defendants – place some police officers (depending on

location around the Capitol building) in apprehension of immediate violence?  Yes.  Does that have anything to do with Zachary Rehl?  No.

      **R)**      **<u>Claim for Negligence Not Sustainable</u>**

      Plaintiffs allege the claim of negligence under D.C. local ("State") law.  Implicitly acknowledging that a plaintiff must plead and prove that a defendant owed a legal or legally-recognized duty (which may seem harsh as being different from social sensitivity) to the plaintiff, the Plaintiffs argue that the Defendants by violating D.C. statutes breached a duty or duties to these Plaintiffs.

      In fact, of course, as even presented in the Amended Complaint, the Plaintiffs and Defendants are and were at the time total strangers to each other.  There are no allegations that any of these Plaintiffs ever met any of these Defendants under any circumstances.  There are no allegations that any of these Plaintiffs ever interacted with any of these Defendants.

      The Plaintiffs here are clearly victims of negligence by the Speaker of the House of Representatives Nancy Pelosi, the Sargeant-at-Arms of the U.S. House of Representatives, the Chief and leadership of the U.S. Capitol Police, the Mayor of the District of Columbia and legal head (like a State) of the D.C. National Guard and ultimate head of the Metropolitan Police Department of the District of Columbia.   Despite ample warnings of a large demonstration and an offer of 10,000 National Guard troops by President Donald Trump, these officials breached their duty to their employees, the Plaintiffs and other law enforcement officers, leaving the officers hanging out to dry with ridiculously inadequate numbers, preparations, and support.

      While it is not an excuse that a small number of hooligans numbering maybe 50 to 250 at most attacked law enforcement officers and broke windows, the leadership who placed these Plaintiffs and their colleagues in harm's way put a ridiculous five (5) officers at the so-called

"Pedestrian Gate" as the entrance to the long, gently-sloping stairs from Second Street N.W. up to the West face of the Capitol.  There is no possibility that 5 officers standing behind a flimsy assemblage of bike racks and chicken wire strung between decorative-only faux walls (offering only the hint in a decorative sense of walls on either side of the walk way at the street, but not actually functional as genuine walls) could maintain a restricted area between Second Street West and the West face of the U.S. Capitol.

Undeniably, the plans for managing crowds on January 6, 2021, were designed to fail.

This does not excuse individual actions, but it does change who was negligent.

Viewing the video recordings, including some scenes painful to watch, it is abundantly clear that there were no more than a couple of hundred USCP officers deployed for the entire Capitol complex, including nearby office buildings.  Claims of 1200 to 1400 officers being on duty are clearly lies.  Had USCP and Congressional leadership placed 1200 officers on duty, there would have been 50 to 150 officers at the Pedestrian Gate – the most important opening to guard at that point in the timeline -- and the crowd would never have entered the Capitol Grounds.  Provocateurs caught on video dismantling the heavy-duty roll-up fencing (like chicken wire but much more sturdy, but still of temporary design and subject to being rolled up) would have been stopped and arrested if there were 1200 USCP officers on duty.

USCP leadership issued six (6) different demonstration permits that allowed people to be on the Capitol Grounds, thus negating any charge of entering a restricted area *without authorization* – because the crowds had authorization to attend the permitted demonstrations.[10]

---

[10]     Jason Leopold, "The Capitol Police Granted Permits For Jan. 6 Protests Despite Signs That Organizers Weren't Who They Said They Were," BuzzFeed News, September 9, 2021, https://www.buzzfeednews.com/article/jasonleopold/the-capitol-police-said-jan-6-unrest-on-capitol-grounds?origin=web-hf

Even without the obvious advance warning, January 6 is a special day every 4 years and the leadership actually negligent should have provided for full attendance of USCP personnel sharp and in uniform and making the best impression for this quadrennial special day.

It is not a defense to those who actually committed any violence or property damage that there weren't enough police officers to stop them.  But neither does the clear negligence of the USCP's leadership make others negligent in their place for the leadership's inexcusable failures.

In fact, none of the Defendants in this case engaged in any violence on or around January 6, 2021, nor damaged any property, except that Dominic Pezzolla as a very recent addition to the Proud Boys of New York (apparently joining only in December 2020) is alleged to have somehow taken or gotten a hold of a riot shield (with reports that improperly-stored USCP equipment shattered in actual use) and broken a window.

None of the other Defendants, to counsel's knowledge, are charged with committing any violence or property damage.

