IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONRAD SMITH, *et al.*,

                 Plaintiffs,

     v.

DONALD J. TRUMP, *et al.*,

                 Defendants.

Civil Action No. 1:21-CV-02265-APM

PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION
TO THE MOTIONS TO DISMISS BY DEFENDANTS
NORDEAN, KINNISON, MARTINEZ, STRAKA, STONE, REHL, TRUMP,
TRUMP FOR PRESIDENT, MAKE AMERICA GREAT AGAIN PAC,
MEGGS, AND CALDWELL

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 3

I.      Standard of Review ............................................................................................ 3

II.     Plaintiffs State Claims under the Ku Klux Klan Act ........................................ 4

        A.     Plaintiffs Sufficiently Allege Defendants' Conspiratorial
              Involvement under Section 1985 ................................................................ 4

        B.     Plaintiffs Properly Allege Conspiracies to Interfere with Federal
              Officers Under Section 1985(1) ............................................................... 22

        C.     Section 1985(1) Does Not Require State Action or Discriminatory
              Animus ...................................................................................................... 26

        D.     The Intracorporate Conspiracy Doctrine Does Not Apply ..................... 26

        E.     Washington, D.C., Constitutes a "State or Territory" Under Section
              1985(1) ..................................................................................................... 29

        F.     Claims under Section 1985(1) Are Distinct from Section 1985(3) ......... 30

        G.    Plaintiffs Sufficiently Allege a Section 1986 Claim ............................... 31

III.    Plaintiffs Sufficiently Allege Claims under D.C. Law ...................................... 35

        A.     Plaintiffs' Claims under the D.C. Bias-Related Crimes Act Are
              Valid ......................................................................................................... 35

        B.     Plaintiffs' Sufficiently State Assault and Battery Claims ...................... 44

        C.     Plaintiffs Sufficiently State a Negligence Claim .................................... 48

IV.    The Constitution Does Not Bar Plaintiffs' Claims ............................................ 52

        A.     Presidential Immunity Does Not Apply ................................................... 52

        B.     The First Amendment Does Not Shield the Defendants from
              Liability for Their Unlawful Conduct ...................................................... 57

V.     Defendants' Remaining Arguments Are Baseless .............................................. 72

        A.     The Political Question Doctrine Does Not Bar Plaintiffs' Claims
              against Trump .......................................................................................... 72

B.    Neither Res Judicata, Collateral Estoppel, nor the Impeachment Clause Bar Plaintiffs' Claims against President Trump ......................... 73

C.    Plaintiffs Have Standing to Bring This Action ........................................ 75

D.    This Court Has Personal Jurisdiction over the Trump Campaign ........... 77

E.    The Abstention Doctrine Does Not Support Dismissal .......................... 81

F.    Plaintiffs' Sufficiently Allege the Sought-After Relief ......................... 81

CONCLUSION .................................................................................................................... 85

## INTRODUCTION

This case seeks accountability for a conspiracy between a former President, militant vigilantes, and others to use force, intimidation, and threats to attack a co-equal branch of government and U.S. Capitol Police, all in a concerted effort to overturn a democratic election. Although moving Defendants have, amongst them, made several arguments in their motions to dismiss, the allegations in the Amended Complaint firmly establish each of the claims against them under the governing legal standards. When all of the allegations are taken as true and considered together, as the law requires, including the allegations pertaining to each Defendant's coconspirators, they more than meet the requirement to state plausible claims against the Defendants.

The allegations allow the Court to draw reasonable inferences that each of the Defendants agreed with at least one other person to objectives that are unlawful under 42 U.S.C. § 1985(1), that Defendants carried out acts in furtherance of their conspiracies, and that Plaintiffs were injured as a result.

They also establish plausible claims that each Defendant violated 42 U.S.C. § 1986 by failing to act to help prevent the harms of the § 1985(1) conspiracies. Each defendant had it within their power to help avoid the violent attack on the Capitol and the harms caused to Plaintiffs. Not one Defendant made any effort to help prevent or stop the Attack.  And in the aftermath, many ratified it.

The Amended Complaint firmly establishes plausible claims against each Defendant under the D.C. Bias Related Crimes Act. It properly alleges that each Defendant committed an underlying criminal act, such as a violation of D.C.'s Anti-Terrorism Act, rioting, or destruction of property; that they were motivated to do so by prejudice against certain members of Congress and the Vice

President based on their actual or perceived political affiliations; and that their actions resulted in injuries to the Plaintiffs. Likewise, the allegations establish plausible claims that each Defendant is liable for battery and assault of the Plaintiffs based on their aiding and abetting of the primary tortfeasors, or their conspiracy with others whose acts in furtherance of the conspiracy in executing the Attack injured the Plaintiffs. Further, the Amended Complaint establishes Defendants' liability to Plaintiffs in negligence for having injured Plaintiffs as a result of Defendants violations of their duties of reasonable care in facilitating the Attack, and their duties to abide by criminal statutes prohibiting rioting and violence at the Capitol.

Presidential immunity does not shield Defendant Trump from liability. Using force, intimidation and threats to prevent a co-equal branch of government from performing its constitutionally mandated duties, and to prevent his duly elected successor from taking office as President, is not within the "outer perimeter" of the President's official duties. This can be held with certainty, without regard to a President's motives in undertaking such action, or whether such action is undertaken directly or by agreement with others. Further, in committing the acts alleged in the Amended Complaint, Defendant Trump acted only in his personal capacity as a candidate for office.

Nor does the First Amendment provide safe harbor for Defendants' unlawful and abhorrent conduct. Conspirators to unlawful ends cannot acquire immunity by seeking refuge under the umbrella of "political expression." The First Amendment protects neither violence nor agreements to commit it.

Defendant's remaining arguments are baseless. Ultimately, Defendants' arguments in defense of the claims against them are as empty as the false grievances they sowed in furtherance of their unlawful conspiracies.

## ARGUMENT

### I.    Standard of Review

Among other arguments, all addressed below, Defendants challenge the sufficiency of the allegations in the Amended Complaint to establish the claims against them. Defendants, however, largely ignore the standard of review on such motions. Federal Rule of Civil Procedure 8 provides that a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In assessing the sufficiency of the complaint, the Court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiffs. *Hurd v. D.C., Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017); *see Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."). Further, the complaint must be viewed as a whole, considering all of the allegations in their totality, rather than parsing the allegations to assess the strength of each. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009).

Read as a whole, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Respecting conspiracy claims in particular, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is

improbable, and that a recovery is very remote and unlikely." *Id.* (internal quotation marks omitted). "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible. The choice between or among plausible inferences or scenarios is one for the factfinder." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (internal citations omitted).

## II.     Plaintiffs State Claims under the Ku Klux Klan Act

### A.     Plaintiffs Sufficiently Allege Defendants' Conspiratorial Involvement under Section 1985

The Court should deny the motions of Defendants Stone, Nordean, Kinnison, Martinez, Meggs, Rehl, Straka, and Caldwell to dismiss the Amended Complaint for failure to allege sufficient claims under section 1985(1). The Amended Complaint sufficiently alleges that each Defendant conspired to use force, intimidation, and threats in violation of section 1985(1), and that overt acts taken in furtherance of those conspiracies—the support, planning, and attack on the Capitol—caused Plaintiffs' injuries. Additionally, Defendant Trump has waived any argument as to whether Plaintiffs' sufficiently allege his participation in a conspiracy, and even he has not, Plaintiffs sufficiently allege Trump's participation.

#### 1.     Conspiracy Law Supports Defendants' Liability

To violate section 1985(1), a plaintiff must allege a conspiracy:

> to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any . . . place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof . . . .

42 U.S.C. § 1985(1). In this Circuit, civil conspiracies require a plaintiff to show "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the

agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

A conspiratorial agreement exists wherever two or more persons share a commitment to a "general objective or common plan." *Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 80-81 (D.D.C. 2004). Such agreements do not need to be explicit—proof of a tacit understanding is sufficient to show agreement, since "conspiracies are rarely evidenced by explicit agreements and nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (internal quotations and citations omitted).

On a motion to dismiss, Plaintiffs need not show that each participant knew "the exact limits of the illegal plan or the identity of all participants therein." *Hobson v. Wilson*, 737 F.2d 1, 51 (D.C. Cir. 1984) (citations omitted). Nor must Plaintiffs "definitively show an agreement" to overcome a motion to dismiss. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 426 (4th Cir. 2015). Instead, Plaintiffs must only "raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." *Twombly*, 550 U.S. at 556; *see also Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157 (1970) (conspiracy could be established where "the sequence of events created a substantial enough possibility of a conspiracy . . . especially given the fact that the noncircumstantial evidence of the conspiracy could only come from adverse witnesses.").

In most cases, "the court will have to infer a conspiracy from indirect evidence."[1] *Halberstam*, 705 F.2d at 481. For example, conspiratorial agreements can be demonstrated through allegations of "communications and meetings among conspirators" that "support an inference of

---

[1]   Thus, "dismissals prior to giving the plaintiffs ample opportunity for discovery should be granted with caution and very sparingly." *In re Consumer Credit Counseling Services Antitrust Litig.*, 1997 WL 755019, at *4  (D.D.C. Dec. 4, 1997).

agreement because they provide the means and opportunity to conspire." *See SD3*, 801 F.3d at 432. They can also be demonstrated through "parallel conduct" by the Defendants coupled with other circumstances that "point[] toward a meeting of the minds," *Twombly*, 550 U.S. at 557. A "unity of purpose or common design and understanding" to accomplish the objects of the conspiracy and "the relationship among co-defendants" likewise may give rise to an inference of agreement. *United States v. Dowlin*, 408 F.3d 647, 657 (10th Cir. 2005).

A defendant's participation in a conspiracy can be "inferred from an invitation, followed by responsive assurances and conduct." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008). Later ratification of the overt acts in furtherance of a conspiracy can also evidence a defendant's participation in the conspiracy. *See, e.g.*, *Sines v. Kessler*, 324 F. Supp. 3d 765, 796-97 (W.D. Va. 2018) (defendants' ratification of the attack demonstrated that the attack was consistent with the conspiracy's goals); *Braver v. Ameriquest Mortg. Co.*, 2006 WL 8436631, at *4 (W.D. Okla. Oct. 13, 2006). "Motive or intent may be proved by the acts or declarations of some of the conspirators in furtherance of the common objective." *Pinkerton v. United States*, 328 U.S. 640, 647 (1946). In addition, communications evidencing a conspiracy do not need to be made in private or made surreptitiously—public statements by defendants can be construed as "invitations to agree." *In re California Bail Bond Antitrust Litig.*, 2020 WL 3041316, at *13 (N.D. Cal. Apr. 13, 2020). Even without any communication, an agreement may be inferred from circumstances suggesting purposeful action in concert. *See U.S. v. Scott*, 979 F.3d 986, 990-91 (2d Cir. 2020) (affirming conviction of correctional officers for conspiring to beat plaintiff even without communication; though initiation of beating "may have been spontaneous, the evidence at trial revealed that the other officers acted in concert and purposefully joined the assault").

Each Defendant is liable for the reasonably foreseeable acts of their coconspirators. *See Pinkerton*, 328 U.S. at 647-48; *Sines*, 324 F. Supp. 3d at 795 (applying *Pinkerton* liability to conspiracy under § 1985). Significantly, under the plain text of § 1985, coconspirators are liable if they "do, or cause to be done" any injurious act in furtherance of the conspiracy. 42 U.S.C. § 1985. "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, *but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury*." *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978) (emphasis added) (interpreting similarly language—"subjects, or causes to be subjected" to a deprivation of civil rights—in 42 U.S.C. § 1983).

Furthermore, in evaluating the sufficiency of Plaintiffs' conspiracy claims, the Court must consider the Amended Complaint in its entirety. *Tellabs*, 551 U.S. at 322-23; *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962), *superseded by statute on other grounds*, Pub. L. No. 97-290, 15 U.S.C. § 6a; *Sines*, 324 F. Supp. 3d at 785-98 (evaluating the factual allegations of the plaintiff as a whole in determining whether each defendant participated in a conspiracy to violate federal and state laws as alleged). Thus, this Court should not consider alleged overt acts by individual defendants separately in determining whether the Amended Complaint sufficiently alleges that a defendant participated in an illegal conspiracy. *See In re Consumer Credit Counseling Services Antitrust Litig.*, 1997 WL 755019, at *5 (D.D.C. Dec. 4, 1997) (applying *Continental Ore* in denying motion to dismiss).

### 2. Plaintiffs Properly Allege the Facts Necessary to Establish Each Moving Defendant's Liability for Conspiracy under Section 1985(1)

The Amended Complaint sufficiently alleges that each moving Defendant participated in a conspiracy to use force, intimidation, and threats to violate section 1985(1), and that the overt acts

of Defendants and their coconspirators caused Plaintiffs' injuries. As demonstrated in the subsections below, the Amended Complaint includes allegations evidencing either an explicit agreement by each moving Defendant to participate in a conspiracy or sufficient facts from which the Court may reasonably infer such agreement. As alleged, Defendants had pre-existing relationships with one another, shared goals of preventing election certification, had numerous opportunities to conspire, and participated in similar and coordinated actions at events and rallies preceding the January 6 Capitol Attack. Moreover, Defendants expressly and repeatedly ratified the conduct of the attackers, further demonstrating that the January 6 Attack was the intended result of their actions.

### a.    Roger Stone

Stone worked closely with coconspirators while acting to prevent certification of Biden and Harris's election.

- A longtime associate and advisor of Trump, Stone promoted Trump's false claims of election fraud to sow doubt and anger about the electoral process and legitimize the use of force to prevent certification of the election results. ECF 89, Amended Complaint, ¶¶ 24, 54-55, 81.

- During the campaign, Stone publicly urged Trump to invoke the Insurrection Act, seize ballot boxes, and arrest political opponents and members of the media. *Id.* ¶ 55.

- In the weeks leading up to the attack on the Capitol, Stone campaigned with his coconspirators who attacked the Capitol—with all of them promoting the use of force, intimidation, and threats to overturn the election and urging Trump supporters to fight against it. *Id.* ¶¶ 79, 80, 86, 106-09.

- Working with the Proud Boys and leaders Tarrio and Nordean, Stone promoted and appeared on stage the night before a December 12, 2020 Stop the Steal rally at which Trump for President adviser Katrina Pierson explicitly called for extra-legal action and promoted the use of force, intimidation, and threats to keep Defendant Trump in power. *Id.* ¶ 98.

- On January 2, 2021, with a crowd of Trump supporters and the Proud Boys, including Tarrio, Stone appeared at the front of U.S. Senator Marco Rubio's private residence to pressure Rubio to not certify election results. *Id.*

In the days leading up to and including January 6, Stone fundraised and worked directly to

stop the certification with multiple Oath Keepers who attacked the Capitol.[2] *Id.* ¶¶ 86-98.

- Stone also engaged the Oath Keepers, including Meggs, to provide personal security for him for the January 5 rally at the Supreme Court, during which Stone told Trump supporters that he would march with them the next day to stop Congress from certifying the election results—telling Trump's supporters "nothing is over until we say it is over." *Id.* ¶ 107.

- At the protest held the same day (January 5) at Freedom Plaza, Stone (accompanied again by Oath Keepers), Straka, Alexander, Taylor, and coconspirator Alex Jones stoked anger in Trump supporters by repeating false claims of election fraud, using violent rhetoric, and advocating for the use of violence to stop the certification of the election: Jones told the crowd, "they want to fight, they better believe they've got one"; Alexander led the crowd in chants of "Victory or Death," telling the crowd "1776 is always an option. These degenerates in the deep state are going to give us what we want, or we are going to shut this country down"; and, Stone repeated his earlier call to action and said that he would be "shoulder to shoulder" with the crowd the next day. *Id.* ¶ 108.

- Stone publicly acknowledged Alexander for driving the Stop The Steal movement, and Alexander said that Stone had offered "wise counsel to Trump's legal team and this movement" and that it "couldn't be done without Stone." *Id.* ¶ 109.

Finally, Stone actively supported the efforts of the Proud Boys and Oath Keepers to prepare

and execute their attack on the Capitol and the Capitol Police.

- Stone, who worked with the Proud Boys for years and had participated in their initiation ritual, raised money for equipment and security for the January 6 appearance in Washington, where the Proud Boys attacked the Capitol. *Id.* ¶¶ 25, 98-105, 125-28.

These conspiratorial acts furthered the effort to use the violent attack on the Capitol and

Plaintiffs to stop the electoral count and certification. *Id.* ¶¶ 111, 114-150. Each of the Plaintiffs

suffered physical and emotional injuries as a direct result of that attack. *Id.* ¶¶ 157-165. Thus,

Plaintiffs have more than met the pleading standard to defeat Stone's motion to dismiss their

Section 1985(1) claim. Stone's assertion that because he did not physically attack the Capitol on

---

[2]   Filings by Stop The Steal revealed that Stone, Straka, and Alexander planned to appear together as speakers on January 6. AC ¶ 106.

January 6 he was not a part of the conspiracy is legally baseless. *See Pinkerton*, 328 U.S. at 647

(in a conspiracy to use the mails or defraud, all conspirators are responsible even though only one

did the mailing).

### b.      Ethan Nordean

Nordean directly communicated with other Defendants to organize and plan the attack on

the Capitol.

- Nordean acted with several other coconspirators—including Tarrio, Biggs, Donohoe, and Rehl—in a Proud Boys leadership structure called the Ministry of Self Defense that was created to help coordinate the Capitol Attack.[3] ECF 89, ¶ 26.

- All of these coconspirators were then members of encrypted messaging channels named "New MOSD [Ministry of Self Defense]" and "Boots on the Ground," and used those channels for instructions regarding their January 6 attack on the Capitol. *Id.* ¶ 99(c) and (e).

In addition, Nordean advocated for the use of force to overturn the election results.

- For example, on November 28, 2020, he stated that "we tried playing nice and by the rules, now you will deal with the monster you created. The spirit of 1776 has resurfaced and has created groups like the Proudboys and we will not be extinguished. . . . Good luck to all you traitors of this county we so deeply love … you're going to need it." *Id.* ¶ 72(f).

- He continued to post threats as January 6 neared, writing, "Democracy is dead? Well, then no peace for you. No democracy, no peace," and "Fight now, or lose everything." *Id.* ¶ 93.

- Along with Stone and Stop the Steal, Nordean also attended the December 12, 2020 rally in Washington, D.C., where Pierson urged the use of force, intimidation, and threats to stop the certification of Biden's election. *Id.* ¶ 79.

- The night before, Nordean, Stone, and Tarrio had appeared together to publicly promote the rally. *Id.*

---

[3]      Nordean argues that this allegation cannot establish an agreement because "Capitol Attack" is not defined in the Amended Complaint. He is mistaken. *See* AC ¶ 2 (defining the term).

Nordean also fundraised and planned for the Capitol Attack.

- On December 27, 2020, Nordean created an online crowdfunding campaign soliciting donations for "Protective gear and communications" to be used by Proud Boys on January 6 and shared a link to the campaign on his Parler account. Id. ¶ 98.

- He later published a fundraising video captioned, "Let them remember the day they decided to make war with us," again soliciting donations for "protective gear and communications equipment." *Id.* ¶ 98.

- In a clear effort to coordinate the Capitol Attack and enhance its chances of success, Nordean directed other Proud Boys members not to wear Proud Boys colors on January 6. *Id.* ¶ 105.

- These actions clearly evinced his leadership role in the Attack, consistent with others recognizing prior to the attack that Nordean was "in charge." *Id.* ¶ 103(b).

Nordean then led coconspirators and physically participated in the Capitol Attack.

- On January 6, Nordean, together with Biggs, directed a group that assembled near and attacked the Capitol, communicating through ear pieces and walkie-talkie-style communications devices.[4] *Id.* ¶¶ 30, 125-26.

- Once Trump said to march on the Capitol, Nordean coordinated with Biggs, Donohoe, Rehl, and Tarrio to direct the attackers' movements. *Id.* ¶¶ 125, 215.

After the Capitol Attack, Nordean ratified his involvement and agreement with his coconspirators in the Capitol Attack.