Certainly with regard to ZACHARY REHL in the U.S. District Court for the Eastern District of Pennsylvania, the prosecution conceded in proper candor in a bail hearing:

> **To be sure, the indictment does not allege that Mr.  Rehl engaged directly in violence against officers or destruction of property * * * .**

*Assistant U.S. Attorney Luke M. Jones, Esq., Page 3, Transcript of Detention/Rule 5 Hearing Before Honorable Richard A. Lloret, United States v. Zachary Rehl, Case No. 2:21-mj-526-1, United States Magistrate Judge, U.S. District Court for the Eastern District of Pennsylvania, March 26, 2021, filed publicly as ECF Docket # 9 in that Court.*

The group, conclusory allegations devoid of facts, and non-specific to anyone in particular, fail the requirements of credibility and plausibility of *Twombly* and *Iqbal.*

The conduct of the Defendants complained of consists of the exercise of free speech protected under the First Amendment as made clear by *Brandenburg v. Ohio* and *NAACP v.*

*Claiborne Hardware* and their progeny.  The allegations fail to plausibly allege proximate causation.

The Amended Complaint argues that the Defendants collectively violated a duty of care to the Plaintiffs by violating D.C. Code § 22-1322(rioting or inciting to riot); D.C. Code § 10-503.16(b)(6) (engaging in physical violence); D.C. Code § 10-503.16 (a grab-bag of charges sounding in violence or entering restricted areas), [11] and 40 U.S.C. § 5104(e)(2)(F) (physical violence on Capitol Grounds or in the Capitol complex buildings).

However, there are no allegations that ZACHARY REHL did any of these things, or even that any of the Defendants did any of these things, except possibly allegations against Dominic Pezzolla in allegedly breaking a window, except in group collective conclusory allegations devoid of facts or specificity to any of the Defendants.  There are no allegations that are plausible or credible of any proximate causation to any injuries or interests of these Plaintiffs.

None of these Defendants have been charged with committing any violence or property damage or any of the subjects of the criminal statutes mentioned, except Pezzola.  In prosecutions, the Government has claimed aiding and abetting but refuses to provide any specifics as to who, what, when, or where anything like that ever occurred.  Given the contradictions with official government allegations, the claim fails *Twombly* and *Iqbal*.

## VI.        CONCLUSION

The Court should dismiss the Complaint.

Dated:  December 24, 2021                RESPECTFULLY SUBMITTED
                                         ZACHARY REHL, *By Counsel*

---

[11]      https://code.dccouncil.us/us/dc/council/code/sections/10-503.16.html#:~:text=Code%20of%20the%20District%20of%20Columbia%20%C2%A7%2010%E2%80%933503.16.,shall%20be%20promulgated%20by%20the%20Capitol%20Police%20Board%3A

Jonathon A. Moseley, Esq.

USDCDC Bar No. VA005
Virginia State Bar No. 41058
Mailing address only:
5765-F Burke Centre Parkway, PMB #337
Burke, Virginia 22015
Telephone:  (703) 656-1230
Facsimile:  (703) 997-0937
Contact@JonMoseley.com
Moseley391@gmail.com

Jonathon A. Moseley, Esq.

Mr. Damon Hewitt, Esq.
Jon Greenbaum, Esq., D.C. Bar No. 489887
Edward G. Caspar, Esq., D.C. Bar No. 1644168
David Brody, Esq., D.C. Bar No. 1021476
Arusha Gordon, Esq., D.C. Bar No. 1035129
Noah Baron, D.C. Esq., Bar No. 1048319
Adonne Washington Esq.,
Lawyers' Committee for Civil Rights Under Law
1500 K Street N.W., Suite 900
Washington, DC 20005
Telephone: (202) 662-8300
jgreenbaum@lawyerscommittee.org
dhewitt@lawyerscommittee.org
ecaspar@lawyerscommittee.org
dbrody@lawyerscommittee.org
agordon@lawyerscommittee.org
nbaron@lawyerscommittee.org
awashington@lawyerscommittee.org
*Legal Co-Counsel for Plaintiffs*

Mr. Robert C Buschel, Esq.
BUSCHEL & GIBBONS, P.A.
501 East Las Olas Boulevard, Suite 304

Fort Lauderdale, Florida 33301
Telephone: 954-530-5748
Buschel@bglaw-pa.com
*Legal Counsel for Defendant Roger Stone*

Juli Zsuzsa Haller, Esq.
LAW OFFICES OF JULIA HALLER
601 Pennsylvania Avenue, NW, Suite 900
S. Building
Washington, DC 20036
Telephone: 202-352-2615
hallerjulia@outlook.com
*Legal Counsel for Kelly Meggs*

Stephen R. Klein, Esq.
BARR & KLEIN PLLC
1629 K Street NW, Suite. 300
Washington, DC 20006
Telephone: 202-804-6676
steve@barrklein.com
*Legal Counsel for Brandon J. Straka*

Nicholas D. Smith
DAVID B. SMITH, PLLC
7 East 20th Street, Suite 4r
New York, NY 10003
Telephone: 917-902-3869
nds@davidbsmithpllc.com
*Legal Counsel for Felipe Antonio Martinez*

Jonathon A. Moseley, Esq.