- Nordean posted that "Patriots" should "Take honor in knowing YOU were chosen to live in these times and lead" and that they were "warriors of God*," id.* ¶ 140(g), and posted a picture of a Capitol Police officer administering pepper spray, with a caption

---

[4]    Nordean attempts but fails to exclude the communications among the "Ministry of Self Defense" and "through earpieces and walkie-talkie communication devices" on the grounds that they are contradicted by information outside the record. ECF 95, Nordean Motion to Dismiss ("MTD"), at 17–18. But neither the purported 1,500 "Ministry of Self Defense" messages he references as produced in his criminal case nor the transcript to which he cites as 'public records' are publicly accessible. And the remaining records are statements denying these facts, in addition to selectively referenced "Ministry of Self Defense" communications, in his own contested motions filed in his criminal case. Such facts are not subject to judicial notice. *Kaspersky Lab, Inc. v. United States Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) (recognizing a court may only consider facts in "public records subject to judicial notice" at the dismissal when the facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned") (citations omitted).

that read, in part, "if you feel bad for the police, you are part of the problem." *Id.* ¶ 140(k).

- Later, Nordean acknowledged that he worked at the direction of his coconspirator Trump, stating, "facing jail time cuz we followed [Trump's] lead and never questioned it." *Id.* ¶ 142.

Taken together, Nordean's statements and actions supporting efforts to overturn the election, including his coordination and planning of the attack with coconspirators and physical participation with coconspirators in the Capitol Attack that injured Plaintiffs, are more than sufficient to support the claim that Nordean entered into an agreement with other persons to participate in the unlawful act of conspiring to violate section 1985(1). *Id.* ¶¶ 157-65.[5]

### c.    Derek Kinnison

Kinnison planned the Capitol Attack with co-defendants and coconspirators.

- He arranged plans to travel to Washington, D.C., on a Telegram chat later named "The California Patriots-Answer the Call Jan 6" with coconspirators Hostetter, Taylor, and Martinez, and joined a separate Telegram chat with thirty other individuals—including coconspirators Hostetter, Warner, Martinez, and Mele—called "The California Patriots-DC Brigade." *Id.* ¶ 99(a).

- The website of the Three Percenters, of which Kinnison is a member, *Id.* ¶ 44, stated that the group "stand[s] fully behind President Trump," and that they "stand ready and are standing by to answer the call from our President" "to enter into battle," but only if "we are told to." *Id.* ¶ 72(i).

Communications with coconspirators leading up to the Attack also show Kinnison's explicit agreement to participate.

- Kinnison was appointed by coconspirator Taylor to "lead on Comms" in "The California Patriots-DC Brigade." *Id.* ¶ 103(e).

---

[5]    Nordean and Kinnison's argument that to be liable under section 1985 they must have "specifically intended to commit the acts of violence that other members of [Proud Boys or Three Percenters] or of the crowd [at the Capitol] committed," Nordean at 30; Kinnison at 26, is also baseless. *See Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983) ("[A] conspirator can be liable even if he neither planned nor knew about the particular overt act that caused injury, so long as the purpose of the act was to advance the overall object of the conspiracy.").

- In that chat, Kinnison stated that he and coconspirators Mele and Warner had agreed to bring "medical kits, radios, multiple cans of bear spray, knives, flags, plates[,] goggles, [and] helmets" for the Capitol Attack. *Id.* ¶ 101.

- Kinnison asked in a text message to Mele, Warner, and Martinez whether they were sure they wanted to bring a "shotty" (shotgun) and "another long iron" (rifle), and stated "Got the bandolier," and attached a photograph of him wearing a bandolier with shotgun ammunition. *Id.*

Kinnison also physically participated in the Capitol Attack that injured the Plaintiffs.

- During the Attack, Kinnison communicated with fellow Three Percenters, Hostetter and Taylor, who had joined attackers trying to push through a line of law enforcement at the Lower West Terrace of the Capitol. *Id.* ¶ 134.

- Kinnison and his coconspirators were at one point located on the Upper West Terrace of the Capitol, and Kinnison was wearing a gas mask. *Id.*

- Kinnison, along with his coconspirators, violently breached barricaded areas of the Capitol grounds and the Capitol Building and attacked the police officers guarding the Capitol. *Id.* ¶¶ 44, 215.

These statements and actions by Kinnison are more than sufficient to support the claim that Kinnison entered into an agreement with other persons to participate in the unlawful act of trying to prevent the certification of the 2020 Presidential election results by attacking the Capitol and Plaintiffs and thereby causing Plaintiffs' physical and emotional injuries. *Id.* ¶¶ 157-65.

### d.   Tony Martinez

Martinez's planning and communications leading up to the Capitol Attack demonstrate his participation in the unlawful conspiracies.

- Martinez arranged plans with coconspirators Hostetter, Taylor, and Kinnison to travel to Washington, D.C., on the "The California Patriots-Answer the Call Jan 6" Telegram chat and the "The California Patriots-DC Brigade" Telegram chat that included coconspirators Hostetter, Warner, Kinnison, and Mele. *Id.* ¶ 99(a).

- In "The California Patriots-DC Brigade" chat, Martinez planned the Attack with Kinnison and others. *Id.* ¶ 101.

- As noted above, the website of the Three Percenters, of which Martinez is a member, ECF 89, ¶ 43, stated that the group "stand[s] fully behind President Trump," and that

they "stand ready and are standing by to answer the call from our President" "to enter into battle." *Id.* ¶ 72(i).

Martinez also physically participated in the Capitol Attack.

- Like Kinnison, Martinez communicated during the Attack with fellow Three Percenters Hostetter and Taylor, who had joined attackers trying to push through a line of law enforcement at the Lower West Terrace of the Capitol. *Id.* ¶ 134.

- Martinez (wearing a plate-carrier vest) and his coconspirators at one point moved to the Upper West Terrace of the Capitol. *Id.*

- Martinez and his coconspirators then violently breached barricaded areas of the Capitol grounds and the Capitol Building and attacked the police officers guarding the Capitol. *Id.* ¶¶ 43, 215.

These actions by Martinez are sufficient to support the claim that Martinez entered into an agreement with other persons to participate in the unlawful act of trying to prevent the certification of the 2020 Presidential election results by attacking the Capitol and, as a result, causing Plaintiffs' physical and emotional injuries. *Id.* ¶¶ 157-65.

### e. Kelly Meggs

Meggs's communications with his coconspirators, planning, and coordination and invitation of others to join their plans show his participation in the unlawful conspiracies.

- On December 22, 2020, in direct response to Trump's invitation for his supporters to travel to Washington, D.C., on January 6, Meggs stated on social media, "Trump said It's gonna be wild!!!!!!! It's gonna be wild!!!!!!! He wants us to make it WILD that's what he's saying. He called us all to the Capitol and wants us to make it wild!!! Sir Yes Sir!!! Gentlemen we are heading to DC pack your sh*t!!" *Id.* ¶ 92.

- Meggs also mobilized others to join with him in responding to Trump's request to march on Congress on January 6. For example, Meggs messaged another person that, "[P]ence announced he is going to allow the evidence to be presented to Congress. That checks all the boxes. I think this is why we were called there [by Trump]. Anything less would be a terrible mistake. The natives are very restless." *Id.*

Meggs communicated with coconspirators, including Rhodes, to coordinate their attack.

- They discussed bringing weapons and equipment, including flashlights, "Collapsible Batons," "Good hard gloves," "eye pro[tection]," and helmets. *Id.* ¶ 101.

- Meggs told one potential attacker to bring "mace," "gas masks," "batons," and "armor," and advised that person that if they did not have armor to "at least get a plate carrier on Amazon multi cam is best." *Id.*

- Meggs and other members of the Oath Keepers received training in firearms, and Meggs and coconspirators, including Watkins and Caldwell, arranged to store weapons near Washington, D.C., that could quickly be brought to the Capitol after the Capitol Attack started. *Id.* ¶¶103(a), 104.

- Meggs also organized an alliance between the Proud Boys and Oath Keepers in support of the January 6 Capitol Attack, assuring his other coconspirators that the groups had "decided to work together." *Id.* ¶ 100. Caldwell expressed his agreement to the alliance, organized by Meggs, by stating that he "expect[ed] a big turn out [sic] of the Proud Boys." *Id.*

- Further, Meggs assured others that Oath Keepers would have at least 50 to 100 members present on January 6, and that he had "made contact" with Proud Boys, calling them a "Force multiplier." *Id.* ¶ 102.

- Meggs and other coconspirators accompanied Stone when he spoke to the crowd on January 5, in order to provide him with security as they had previously done at the Stop the Steal rally on December 12. *Id.* ¶ 86. At that January 5 rally, Stone further demonstrated his participation in the conspiracy with Meggs, as described above, regarding Stone.

And Meggs participated in the Attack.

- Along with other Oath Keepers, Meggs breached the United States Capitol on January 6, violently breaking through barricaded areas of the Capitol grounds and the Capitol Building and attacking the police officers guarding the Capitol, including Plaintiffs. *Id.* ¶¶ 39, 215.

- Meggs and other Oath Keepers used the Zello walkie-talkie app to coordinate and communicate during the Attack. *Id.* ¶ 138.

- During the Attack, a coconspirator broadcast over the app the explicit objective of the conspiracies to violate section 1985(1) to Oath Keepers inside the Capitol: "You are executing a citizen's arrest. Arrest this assembly, we have probable cause for acts of treason, election fraud." *Id.* ¶ 138.

These statements and actions by Meggs, the Oath Keepers, and the other Defendants and coconspirators, are sufficient to support the claim that Meggs entered into an illegal agreement with other persons to violate section 1985(1) and attack the Capitol, which resulted in Plaintiffs' physical and emotional injuries. *Id.* ¶¶ 157-65.

### f.     Zachary Rehl

Rehl directly communicated with other Defendants to organize and plan the Capitol Attack.

- Rehl acted with coconspirators Tarrio, Nordean, Biggs, and Donohoe in the Ministry of Self Defense leadership structure that was specifically intended to help coordinate the Capitol Attack and Proud Boys' activities on January 6. *Id.* ¶ 26.

- Members of this "Ministry" identified Rehl as within the chain of command and someone who could provide directions for the Proud Boys and its members. *Id.* ¶ 99(b).

- Rehl also participated in the encrypted Ministry messaging channel with Nordean, Biggs, Donohoe, and others called "Boots on the Ground" to convey instructions to Proud Boys members regarding January 6. *Id.* ¶ 99(c)-(d).

In the course of the conspiracy, Rehl explicitly advocated for the use of force to overturn the election results and actively participated in making preparations for the January 6 attack.

- For example, on November 27, 2020, Rehl posted to social media, "Hopefully the firing squads are for the traitors that are trying to steal the election from the America people." *Id.* ¶ 72(g).

- Rehl created a crowdfunding campaign on www.givesendgo.com called "Travel Expenses for upcoming Patriot Events." *Id.* ¶ 98.

- The Proud Boys, Oath Keepers, and other extremist groups coordinated their preparation for the Attack. *Id.* ¶ 100.

- And in the days leading up to the Attack, Rehl—along with his coconspirators Nordean, Biggs, Donohoe, and Tarrio —directed other Proud Boys members not to wear Proud Boys colors on January 6. *Id.* ¶ 105.

Rehl's participation in and leadership of the Capitol Attack also demonstrates his agreement with his coconspirators.

- Rehl physically breached the Capitol on January 6, *Id.* ¶¶ 32, 125, and during the Attack, he coordinated movements with coconspirators Nordean, Biggs, Donohoe, and Tarrio. *Id.* ¶ 125.

- Wearing goggles and equipped with a radio, Rehl personally led his coconspirators and fellow attackers to the west side of the Capitol, charged over barricades, and overwhelmed law enforcement before entering the Capitol. *Id.* ¶ 125.

- As the Attack progressed and after it was complete, Rehl communicated his participation and understanding of *exactly* what he was doing—at 2:29 p.m., he sent a

text message stating that the "Civil war started," and about twenty minutes later sent another message stating, "They just broke all the doors and windows open, people are pouring in." *Id.* ¶ 129.

Rehl then ratified his participation in the conspiracies.

- The day after the Attack, he sent a private message that he was "proud as f**k what we accomplished yesterday," and posted publicly, "THIS is what patriotism looks like." *Id.* ¶ 140(i).

- In that same public message, Rehl condemned the law enforcement officers who sought to defend the Capitol, stating, "They deserve to be tarred and feathered." *Id.* ¶ 140(i).

- Exhibiting his understanding that the purpose of the conspiracy was to take the Capitol and "[take] the country back," Rehl sent text messages lamenting that the attackers "shoulda held the capital" and "shoulda showed up armed." *Id.* ¶ 155.

Rehl's direct coordination with his coconspirators, planning of and participation in the Capitol attack, and ratification of these acts, are more than sufficient to support the claim that Rehl entered into an agreement with others to prevent by force, intimidation, and threats the election of Biden, the certification of the 2020 Presidential election results, and the defense of the Capitol and its lawful occupants by Plaintiffs.[6] As Plaintiffs have alleged that the Attack and overt acts described above caused Plaintiffs' physical and emotional injuries, *Id.* ¶¶ 157-65, Rehl's motion to dismiss should be denied.

### g.    Brandon Straka

Straka's acts and statements demonstrate a "general objective or common plan," *Jin*, 335 F. Supp. 2d at 80-81, with his coconspirators, which shows his participation in the unlawful conspiracies.

- On November 6, 2020, he told a crowd in Detroit about his intent to work with coconspirators to disrupt the election results, stating that "People are out of their

---

[6]    The continuation of the conspiracy and its culmination in the Capitol in which Rehl participated rebuts Rehl's claims that the conspiracy was terminated when Tarrio told Proud Boys to dress incognito. ECF 102-1, Rehl MTD, at 6; ECF 89, Amended Complaint, ¶ 105.

f**king minds if they think that we're going to sit down quietly and allow them to steal this election." *Id.* ¶ 72(a).

- He vowed that "[w]e are not going to take it," directed others to "never ever back down," and pledged to "do whatever needs to be done to make sure that Donald Trump is victorious as our President for four more years." *Id.*

- Straka appeared at the Freedom Plaza rally on January 5 along with Stone, Alexander, Taylor, and other coconspirators and made threats of violence to stop the count of electoral votes. *Id.* ¶ 108. And filings by Stop the Steal show that Stone, Straka, and Alexander planned to speak on January 6. *Id.* ¶ 106.

Straka then physically participated with his coconspirators in the Capitol Attack.

- He breached Capitol barricades by force, and in the heat of the Attack, he yelled directions and encouragement to his coconspirators to breach the Capitol. *Id.* ¶¶ 24, 127.

- In one instance, Straka directed his fellow attackers to take a protective shield from a Capitol Police officer defending the Capitol during the attack. *Id.* ¶ 127.

These statements and actions by Straka are sufficient to support the claim that Straka entered into an agreement with other persons to prevent by force, intimidation, and threats Biden and Harris from taking office, and Congress and the Capitol Police from discharging their duties.

### h.   Thomas Caldwell

Plaintiffs allege that Caldwell conspired with Oath Keepers, Trump, and others to plan and participate in the Capitol Attack. *Id.* ¶¶ 37, 140a, 170a, 170f, 170h. He came to Washington "at the urging of" Trump. *Id.* ¶ 142. He coordinated collaboration between Oath Keepers, Proud Boys, and Three Percenters, including planning logistics and arranging for weapons to be easily accessible. *Id.* ¶¶ 100, 104. He said he expected big turnout from Proud Boys and messaged Three Percenters to ask to meet with them to plan for Jan. 6. *Id.* ¶ 100. He worked with other Oath Keepers, texting about busing people to Washington, where to muster, who would lead the attack, and other logistics, *id.* ¶¶ 102, 103c, as well as about the availability of guns at the "QRF" location so that "the boys don't have to try to schlep weps on the bus." *Id.* ¶ 104. On the day of the attack,

he mustered with others near the Capitol, *id.* ¶ 123, and then personally led attackers, reporting, "We are surging forward. Doors breached" and later recounting, "I said let's take the damn capitol so people started surging forward and climbing the scaffolding outside so I said lets storm the place and hang the traitors. Everybody thought that was a good idea so we did . . . . If we'd had guns I guarantee we would have killed 100 politicians." *Id.* ¶ 127; *see id.* ¶¶ 138, 140a. And after the attack, he wanted to collaborate on more attacks, including on the Ohio statehouse. *Id.* ¶ 155.

### i.      Donald J. Trump

Trump does not argue that Plaintiffs' allegations do not suffice to allege that he conspired with other Defendants, and he has waived this argument. *Cement Kiln Recycling Coal. v. E.P.A.*, 255 F.3d 855, 869 (D.C. Cir. 2001) ("A litigant does not properly raise an issue by addressing it in a cursory fashion with only bare-bones arguments.") (quotation omitted). Regardless, the detailed allegations of Trump's involvement in and leadership of the conspiracies are more than sufficient to survive a motion to dismiss.

Because of Trump's waiver, Plaintiffs do not include an exhaustive examination of the allegations establishing his participation in the conspiracy, but summarize them here. First, Trump issued multiple invitations for others to join a conspiracy to prevent certification of the electoral votes, including when he tweeted on several occasions for his supporters to come to Washington, D.C., on January 6. *See* ECF 89, ¶¶ 87-88. His coconspirators, including moving Defendants, understood the common purpose behind these calls was to prevent Congress from certifying the election results because of the many months of his disseminating the false narrative of a "rigged" election, *id.* ¶¶ 50-55, 61, 110-11, public filing of scores of baseless lawsuits asserting false claims of election fraud, *see id.* ¶¶ 64-67, and from the text of his calls for them to come to Washington, D.C., to "StopTheSteal" on the very date that Congress was to count the electoral votes. *Id.* ¶ 88.

At the very latest, Trump issued an invitation for others to join his conspiracy when he told the crowd on January 6 that they must "stop the steal" and "ensure that such outrageous election fraud never happens again," and that he would "walk down to the Capitol" and "be there with you." *Id.* ¶¶ 115-16.

Trump, his agents, and his coconspirators also employed threats and intimidation themselves during the course of the conspiracy. *Id.* ¶ 76. Trump specifically planned for a march on the Capitol, rather than just a rally at the Ellipse, *id.* ¶ 84, despite knowing that his supporters were turning to violence in response to his claims of election fraud. *Id.* ¶¶ 69, 74-75, 77-81. Furthermore, having previously supported their acts of violence, *id.* ¶¶ 56-57, and been specifically warned that his targeting of public officials would lead his supporters to violence, *id.* ¶ 73, Trump was aware of the substantial likelihood of violence on January 6. *Id.* ¶ 94. And throughout his speech on January 6, the crowd yelled, "Storm the Capitol," "Invade the Capitol Building," and "Take the Capitol right now!" *Id.* ¶ 118. But Trump was undeterred, and invited the crowd to "fight like hell" and march on the Capitol anyway. *Id.* ¶¶ 114-16, 119. His co-defendants and coconspirators immediately accepted the unambiguous invitation, and attacked the Capitol in an effort to stop the certification of the electoral count. *Id.* ¶¶ 123-42.

Once the Capitol Attack was underway, Trump's actions demonstrate that the violence and lawlessness was the intended result of his actions. Rather than seeking to correct the attackers supposed "misinterpretation" of his words, Trump at 5, Trump ratified and endorsed their violent actions. As attackers overwhelmed perimeter barricades, Trump tweeted a video of his incendiary speech and declared in another tweet that Vice President Pence had failed "to do what should have been done" by going forward with the certification. *Id.* ¶¶ 144-45. He refused repeated requests to call off the attackers. *Id.* ¶ 148. And he did not tell the attackers to go home until more than two

hours after the initial breach of the Capitol, and when he did so, he ratified the attack by telling the

attackers, "We love you. You're very special." *Id.* ¶ 150. In subsequent interviews, Trump has said

he wanted "what they wanted" and has described the attackers as "great people." *Id.* ¶ 154. He and

his coconspirators also used the delay to continue to work to stop the certification. *Id.* ¶¶ 147, 149,

151, 152. These allegations are more than sufficient to show Trump participated in the unlawful

conspiracies.

_____

Based on the foregoing, it is clear that Defendants and their coconspirators committed these

overt acts to explicitly support, encourage, and direct their coconspirators to use the violent attack

on the Capitol and the Capitol Police to stop the electoral count and certification, and that each of

the Plaintiffs suffered physical and emotional injuries as a direct and foreseeable result of such

acts in furtherance of the conspiracies. *See id.* ¶¶ 157-165 (injuries); *Sines*, 324 F. Supp. 3d at 795-

97 (complaint sufficiently pled that § 1985 conspiracy caused plaintiffs' injuries based on

allegations that, among other things, unknown participants in a violent white supremacist

demonstration "pepper sprayed and otherwise assaulted" plaintiffs at the location where

defendants had led the demonstrators and defendants shouted "[t]he heat here is nothing compared

to what you're going to get in the ovens!"); *Marsh v. Barry*, 824 F.2d 1139, 1143-45 (D.C. Cir.

1987) (holding that defendant officials could have caused plaintiffs' injuries resulting from jail riot

because officials had created the circumstances (overcrowding) that foreseeably led to the riot);

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003) (plaintiffs injured

in the September 11 terrorist attacks properly alleged that defendants caused their injuries because

the attacks could fairly be seen as the "natural and probable consequence" of defendants' knowing

financial support to the terrorist group). Indeed the Attack on the Capitol and Capitol Police was

not just the foreseeable consequence of Defendants' acts, but the intended one, as demonstrated by Defendants' numerous statements ratifying the violence. *See Sines*, 324 F. Supp. 3d at 785, 791, 797 (defendants post-attack comments ratifying other attackers' acts supported defendants' liability under *Pinkerton*). In sum, Plaintiffs have more than met the pleading standard to defeat the Defendants' motions to dismiss the § 1985(1) claims.

### B. Plaintiffs Properly Allege Conspiracies to Interfere with Federal Officers Under Section 1985(1)

Defendants argue that President-elect Biden, Vice President-elect Harris, members of Congress, and the Capitol Police are not the types of federal officials that § 1985 protects from the conspiracies described therein. The argument is specious and should be rejected.

First, by its plain language, the statute applies to conspiracies against the President- and Vice President-elect, Members of Congress, and Capitol Police. Statutory construction "start[s] . . . with the statutory text." *Sebelius v. Cloer*, 569 U.S. 369, (2013). The statutory language here plainly casts a broad net of protection for federal officials. It prohibits conspiracies to prevent "*any person* from accepting or holding any office, trust, or place of confidence under the United States" or to injure "*any* officer of the United States . . . on account of his lawful discharge of the duties of his office." 42 U.S.C. § 1985(1) (emphasis added). Interpreting this language with the "broad applicability" accorded to it by courts, the language on its face encompasses President-elect Biden, Vice President-elect Harris, members of Congress, and the Capitol Police. *See Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1335 (7th Cir. 1977); *see also Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971) ("Reconstruction civil rights statutes," like section 1985, should be "accord[ed] a sweep as broad as their language."); *Spagnola v. Mathis*, 809 F.2d 16, 29 (D.C. Cir. 1986) (recognizing the "sweep of § 1985 in particular as 'enormous.'" (citations omitted)).

Moreover, the settled broad scope of section 1985(1)'s nearly identical precursor criminal statute—now codified at 18 U.S.C. § 372—confirms this understanding. *See Stern*, 547 F.2d at 1339 (recognizing that courts consider the two laws as "counterpart[s]" of each other). Under § 372, courts consistently have upheld criminal convictions for conspiracies against a range of federal officials, including law enforcement officials like U.S. Marshalls. *See, e.g.*, *United States v. Gerhard*, 615 F.3d 7, 12 (1st Cir. 2010).

The legislative history of section 1985 further supports this reading of federal officers under the United States. "[C]ourts, in construing a statute, may with propriety recur to the history of the times when it was passed." *Stern*, 547 F.2d at 1335 (quotations and citations omitted). At the time of enactment, "restoration of civil authority . . . was a major concern." *McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980) (citing Cong. Globe, 42nd Cong., 1st Sess. 244 (1871)). Attacks on federal officials were commonplace, and there are multiple references to violence or threats of violence against elected officials in the legislative record.[7] Congress used expansive language to provide ample latitude to protect broadly federal officials and government functions.[8] *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1041 (11th Cir. 2000). The protection was

---

[7]   *See*, *e.g.*, Cong. Globe, 42d Cong., 1st Sess. 443 (1871) (Representative Butler: "[T]he lawlessness of the South . . . is now become organized in the service of apolitical party to crush its opponents, and to drive from their borders every friend of a Republican Administration. . . . For this purpose it murders legislators and judges . . . ."); Cong. Globe, 42d Cong., 1st Sess. 654 (1871) (Senator Osborn: "[O]ne [Republican candidate] resigned for fear of assassination should he work with the Republicans in the Legislature."); *see also* Janet A. Barbiere, *Conspiracies to Obstruct Justice in the Federal Courts: Defining the Scope of Section 1985(2)*, 50 Fordham L. Rev. 1210, 1226-27 (1982).

[8]   Cong. Globe, 42d Cong., 1st Sess. 395 (1871) (Representative Rainey: "[T]he importunate demands of the present emergency" requires "so broad and liberal a construction be placed upon its provisions as will insure protection to the humblest citizen."), App. B to Campaign Legal Center Br. at 18, ECF 34-4; Cong. Globe, 42nd Cong., 1st Sess. 492 (1871) (Representative Swann: Recognizing the scope of the statute "leav[es] the widest latitude to those who may be called on to execute it."), App. B to Thompson Opp. at 2, ECF 29-2.

intended to be broad and encompass senior officials as well as those of much lower rank. *McCord*, 636 F.2d at 615 (recounting that noted attacks on mail carriers and revenue agents and the need to preserve orderly government).

The U.S. Department of Justice Office of Legal Counsel ("OLC") also has determined that the legislative history of § 372 establishes that the statute was enacted to "protect Federal officers by providing for Federal prosecution whenever they were injured because of or in the course of their duties." *Conspiracy to Impede or Injure an Officer of the United States*, *18 U.S.C. § 372*, 1 U.S. Op. Off. Legal Counsel 274, 276 (1977). As a result, the OLC has interpreted the term "officer" to encompass "both permanent and temporary, full- and part-time officers and employees of the United States." *Id.* Given that section 1985(1) is "virtually identical" to section 372, *Stith v. Barnwell*, 447 F. Supp. 970, 972 (M.D.N.C. 1978) ; *Stern*, 547 F.2d at 1339, this application further supports that President-elect Biden, Vice President-elect Harris, members of Congress, and the Capitol Police are federal officers protected by § 1985.

### 1.    No Legal Authority Supports Defendants' Position

The moving Defendants contend that scattered and unrelated provisions of the Constitution provide dispositive definitions for the meaning of federal officers under section 1985(1). *See* ECF 95, Nordean Motion to Dismis ("MTD"), at 12-13; ECF 96, Kinnison MTD, at 10-11. But the Supreme Court has flatly rejected the notion that the Constitution serves as a master dictionary for all statutes and has done so in the context of defining federal officers under other statutes. *See Lamar v. United States*, 240 U.S. 60, 65 (1916) (rejecting the argument that the meaning of "officer" in the Constitution extends to a statute because "of course words may be used in a statute in a different sense from that in which they are used in the Constitution"); *United States v. Hendee*, 124 U.S. 309, 313 (1888) (holding that a Navy "paymaster's clerk" was an "officer" under a

24

compensation statute, although not "in the constitutional sense of the word, an officer of the United

States;" "congress may have used the word 'officer' in a less strict sense" than the Constitution).

### 2. Plaintiffs Themselves Need Not Be the Federal Officials against Whom Defendants Conspired

Defendants Straka, Nordean, and Kinnison also misconstrue section 1985(1) to suggest

that the statute requires Plaintiffs to allege interference with their own duties. *See* ECF 98, Straka

MTD, at 10-13; ECF 95, Nordean MTD, at 9-10; ECF 96, Kinnison MTD, at 7-8. Section 1985

requires no such thing, and adopting such a restrictive interpretation would ignore its plain text.

Section 1985 plainly provides that any person injured by an act in furtherance of the conspiracy

may have a right of action against the conspirators. 42 U.S.C. § 1985(3) ("[I]n any case of

conspiracy set forth in this section, . . . *the party so injured or deprived* may have an action . . .

against any one or more of the conspirators." (emphasis added)); *see Stern*, 547 F.2d at 1332, n.2

("Section 1985(1) defines conspiracies, for which Section 1985(3) establishes a private right of

action . . . ."). Plaintiffs' allegations satisfy this standard by showing defendants conspired to

interfere with the duties of members of Congress and the opportunity for President-elect Biden

and Vice President-elect Harris to hold office. *See* ECF 89, Amended Complaint, ¶¶ 1, 5, 9, 71,

72, 82, 83, 85, 89, 97, 123-51, 168. Of course, Plaintiffs have satisfied their obligation to allege

conspiracies to interfere with their own duties even under the moving Defendants' strained

interpretation of section 1985(1). Plaintiffs allege that Capitol Police, including Plaintiffs, had the

duty to protect the Capitol grounds under 2 U.S.C. § 1961; ECF 89, ¶ 156, and that Defendants

conspired to disrupt these duties, ECF 89, ¶¶ 1, 5, 7, 126-39 (detailing the attack on the Capitol),

157-63 (describing the resulting injuries to Plaintiffs), 168.

### C.      Section 1985(1) Does Not Require State Action or Discriminatory Animus

Defendants misstate the law in asserting that claims under § 1985(1) must allege invidious discrimination or state action. *See* ECF 110-1, Meggs MTD, at 25-27; ECF 102-1, Rehl MTD, at 14-17. It is well-settled that a section 1985(1) claim does not require racial animus. *See Bryant v. Mil. Dep't of Mississippi*, 597 F.3d 678, 688 (5th Cir. 2010) ("A cause of action under § 1985(1) requires no allegation of racial or class-based discriminatory animus."); *Stern*, 547 F.2d at 1340 (explicitly rejecting the requirement that invidious animus be pleaded under a section 1985(1) claim); *Pope v. Bond*, 641 F. Supp. 489, 497 (D.D.C. 1986) ("[T]here is no requirement under § 1985(1) that plaintiff allege racial or other class-based, invidiously discriminatory animus.") (citing *Kush v. Rutledge*, 460 U.S. 719, 726 (1983) (addressing § 1985(2))).

Further, a section 1985(1) claim does not require state action. The plain text of the statute permits civil actions against "persons," 42 U.S.C. § 1985(3) (remedy provision), which the Supreme Court held applied to private conspiracies, *see Griffin v. Breckenridge*, 403 U.S. 88, 104 (1971). Moreover, limiting section 1985(1) to only conspiracies involving state action would defeat the purpose of the statute, which was intended to quell the civil unrest instigated by non-state actors like the Ku Klux Klan. *See McCord*, 636 F.2d at 615. The legislative history "point[s] unwaveringly to § 1985(3)'s coverage of private conspiracies." *Griffin*, 403 U.S. at 101. Because both paragraphs (1) and (3) of § 1985 come from the same section of the Ku Klux Klan Act and share the same legislative history, *see Kush*, 460 U.S. at 724, this same reasoning applies with equal force to section 1985(1).

### D.      The Intracorporate Conspiracy Doctrine Does Not Apply

Defendant Meggs and Nordean assert that the intracorporate conspiracy doctrine shields them from liability for the conspiracy claims. *See* ECF 110-1, Meggs MTD, at 26; ECF 95, Nordean MTD, at 20-21. It does not. "Simply put, under the doctrine, a corporation cannot conspire

26

with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000). As discussed below, first, Plaintiffs allege *inter*-corporate conspiracy between multiple groups of Defendants; the doctrine would not apply to the conspiracies that Meggs or Nordean joined with individuals outside their respective organizations (the Oath Keepers and the Proud Boys). Second, this doctrine cannot apply to conspiracies against civil rights, particular those by members of organizations akin to the Ku Klux Klan, against whose threat § 1985 was intended to guard.

### 1.   The Doctrine Does Not Apply to Meggs's and Nordean's Conspiracies with Those outside Their Organizations

Both Meggs and Nordean are alleged to have conspired with individuals and organizations *outside* their respective organizations, *see supra* II.A, and the doctrine does not apply to those conspiracies. *See Lerner v. D.C.*, 362 F. Supp. 2d 149, 165 (D.D.C. 2005). Defendant Meggs, a member of Defendant Oath Keepers, conspired with Defendants Trump, Stop the Steal, Alexander, Stone, Proud Boys, members of the Proud Boys, and others outside of his organization. *See* ECF 89, Amended Complaint, ¶¶ 86 (Stone), 100 (Proud Boys and others), 102 (Proud Boys); 170 (listing agreements supported by Amended Complaint). Defendant Nordean, a member of Defendant Proud Boys, conspired with Defendants Trump, Stop the Steal, Alexander, and Stone. *See* ECF 89, ¶¶ 79 (Stone, Alexander, Stop the Steal), 142 (Trump), 170 (listing agreements supported by Amended Complaint).

### 2.   The Doctrine Does Not Apply to Conspiracies against Civil Rights

Extending the intracorporate conspiracy doctrine to conspiracies prohibited by § 1985 would contravene Congress's intent in passing the Ku Klux Klan Act. As its common name suggests, the act that included § 1985(1) was designed to address the threat posed by organizations

like the Ku Klux Klan. *See* Douglas G. Smith, *The Intracorporate Conspiracy Doctrine and 42 U.S.C. § 1985(3): The Original Intent*, 90 Nw. U. L. Rev. 1125, 1132 (1996) ("The Ku Klux Klan Act, of which Section 1985 is a part, was passed by Congress in order to prevent acts of violence— perpetrated primarily by the Ku Klux Klan—that threatened Reconstruction efforts after the Civil War.").[9] If members of such organizations could escape liability simply by incorporating, the purposes of the Act would be defeated. *See Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 840 (6th Cir. 1994) ("A corporation formed for the purpose of depriving citizens of their civil rights would not be shielded by the intracorporate conspiracy doctrine."); *People by Abrams v. 11 Cornwell Co.*, 695 F.2d 34, 41 (2d Cir. 1982) ("[I]t would be anomalous in any case to permit an entity which was established for the very purpose of engaging in a discriminatory act to be insulated, and to insulate its members, from liability as conspirators, by virtue of its establishment."), *vacated in part on other grounds*, *People of State of N.Y. by Abrams v. 11 Cornwell Co.*, 718 F.2d 22 (2d Cir. 1983); *Dombrowski v. Dowling*, 459 F.2d 190, 196 (7th Cir. 1972) ("Agents of the Klan certainly could not carry out acts of violence with impunity simply because they were acting under orders from the Grand Dragon.").

Though the D.C. Circuit has not yet decided the issue, *see Bowie v. Maddox*, 642 F.3d 1122, 1130 (D.C. Cir. 2011), and the federal circuits have taken different approaches, *see Ziglar*

---

[9]  The legislative history recounts numerous discussions of the destabilizing impact of the Ku Klux Klan.  *See*, *e.g.*, Cong. Globe, 42d Cong., 1st Sess. 443 (1871) (Rep. Butler: "The recent trials and the reports of the Senate committee of investigation have shown the existence of a secret Ku Klux organization in this State, as we have already seen, of forty thousand men, controlling the election, murdering a State senator in the jury-room of a court-house on the day when a Democratic convention was sitting in the court-room overhead; able to put at defiance the courts; requiring martial law to be proclaimed by the Governor; strong enough to resist even that . . . "); Cong. Globe, 42d Cong., 1st Sess. 457 (1871) (Mr. Corburn: "We find a society, with well-known names, such as the Ku Klux Klans and the White Brotherhood, with officers, with obligations of secrecy, with a large membership, numbering thousands, extending over counties and over States, whose object is to perpetrate these crimes and to screen from punishment others who are guilty.")

*v. Abbasi*, 137 S. Ct. 1843, 1868 (2017), it is clear that application of the intracorporate conspiracy doctrine in the civil rights context presents unique dangers. In conspiracies against civil rights, "the action by an incorporated collection of individuals creates the 'group danger' at which conspiracy liability is aimed, and the view of the corporation as a single legal actor becomes a fiction without a purpose." *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994) (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 603 (5th Cir.1981)). The actions of Defendants Meggs and the members of Defendant Oath Keepers, and those of Defendant Nordean and Defendant Proud Boys, as alleged in the Amended Complaint, show the truth of this observation.

Regardless of whether the doctrine may apply in other contexts, it is inapplicable to Nordean's conduct because the doctrine has been found inapplicable to entities formed for the express purpose of violating the civil rights of certain individuals. The Proud Boys espouse "violence and white supremacy" and "aspire[s] to develop and maintain a dominant white, western European racial and national identity." ECF 89, ¶ 27. To permit Proud Boys' members like Nordean to be insulated from liability for entering into conspiracies that targeted minorities and expressed other white supremacist sentiment, *see id.* ¶¶ 68, 77, 80, 123, 132, 157-60, 162, 164, would completely contravene the purpose and intent of section 1985(1). For the foregoing reasons, the intracorporate conspiracy doctrine cannot shield Meggs or Nordean from liability for conspiring with the Oath Keepers, Proud Boys, or their members.

### E.     Washington, D.C., Constitutes a "State or Territory" Under Section 1985(1)

The D.C. Circuit has expressly ruled that section 1985 includes section 1985 conspiracies within the District of Columbia. In *McCord*, the court found that the "requirement [in section 1985(2)] that the conspiracy consist of two or more persons 'in any State or Territory' does not

exclude conspiracies conducted in the District of Columbia." 636 F.2d at 617, n.15; *accord Bowie*, 642 F.3d at 1128, n.2 ("The phrase 'State or Territory' in this provision embraces the District of Columbia."). In so reasoning, the *McCord* court stated that it "cannot presume Congress intended to attack conspiracies throughout the nation except for the District of Columbia." *McCord*, 636 F.2d at 617, n.15. *McCord* and *Bowie* concerned conspiracies under section 1985(2), but section 1985(1) contains the identical language: "If two or more persons in any State or Territory conspire," and there is no reason to conclude Congress did not mean for 1985(1) to apply to the District of Columbia.[10]

### F.   Claims under Section 1985(1) Are Distinct from Section 1985(3)

Defendants Nordean and Kinnison incorrectly argue that Plaintiffs should have brought their section 1985(1) claim under section 1985(3), because, as they inaccurately assert, paragraph (3) "explicitly prohibits conspiracies to interfere with the federal voting process." ECF 95, Nordean MTD, at 15; ECF 96, Kinnison MTD, at 14. Defendants suggest that interpreting section 1985(1) to permit Plaintiffs' conspiracy claim would render the voting rights protections of 1985(3) superfluous. *See id.* The two paragraphs of section 1985 are clearly distinct, however. By their plain language, paragraph (1) addresses conspiracies to interfere with federal officials by force, intimidation, or threat. Paragraph (3) addresses conspiracies to prevent "any citizen who is lawfully entitled to vote, from giving his support or advocacy" to any federal candidate. 42 U.S.C. § 1985(3). Plaintiffs do not bring a claim under paragraph (3).

Nonsensically, Defendants' claim that Plaintiffs are attempting to sidestep section 1985(3)'s "pleading requirements" by bringing this action under § 1985(1). But "plaintiffs suing

---

[10]   Defendants rely on *D.C. v. Carter*, 409 U.S. 418 (1973), but that case interpreted 42 U.S.C. § 1983, and the D.C. Circuit explicitly declined to apply *Carter*'s interpretation of § 1983 to § 1985. *See McCord*, 636 F.2d at 617, n.15.

under the Support or Advocacy Clause," which Defendants here invoke, "*need not demonstrate that defendants acted with discriminatory, class-based animus.*" *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 487 (S.D.N.Y. 2020) (emphasis added) (citing *Kush*, 460 U.S. at 726). Defendants' argument is wholly without merit.

### G.     Plaintiffs Sufficiently Allege a Section 1986 Claim

Section 1986, part of the KKK Act, imposes a duty to make a reasonable effort to intervene to prevent or aid in preventing the harms of § 1985 conspiracies if one has the power to do so and knows of the wrongs conspired to be done. Plaintiffs sufficiently allege that each Defendant—independently of their liability under §1985—is also liable for breaching their duty of care under § 1986.

For a claim under 42 U.S.C. § 1986, a plaintiff must show "(1) the defendant had actual knowledge of a § 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed." *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d. Cir. 1994). For the third element, "negligence is sufficient to maintain a § 1986 claim." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997) (citing *Clark*, 20 F.3d at 1298). Section 1986 applies to both private and state actors. *See, e.g.*, *Washington v. Duty Free Shoppers, Ltd.*, 696 F. Supp. 1323, 1324 (N.D. Cal. 1988) (plaintiffs stated a claim that agents and employees of a store violated § 1986 by failing to prevent a § 1985 conspiracy to discriminate against Black patrons); *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 518 F. Supp. 993, 1007 (S.D. Tex. 1981) (finding § 1986 violation where defendant admonished others not to use violence but did not attempt to dissuade them from intimidating minority fishermen). Moreover, while a § 1986 claim requires the existence of a § 1985 conspiracy, *Moore v. Castro*, 192 F. Supp. 3d 18, 36

(D.D.C. 2016), the § 1986 defendant need not be a party to the § 1985 conspiracy or share the same motives, *Park*, 120 F.3d at 1160-61 (collecting cases). In *Park*, the Eleventh Circuit allowed § 1986 claims to proceed where plaintiffs alleged that Atlanta police failed to intervene quickly enough after a violent bias-motivated crowd attacked them and their store. *Id*. Similarly, in *Bergman v. United States*, the court held that the United States violated section 1986 when it failed to protect Freedom Riders from assault by white supremacists. *See* 565 F. Supp. 1353, 1393-95 (W.D. Mich. 1983) ("*Bergman I*"); 579 F. Supp. 911, 934 (W.D. Mich. 1984) ("*Bergman II*").

Plaintiffs sufficiently allege each element of a § 1986 claim as to each Defendant. ECF 89, ¶¶ 173-181. Defendants make two principal arguments against the § 1986 claim: (1) that there was no § 1985 conspiracy (which is addressed above), and (2) that they lacked the ability to prevent or aid in preventing the harms of the § 1985 conspiracy. *See* ECF 103-1,Trump MTD, at 37-38; ECF 100, Stone MTD, at 16-19; ECF 98, Straka MTD, at 16; ECF 110-1, Meggs MTD, at 27; ECF 102-1, Rehl MTD, at 17-18.[11] Defendants do not dispute that they had knowledge of the § 1985 conspiracy or (except for Defendant Trump) whether they neglected or refused to try to prevent the wrongs. Such arguments are now waived. *See David v. Dist. of Columbia*, 436 F. Supp. 2d 83, 90 n.2 (D.D.C. 2006).[12] Consequently, the only issue before the Court is whether Plaintiffs sufficiently alleged that Defendants had the ability to prevent or aid in preventing the harms of the §1985 conspiracy. The Amended Complaint thoroughly addresses this issue.

Plaintiffs allege numerous actions that Trump could have taken in his personal capacity, including through directions to his campaign, agents, and supporters, to have prevented, mitigated,

---

[11]   Defendants Nordean, Kinnison, Martinez, Trump for President, and MAGA PAC do not make any § 1986 argument beyond what has already been addressed for the § 1985 claim.

[12]   Trump argues he did exercise reasonable efforts, citing information not in the record.

or halted the Attack. ECF 89, ¶ 177. In short, he could have not done his myriad actions that promoted a false election fraud conspiracy theory, not engaged in threats and intimidation against election and elected officials and caused his followers to do the same, and not undertaken his actions that precipitated the Capitol Attack. *Id.* Moreover, on January 6, he could have told his supporters to be peaceful and follow the law, and once he saw that violence was occurring he could have spoken out forcefully to tell his supporters to stop it. *Id.* ¶¶ 119, 131, 142, 177. The attackers were hanging onto Trump's every word, in real time. *Id.* ¶¶ 131, 142-46. Had he engaged in any reasonable diligence, the harms could have been prevented. *Id.* ¶ 177. But he did not and they were not.

Instead of trying to stop the Attack, Trump reveled in it. He watched live television coverage of the attack and refused to call off the attackers. *Id.* ¶ 144. During the Attack, he egged on the attackers. *Id.* ¶¶ 145-46. He knew of the dangerous situation at the Capitol. *Id.* ¶ 147. And yet, when House Minority Leader Kevin McCarthy called Trump during the Attack to beg for him to call off the attackers, Trump responded, "Well, Kevin, I guess these people are more upset about the election than you are." *Id.* ¶ 148. He did not condemn the attackers; he praised them. *Id.* ¶ 149.

When he did finally issue an insipid video asking the attackers to go home, it was *two hours* after the breach—two hours in which U.S. Capitol Police officers engaged in hand-to-hand combat in broken doorways and gas-filled corridors to protect the very lives of democratically elected representatives in the United States Congress. *Id.* ¶¶ 150, 157-64.

Instead of doing his duty, he told the insurgents, "We love you. You're very special." *Id.* ¶ 150.

Every other Defendant likewise had the ability to prevent or aid in preventing harms. Stone and Straka could have not promoted or raised funds to promote the false election fraud conspiracy

or pay for January 6 events. *Id.* ¶¶ 98, 178. Alexander said it "couldn't be done without Stone." *Id.* ¶ 109. They could have instructed the crowds and their followers not to attack the Capitol and to comply with police instructions. *Id.* ¶ 178 And they could have notified law enforcement of the unlawful acts being conspired. *Id.* Stone, a close friend of Trump, *id.* ¶¶ 81, 86, could have given him different counsel, such as to abide by the election results or tell attackers to go home. Stone could have told his Oath Keeper bodyguards on January 5 and 6 to not participate in the Attack. *Id.* ¶¶ 86, 107. These are just some examples of acts that could have prevented or aided in preventing the wrongs had Defendants exercised reasonable diligence, which they did not. *Id.* ¶ 178.

Stone argues that § 1986 applies only to those who have some sort of formal authority. *See* ECF 100, Stone MTD, at 18. None of the cases he cites remotely supports his argument. Neither does the plain and unambiguous language of the statute, which imposes a duty on "*Every person*." 42 U.S.C. § 1986 (emphasis added); *see Doe 2 v. Shanahan*, 917 F.3d 694, 733 (D.C. Cir. 2019) ("'all' means 'all'"); *Vietnamese Fishermen's Ass'n*, 518 F. Supp. at 1007 (Klansmen held liable under § 1986 for failure to prevent wrongs by other Klansmen). The legislative history, in fact, says the opposite. *See* Cong. Globe 42nd Cong., 1st Sess. 824 (Senator Edmunds: the provision creates "individual responsibility on the part of every man who should have failed to exert his full duty as a citizen to prevent an outrage upon his fellow-citizen.").

Nordean, Rehl, Meggs, Martinez, Kinnison, and Straka each had the power to prevent or aid in preventing the harms by, among other things, (1) not attacking the Capitol; (2) telling their followers and fellow attackers not to attack the Capitol; and (3) informing law enforcement of the plan to attack the Capitol. ECF 89, ¶ 179.

### III.    Plaintiffs Sufficiently Allege Claims under D.C. Law

### A.    Plaintiffs' Claims under the D.C. Bias-Related Crimes Act Are Valid

Plaintiffs allege that Defendants' Capitol Attack targeted particular members of Congress and Vice President Pence, because of their actual or perceived political affiliation, for the ultimate purpose of subverting the election. In the course of the Attack, Defendants committed numerous D.C. crimes, including acts of terrorism, rioting, and destruction of property. Plaintiffs suffered injuries as a result of these criminal acts. These allegations give rise to civil liability under the District of Columbia Bias-Related Crimes Act of 1989 ("BRCA"), D.C. Code § 22-3701, *et seq*.

To make out a civil claim under BRCA, a plaintiff must show: (1) the defendant committed a crime under D.C. law; (2) an intentional act of the defendant demonstrates their prejudice against a protected characteristic of an intended victim of such crime; and (3) as a result of such intentional act, the plaintiff was injured. *See* D.C. Code § 22-3704(a).

It is well established by the D.C. Court of Appeals that "civil rights statutes are remedial and must be generously construed." *Simpson v. Dist. of Columbia Off. of Hum. Rts.*, 597 A.2d 392, 398 (D.C. 1991). Any criminal act under D.C. law can give rise to BRCA liability. *Aboye v. United States*, 121 A.3d 1245, 1249-50 (D.C. 2015). Notably, the plain text of the statute makes clear that the plaintiff need not be the targeted "victim" of the bias-motivated crime; they need only be injured "as a result" of the crime. D.C. Code § 22-3704(a) ("*any person* who incurs injury ... as a result … shall have a civil cause of action") (emphasis added); *see also United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible to every clause and word of a statute."); *Lucas v. United States*, 240 A.3d 328, 335 (D.C. 2020) ("Questions of statutory interpretation begin with the plain language of the statute, and we construe words according to their ordinary meaning."). The defendant's bias must be a but-for cause of the defendant's criminal act, but *Lucas* takes care to emphasize at great length that this is a low bar, 240 A.3d at 339-42, as

"a factor can satisfy but-for causation when it is one of multiple contributing factors; it does not have to be the largest contributing factor, but can be one factor that combines with others to produce the result." 240 A.3d at 341.

### 1.   First BRCA Element - Plaintiffs Sufficiently Allege Criminal Acts

Plaintiffs sufficiently allege the first element of BRCA as to each moving Defendant: that each Defendant committed a crime. *See* D.C. Code § 22-3704(a). The Amended Complaint alleges that Defendants engaged in three D.C. crimes: (1) acts of terrorism in violation of the D.C. Anti-Terrorism Act of 2002 ("ATA"), D.C. Code § 22-3153; (2) rioting or incitement to riot in violation of D.C. Code § 22-1322; and (3) destruction of property in violation of D.C. Code § 22-303. ECF 89, ¶¶ 184, 190-98. The ATA claim is predicated on a violation of § 22-303, so establishing the ATA claim necessarily establishes the § 22-303 claim as well. Any one of these crimes is sufficient for a BRCA claim. The Amended Complaint alleges that each Defendant attempted to, conspired to, aided and abetted, and/or did in fact do each of these crimes. *Id.* ¶¶ 190-98.

### a.   Acts of Terrorism

An "act of terrorism" under the ATA is "an act or acts that constitute a specified offense" intended to "intimidate or coerce a significant portion of the civilian population of The District of Columbia [or] The United States" or to "influence the policy or conduct of a unit of government by intimidation or coercion." D.C. Code § 22-3152(1).

The allegations in the Amended Complaint sufficiently plead violations of the ATA. Plaintiffs allege that Defendants attempted to, conspired to, and/or did in fact commit malicious destruction of property in excess of $500,000 in their attack on the Capitol, ECF 89, ¶ 191, which qualifies as a specified offense. *See* D.C. Code §§ 22-3152(8)(J)-(K), 22-3153(i)-(l). The Amended Complaint alleges Defendants' intended purpose was to intimidate or coerce Congress and Vice President Pence to delay the electoral vote count, cast doubt on the election outcome, overturn the

election results, or stop Biden or Harris from taking office. ECF 89, ¶ 192. The Amended Complaint further alleges that Defendants intended to intimidate or coerce the civilian population—they sought to compel the American public to accept unlawful and undemocratic subversion of the will of the electorate. *Id.* ¶ 193.

No Defendant substantively challenges the sufficiency of these allegations that an act of terrorism occurred. *See David*, 436 F. Supp. 2d at 90 n.2 (arguments not raised in original motion are waived). Defendants Nordean and Kinnison make an incorrect, unsupported, cursory argument that the ATA enumerates sentencing designations and not crimes. *See* ECF 95, Nordean MTD, at 22; ECF 96, Kinnison MTD, at 19. Other statutes demonstrate that acts of terrorism are separate criminal offenses. *See* D.C. Code § 23-113(a)(1)(A)-(F) (separately enumerating degrees of murder as well as degrees of murder that constitute acts of terrorism); D.C. Code § 42-3541.02(d) (separately enumerating acts of terrorism from other crimes); D.C. Code § 22-1831(5B) (same).

### b.      Rioting and Inciting a Riot

A riot is "a public disturbance involving an assemblage of 5 or more persons which by tumultuous and violent conduct or threat thereof creates grave danger of damage or injury to property or persons." D.C. Code § 22-1322. It is a crime to riot or incite a riot. *Id.* The Amended Complaint alleges and no Defendant disputes that the Capitol Attack was a riot. ECF 89, ¶ 194; *see David*, 436 F. Supp. 2d at 90 n.2.

The Amended Complaint alleges that Nordean, Kinnison, Martinez, Meggs, Rehl, and Straka participated in the riot. ECF 89, ¶¶ 24, 30, 32, 39, 43-44, 125-28, 134, 140, 195. Nordean and Kinnison argue that they did not willfully engage in or incite a riot, ECF 95, Nordean MTD, at 23; ECF 96, Kinnison MTD, at 20, but under no circumstances does violently breaching police barricades constitute a non-willful act, ECF 89, ¶¶ 44, 126. The Amended Complaint alleges that

Defendants Trump, Trump for President, MAGA PAC, Stone, Straka, and Meggs, incited others to engage in the riot. ECF 89, ¶ 196; *see supra* II.A (liability for § 1985 conspiracy).

### c. Destruction of Property

D.C. Code § 22-303 makes it a crime to maliciously injure, break, or destroy the property of another worth more than $1,000. The Amended Complaint alleges that Defendants either directly or vicariously committed this crime through the Capitol Attack. ECF 89, ¶ 198. No defendant disputes that unlawful destruction of property in excess of $1,000 occurred. *See David*, 436 F. Supp. 2d at 90 n.2. As § 22-303 is the operative specified offense for the ATA claim above, those allegations apply equally here.

### d. BRCA Predicate Offenses May Be Established by Conspiracy and Aiding and Abetting

Plaintiffs may establish that Defendants committed the predicate criminal offenses for BRCA by showing that they aided and abetted such offenses or conspired to commit them. (See Section II.A, above, for a discussion of the law on conspiracy, and section III.B.1, below, on aiding and abetting.) By recruiting attendees, arranging logistics, arming themselves and others, and/or fundraising for the Attack, Defendants Stone, Nordean, Kinnison, Martinez, Meggs, Rehl, and Straka aided and abetted the riot and destruction of property giving rise to all three predicate criminal acts for BRCA. ECF 89, ¶¶ 72, 79, 93, 98-107, 125-127. Moreover, because each of the Defendants engaged in a conspiracy, *see supra* II.A (liability for § 1985 conspiracy), and because the criminal acts discussed above were acts in furtherance of the conspiracy, undertaken either directly by Defendants or by their coconspirators in the the Capitol Attack, and were reasonably foreseeable consequences of the conspiracy, all conspirators are liable for such acts. *See Pinkerton*,

328 U.S. at 646-48.[13] Thus, it does not matter whether any of the moving Defendants did not physically participate in the predicate criminal acts discussed above; the Amended Complaint sufficiently establishes that such Defendants committed those crimes nonetheless.

## 2. Second BRCA Element - Plaintiffs Allege Political Affiliation Bias

Plaintiffs also establish the second BRCA element for each moving Defendant: an intentional act of the defendant demonstrating their prejudice against a protected characteristic of an intended victim of such crime. *See* D.C. Code § 22-3704(a). One of the protected characteristics under BRCA is political affiliation. D.C. Code § 22-3704(a). The Act does not define "political affiliation" but the legislative history indicates that BRCA's list of protected characteristics was based on the D.C. Human Rights Act. *See* Appendix at 15 (Report to the Council of the District of Columbia on Bill 8-168 from the Committee on the Judiciary, at 15 (Oct. 18, 1989) (Testimony of David W. Bostrom, Metropolitan Police Department)); D.C. Code § 2-1401.01. The Human Rights

---

[13] Defendant Stone is incorrect when he argues that conspiracy cannot be a theory of liability for a BRCA claim. ECF 100, Stone MTD, at 21. First, BRCA explicitly covers conspiracy to engage in property destruction (which includes § 22-303 and § 22-3153(i)). D.C. Code § 22-3701(2). Second, the ATA explicitly covers conspiracy. D.C. Code § 22-3152(8)(K). Finally, civil conspiracy liability has not been foreclosed to civil rights statutes like BRCA, which "must be generously construed." *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 731, 738-39 (D.C. 2000); *accord Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1129 (D.C. 2015). D.C. law recognizes civil conspiracy as "a means for establishing vicarious liability for the underlying tort." *Democracy Partners v. Project Veritas Action Fund*, 453 F. Supp. 3d 261, 290 (D.D.C. 2020) (internal quotation marks omitted). Further, Maryland recognizes civil conspiracy as a theory of liability for violation of a statute. *See Marshall v. James B. Nutter & Co.*, 816 F.Supp.2d 259, 266 (D.Md. 2011). "Maryland authorities expounding the common law of that state constitute powerful precedent in this jurisdiction" because D.C. common law is derived from Maryland's. *Little v. United States*, 709 A.2d 708, 711 (D.C. 1998); *see also Napoleon v. Heard*, 455 A.2d 901, 903 (D.C. 1987) (Maryland provides "especially persuasive authority when the District's common law is silent").

Defendant Trump's argument that destruction of property was not contemplated and therefore outside the scope of vicarious liability like conspiracy, ECF 103-1, Trump MTD, at 42, is unpersuasive given that a violent attack on a physical building was a central component of the conspiracy.

Act says "'Political affiliation' means the state of belonging to or endorsing any political party." D.C. Code § 2-1401.02(25); *accord Blodgett v. Univ. Club*, 930 A.2d 210, 221 (D.C. 2007). In *Kurd v. Republic of Turkey*, the court held that being opposed to Turkish President Recep Tayyip Erdogan constituted a political affiliation. 374 F. Supp. 3d 37, 58-59 (D.D.C. 2019). In addition, BRCA states that a prejudice can be "based on the actual or perceived … political affiliation of a victim." D.C. Code § 22-3704(a). This means BRCA covers four types of political affiliation prejudice: (1) bias against a political party or its actual members; (2) bias against perceived political party members; (3) bias against individuals actually endorsing a political party or party member; and (4) bias against individuals perceived to be endorsing a political party or party member.

Plaintiffs are not required to allege that each Defendant "personally made . . . political comments," as "[t]he biased intent of all Defendants can be inferred from circumstantial evidence, including the factual background of the protest and each Defendants' actions at the protest." *Kurd*, 374 F. Supp. 3d at 59. Indeed, "background information plays an important role in evidencing intent for the attacks that later ensued." *Id.* at 58. In *Kurd*, plaintiffs—members of the Kurdish community who had organized a demonstration against Turkish President Erdogan—brought suit under BRCA against pro-Erdogan counter-protesters who attacked them. *Id.* at 58-59. The court found evidence sufficient to establish bias, including on the basis of political affiliation, in allegations that defendants yelled anti-Kurdish slurs, made statements in support of President Erdogan during their attack, and "played a Turkish nationalist song over a loudspeaker." *Id.* at 58-59.

The Amended Complaint alleges that the targeted victims of Defendants' criminal acts were Democratic members of Congress, some Republican members of Congress, and Vice

President Pence. ECF 89, ¶ 188. Defendants perceived these Republican members and Vice President Pence to be endorsing Democrats Joe Biden and Kamala Harris by announcing election results. *Id*. The Amended Complaint alleges that Defendants targeted these victims because of their political affiliation: because of their prejudice against persons affiliated with the Democratic Party, persons Defendants perceived to be Democrats, persons endorsing Democrats, and persons Defendants perceived to be endorsing Democrats. ECF 89, ¶ 189. Plaintiffs sufficiently allege that but for Defendants' bias against these groups, they would not have committed the BRCA designated acts—Defendants and their coconspirators attacked the Capitol because Democrats won the presidential election and would not have done so if Democrats had lost.

The Amended Complaint sufficiently alleges Defendants' and their coconspirators' political affiliation bias including, *inter alia*:

- **Trump:** When Trump supporters attacked a Biden campaign bus, Trump celebrated it, "In my opinion, these patriots did nothing wrong." ECF 89, ¶ 56. He threatened violence to prevent Biden and Harris from taking office. *Id.* ¶ 71. His agent, Giuliani, said Democrats are "corrupt" and "very bad people" who "want to destroy us," and, "Somebody's got to cut the head off." *Id.* ¶ 72d. Trump called Georgia Secretary of State Brad Raffensperger an "enemy of the people," leading to death threats against him and other election officials who refused to subvert the Democrats' victory. *Id.* ¶ 73. *See also id.* at ¶¶ 74-75 (threats against election officials in states Biden won). Trump told supporters, "[T]he Democrats are trying to steal the white house. You cannot let them, you just can't let them …." *Id.* ¶ 96. At the Jan. 6 Ellipse rally, Trump said "radical left Democrats" were stealing his victory and "we will never give up" because "you don't concede when there's theft involved." *Id.* ¶ 115. Giuliani said Pence's actions were treasonous and urged the crowd to fight. *Id.* ¶ 114. Trump told the crowd to give "weak" Republicans "pride and boldness … to take back our country!" *Id.* ¶ 120. During the attack, Trump tweeted, "Mike Pence didn't have the courage to do what should have been done[.]" *Id.* ¶ 145. Capitol attackers read this on megaphones, took it as a directive to find and kill him, and chanted, "Hang Mike Pence!"; "Mike Pence is a B*tch!"; and "Mike Pence, we're coming for you … f**king traitor!" *Id.* ¶ 146. An attacker later recounted, "Once we found out Pence turned on us and that they had stolen the election, like, officially, the crowd went crazy." *Id*. Trump's attorney Eastman told one of Pence's aides that the "siege" was the fault of "YOU and your boss." *Id.* ¶ 149. Months later, when asked about chants of "Hang Mike Pence!" Trump sympathized with the violent rioters. *Id.* ¶ 154.

- **Stone:** Stone urged Trump to use martial law to arrest political opponents in the Democratic Party. *Id.* ¶ 55. On Jan. 5, Stone told a crowd, regarding Biden's victory, "nothing is over until we say it is over." *Id.* ¶ 107. Later, he said this was a fight between "good and evil." *Id.* ¶ 108. He tried to block Democrats from taking office. *Id.* ¶ 109.

- **Straka:** On Nov. 6, Straka told a crowd, "People are out of their f**king minds if they think that we're going to sit down quietly and allow them to steal this election." *Id.* ¶ 72a.

- **Alexander**: Alexander wrote they needed to "put bodies in the streets and make the American oligarchs scared of what we'll do" and "We've got to punch the left in the nose and we've got to stop being nice about it." *Id.* ¶ 72c. Addressing the certification of Biden and Harris's election, he said, "*If they do this, everyone can guess what me and 500,000 others will do to that building.*" *Id.* (emphasis added). Alexander told a rally, "We're going to convince them to not certify the vote on January 6," and on Jan. 6, "today will determine which Republicans are going to suffer [Trump's] wrath going forward." *Id.* ¶¶ 85, 93.

- **Rhodes**: Rhodes told his supporters to be ready for "violence" and "a bloody fight" over the election results, and that Oath Keepers was preparing for military action. *Id.* ¶ 72b.

- **Biggs:** Responding to a call for unity, Biggs said, "No bi**h. This is war." *Id.* ¶ 72e.

- **Nordean:** On Nov. 27, Nordean wrote, "now you will deal with the monster you created. . . . Good luck to all you traitors . . . you're going to need it." *Id.* ¶ 72f.

- **Rehl:** On Nov. 27, Rehl wrote, "Hopefully the firing squads are for the traitors that are trying to steal the election from the America people." *Id.* ¶ 72g.

- **Hostetter:** Hostetter repeatedly called for "people at the highest levels" to experience "an execution or two or three." *Id.* ¶ 72h. He urged others to attend on Jan. 6 "to let the swamp dwellers know we will not let them steal our country from us." *Id.* ¶ 90.

- **Meggs:** Meggs wrote that Pence doing his duty "is why we were called there." *Id.* ¶ 92.

Like in *Kurd*, Defendants' and coconspirators' participation in the Capitol Attack also demonstrated support for Trump's targeting of those he considered to be "Radical Left Democrats," Vice President Pence, and other Republicans willing to certify the election results. *Id.* ¶¶ 110, 116, 145. The crowd at the Capitol "waved Trump flags, played Trump's speech on a bullhorn, read his tweets aloud, and told United States Capitol Police officers they were 'listening to Trump—your boss,' and that they were 'invited here by the President of the United States.'" *Id.* ¶ 142. Nordean wrote he was "facing jail time cuz we followed [Trump's] lead and never

questioned it," *id.*, and Straka told a crowd on November 6, 2020, that he would "do whatever needs to be done to make sure that Donald Trump is victorious as our President for four more years," *id.* ¶ 72.

Several Defendants misunderstand the prejudice requirement under BRCA, arguing that the Capitol Police officers do not have a political affiliation or that no one exhibited bias against them. *See* ECF 100, Stone MTD, at 22; ECF 110-1, Meggs MTD, at 28; ECF 102-1, Rehl MTD, at 24-25. Under BRCA, what matters is prejudice against the intended "victim" of the crime, who is not necessarily the same as the "person" injured "as a result" of the crime. D.C. Code § 22-3704(a). The statute says "any person" at the beginning of the provision and "victim" at the end, and these mean different things. "It is our duty to give effect, if possible to every clause and word of a statute." *Menasche*, 348 U.S. at 538-39. Here, the intended victims are alleged to be members of Congress and Vice President Pence, who were targeted because of their actual or perceived affiliation with the Democratic Party or endorsement of Democrats. The Plaintiffs were injured as a result of Defendants' bias-motivated criminal acts.

### 3.    Third Element - Plaintiffs' Allege Injuries Resulting From the Crimes

The Amended Complaint sufficiently alleges that as a result of Defendants' bias-motivated crimes, Plaintiffs suffered injuries in their defense of the Capitol. ECF 89, ¶¶ 156-64, 186. It does not matter, as some Defendants argue, that a Defendant did not personally cause any particular Plaintiff's injury, because Defendants are liable for the acts of their coconspirators and those they aided and abetted. *See Pinkerton*, 328 U.S. at 647-48; *supra* II.A (conspiracy law); *infra* III.B (aiding and abetting). Defendant Straka argues incorrectly that there must be a but-for causal link between his actions and Plaintiffs' injuries. ECF 98, Straka MTD, at 21. This misstates *Lucas v. United States*, which holds that what is required is proof "that the accused would not have

committed the underlying crime but-for prejudice against the victim." 240 A.3d 328, 340 (D.C. 2020). Once the bias-motivated crime is established, if Plaintiff is injured "as a result" of that crime, they have a cause of action. D.C. Code § 22-3704(a).

### B.   Plaintiffs' Sufficiently State Assault and Battery Claims

Defendants Trump and his campaign organizations, Stone, Nordean, Kinnison, Martinez, Straka, Meggs, and Caldwell challenge the sufficiency of Plaintiffs' assault and battery claims, Claims IV and V of the Amended Complaint. Plaintiffs' assault and battery claims are premised on two theories of liability—aiding and abetting and conspiracy. The Amended Complaint easily satisfies the pleading requirements for the assault and battery claims under each theory of liability.

An assault is "'an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the victim.'" *Hall v. District of Columbia*, 867 F.3d 138, 158 (D.C. Cir. 2017) (quoting *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007)). To state a claim, "a plaintiff must show that he suffered apprehension of harmful or offensive contact and that a reasonable person in his position would have experienced such apprehension." *Collier v. D.C.*, 46 F. Supp. 3d 6, 14 (D.D.C. 2014). A plaintiff establishes a claim for battery "by proving an 'intentional act that causes harmful or offensive bodily contact.'" *D.C. v. Chinn*, 839 A.2d 701, 705 (D.C. 2003).

### 1.   Aiding and Abetting Liability

To support a claim for aiding and abetting battery or assault, a plaintiff must allege that (1) the party whom the defendant aided committed battery or assault on the plaintiffs, (2) the defendant was generally aware of the defendant's role in the tortious activity, and (3) the defendant knowingly and substantially assisted in the battery or assault. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 50 (D.D.C. 2019). "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act

encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance." *Halberstam*, 705 F.2d at 478. Significantly, a defendant's "'creation of a free-for-all, [that] was both dangerous and ultimately injurious' may be sufficient to impose liability on even a 'minimally involved participant.'" *Bassi v. Patten*, No. 07-cv-1277, 2008 WL 4876326, at *1 (D.D.C. Nov. 12, 2008) (quoting *Halberstam*, 705 F.2d at 484); *see also Halberstam*, 705 F.2d at 484 (observing that "defendant's war cry for more blood may well have contributed to the assaulter's hysteria, which was fueling his physical acts of violence").

First, the facts alleged in the Amended Complaint firmly establish that the Plaintiffs were subject to assaults and batteries. "Plaintiffs were violently assaulted, spat on, tear-gassed, bear-sprayed, subjected to racial slurs and epithets, and put in fear for their lives." ECF 89, ¶ 1. "Defendants, their coconspirators, and the rest of the mob overwhelmed United States Capitol Police officers, broke through the Capitol's outer barricades, and assaulted the officers, including Plaintiffs, in and outside the Capitol." *Id.* ¶ 128. Plaintiffs were forced to barricade doors against the attackers to protect their own lives and the lives the members of Congress, subjecting them to severe anxiety and mental stress. *Id.* ¶¶ 139, 157-65. They were injured from exposure to noxious pepper spray, bear spray, fire extinguishers, mace, and other pollutants sprayed by attackers. *Id.* Attackers violently confronted them inside and outside the Capitol, pushing, shoving, and physically striking and assaulting them. *Id.* ¶¶ 157-65.

The facts alleged in the Amended Complaint further establish that each of the moving defendants were generally aware of their role in the tortious activity and knowingly instigated, encouraged, planned for, or participated in, the unlawful assault on the Capitol, and that each Defendant thereby knowingly and substantially assisted the assaults and batteries on Plaintiffs. *See, e.g.*, *id.* ¶¶ 50-81 (Defendants, including Trump, Trump for President, Stone, Straka, Nordean,

45

and Rehl, made widespread public statements instigating and encouraging violent obstruction of the democratic process); *id.* ¶¶ 82-106 (Defendants, including Trump, Trump for President, Stone, Meggs, Nordean, Rehl, Martinez, and Kinnison, organized and promoted the January 6 rally, and encouraged attendees to use any means necessary to prevent certification); *id.* ¶¶ 107-43 (Defendants, including Nordean, Kinnison, Martinez, Meggs, Rehl, and Straka directly participated in the Capitol Attack); *see also supra* II.A (facts establishing participation in conspiracy). In sum, the Amended Complaint firmly establishes that "Defendants directed, incited, aided, and abetted attackers to break through police lines, to overwhelm and assault Plaintiffs and their fellow police officers, and to put Plaintiffs and their fellow police officers in reasonable fear for their lives." ECF 89, ¶ 165.

Defendants Nordean and Kinnison wrongly suggest that they cannot be held liable unless Plaintiffs can identify the primary tortfeasors committing assault and battery. "[N]o court has required a specific perpetrator to be identified" to proceed on an aiding and abetting claim, as "such a requirement . . . would effectively preclude aiding and abetting liability in those cases in which it is unclear which of several persons involved in a crime was the perpetrator, but equally clear that those persons acted together in committing the crime," as is the case here. *People v. Quiroz*, 215 Cal. App. 4th 65, 72 (Cal. Ct. App. 2013); *see also Corbin v. U.S.*, 237 A.2d 466, 467 (D.C. 1968) (affirming conviction for aiding and abetting an assault where principal offender was not identified). Moreover, Defendants need not have been physically present during the Attack to be held liable for aiding and abetting or conspiracy. *See Halberstam*, 705 F.2d at 482 (an "aiding-abetting action may also be more distant in time and location and still be substantial enough to create liability"); *id.* ("[T]o the extent that the acts of aiding-abetting occur further from the actual

scene of the tortious injury, the cases become more readily treatable as either conspiracies or substantial assistance cases.").

Finally, Defendant Stone is incorrect when he argues that aiding and abetting theories of liability do not exist under D.C. law and/or cannot apply to a BRCA claim. The United States Court of Appeals for the District of Columbia has recognized aiding and abetting liability in cases applying D.C. law, *see Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983), and this Court has rejected Stone's exact argument, holding that this Court is bound by *Halberstam*. *See EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 87-88 (D.D.C. 2017) (Mehta, J.), *aff'd,* 894 F.3d 339 (D.C. Cir. 2018); *accord Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 49-50 (D.D.C. 2019).

### 2.    Conspiracy Liability for Assault and Battery

Plaintiffs also establish Defendants' liability for assault and battery based on conspiracy liability. Under D.C. law, a civil claim for conspiracy "is a means for establishing vicarious liability for the underlying tort." *Democracy Partners v. Project Veritas Action Fund*, 453 F. Supp. 3d 261, 290 (D.D.C. 2020). Establishing civil conspiracy liability requires an agreement between two or more persons to participate in an unlawful act, and injury caused by an overt act in furtherance of the conspiracy. *Id.*; *see Halberstam*, 705 F.2d at 479. As set out above, *see supra* II.A (liability for § 1985 conspiracy), the Amended Complaint alleges agreements among the Defendants related to the Attack on the Capitol and U.S. Capitol Police, including Plaintiffs, *see* ECF 89, at ¶¶ 114, 170, 203, 209, and various overt acts by one or more Defendants in support of the conspiracies, which would foreseeably result in the assault and battery of the Capitol Police officers. *See supra* II.A; *see also* ECF 89, at ¶¶ 72, 77, 103, 124, 128, 133, 137 (breaching barriers,

breaking windows, throwing explosives, spraying toxicants, defacing property, and encouraging and planning for the use of force, intimidation, and threats).

### C.    Plaintiffs Sufficiently State a Negligence Claim

Plaintiffs sufficiently allege that each Defendant committed negligence. Each Defendant owed a duty of reasonable care and the duty of care defined by specific statutes intended to protect public safety and welfare. *See* ECF 89, ¶ 212. Each Defendant breached their duty by planning, recruiting participants for, executing, or participating in the Capitol Attack. *Id.* These breaches caused Plaintiffs to be injured in their defense of the Capitol and Congress. *Id.* ¶ 220.

For a negligence claim, the plaintiff must "establish a duty of care, a deviation from that duty, and a causal relationship between that deviation and an injury sustained by the plaintiff." *Youssef v. 3636 Corp.*, 777 A.2d 787, 792 (D.C. 2001) (citation omitted). The District of Columbia "does not recognize varying standards of care depending upon the relationship of the parties but always requires reasonable care to be exercised under all the circumstances." *Blumenthal v. Cairo Hotel Corp.*, 256 A.2d 400, 402 (D.C. 1969). Plaintiffs adequately allege Defendants breached the duty of reasonable care owed to Plaintiffs by planning, recruiting participants for, executing, or participating in the Capitol Attack. ECF 89, ¶ 212.

A plaintiff may "rely on a statute or regulation as proof of the applicable standard of care" under the theory of negligence *per se. McNeil Pharm. v. Hawkins*, 686 A.2d 567, 578 (D.C. App. 1996). In such cases, an "unexplained violation of that standard renders the defendant negligent as a matter of law, so long as the violation was the proximate cause of the injuries, and the alleged injuries were of the type which the statute was designed to prevent." *McNeil Pharm.*, 686 A.2d at 578. Moreover, the statute relied on "must promote public safety and have been 'enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred.'" *Id.* at 579. The

statute "must not merely repeat the common law duty of reasonable care, but must set forth 'specific guidelines to govern behavior.'" *Id*.

Plaintiffs allege that Defendants violated three criminal statutes as the basis for their negligence *per se* theory: D.C. Code § 22-1322; D.C. Code § 10-503.16(b)(6); and 40 U.S.C. § 5104(e)(2)(F). ECF 89, ¶¶ 213-20. The first prohibits rioting and incitement to riot and the latter two prohibit engaging in violence on U.S. Capitol grounds. Plaintiffs further allege that Defendants proximately caused their injuries and that these injuries were of a type the statutes are meant to prevent. ECF 89, ¶¶ 214, 216, 218.

**1. Rioting and Incitement to Riot -** Defendants' violations of D.C. Code § 22-1322 and Plaintiffs' resulting injuries are discussed above. *See supra* III.A (BRCA liability), III.B.1 (assault and battery liability); *see also* ECF 89, ¶ 213-14. The remaining question is whether this statute establishes a duty of care for the purposes of negligence *per se*. A prohibition of rioting is integral to protecting public safety and the rule of law. *See U.S. v. Fenwick*, 25 F. Cas. 1062, 1064-65 (Cir. Ct. D.C. 1836) (Cranch, C.J.). Second, the statute protects officers charged with keeping the peace; their safety is jeopardized by having to respond to riots. And it establishes a clear standard of care: do not riot and do not incite a riot.

**2. Violence at the Capitol -** D.C. Code § 10-503.16(b)(6) prohibits "willfully and knowingly . . . engag[ing] in any act of physical violence upon the United States Capitol grounds or within any of the Capitol buildings." The federal counterpart, 40 U.S.C. § 5104(e)(2)(F), similarly prohibits "willfully and knowingly . . . engag[ing] in an act of physical violence in the Grounds or any of the Capitol Buildings." As discussed at length above, Plaintiffs sufficiently alleged that certain Defendants or their agents willfully engaged in violence on Capitol grounds. *See supra* II.A (liability for § 1985 conspiracy). These statutes promote public safety by

49

prohibiting violence at the seat of democratic governance. *See Fenwick*, 25 F. Cas. at 1065 (Cranch, C.J.) ("No voluntary association of individuals, unknown to the constitution, have a right to make or execute the laws, or to judge, condemn, or punish those whom they may deem to be offenders."). U.S. Capitol Police officers, as those charged with protecting Capitol grounds, are clearly protected by these statutes. And these statutes establish clear standards of care: do not willfully or knowingly engage in physical violence in a specific set of identified locations.

**3. Defense Arguments Fail -** Defendants' various arguments all fail. Trump argues (1) that his speech was protected by the First Amendment and (2) that he owed no duty of care to members of Congress or the Capitol Police when he spoke at the Ellipse. The first argument fails for the reasons addressed below. *See infra* IV.B. His second argument is meritless, as Plaintiffs specifically allege that Trump and Giuliani, his agent, incited the crowd at the Ellipse to go to and attack the Capitol. ECF 89, ¶¶ 114-122.

Rehl admits that unlawful violence and rioting occurred on Capitol grounds, admits that restricted areas were breached, and tries to blame the victims by arguing that it is the fault of various federal and state officials for not adequately preparing for the severity of Defendants' violent attack. *See* ECF 102-1, Rehl MTD, at 41-42. Even if his allegations were part of the record before the court, "one cannot escape liability for one's own negligence merely because another person … may have contributed to the injury by his wrongful or negligent act." *Hill v. McDonald*, 442 A.2d 133, 137 (D.C. 1982). Plaintiffs alleged Rehl's participation in the riot and violence on Capitol grounds. *See* ECF 89, ¶ 125 ("REHL … led more members of PROUD BOYS to the west side of the Capitol where, just before 1:00 p.m., REHL and other coconspirators charged over barricades and overwhelmed law enforcement before entering the Capitol."); *see also* ECF 89, ¶¶ 129, 140i, 155.

Straka claims that the statutes Plaintiffs cite cannot support a negligence *per se* claim because they supposedly impose duties on "every member of the public." ECF 98, Straka MTD, at 24. But none of the cases Straka cites support this proposition.[14] And, at any rate, D.C. Code § 10-503.16 and 40 U.S.C. § 5104 apply specifically to those individuals entering Capitol grounds and D.C. Code § 22-1322 applies specifically to those who engage in or incite riots.

Plaintiffs sufficiently allege that Stone committed negligence. Stone had a duty to act reasonably—to not play a central role in fostering a violent insurrection directed at the Capitol. Planning, fundraising, and recruiting participants to attack the Capitol and police officers, including Plaintiffs, was a breach of that duty. *See* ECF 89, ¶ 212. Plaintiffs alleged numerous acts by Stone, both directly and in his support for other Defendants, that played a central role in bringing to fruition the Capitol Attack. *See id.* ¶¶ 54-55, 61, 81, 86, 95, 98, 107, 109. Stone's failure to act reasonably directly and proximately caused Plaintiffs' injuries. *See id.* ¶ 220.

Plaintiffs sufficiently alleged that Defendants Nordean and Kinnison participated in the riot and violence, contrary to their arguments. *See id.* ¶¶ 101 (Kinnison planning to bring weapons), 103b (Nordean in charge of Proud Boys on Jan. 6), 125 (Nordean led hundreds of Proud Boys to Capitol and coordinated their movements), 126 (Nordean breached barricade and led assault), 134 (Kinnison stormed the Upper West Terrace).[15]

---

[14] His lead case, *McCracken v. Walls-Kaufman*, simply cites the legal standard and remands to the trial court. 717 A.2d 346, 354 (D.C. 1998). His other cases do nothing more than apply the legal standard to a specific situation, *Marusa v. Dist. of Columbia*, 484 F.2d 828, 834 (D.C. Cir. 1973), or hold that a statute fails to define a duty of care. *Ray v. Proxmire*, 581 F.2d 998, 1001 (D.C. Cir. 1978).

[15] Meggs also appears to suggest that Plaintiffs have insufficiently alleged causation. ECF 110-1, Meggs MTD, at 31–32. However, his argument rests solely on facts not in the record.

**IV.    The Constitution Does Not Bar Plaintiffs' Claims**

**A.    Presidential Immunity Does Not Apply**

Using force, intimidation and threats to prevent a co-equal branch of government from performing its constitutionally mandated duties, and to prevent the President- and Vice-President-elect from taking office, is not within the "outer perimeter" of a President's official duties. This can be held with certainty, without regard to a President's motives in undertaking such disruption, or whether such disruption is undertaken directly or by agreement with others. It does not depend on whether such disruption of a co-equal branch of government is unlawful or not. Insofar as each of the claims in the Amended Complaint is predicated on such conduct, presidential immunity does not shield Defendant Trump from liability. Additionally, Defendant Trump's actions as alleged in the Amended Complaint were taken in his personal capacity as a candidate for office—and not in his official capacity as President. Because such actions also are not within the "outer perimeter" of a President's official duties, Presidential immunity does not apply. Allowing a candidate to use his position as President to usurp the Constitutionally and legally mandated process to ensure his own election would render that process a nullity.

**1.    Defendant Trump's Misconduct Falls Well Outside the Perimeter of His Official Duties, and Immunity for It Would Contravene the Principle of Separation of Powers**

In *Nixon v. Fitzgerald*, the Supreme Court held that a former President of the United States "is entitled to absolute immunity from damages liability predicated on his official acts." 457 U.S. 731, 749 (1982). In defining the scope of a President's "official acts" immunity, the Court held that it applied to "acts within the 'outer perimeter' of his official responsibility." *Id.* at 756. Whether a President's challenged actions fall within or without that perimeter does not depend on the President's "motives" or on whether the action was "unlawful" or "taken for a forbidden

purpose." *Id.* Rather, "the sphere of protected action must be related closely to the immunity's justifying purposes." *Id.* at 755.

The Court's "central concern" in recognizing absolute immunity for official acts of the President "was to avoid rendering the President 'unduly cautious in the discharge of his official duties.'" *Clinton v. Jones*, 520 U.S. 681, 693-94 (1997) (quoting *Fitzgerald*, 457 U.S. at 752, n.32). The Court emphasized, however, that "the Presidential privilege is 'rooted in the separation of powers under the Constitution.'" *Fitzgerald*, 457 U.S. at 753 (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)). And while a court "must balance the constitutional weight of the interest to be served [by exercising jurisdiction] against the dangers of intrusion on the authority and functions of the Executive Branch," when "judicial action is needed to serve broad public interests—*as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance* . . . the exercise of jurisdiction has been held warranted." *Id.* at 754 (emphasis added).

In this case, extending Presidential immunity to a President's use of force, intimidation, and threats to prevent his duly elected successor from taking office and to disrupt the workings of a co-equal branch of government would be "in derogation of the separation of powers," and rejecting such expansive immunity would "maintain their proper balance." *Id.* The Court in *Fitzgerald* observed that Presidential immunity "will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive," primarily because Congress, through its impeachment power and its authority to conduct "[v]igilent oversight" may deter Presidential abuses of offices. *Id.* at 757. Those congressional protections against Presidential misconduct are voided, however, when the misconduct is directed by force against Congress. The "essential purpose of the separation of powers is to allow for independent functioning of each

coequal branch of government within its assigned sphere of responsibility, *free from risk of control, interference, or intimidation by other branches*." *Id.* at 760-61 (Burger, C.J., concurring) (emphasis added). If immunity is afforded for Defendant Trump's actions here, it would severely undermine, if not collapse altogether, the ability of Congress to act independently of the executive.

The principle of separation of powers under the Constitution therefore forecloses the recognition of Presidential immunity for the acts alleged in the Amended Complaint. And to the extent that the purpose of Presidential immunity is to allow a President to act decisively in his official acts without fear of civil liability, *see Fitzgerald*, 457 U.S. at 752, n.32, that purpose does not apply here. Indeed, the opposite applies. If the President is thinking of using force to prevent Congress from carrying out its duties, he *should* think twice. Such action—regardless of the President's motives (whether to secure illegitimately his place in power, or to remedy perceived election fraud), and regardless of whether such action may be considered unlawful—simply is not within the outer perimeter of a President's official duties.

Nor can the President's private campaign activity be considered within the perimeter of his official acts. The Supreme Court has "never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action taken in an official capacity." *Jones*, 520 U.S. at 694 (citing *Fitzgerald*, 457 U.S. at 759 (Burger, C. J., concurring)). Not only did Trump act in his personal capacity in conjunction with his campaign and campaign officials throughout the conspiracy, ECF 89, ¶¶ 19, 54, 61-62, 64, 66, 68, 76, 85, 95, 114, 152, with his campaign reimbursing expenses for his personal attorneys, *id.* ¶¶ 66, 112, but his campaign and other private parties planned, organized, promoted, and arranged funding for the January 6 rally, *id.* ¶¶ 84, 95—the focus of which was the result of the 2020 presidential election. *Id.* ¶¶ 114-22. Defendant Trump's actions in the Amended Complaint were taken solely in his personal capacity as a

candidate for office and not in his official capacity as President. Absolute immunity is "strong medicine, justified only when the danger of officials' being deflected from the effective performance of their duties is very great." *Forrester v. White*, 484 U.S. 219, 230 (1988) (internal quotation marks, alterations, and citations omitted). There is no danger that Presidents will be "deflected from" their duties if they are subject to liability for private acts committed as candidates.

### 2.    Defendant Trump Fails to Meet His Burden to Establish Immunity for His Actions

Ultimately, Defendant Trump bears the burden of establishing immunity for his acts. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1140 (D.C. Cir. 2015) ("The burden of establishing immunity must be borne by the official claiming it."). He fails to do so here. In claiming Presidential immunity, Defendant Trump distorts the nature of the conduct alleged in the Amended Complaint, mischaracterizing it as "using his bully pulpit" to "lobby[] for legislative action" by "petitioning Congress not to certify the electors from States with ongoing election challenges." ECF 103-1, Trump MTD, at 12, 14. In assessing an immunity defense, however, "[t]he appropriate focus . . . is on the relationship between '*the act complained of*' and the corresponding 'matters committed by law to [the official's] control or supervision.'" *Graham*, 798 F.3d at 1141 (quoting *Barr v. Matteo*, 360 U.S. 564, 573 (1959)) (emphasis added).

"[A]bsolute immunity is at odds with fundamental notions of American justice which hold that all officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it." *Canell v. Or. Dep't of Justice*, 811 F. Supp. 546, 552 (D. Or. 1993) (citing *Butz v. Economou*, 438 U.S. 478, 506 (1978)). In assessing claims of immunity, then, courts must take care not to overgeneralize the nature of the "complained of" acts. *Graham*, 798 F.3d at 1141 (cautioning against overgeneralizing the complained of acts because "[a]t a high enough level of generality, almost any act that has any relationship to an overarching duty . . . will be immunized").

Viewing Defendant Trump's challenged acts as Presidential advocacy would be overgeneralizing and mischaracterizing the misconduct alleged in the Amended Complaint.

Plaintiffs seek to hold Defendant liable not for "petitioning Congress," ECF 103-1, Trump MTD, at 12, but for his efforts to disrupt by force the workings of a co-equal branch of government, and for the injuries caused to Plaintiffs thereby. Such efforts included conspiring with others "to prevent Congress from certifying the election results through the use of force, intimidation, and threats," ECF 89, ¶ 2, encouraging the use of force, intimidation, and threats to try to stop the Congressional count of electoral votes on January 6, *id.* ¶ 9, and aiding and abetting the battery and assault of plaintiffs, *id.* ¶¶ 201, 207. Defendant Trump simply had no official "mandate" to engage in such acts. *Fitzgerald*, 457 U.S. at 757. Moreover, the acts "complained of," *Graham*, 798 F.3d at 1141, were not official acts, but acts taken in his capacity as a candidate for office, as explained above. For these reasons, the acts of Defendant Trump complained of in the Amended Complaint do not lie within the scope of conduct protected by Presidential immunity.

Trump's power as president "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). There is no role set forth in the Constitution for the sitting President—nor any of his appointees—in the process of certifying and counting electoral votes.[16] Trump thus cannot assert he was acting in the "outer perimeter" of his official responsibilities when there is no constitutional or statutory authority for such responsibilities. And certainly Trump cannot rely on a fabricated crisis of

---

[16]   The Constitution prescribes that "Each State" selects its electors, U.S. Const. art. II, § 1, cl. 2, and that these state electors then "meet in their respective states and vote by ballot for President and Vice-President." U.S. Const., amend. XII. The Constitution further prescribes that the counting of the votes that are cast and certified by the Electors shall be conducted by the President of the Senate in the presence of the Senate and House of Representatives. *Id.* Nor does the Electoral Count Act, 3 U.S.C. § 1 et seq., the statute that governs the electoral count process, prescribe any official role or responsibility for the president.

"election integrity"—consisting of false claims of election fraud considered and repeatedly rejected by the courts—as a basis for his official authority to act. ECF 103-1, Trump MTD, at 12. Otherwise, nothing could stop a President from fabricating a crises to justify ordering a violent attack on a co-equal branch of government.

The cases cited by Trump do not advance his argument and are not remotely applicable to this case. *Tenney v. Brandhove*, 341 U.S. 367 (1951), and *Imbler v. Pachtman*, 424 U.S. 409 (1976), concern immunity for indisputably official action. *Brandhove* involved a lawsuit against legislators who were being sued for their actions taken in legislative hearings. *Brandhove*, 341 U.S. at 371. *Imbler* involved a lawsuit against a prosecutor, for unlawful prosecution. *Imbler*, 424 U.S. at 409. Trump also cannot seek refuge from the consequences of his actions under the president's authority to "faithfully execute[]" the laws under the Take Care Clause. ECF 103-1, Trump MTD, at 12, 14. It has been long established that the "President cannot rely on his Take Care powers" to faithfully execute the law when there are no constitutionally established or congressionally enacted laws for him to execute. *Medelin v. Texas*, 552 U.S. 491, 532 (2008); *see also Youngstown Sheet & Tube*, 343 U.S. at 587-88 (rejecting idea that the Take Care Clause permits the president to define his own powers).

Thus, both the controlling Supreme Court precedent and the underlying justification for the absolute Presidential immunity forecloses Trump's claim for such immunity, and his motion to dismiss the complaint on this ground should be denied.

**B.    The First Amendment Does Not Shield the Defendants from Liability for Their Unlawful Conduct**

In asserting that they cannot be held liable for their speech under the First Amendment, Defendants are playing "hide the ball" with the Court. Plaintiffs do not assert claims against Defendants because of their speech, but because of their conspiracies to violently attack Congress

and the Capitol Police, ECF 89, ¶¶ 166-72, failing to prevent such harms, *id.* ¶¶ 173-81, knowingly and intentionally subjecting them to battery and assault, *id.* ¶¶ 199-210, injuring them through intentional acts amounting to terrorism, rioting, and destruction of property, *id.* ¶¶ 182-98, and as a result of their planning, executing, and participating in a violent mass attack on the Capitol, *id.* ¶¶ 211-20. The First Amendment provides no safe harbor for such unlawful and abhorrent conduct.

 "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed . . . ." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)); *see United States v. Williams*, 553 U.S. 285, 298 (2008) ("Many long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech . . . that is intended to induce or commence illegal activities." (citation omitted)). Rather, "[i]t is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." *Cal. Motor Transp.*, 404 U.S. at 514. This applies with equal force to Plaintiffs' conspiracy claims (as addressed immediately below) and state law claims premised on aiding and abetting liability. *See Rice v. Paladin Enter., Inc.*, 128 F.3d 233, 244-45 (4th Cir. 1997) ("*[E]very* court that has addressed the issue, including this court, has held that the First Amendment does not necessarily pose a bar to liability for aiding and abetting a crime, even when such aiding and abetting takes the form of the spoken or written word.") (emphasis in original).

### 1. The First Amendment Is No Defense because the Defendants' Speech Was Integral to Their Unlawful Conspiracies

Speech used as an integral part of civil conspiracies is not protected by the First Amendment. *See Cal. Motor Transp.*, 404 U.S. at 511-13, 515 (upholding civil antitrust conspiracy

claim and rejecting defense argument that their conduct involved advocacy protected by the First Amendment). Courts may hold defendants liable when they agree "to engage[] in a conspiracy against the public peace and order," such as when they "authorize[], direct[], or ratif[y] specific tortious activity," "incite lawless action," or "g[i]ve other specific instructions to carry out violent acts or threats." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 908-09, 926-27 (1982); *see also Sines v. Kessler*, 324 F. Supp. 3d 765, 802 (W.D. Va. 2018). Critically, "[i]f the end result [of a conspiracy] is unlawful, it matters not that the means used in violation may be lawful." *Cal. Motor Transp. Co.*, 404 U.S. at 515. Conspirators to unlawful ends "cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'" *Id.* at 513. "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' which the legislature has the power to control." *Id.* at 515 (quoting *NAACP v. Button*, 371 U.S. 415, 444 (1963)).

The instances of speech cited in the Amended Complaint were not benign expressions of political opinion, but integral parts of Defendants' unlawful conspiracy. Defendant Trump asserts that the First Amendment bars the claims against him because his speech on January 6 amounted to protected "petitioning activity." ECF 103-1, Trump MTD, at 25. The Supreme Court rejected this same claim in *California Motor Transport*, however, where the defendants characterized their allegedly unlawful anticompetitive conspiracy as "a concerted effort to influence public officials." *Cal. Motor Transp. Co.*, 404 U.S. at 511. The Court held that the allegations stated a claim for an unlawful conspiracy and that, although the defendants did have rights to petition under the First Amendment, such rights did not immunize the defendants from liability when the rights were used as an integral part of an unlawful conspiracy. *Id.* at 513-14. Likewise, the other statements Defendant Trump identified in his motion—including the propagation of false claims of election fraud; encouragement of the use of force, intimidation, and threats; incitement of violence against

members of Congress; and the planning to gather his incensed supporters in Washington, D.C., on January 6, *see* ECF 103-1, Trump MTD, at 26 (citing such allegations in the Amended Complaint)—were integral to the alleged unlawful conspiracy, as set out above, *see supra* II.A (liability for § 1985 conspiracy), and just because they may have been lawful actions on their own, their lawfulness under the First Amendment does not insulate Defendant Trump from liability for the unlawful conspiracy they served. *See Cal. Motor Transp. Co.*, 404 U.S. at 515 ("If the end result is unlawful, it matters not that the means used in violation may be lawful.").

The statements identified by Defendants Straka, Nordean, Kinnison, Stone, and Martinez[17] in their motions likewise fail to garner First Amendment insulation from liability, as they were integral to the unlawful conduct in which those Defendants engaged. Defendant Stone, citing *Barr v. Clinton*, notes that the First Amendment can apply to section 1985 claims. *See* ECF 100, Stone MTD, at 25; 370 F.3d 1196 (D.C. Cir. 2004). *Barr* is inapposite, however. The court held in *Barr* that First Amendment protections apply to 1985 claims in the same way they apply to defamation claims when the 1985 claim rests "entirely" on the claim that the defendant's "conspiratorial publication . . . injured his reputation and mental state." *Id.* at 1203. *Barr*'s holding is inapplicable here, where the Plaintiffs do not claim that the Defendants' statements injured their reputation or mental state. Plaintiffs do not argue that Defendants should be held liable for what they said, but for the violent conspiracies and other unlawful conduct in which they engaged and of which their statements were an integral part. For this reason, the First Amendment does not shield them from liability. *See United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (holding that the First

---

[17]  *See* ECF 98, Straka MTD, at 4-5; ECF 95, Nordean MTD, at 26-30; ECF 96, Kinnison MTD, at 22-26; ECF 100, Stone MTD, at 27-29; ECF 97, Martinez MTD, at 2. Defendant Rehl does not identify any statements or other activities warranting First Amendment protection. *See* ECF 102-1, Rehl MTD, at 29-34.

Amendment is no defense where "the speech is not 'itself the proscribed conduct,'" but instead is used to establish the defendant's participation in an unlawful enterprise (citation omitted)).

### 2.     Defendants' Speech Serves as Evidence Supporting the Claims against Them, Consistent with the First Amendment

Just as the First Amendment does not block claims where defendants' speech is integral to their otherwise unlawful conduct, the First Amendment does not "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *accord Claiborne Hardware*, 458 U.S. at 926-27 ("[S]peeches might be taken as evidence that [defendant] gave other specific instructions to carry out violent acts or threats."). Thus, even if Defendants engaged in political speech or expressive conduct, that speech and conduct is still admissible as evidence of their agreements, purpose of, and participation in unlawful conspiracies to attack the Capitol to prevent Congress from certifying the 2020 presidential election results. *See, e.g.*, *United States v. Hassan*, 742 F.3d 104, 127 (4th Cir. 2014) ("Forming an agreement to engage in criminal activities—in contrast with simply talking about religious or political beliefs—is not protected speech." (quoting *United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012))); *United States v. Fullmer*, 584 F.3d 132, 158 (3d Cir. 2009) (political speeches provided circumstantial evidence of conspiracy); *United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) (political speech can be used to prove conspiracy). Indeed, courts have applied this principle in the criminal cases of non-parties who attacked the Capitol on January 6 and in civil cases brought under section 1985.[18.]

---

[18]     *See United States v. DeGrave*, 539 F. Supp. 3d 184, 209 (D.D.C. 2021) (court may consider statements as evidence of motive or intent even if statements themselves were protected); *United States v. Chansley*, 525 F. Supp. 3d 151, 164 (D.D.C. 2021) ("[C]ourts *may* consider otherwise-protected speech to establish a defendant's motive or intent during the commission of some other unlawful conduct."); *Sines*, 324 F. Supp. 3d 804.

None of Defendants' cases supports their sweeping proposition that they are immunized from liability because their conspiracies involved speech or because their speech provides evidence of their participation in the unlawful activity claimed. Nor is this a case that involves the regulation of content-based speech, as Stone asserts. *See* Stone at 25-27. Indeed, Defendants rely almost entirely on cases in which speech or expressive conduct was the sole basis for liability, such as *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329 (7th Cir. 1977), in which the complaint "allege[d] no more" than defendants' official complaints about an IRS agent's job performance. *See id.* at 1342, 1344. In contrast, the conspiracies and other claims in the Amended Complaint involve unprotected conduct, including violence, incitement, and threats.[19]

Nordean, Kinnison, and Rehl look for safe harbor in *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). *See* ECF 95, Nordean MTD, at 27-28; ECF 96, Kinnison MTD, at 23-24; ECF 102-1, Rehl MTD, at 31-33. But *Claiborne Hardware* predicates First Amendment protection on the absence of violence, *see* 458 U.S. at 928, which is dramatically at odds with the facts asserted in the Amended Complaint. "The First Amendment does not protect violence." *Claiborne Hardware*, 458 U.S. at 916; *see Mitchell*, 508 U.S. at 484 ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment."). Nor does it protect agreements to commit violence. *See Rahman*, 189 F.3d at 115 (First Amendment does not protect "conspiracy[ies] to take violent action"); *Sines*, 324 F. Supp. 3d at 802. The conspiracies alleged in the Amended Complaint caused a massive, violent attack in which Plaintiffs were "violently assaulted, spat on, tear-gassed, bear-sprayed, subjected to racial slurs

---

[19]   That much of Defendants' speech occurred in the open does not "immunize [their] agreement." *United States v. Spock*, 416 F.2d 165, 170 (1st Cir. 1969).  "A group of vigilantes agreeing in the town square to solicit cohorts to call out a lynch mob would not be absolved because their agreement was open."  *Id.*

and epithets, and put in fear for their lives." ECF 89, ¶ 1. Defendants' purposes were to accomplish unlawful ends. *Id.* ¶ 168. And Defendants ratified, and authorized the use of force, intimidation, and threats to accomplish those ends. *See supra* II.A (liability for § 1985 conspiracy). Indeed, many of the Defendants that challenge the use of their speech and conduct as protected under the First Amendment, including Straka, Nordean, Kinnison, Rehl, and Meggs, participated in the Attack itself. *See* ECF 89 ¶¶ 86 (Meggs), 125-26 (Nordean and Rehl), 127 (Straka), 134 (Kinnison).

### 3.     The First Amendment Does Not Protect Incitement

Even if the First Amendment afforded some protection to Defendants' speech in furtherance of their conspiracies or violence (it does not), Defendants' statements nonetheless constitute unprotected speech. This is because the First Amendment draws a "line between permissible advocacy and impermissible incitation to crime or violence." *R.A.V. v. St. Paul*, 505 U.S. 377, 420 (1992) (Stevens, J., concurring) (quotation marks and citation omitted).

It is well established that the First Amendment does not protect speech that "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Courts applying the *Brandenburg* standard consider (1) whether the speech "explicitly or implicitly encouraged the use of violence or lawless action," (2) whether the speaker "intends that his speech will result in the use of violence or lawless action," and (3) whether the "imminent use of violence or lawless action is the likely result of his speech," *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 246 (6th Cir. 2015), as well as other context-specific factors such as whether the speech is directed at a particular person or group of people. *See Hess v. Indiana*, 414 U.S. 105, 107-08 (1973). Critically, courts also consider the context in which the speech occurs to assess whether or not it is protected. *See R.A.V.*, 505 U.S. at 420

(Stevens, J., concurring); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985) (evaluating First Amendment protections "requires us to examine the 'content, form, and context' of that speech, 'as revealed by the whole record'" (citation omitted)).

As part of the conspiracies alleged, and in furtherance of them, particular Defendants (directly and through their representatives) made speeches and statements to rally goers on January 6 that explicitly and implicitly encouraged violence and lawless action. These statements were intended to rile up the crowd and incite rally goers to violence, and they ultimately did just that. ECF 89, ¶ 114. There is no question that imminent violence was the likely result of these statements, as they *actually led to* violence and lawless action, with the Capitol Attack ensuing moments after speeches made by Trump and Giuliani. *See Brandenburg*, 395 U.S. at 447.

At least the following statements from the January 6 rally were directed to inciting or producing imminent lawless action and likely to do so. It is important to bear in mind the context that, as all involved knew, the event that Defendants wished to disrupt—Congress's confirmation of the results of the Presidential election—was to take place a short walk away within one or two hours. ECF 89, ¶¶ 82-84.

- Giuliani told the crowd at the January 6 rally, immediately before the Capitol Attack, "If we're right, a lot of them will go to jail. So, ***let's have trial by combat***. I'm willing to stake my reputation, the President is willing to stake his reputation, on the fact that we're going to find criminality there . . . I'll be darned if they're going to take our free and fair vote . . . ***We're going to fight to the very end to make sure that doesn't happen***." ECF 89, ¶ 114 (emphasis added).

- Trump told the crowd at the January 6 rally "we will never give up" or "concede," because "you don't concede when there's theft involved," and "We must stop the steal and then ***we must ensure that such outrageous election fraud never happens again, can never be allowed to happen again***." *Id.* ¶ 115 (emphasis added).

- Trump also told the crowd at the January 6 rally, "After this, we're going to walk down, and I'll be there with you. We're going to walk down. We're going to walk down any one [sic] you want, but I think right here. We're going to walk down to the Capitol, and we're going to cheer on our brave Senators, and Congressmen and women. ***We're probably not going to be***

*cheering so much for some of them because you'll never take back our country with weakness. You have to show strength, and you have to be strong*." *Id.* ¶ 116 (emphasis added).

- As members of the crowd at the January 6 rally shouted "Storm the Capitol," "Invade the Capitol Building," "Take the Capitol right now!" and "Fight! Fight! Fight!" Trump explicitly encouraged violence by stating, "[w]hen you catch somebody in a fraud, *you're allowed to go by very different rules* . . . Something's wrong here, something is really wrong, can't have happened and *we fight, we fight like hell, and if you don't fight like hell, you're not going to have a country anymore*." *Id.* ¶¶ 118-19 (emphasis added).

- Trump then directed the mob at the Capitol by instructing them to "walk down Pennsylvania Avenue" to give "weak" Republicans "pride and boldness . . . to *take back our country*!" *Id.* ¶ 120 (emphasis added).

In addition to Trump's and Giuliani's statements, other Defendants made statements in the midst of the Capitol Attack that were similarly directed to inciting violence and lawless action. As they assembled near the Capitol, one member of Proud Boys yelled, "Let's take the f**king Capitol!" and was told by another member, "Don't yell it. Do it!" *Id.* ¶ 125. Several Proud Boys started chants of "take the stairs" in order to steer the mob toward lightly guarded areas. *Id.* ¶ 127. While participating in the Attack, Straka "yelled encouragement to the other attackers to breach the Capitol" and "directed his fellow attackers to take a protective shield from the hands of a Capitol Police officer." *Id.* Caldwell said "let's take the damn capitol." *Id.* Taylor yelled "Move forward Americans!" at other attackers, even as the attackers pushed through to the Upper West Terrace of the Capitol. *Id.* ¶ 134.

These statements explicitly, by their plain language, called for the rally goers-turned-attackers (including other Defendants) to use violence and lawless action to stop Congress from certifying the election results. For example, Giuliani expressly called for "combat" and told the crowd to "fight to the very end." ECF 89, ¶ 114. Trump told the crowd they would "never take back our country with weakness," and to "show strength," *id.* ¶ 116, and then told them they should "go by very different rules" and "fight like hell" or "you're not going to have a country anymore." ECF 89, ¶ 119. He then directed the riotous crowd to *go to the Capitol* where they were to "show

strength" and "be strong" because "you'll never take back our country with weakness." *Id.* ¶ 116. Likewise, Straka's directive to steal a protective shield from a police officer, and statements by other Defendants to take the Capitol or parts of it *during the Attack* cannot be interpreted as anything but calls for such action. And when considered in context, it is clear the statements implicitly called for imminent violent and lawless action as well. *See Hess*, 414 U.S. at 108; *Bible Believers*, 805 F.3d at 246; *Sines*, 324 F. Supp. 3d at 802-03 (*Brandenburg* exception to First Amendment privilege applied to defendant's statements encouraging the throwing of torches at counter-protestors and ordering others to "charge!" where plaintiffs were physically assaulted during white supremacist rallies).[20]

Considering the overall context of the Amended Complaint makes Defendants' intent to incite violence and lawless action even more clear. *See R.A.V.*, 505 U.S. at 420. This was no mere "political speech," as Defendants assert. *See, e.g.*, Trump at 24-28; Stone at 2; Straka at 10. Defendants repeatedly and deliberately made false statements about election fraud in order to undermine the election results by any means necessary, and they encouraged and condoned the use of violence and threats against their political opponents. *See, e.g.*, ECF 89, ¶¶ 56-57, 61-68, 69-81. They talked openly about their willingness to use force and violence to change the election results. *See, e.g., id.* ¶¶ 87, 103, 107-08. And they planned and prepared for violence to occur on the Capitol grounds that day. *See, e.g., id.* ¶¶ 89-93, 98, 103-06. Taken together, these allegations

---

[20]   It is irrelevant that the statements were made to many people, as the First Amendment does not insulate a speaker "from responsibility for his actions simply because he may have disseminated his message to a wide audience."  *Rice*, 128 F.3d at 248.  In addition, despite Defendant Trump's suggestion otherwise, there is no public official exemption from *Brandenburg*. *See* Trump at 5; *see also Tri-Corp Housing Inc. v. Bauman*, 826 F.3d 446, 449 (7th Cir. 2016) (public officials may urge action from constituents and other officials "as long as they refrain from making the kind of threats that the Supreme Court treats as subject to control under the approach of *Brandenburg v. Ohio*.").

demonstrate Defendants' willingness and intent to use unlawful means to achieve their ends, including by threatening and advocating for violence and lawless action.

Rather than address the detailed factual allegations demonstrating intent to incite violence, Trump asks the Court to rely on a single, calculated statement from Trump's speech for the crowd to march "peacefully and patriotically" on the Capitol to find that the *Brandenburg* standard cannot be met. *See, e.g.*, Trump at 26-27; *see also* ECF 89, ¶ 117. But the law does not permit Defendants to evade liability by ignoring the facts and circumstances surrounding their actions, and the inference Defendants ask the Court to make is improper on a motion to dismiss. *See Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1134 (D.C. Cir. 2002) ("In ruling on a motion to dismiss a complaint the district court must draw all reasonable inferences in favor of the plaintiff."). Indeed, such a rule would effectively shield almost *any* attempt to incite violence from *Brandenburg*, no matter how brazen and no matter the intent, so long as the speaker uttered a single mitigating word.

Defendants also argue that they cannot be held liable for "misinterpretations" of their statements by listeners at the January 6 rally, but an audience's reaction and the immediacy of the disorder are relevant considerations to assessing whether speech is protected where the speaker "passes the bounds of argument or persuasion and undertakes incitement to riot." *Allen v. District of Columbia*, 187 A.2d 888, 889 (D.C. 1963); *see Bible Believers*, 805 F.3d at 246 (acknowledging that listeners' reactions and the speaker's intent were important factors to consider in assessing whether speech incites lawlessness). In *Bible Believers*, on which Defendants rely, the record was "devoid of any indication" that the speakers intended lawlessness to follow their statements and the speakers themselves remained entirely peaceful. *Id.* at 244. The same cannot be said for the Defendants' conduct here, as Trump's and Giuliani's speeches called for violence and lawless

67

action explicitly by their plain language and implicitly when considered in context. Furthermore, that Defendants planned for—and intended—violence and lawless action to occur, and in some cases participated directly in it, makes clear the other attackers did not "misinterpret" anything. *See supra* Section II.A (liability for § 1985 conspiracies), III.A (BRCA).

### 4. The First Amendment Does Not Bar Liability Under the D.C. Bias-Related Crimes Act

Some Defendants raise First Amendment arguments against Plaintiffs' claim under the D.C. Bias-Related Crimes Act ("BRCA"), D.C. Code § 22-3701 *et seq*. *See* ECF 98, Straka MTD, at 19; Stone at 21; Trump at 39-40. Those arguments fail for the same reasons discussed above—Plaintiffs have alleged that Defendants' statements and expressive conduct are integral to unlawful acts, such as conspiracy or aiding and abetting, and/or qualify as incitement. Straka's facial challenge to BRCA is meritless. The D.C. Court of Appeals decided this issue in *Lucas v. United States*, interpreting BRCA to prohibit bias-motivated *conduct*, not protected speech, and holding that bias must be a but-for cause of the criminal act to be integral to the conduct. *See* 240 A.3d 328, 336-38 (D.C. 2020). Statements can be used as evidence of unlawful conduct or bias motive. *See Wisconsin*, 508 U.S. at 489. Defendants' bias was a but-for cause of their criminal acts. *See supra* Section III.A (BRCA).

### 5. Section 1985(1) Is Neither Unconstitutionally Vague nor Overbroad

Defendants Trump and his campaign organizations cursorily assert that if the claims against them are valid under § 1985, "conspiracy could be construed any time there is a standoff between the political branches that involves emotionally charged speech," which would render § 1985 facially overbroad or void for vagueness. ECF 103-1, Trump MTD, at 29. The argument is manifestly baseless. Section 1985 requires a conspiracy, and one to use force, intimidation, or threat, 42 U.S.C. § 1985(1), which is a far cry from a mere "standoff between the political branches

that involves emotionally charged speech." In any event, a statute may be held facially overbroad in the First Amendment context only if a challenger shows that "a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 n.6 (2008) (internal citations omitted). And courts "generally do not apply the 'strong medicine' of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law." *Id.* Trump utterly fails to describe how a "substantial number" of applications of § 1985(1) are unconstitutional, and so the "strong medicine" of overbreadth analysis should not be applied. *Id.* Moreover, multiple courts have rejected overbreadth challenges to the criminal analogue to section 1985(1), Title 18 U.S.C. Section 372. *See United States v. Fulbright*, 105 F.3d 443, 452 (9th Cir. 1997), *overruled on other grounds by United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007); *United States v. Payne*, No. 2:16-cr-46, 2017 WL 8941311, at *9 (D. Nev. Jan. 3, 2017), *report and recommendation adopted*, 2017 WL 480392 (D. Nev. Feb. 2, 2017). Section 1985(1) contains identical language and is entitled to greater tolerance than a criminal statute. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498-99 (1982).

Nor have Defendants shown § 1985 to be unconstitutionally vague. When a law is challenged as vague in its application in a First Amendment context, courts focus upon "whether the enactment provided fair notice that the defendant's contemplated conduct fell within the legitimate scope of the prohibition." *United States v. Thomas*, 864 F.2d 188, 194 (D.C. Cir. 1988). Defendants cannot and do not show that section 1985(1) does not provide adequate notice that conspiring with others to violently interfere with Congress and the Capitol Police fall within the scope of § 1985's prohibition. Indeed, multiple courts have rejected vagueness challenges to §

1985's criminal analogue. *See Fulbright*, 105 F.3d at 452; *United States v. Bundy*, No. 3:16-cr-51, 2016 WL 3156310, at *3 (D. Or. June 3, 2016); *Payne*, 2017 WL 8941311, at *7.

Trump argues that section 1985(1) should be limited to "an actual agreement to perform an overt act that extends beyond protected political speech," ECF 103-1, Trump MTD, at 30, but Trump's argument is rife with misconceptions. Conspiracies do not require agreements to commit specific unlawful acts—they involve agreements for an "unlawful purpose" in which the overt acts themselves "may be entirely innocent when considered alone." *United States v. Miselis*, 972 F.3d 518, 535 (4th Cir. 2020), *cert. denied sub nom. Daley v. United States*, 141 S. Ct. 2756 (2021) (internal citations omitted). And regardless, the Amended Complaint alleges many overt acts beyond speech*, see supra* II.A (liability for § 1985 conspiracies), IV.B.3 (incitement), but Trump does not address them.

For his part, Defendant Straka argues that section 1985(1) "suffers from overbreadth because it allows suit to be brought against speakers engaged in protected advocacy" and "include[s] conspiracies against other federal officials." ECF 98, Straka MTD, at 13. Defendant Straka's arguments fail for the reasons set out above. *See also supra* II.B (federal officers). And *United States v. Miselis*, 972 F.3d 518 (9th Cir. 2020), on which the Defendant relies, *see* ECF 98 at 13, does not help his cause. In *Miselis*, the Fourth Circuit *upheld* the Anti-Riot Act to the extent it criminalized organizing, participating, or carrying on a riot. *See Miselis*, 972 F.3d at 542. The court found that "speech tending to 'organize' others to riot consists *not* of mere abstract advocacy, but rather of concrete aid," because "by the time speech reaches the point of organizing a riot, it has crossed the line dividing abstract idea from material reality." *Id.* at 537 (emphasis in the original). The definition of "riot" itself was not overbroad and it encompassed both acts of violence and threats of violence. *Id.* at 540. The same reasoning applies to section 1985(1). Like the Anti-

Riot Act's use of "organize," section 1985(1) extends only to persons who "conspire." 42 U.S.C. § 1985(1). And as with the definition of riot, section 1985(1) is limited to conspiracies that involve the use of "force, intimidation, or threat." *Id.*[21]

### 6.    The Actual Malice Standard from Defamation Law Does Not Apply

Defendant Straka asserts that the "actual malice" standard from *New York Times v. Sullivan*, a defamation case, applies to Plaintiffs' claims under section 1985(1). ECF 98, Straka MTD, at 15-16. His argument fails, however, because the unique rationale for the rule in *New York Times v. Sullivan*, 376 U.S. 254 (1964), has no application in suits that do not involve defamation actions brought by public officials against their critics. Requiring public officials, as plaintiffs in a defamation suit, to prove "actual malice" on the part of defendants for their criticism of the plaintiff public official protects the critics of the public official. *Id.* at 280-82. Plaintiffs are not public officials,[22] nor do they claim that Defendant Straka has made statements that are injurious to their reputations or critical of them in any way. A court may apply defamation principles to 1985 claims alleging conspiracies to harm the plaintiffs' reputation, *see Sculimbrene v. Reno*, 158 F. Supp. 2d 8, 18-19 (D.D.C. 2001); *Barr v. Clinton*, 370 F.3d 1196, 1203 (D.C. Cir. 2004) ("constitutional protections available to defendants charged with defaming public officials may extend to other civil actions alleging reputational or emotional harm from the publication of protected speech"), but that circumstance is absent here. There are simply no grounds to extend to this case the unique defamation standards of *New York Times*.

---

[21]    Defendant Rehl's overbreadth arguments also fail for the reasons set out above.

[22]    For purposes of *New York Times*, "public official" plaintiffs in a defamation suits are high-ranking government officials. *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966) (recognizing that a public official hold a "position in government" with "such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees.").

## V.     Defendants' Remaining Arguments Are Baseless

### A.     The Political Question Doctrine Does Not Bar Plaintiffs' Claims against Trump

The political question doctrine, raised by Defendant Trump, *see* ECF 103-1 at 14-16, is not remotely applicable to this case. The political question doctrine is a "narrow exception" to the rule that courts have "a responsibility to decide cases properly before it, even those it would gladly avoid" and those with "political implications." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95, 196 (2012) (quotations omitted).

Defendant Trump notes that cases may be non-justiciable "when there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department,'" among other circumstances. ECF 103-1 (citing *Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006)); *see Baker v. Carr*, 369 U.S. 186, 217 (1962) (identifying potential grounds for non-justiciability). He suggests that deciding this case would implicate such circumstances because it would require the Court to "improperly regulate the executive department," ECF 103-1 at 15, and make "value determinations about the content of speech [that] are not appropriate for the judiciary," *id.* Nothing in Plaintiffs' action requires the Court to determine a "textually demonstrable constitutional issue that is committed to a coordinate political department." *Baker*, 369 U.S. at 217. Defendant Trump identifies no such text or constitutional issue. Nor is it apparent how deciding this case will require the Court to "regulate the executive department." ECF 103-1 at 15. Defendant Trump is no longer in the executive department, and his conduct at issue was not taken in his official capacity, as discussed above. Moreover, assessing the allegations in the Amended Complaint to decide whether they sufficiently state the claims asserted therein does not require the Court to make "value determinations about the content of speech [that] are not appropriate for the judiciary." ECF 103-1 at 15. Courts routinely adjudicate claims under § 1985,

including claims involving speech that defendants claim to be protected. Defendant Trump's political question argument is simply devoid of merit.

## B. Neither Res Judicata, Collateral Estoppel, nor the Impeachment Clause Bar Plaintiffs' Claims against President Trump

Defendant Trump argues that the Senate's acquittal of him at his impeachment trial bars Plaintiffs' action under the Impeachment Judgment Clause and the doctrines of res judicata and collateral estoppel. *See* ECF 130-1 at 16-24. These arguments too are wholly without merit.

### 1. Neither Res Judicata nor Collateral Estoppel Applies

The result of the impeachment proceeding has no bearing on Plaintiffs' action. Res judicata precludes a lawsuit if there was prior litigation "(1) involving the same claims or causes of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction." *Capitol Hill Grp. v. Pillsbury, Winthrop, Shaw, Pittman, LLC*, 569 F.3d 485, 490 (D.C. Cir. 2009) (citations omitted). Similarly, the doctrine of collateral estoppel precludes the litigation of an issue of fact or law if "(1) the issue is actually litigated; (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; and (4) under circumstances where the determination was essential to the judgment, and not merely dictum." *Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 794 (D.C. Cir. 2019) (citations omitted). Each and every one of these elements is absent from this action.

At the outset, none of the "same parties or their privies" is present from the impeachment proceeding. Plaintiffs are not privies of the Capitol Police, let alone Congress; they are litigating in their personal capacities. *Andrews v. Daw*, 201 F.3d 521, 526 (4th Cir. 2000); *Johnson v. D.C.*, No. 1:04-cv-00936-RMC, 2005 WL 1903551, at *7 (D.D.C. July 20, 2005) ("[A]n official sued in his *individual* capacity is not in privity with either himself in his official capacity or his employer,

73

the government."). Trump's impeachment also did not involve the same claims or issues as Plaintiffs' action. The Article of Impeachment made no reference to the statutory or state laws on which Plaintiffs rely for their claims. *See* Article of Impeachment (Jan. 25, 2021), https://www.congress.gov/117/bills/hres24/BILLS-117hres24rds.pdf (last accessed Jan. 5, 2022). Further, none of the issues raised by Plaintiffs' claims—notably the injuries and damages they suffered from the alleged actions of Trump and his co-Defendants—was actually at issue in the impeachment, nor could these have been raised in that forum. *See* U.S. Const. art. I, § 3, cl. 7 (limiting judgment in impeachment to "removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States").

In addition, the impeachment trial did not provide a "full and fair opportunity" for litigation. The different burden of proof facing Plaintiffs, in addition to the inability to obtain review of the judgment, precludes any finding of a "full and fair opportunity" to litigate. *Hurd v. D.C., Gov't*, 864 F.3d 671, 680 (D.C. Cir. 2017) ("[I]ssue preclusion does not apply if the party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action.") (quotations, citations, and alterations omitted); *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1322 (9th Cir. 1992) ("[C]ollateral estoppel does not preclude claims that have a different burden of proof than previously decided claims."). Furthermore, the impeachment verdict was not accompanied by any statement of reasons, so there is no way to assess whether judgment was on the merits. *Havens v. Mabus*, 759 F.3d 91, 98 (D.C. Cir. 2014) ("[D]ismissals for lack of jurisdiction are not decisions on the merits and therefore have no *res judicata* effect on subsequent attempts to bring suit in a court of competent jurisdiction.").

### 2.    The Impeachment Judgment Clause Also Does Not Preclude This Suit

Trump's argument that the Constitution implicitly precludes liability for those who are acquitted under the Impeachment Judgment Clause also fails. There is established precedent for imposing civil liability on a sitting president following an impeachment acquittal. After President Clinton was acquitted of "obstruction of justice" at his impeachment trial, a court found that sanctions for civil contempt were warranted based on the same conduct at issue in his impeachment. *Jones v. Clinton*, 36 F. Supp. 2d 1118, 1127 (E.D. Ark. 1999). Clinton's impeachment acquittal also did not preclude courts from rendering findings and issuing sanctions related to his license to practice law. *See In re Discipline of Clinton*, 534 U.S. 806 (2001). In fact, no authority supports Trump's position. The Impeachment Judgment Clause does not specifically address acquittal at all. And the historical context and legislative history demonstrate the Impeachment Judgment Clause did not intend to preclude subsequent litigation against those acquitted. *See* The Federalist No. 69 (Alexander Hamilton) ("The President of the United States would be liable to be impeached, tried, and, upon conviction of treason, bribery, or other high crimes or misdemeanors, removed from office; and would afterwards be liable to prosecution and punishment in the ordinary course of law." ). An opinion by the Office of Legal Counsel of the U.S. Department of Justice also considered the issue and relied on these grounds and other key differences between impeachment and litigation to conclude that acquittal under the Impeachment Judgment Clause does not bar subsequent proceedings against such individuals. *Whether A Former President May Be Indicted & Tried for the Same Offenses for Which He Was Impeached by the House & Acquitted by the Senate*, 24 U.S. Op. Off. Legal Counsel 110 (2000).

### C.    Plaintiffs Have Standing to Bring This Action

Defendants do not dispute that Plaintiffs have adequately alleged injury in fact, nor that Plaintiffs' injuries may be redressed by a favorable decision. However, Stone asserts Plaintiffs'

injuries stem from the actions of third parties and thus cannot be traced to his conduct. *See* Stone at 7. His argument has no merit.[23]

To establish standing under Article III of the Constitution, a plaintiff must demonstrate that (1) he has "suffered an 'injury in fact;'" (2) there is "a causal connection between the injury and the conduct complained of;" and (3) it is "'likely' . . . that the injury will be redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Courts examining a motion to dismiss for lack of standing "must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

Article III standing's causation requirement requires the alleged injury to be "'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560. This "'requires no more than de facto causality,'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019), which need not be proved "with absolute certainty." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 113 (D.C. Cir. 1990). A plaintiff's burden to establish causation is "relatively modest" at the motion to dismiss stage. *Bennett v. Spear*, 520 U.S. 154, 170-71 (1997). "[P]roximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014).

Where a plaintiff suffers injury do to the actions of a third party, the plaintiff must show that the third party "likely react[ed] in predictable ways" to the defendant's actions. *Dep't of Com. v. New York*, 139 S. Ct. at 2565-66. A defendant's actions need not be "the very last step in the chain of causation," *Bennett*, 520 U.S. at 169, and the "existence of . . . an equally important player

---

[23]   Nordean and Kinnison also argue that Plaintiffs are improperly attempting to vindicate the rights of members of Congress. *See* ECF 95, Nordean MTD 8-11; ECF 96, Kinnison MTD, at 7-9. This argument fails as discussed above. *See supra* II.B.2.

in the story" does not necessarily negate the causal relationship to support standing, *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017).

Plaintiffs sufficiently allege that the third parties who attacked Plaintiffs reacted in predictable ways to Stone's actions in furtherance of the conspiracies—indeed, in the exact ways that Stone intended. The Amended Complaint shows that the violent crowd came to Washington, D.C., in response to Defendants' false claims of election fraud and calls to come to Washington, D.C., to stop certification of the election results, *see, e.g.*, *id.* ¶¶ 72-81, 85-95; marched on the Capitol in response to Defendants' statements, *see, e.g.*, *id.* ¶¶ 107-22; and did so in accordance with conspiracies to prevent certification to which Stone had agreed, *see, e.g.*, *id.* at ¶¶ 85-93. To the extent Stone argues he had no hand in these conspiracies or that his speech is protected under the First Amendment, *see* Stone at 7, those arguments do not hold water, *see supra* II.A (§ 1985 conspiracy), IV.B (First Amendment).

### D.  This Court Has Personal Jurisdiction over the Trump Campaign

Defendant Trump for President, Inc., claims that the Court lacks personal jurisdiction over it, but its argument is based on a fundamental mischaracterization of its involvement in organizing and planning the January 6 rally in Washington, D.C. The Amended Complaint's allegations establish an ample predicate for this Court to exercise specific personal jurisdiction over Trump for President. Specific personal jurisdiction requires that Plaintiffs' claims arise out of or relate to a Defendant's contact with the forum. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021). There must be some "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Bristol-Myers Squibb Co. v. Superior Ct. of California,*

*San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017). This Court can exercise specific jurisdiction over Trump for President on two grounds.

> **1.      Trump for President's Purposeful Direction of Its Activities at Washington, D.C., Establishes Specific Jurisdiction**

Specific jurisdiction can be exercised over Trump for President because it took purposeful actions in the District of Columbia, invoking the benefits and protections of the District's laws. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). There must be a "connection between the forum and the specific claims at issue." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017) (internal citation and quotation marks omitted); *see Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 175 (D.D.C. 2018) (Defendants' "'suit-related conduct must create a substantial connection with' the District.").

The allegations in the Amended Complaint establish that Trump for President has taken action in the District, including planning and organizing the January 6 rally and work to prevent the certification of the election. ECF 89, ¶ 84. (Trump for President and its staff organized the submission of the application for the rally permit; prepared the venue, vendors, and music for the event; made payments to the event staging company; and helped arrange funding for the rally). Among other things, Agents of Trump for President also spoke at the January 6 rally, drafted legal memos used in the conspiracy to promote the rejection of certified electoral votes, and pressed members of Congress to delay certification while the attack was ongoing. *Id.* ¶ 112, 114, 152. In furtherance of the conspiracy, Trump for President Advisor Katrina Pierson spoke in Washington, D.C., on December 12, 2021, and exhorted co-Defendants and others, including hundreds of members of Defendant Proud Boys to use "take our country back" even if they are unable to do so through lawful means of the courts and other institutions. ECF 89, Amended Complaint para 79.

In furtherance of the conspiracy, Pierson declared that the election "isn't over" and "we're going to fight" because the "courts" and "institutions" had been "weaponized against us," and "We will utilize that system to the very end. And if that doesn't work, we will take our country back." *Id.* For these reasons, *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158 (D.D.C. 2018), on which Trump relies, is plainly distinguishable. In that case, the plaintiff sued the campaign for its alleged involvement during the 2016 campaign disclosing plaintiff's personal communications online, and the court found that no suit-related contacts occurred within the District. *See* 319 F. Supp. 3d at 177-80.

Even aside from these allegations, Trump for President's "absence of physical contact with a forum will not defeat personal jurisdiction," as long as its conduct and connection is such that it "should reasonably anticipate being haled into court there." *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997) (citations omitted). And it is reasonable for Trump for President to expect to be haled into court in the District when it served a vital planning and organizing role for the January 6 rally from which the attack that underlies this action originated, and its agents took actions in the District to further the illegal acts in the Complaint.

### 2. Trump for President's Participation in the Underlying Conspiracies Also Can Establish Specific Jurisdiction

Specific jurisdiction also can be established based on the commission of overt acts within Washington, D.C., by Trump for President's coconspirators. Such conduct by coconspirators establishes specific jurisdiction upon allegations of (1) "the existence of a civil conspiracy"; (2) "the defendant's participation in the conspiracy"; and, (3) "an overt act by a coconspirator within the forum, subject to the long-arm statute, and in furtherance of the conspiracy." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 90 (D.D.C. 2017), *aff'd*, 894 F.3d 339 (D.C. Cir. 2018).

Plaintiffs allege a sufficient basis for coconspirator jurisdiction. As noted above, Plaintiffs' detailed allegations outline conspiracies to use force, intimidation, and threats to disrupt Congress and the Capitol Police and prevent the certification of the 2020 Presidential election results. *See supra* II.A (liability for § 1985 conspiracy). Plaintiffs further allege that Trump for President actively participated in these conspiracies and took action in furtherance of them, both in and directed toward the District, as set out above. *See supra* IV.D.1. Conspiratorial jurisdiction thus also establishes specific jurisdiction over Trump for President.

### 3.    This Court has Jurisdiction over MAGA PAC as a Continuation of Trump for President

MAGA PAC cannot escape the jurisdiction of this Court because, as MAGA PAC concedes, it is "in essence the same legal entity" as Trump for President. Trump at 34. "A corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor." *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1131 (10th Cir.1991). And D.C. courts have imputed jurisdictional contacts onto a company's successor-in-interest when the successor is a "mere continuation" of the predecessor company. *Jackson v. George*, 146 A.3d 405, 413 (D.C. 2016). Because MAGA PAC operates as the same entity as Trump for President but under a different name, ECF 89, ¶ 21—a point which MAGA PAC has conceded, Trump at 34—MAGA PAC is clearly a "mere continuation" of Trump for President. *Jackson*, 146 A.3d at 413-14 (finding a successor a "mere continuation" of the predecessor company subject to the court's personal jurisdiction when the successor company possessed the same assets as its predecessor but just operated under a different name); *Material Supply Int'l, Inc. v. Sunmatch Indus. Co ., Ltd.*, 62 F. Supp. 2d 13, 23 (D.D.C. 1999) ("[C]ontinuation will be found where it effectively ceased to exist as an active corporation.").

Thus, Trump for President's contacts and liability are imputed onto MAGA PAC, and this Court can exercise jurisdiction over the latter.

### E.     The Abstention Doctrine Does Not Support Dismissal

Nordean and Kinnison ask the Court to decline jurisdiction because other civil cases against those responsible for the January 6 attack also exist. Their reliance on the "first to file" principle is misplaced, however, and provides no reason for the Court to deviate from its "virtually unflagging obligation" to exercise its jurisdiction. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). None of the three circumstances for abstention outlined in *Colorado River* exists here. *See id.* at 814-16. Nor does the first-to-file principle apply, because that rule only deals with "cases between the same parties on the same cause of action." *Wash. Metro Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980) (courts should not simultaneously hear "two cases between the same parties on the same cause of action"); *see also En Fuego Tobacco Shop LLC v. U.S. Food and Drug Admin.*, 356 F. Supp. 3d 1, 7 (D.D.C. 2019) (Mehta, J.) (purpose of the rule is to avoid "allowing the same [ ] plaintiff multiple bites at the apple." (internal quotation marks omitted, alteration in original)).

### F.     Plaintiffs' Sufficiently Allege the Sought-After Relief

Defendants' challenge to the availability of punitive damages and injunctive relief also fails. No legal authority supports Defendants Nordean and Kinnison's argument that punitive damages are not available for section 1985 and 1986 claims. *See* ECF 95, Nordean MTD, at 21; ECF 96, Kinnison MTD, at 18. Courts permit the recovery of punitive damages under section 1985(3). *See, e.g.*, *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376 (1979) ("section 1985(3) expressly authorizes compensatory damages; punitive damages might well follow."); *Thompson v. Int'l Ass'n of Machinists & Aerospace Workers*, 580 F. Supp. 662, 670 (D.D.C. 1984) ("[C]ompensatory and punitive damages are available under § 1981 and §

1985(3)"). Given that section 1985(3) provides the remedial language for section 1985(1) claims, see 42 U.S.C. § 1985, the shared historical purpose between statutes, and that Defendants cite no supporting authority, punitive damages also are recoverable under section 1985(1) and section 1986.

Meggs's challenge to Plaintiffs' allegations supporting punitive damages, *see* ECF 110-1, Meggs MTD, at 33, also fails. Participation in an intentional attack against persons "conducting themselves in a peaceful and lawful manner" constitutes aggravated conduct that permits recovery of punitive damages. *Payne v. Gov't of D.C.*, 559 F.2d 809, 820 (D.C. Cir. 1977). And Meggs not only participated in the attack on the Capitol that inflicted egregious injuries on Plaintiffs, ECF 89, ¶¶ 39, 86, 157-64, but also took actions to make the violent Attack more successful—such as organizing an alliance with the Proud Boys and telling others to bring weapons to the attack. *Id.* ¶¶ 100, 101, 104. Punitive damages are thus properly alleged.

Meggs's contention that Plaintiffs cannot seek injunctive relief because they inadequately allege a risk of future injury also fails. *See* ECF 110-1, Meggs MTD, at 16-19. Plaintiffs include current Capitol Police officers who protect the Capitol on a daily basis and will again stand in the line of fire in 2025 when Congress attempts to certify the 2024 presidential election results. Based solely on allegations concerning conduct subsequent to the Capitol Attack, Plaintiffs demonstrate that Defendants intend to employ the same force, threats, and intimidation that they used following the 2020 presidential election. This shows that Plaintiffs are likely to suffer future injury in 2025. Moreover, because Plaintiffs allege Defendants continue to take the same actions now as those prior to the 2020 presidential election, including spreading false claims of election fraud and encouraging the use of force, threats, and intimidation to prevent certification of election results, Defendants have engaged in a pattern or practice that will result in injury to Plaintiffs.

To have standing to seek injunctive relief, plaintiffs must show that they are "likely to suffer future injury" from the challenged conduct. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). "[A]lthough past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, past wrongs may serve as "evidence bearing on whether there is a real and immediate threat of repeated injury." *NB ex rel. Peacock v. D.C.*, 682 F.3d 77, 84 (D.C. Cir. 2012) (quotations and alterations omitted). Courts routinely find standing where parties challenge practices that, if left in place, will continue to result in the same alleged injury. *See, e.g.*, *In re Navy Chaplaincy*, 697 F.3d 1171, 1176-77 (D.C. Cir. 2012) (holding plaintiffs had standing to challenge practices that would continue to result in religious discrimination); *D.C. Common Cause v. D.C.*, 858 F.2d 1, 9 (D.C. Cir. 1988) (holding "cause to think" pattern and practice of using public funds to campaign against a future initiative was sufficient to show risk of future injury).

*First*, Defendants' intent to employ the same force, intimidation, and threats that they used to halt certification of the 2020 presidential election demonstrates that Plaintiffs likely will suffer future injury. Trump and his agents have approved of the conduct in furtherance of the conspiracies. On January 12, 2021, Trump told reporters his pre-insurrection speech had been "totally appropriate." ECF 89, ¶ 152. In subsequent interviews, Trump has called the attackers "great people" and said, "Personally, what I wanted is what they wanted," and, "Our hearts and minds are with the people being persecuted so unfairly relating to the January 6th protest concerning the Rigged Presidential Election." *Id.* ¶ 154.

Moreover, during and in the immediate aftermath of the Capitol Attack, other Defendants expressed pride in their action in furtherance of the unlawful conspiracies, *see id.* ¶ 140, and they have continued to do so since then. Alexander expressly said, "I don't disavow this. I do not

denounce this." *Id.* ¶ 155. The Proud Boys USA Telegram account has posted messages calling for "all political prisoners of 1/6/21" to be freed. *Id.* Tarrio posted on Telegram that Proud Boys arrested in connection with the Capitol Attack were "political prisoners" and called for their release. *Id.* On July 7, 2021, Tarrio posted to Telegram an FBI "seeking information poster" with the title, "Assault on Federal Officers and Violence at the United States Capitol. Washington, D.C., January 6, 2021" and captioned the poster, "I did this." *Id.* On July 10, 2021, Proud Boys and Oath Keepers—including Tarrio—gathered on the steps of the Florida State Capitol to call for the release of the "political prisoners" arrested in connection with January 6. *Id.* In text messages sent on January 7, 2021, Rehl said, "Looking back, it sucked, we shoulda held the capital," and "Everyone shoulda showed up armed and took the country back the right way." *Id.*

*Second*, Defendants' statements and conduct also exhibit a practice that, if left unchecked, will result in harm to Plaintiffs. Trump has continued to press false claims of election fraud, to encourage his supporters to fight, and to claim falsely that the election will be reversed and he will be reinstated as President. *Id.* ¶ 153. In one interview, Trump stated that on January 6, "the people were very angry" because "it is common sense" that you should not "pass on a fraudulent vote to Congress." *Id.* ¶ 154. In a September 16, 2021, statement on his Save America website, while sympathizing with the Capitol's attackers, Trump repeated his claim that the 2020 presidential election was "Rigged." *Id.* Further, at least two Defendants have expressly stated their willingness to use violence in future unlawful conspiracies. On July 1, 2021, Tarrio posted, "Hey when's the next riot?" *Id.* ¶ 155. And Caldwell has stated, "We need to do this at the local level. Lets [sic] storm the capitol in Ohio. Tell me when!"

These allegations demonstrate that the harm posed by Defendants continues, that they persist in their willingness to stoke anger based on false claims of election fraud, and to use force

to install political leaders in Washington if they do not win at the ballot box. Plaintiffs will face the same harm in 2025, if not sooner, as they did in 2021, when they seek to protect Congress's certification of the 2024 presidential election. And because Defendants are engaging in the same practices as prior to the 2020 presidential election, Plaintiffs have alleged a practice that will result in injury to Plaintiffs.

## **CONCLUSION**

For the foregoing reasons, the Defendants' motions to dismiss the Amended Complaint should be denied.

Dated: January 17, 2022                        Respectfully submitted,

_/s/ Edward G. Caspar_
Jon Greenbaum, D.C. Bar No. 489887
Edward G. Caspar, D.C. Bar No. 1644168
David Brody, D.C. Bar No. 1021476
Arusha Gordon, D.C. Bar No. 1035129
Noah Baron, D.C. Bar No. 1048319
Lawyers' Committee for Civil Rights Under Law
1500 K Street N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 662-8390
jgreenbaum@lawyerscommittee.org
ecaspar@lawyerscommittee.org
dbrody@lawyerscommittee.org
agordon@lawyerscommittee.org
awashington@lawyerscommittee.org

***Counsel for Plaintiffs***