**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CONRAD SMITH, et al.,

*Plaintiffs*,

v.                                                            Case No. 1:21-cv-02265-APM

DONALD J. TRUMP, et al.,

*Defendants*.

**MOTION OF DEFENDANT ALI ALEXANDER
TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Defendant Ali Alexander, through his undersigned counsel, hereby files his motion to

dismiss Plaintiffs' Amended Complaint ("Am. Compl.") (ECF 89) pursuant to Rule 12(b)(6) and

12(b)(1) of the Federal Rules of Civil Procedure and in support thereof, submits the following

points and authorities pursuant to LCvR 7(a).[1]

**INTRODUCTION**

Plaintiffs, eight U.S. Capitol Police Officers who were injured during the attack on the

Capitol on January 6, 2021, sue Defendant Ali Alexander along with the other defendants for

allegedly conspiring to violate the Ku Klux Klan Act, the D.C. Bias-Related Crimes Act, and for

assault, battery, and negligence under local law.  Plaintiffs allege that Alexander's conduct and

---

[1] While there was some question as to when Mr. Alexander's response to the Amended
Complaint was due because of the both the service on the Summons and Complaint on
the Defendant and its Waiver by undersigned counsel, Plaintiffs' counsel agreed nevertheless that
this response would not be due until January 17, 2022.  Because that date is a federal holiday,
Plaintiffs' counsel further acknowledged that the filing was extended to the next business day.

statements made well before January 6 as well as those on and after January 6, all of which are protected First Amendment activity[2] constituted a conspiracy with the other Defendants that somehow directly and proximately caused Plaintiffs' injuries by a few unnamed defendant protestors. These allegations are false, misleading, baseless and legally deficient.  See *Ashcroft v. Iqbal*, 555 U.S. 662, 679 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## BACKGROUND

Defendant Ali Alexander, whose birth name is Ali Abdul-razaq Akbar, (hereinafter Alexander) was raised by his Black single mother in Section 8 housing.  His father was an Arab who abandoned the family when Alexander was just two years old.  About 15 years ago, Alexander was arrested for a minor non-violent offense and judgment was deferred while he was placed on probation.  While any arrest in one's early twenties as a Black man often sets people back so far that they never again find firm footing upon which to succeed, Alexander managed to overcome that setback and refused to fail.

Coupled with his faith in Christ, including attending Bible College, he worked to change a system that society insisted was supposed to hold young Black men down.  He got involved in politics and started putting together coalitions and rallies and raising awareness for a variety of candidates and issues, including advising the Trump Administration on criminal justice reform.[3] He used a silhouette of his most tragic youthful mugshot on a t-shirt to raise money for fatherless Black boys, boys who are growing up like he grew up.  That Alexander is being accused by the

---

[2]  See *Brandenburg v. Ohio,* 395 U.S. 444 (1969), *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 889 (1982); *E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, (1961).

[3] See, e.g., The Hill, *Trump signs criminal justice overhaul* (Dec. 21, 2018). https://thehill.com/homenews/administration/422517-trump-signs-criminal-justice-reform-bill

Plaintiffs and their attorneys of conspiring to violate the Ku Klux Klan Act, the D.C. Bias-Related Crimes Act (Am. Compl. para. 4), and that "[r]acism and white supremacy pervaded Defendants' efforts from the outset" (Am. Compl. para. 5) is particularly odious, let alone factually baseless.[4]

As a conservative grassroots organizer who help lead the Stop the Steal movement devoted to election integrity,[5] he assisted in organizing hundreds of rallies with hundreds of thousands of participants in all fifty states.  Not one single rally turned violent.  Alexander demands non-violence at his events and among his followers, colleagues, and associates. He and his leadership team work closely with law enforcement at every event to ensure peace and order.

Those principles were not compromised on January 6.  Alexander supports the legislative solutions and recommendations on how to prevent violence at the Capitol.[6]  It is clear there was

---

[4] Plaintiffs, as do the liberal media, falsely portray those who supported President Trump and attended the rally on January 6 as a bunch of white supremacists to suit their preferred narrative and baseless lawsuit under the Ku Klux Klan Act.  That stereotypical charge comes as an insult not only to Alexander, but also to many others who attended the January 6 rally, including other Black and other minority protestors.  See also *Virginia White v. Robert J. Contee, III,* No. 21-cv-00027 (D.D.C.) (filed Jan. 5, 2022) (lawsuit by peaceful protestor, a White single mother of four bi-racial children and victim of domestic abuse, against the D.C. Police for using excessive force by beating her over the head approximately 35 times with a metal baton in four minutes until she was bloodied and then punching her in the face five times for good measure as she was involuntarily pushed and trapped inside the tunnel on the West side of the Capitol packed with some 40 D.C. Police in riot gear. She was seen earlier on camera pulling a protestor from a window where he was trying to bash it in, yelling at him and the crowd that such conduct is wrong and should stop. To add insult to injury, she was criminally charged for breaching the Capitol and other "crimes" for the beating she took). See Newsmax Interview of Virginia White and her attorney at https://youtu.be/KhrEWU63nmM.

[5]  While the phrase "Stop the Steal" was originally coined by Roger Stone in 2016, Alexander later adopted that slogan to promote election integrity and established Stop the Steal LLC. Although the Stop the Steal LLC is a named Defendant in this case, the entity is dissolved.

[6]  Alexander fully cooperated with the Select Committee on the January 6th Attack on the United States Capitol and provided the Committee with hundreds of documents, including text messages and emails and later testified on December 9, 2021 for some eight hours before the Committee. See ABC News, *'Stop the Steal' organizer cooperating with Jan. 6 committee probe, sits for 8-*

an appalling lack of planning and security by the Plaintiffs' superiors at the U.S. Capitol Police, other law enforcement agencies, and the House Sergeant at Arms.  Alexander also supports the prosecution of those protestors, who comprise just a small minority of the thousands who peacefully protested that day, who committed unjustified violent acts against law enforcement, including against the Plaintiffs, and who destroyed public property.

Indeed, Plaintiffs' unsupported allegations that Alexander, along with the other defendants, *"had knowledge that the wrongs conspired to be done, as set out in Count I, were about to be committed, and neglected or refused to prevent or aid in preventing those wrongs"* (Am. Compl. para. 175) is demonstrably false.  Not only did Alexander *not* have knowledge that any of the protestors would attack the Capitol or harm the Plaintiffs, but also with the tacit approval of Capitol Police on the East Side of the Capitol, Alexander, along with radio personality Alex Jones, climbed partway up the Capitol steps to shout at the protestors below *not* to breach the Capitol.  Unfortunately, their pleas went unheeded amid the noise of the crowd and blaring music, and so they left the area and Capitol Grounds.

### FACTS

Alexander did not organize the Ellipse rally on January 6 at which President Trump spoke.  He did not speak at the rally but only had a seat in the VIP section.  He did not conspire with the other defendants to cause injury to the Plaintiffs.  He did, however, arrange for a rally "One Nation Under God" in Lot 8 through a professional vendor reported to be preferred by the National Park Service on the Northeast side of the Capitol bounded by Constitution Avenue, N.W. and First Street, N.E. That event was tentatively scheduled to begin at 1:00 pm and so Alexander had to leave the Ellipse rally before President Trump finished his speech in order to

*hour interview* (Dec. 9, 2021*).* https://abcnews.go.com/US/stop-steal-leader-cooperating-jan-committee-probe-deposition/story?id=81645579

get to the site on time and make sure others would attend his rally.  There were three other events permitted nearby on Lots 9, 10, and 11 on the Capitol Grounds.  There were even more permitted events in the surrounding area.

On his way to the Capitol Grounds with Jones, who was also in the VIP section, and accompanied by their paid and bonded private security professionals (not any Oath Keepers or Proud Boys), other rally goers were already on their way (walking, not "marching" in any organized fashion) but had not been earlier been instructed at the Ellipse rally where exactly to gather at the several permitted rallies at the Capitol Grounds.

As they approached the Capitol, coming toward the West side, they observed civil disorder and potential conflict between protestors and police clashing with each other. Soon, tear gas would fill the air.  In an attempt to de-escalate the situation, Jones and Alexander stood atop a makeshift platform of a pallet of wet metal chairs with a megaphone to urge the crowd to act peacefully, not to advance to the West side (tunnel or balcony), and to follow them around the Capitol to the East side where there were permits for his and other peaceful events.  Alexander and Jones are credited with saving hundreds from a confusing and dangerous situation and drawing them away from the problematic West side.

On their way, they encountered a Capitol Police Officer, on the North side, who directed them to continue walking around the Capitol Building to the East side of the Capitol, whereupon they saw that some protestors were also on the steps of the Capitol but further down towards the South East side entrance.  Alexander's security detail repeatedly asked police officers who were lined up at bottom of the steps where Alexander and his group were standing peacefully, whether Alexander could ascend the steps further down the Capitol entrance to address the crowd that had already ascended the steps to de-escalate that situation, having seen what had occurred on

the West side.  Alexander eventually made his way with Jones down the walk to the South East

side entrance and up the steps where the protestors were gathering.  He was surprised to see there

was no Capitol Police presence, since the other officers he first encountered lining the steps on

the Northeast side did not seem worried about that situation.  Alexander and Jones yelled at the

crowd not to remain on the Capitol steps, saying there had been confusion, and Alexander even

physically pulled a couple protestors down the steps himself.  Because of the noise and

confusion, their efforts to de-escalate the situation were unsuccessful and they both left the area.

Their actions were caught on video.  It is Alexander's understanding that after he left, some of

those who scaled those steps entered the Capitol building when the metal doors were opened

from the inside.

Plaintiffs nevertheless allege that Alexander's conduct and statements made well before

January 6 as well as on January 6 and afterwards, all of which are protected First Amendment

activity, constituted a conspiracy to injure the Plaintiff officers and that other allegedly unlawful

conduct directly and proximately caused Plaintiffs' injuries.  These allegations are false,

misleading, baseless, and legally deficient.

For example, Plaintiffs allege that

> In interviews on November 14 and December 23, 2020, ALEXANDER solicited
> people to sign up for an email listserv at StoptheSteal.us, and told followers that
> they had to "put bodies in the streets and **make the American oligarchs scared of
> what we'll do**." (Emphasis added). He also called for "fighters," telling viewers
> that "you teach a bully to stop hitting you by punching him in the nose. **We've got
> to punch the left in the nose and we've got to stop being nice about it.**" (Emphasis
> added). On December 7, 2020, ALEXANDER tweeted, "I am willing to give my
> life for this fight." On December 30, 2020, ALEXANDER tweeted, in reference
> to the Congressional count of electoral votes and announcement of the election of
> Biden and Harris on January 6, "If they do this, everyone can guess what me and
> 500,000 others will do to that building."

Plaintiffs' added emphasis to a couple of Alexander's remarks or tweets taken out of

context miss the mark.  Not only are they clearly within the rubric of constitutionally protected political rhetoric and hyperbole, but also there is no factual support that these remarks, made well before January 6, were heard by the rally goers who breached the Capitol, let alone by those who actually assaulted the Plaintiffs.

The term "fighters" and "fight" and "fight back" has been used by nearly every political commentator, activist, and most Members of Congress, including Hillary Clinton, Maxine Waters, Nancy Pelosi, Charles Schumer, and Donald J. Trump.[7]  Alexander is clearly using an illustrative metaphor when he says to "punch the left in the nose." He is referring to a political

---

[7] See, e.g., Statement of Representative Maxine Waters regarding the trial of Derek Chauvin charged with killing George Floyd:

> "I'm going to fight with all of the people who stand for justice," said Waters, who is Black. "We've got to get justice in this country and we cannot allow these killings to continue."  Waters said: "We've got to stay on the street and we've got to get more active, we've got to get more confrontational. We've got to make sure that they know that we mean business."

https://www.theguardian.com/us-news/2021/apr/19/maxine-waters-minneapolis-remarks-kevin-mccarthy-marjorie-taylor-greene  See also Statement of Senator Charles Schumer standing on the steps of the Supreme Court on March 5, 2020, before a pro-abortion crowd in front of cameras where he shouted:

> "I want to tell you, Gorsuch… I want to tell you, Kavanaugh… you have released the whirlwind, and you will pay the price. You won't know what hit you if you go forward with these awful decisions. (Emphasis added).

As Schumer made this threat, he turned and pointed to the Supreme Court behind him to emphasize his point that he was directing his attack to the justices personally and the Court itself that was hearing oral argument at that time on an abortion case.  The crowd cheered him on.  The Chief Justice, ABA, and others quickly admonished Schumer for these kind of threats to the Justices. https://www.theblaze.com/news/aba-rips-schumer-for-threatening-that-conservative-supreme-court-justices-will-pay-the-price-for-pro-life-rulings.  Schumer denied any threat was made and defended his language on the Senate floor: "I'm from Brooklyn. We speak in strong language." https://newyork.cbslocal.com/2020/03/05/chuck-schumer-supreme-court-neil-gorsuch-brett-kavanaugh-abortion/

ideology which has no physical body. In any event, none of the Plaintiffs allege that they belong within this political category of persons. This is a clear attempt to cherry pick thousands of hours of Alexander's extemporaneous political, philosophical, and theological commentary—wholly outside the scope of this case and the events of January 6, 2021—against him.

In fact, the Department of Justice maintains this same position. On the one-year anniversary of January 6, Attorney General Merrick Garland said that speech would not be investigated or criminally charged. He argued, "As we do this work, we are guided by our commitment to protect civil liberties, including the First Amendment rights of all citizens. The department has been clear that expressing a political belief or ideology, no matter how vociferously, is not a crime. We do not investigate or prosecute people because of their views. Peacefully expressing a view or ideology — no matter how extreme — is protected by the First Amendment."[8] Also, in a recent sentencing recommendation filing, the government concedes that rally speeches and tweets "contain rhetorical flourishes" --such as "fight," "civil war," and "revolution,"-- "that are common in political speech."[9]

Alexander admits he tweeted on December 7, 2020, "I am willing to give my life for this figh.t" however, that too is a political metaphor much like Patrick Henry's "Give me liberty, or give me death" or New Hampshire's Motto, "Live Free or Die," or Reverend Dr. Martin Luther King Jr.'s "A man who won't die for something is not fit to live."

The gravamen of the Plaintiffs' charges is that they object to Alexander's support of the legal objections filed by some State Representatives and Members of Congress with respect to the counting of some State's electoral votes, as if there was no basis to do so. Yet such

---

[8]  Attorney General Merrick B. Garland Delivers Remarks on the First Anniversary of the Attack on the Capitol (Jan. 5, 2022). https://www.justice.gov/opa/speech/attorney-general-merrick-b-garland-delivers-remarks-first-anniversary-attack-capitol
[9] *United States v. Straka, 21-cr-00579,* Sentencing Memorandum at 5,7 (Jan. 5, 2022).

challenges were filed by the Democrats in 2001 and 2017.[10]  Even Nancy Pelosi took to the floor

in 2004 to complain about the presidential votes cast in Ohio because of alleged voting

irregularities, including shifting tallies, electronic voting machines, and voting integrity.[11]

Plaintiffs further try to falsely portray Alexander as one who advocates violence by

alleging that on November 18, 2020, *"at a Stop the Steal rally outside the state capitol in*

*Georgia. ALEXANDER and TARRIO spoke, promoting false claims of election fraud.*

*ALEXANDER asked the crowd of TRUMP supporters, "Who is going to be ready to storm the*

*capitol with us in a few minutes?" after which they led the crowd inside the state capitol."*  Am.

Compl. para. 78.  To be clear, Alexander did not literally "storm the capitol" but meant it

figuratively and his audience took it that way.   He indeed peacefully "led the crowd inside the

state capitol," but at the invitation of a Democrat State Representative Vernon Jones and escorted

in by Georgia State Capitol Police who worked directly with Alexander and his team.  They left

their signs at the door, took a couple photos, and Representative Vernon Jones led the group into

singing a few bars of "Georgia on My Mind."[12]  They promptly departed with the compliments

of law enforcement.  Lawmakers and government staff thanked Alexander for making sure their

work went uninterrupted while he and his supporters were allowed to exercise their civil rights to

petition for redress of grievances.  In particular, Alexander sought to have the Georgia State

Legislature called into session by the Governor of Georgia and for the Secretary of State to pause

the certification process because of allegations of voting irregularities.  All of this activity seeks

---

[10] Daily Signal, "In Past 20 Years, Democrats Objected 3 Times to Electoral College
Certifications" (Jan. 3, 2021) https://www.dailysignal.com/2021/01/04/in-past-20-years-
democrats-objected-3-times-to-electoral-college-certifications/

[11]  https://www.c-span.org/video/?c4932492/user-clip-nancy-pelosi-challenges-vote-2004

[12] https://www.youtube.com/watch?v=Y77L8sxiCFU

protected legal redress from various branches of the government.  Alexander sought to have

every voter legally and truthfully represented.

Alexander also told one protestor that he will not support a civil disobedience "sit-in"

because he didn't support the tactic. How could Alexander support violence at the U.S. Capitol

but not a simple and commonplace peaceful sit-in, all whilst working with law enforcement at

the invitation of a Democrat State Representative?   In any event, peaceful rallies in late

November in Georgia are also irrelevant and have no causal connection to the injuries suffered

by the Plaintiffs on January 6 at the U.S. Capitol in Washington, D.C. weeks later.  In fact,

Alexander was unaware of January 6 during these dates.  Instead, Plaintiffs' allegations and this

lawsuit are meant to punish Alexander for exercising his First Amendment freedoms and to chill

his further exercise of those rights.

Moreover, Plaintiffs mistakenly confuse three separate rallies that occurred on two days

when they allege that *"Defendants, including TARRIO, RHODES, TRUMP FOR PRESIDENT*

*adviser Katrina Pierson, and approximately 400 members of PROUD BOYS, attended a*

*December 12, 2020 rally in Washington, D.C., which was organized by STOP THE STEAL and*

*ALEXANDER, among others."*  Am. Compl.  para. 79.  Neither Alexander nor Stop the Steal

organized a rally on December 12 where 400 Proud Boys and Katrina Pierson allegedly attended.

Rather, Alexander helped organize and participated in a separate Christian and Jewish prayer

rally on the National Mall on December 12.  It was a peaceful permitted event but not permitted

to Alexander.  Stop the Steal LLC helped cover some costs and booked speakers. It featured

prayer, sermons, Christian worship music, and the blowing of the shofar as per Jewish tradition.

Plaintiffs further accuse Alexander of helping to promote attendance at the January 6

rally and the permitted one on Lot 8 on the Capitol Grounds *"despite widespread reports that*

*many had already resorted to violence and threats of violence in response to TRUMP losing the election."* Am. Compl. para. 95.  There is no allegation that Alexander knew of these "widespread reports" of possible violence, and that even if he did, so would the Capitol Police and other law enforcement agencies who would presumably plan for the security of the Capitol so that no violence would break out or be minimized.

Plaintiffs further allege that *"STOP THE STEAL, aware that it was considered an extremist group, purposefully concealed its plans for a January 6 rally by applying for a rally permit on Capitol grounds using a false name ("One Nation Under God"). The so-called One Nation Under God permit application was rife with other misrepresentations too: it estimated just 50 people would attend (despite multiple Congress members, ALEXANDER, STONE, and STRAKA being listed as expected speakers), it stated the planners did not have other events planned in Washington, D.C., and it said no march was planned.*  Am. Compl. para. 106.

Stop the Steal is not an extremist group and has never been regarded as such except by political adversaries, plaintiffs' counsel, and the liberal media, or that Capitol Police would deny Stop the Steal a permit whose previously sponsored rallies were all peaceful.  "One Nation Under God" is not a "false name" as Plaintiffs allege but is the event name representing a broader group that included, but was not limited to solely Stop the Steal. It is not uncommon for citizens, oftentimes with no formal entity or group name, to list their event name on the permit.

Alexander did not handle the permit application but hired a well-qualified consultant to make sure he and his group were compliant and responsive to the application and permitting process.  It is Alexander's understanding that the consultant was advised by the Capitol Police that all applications should list no more than 50 participants and that the other ones given to groups for Lots 9, 10, and 11 also listed 50 participants.  It is Alexander's understanding that if

more than 50 actually show up for the event, that the Capitol Police has the discretion, but not the obligation, to issue a warning to the organizers to shut it down or to give an order to disperse.

As for Plaintiffs' allegations that numerous speakers were expected (though not guaranteed) to appear at the event was somehow contrary to the limit of 50 participants is of no moment: that is not a mutually exclusive scenario, particularly where speakers' presentations even before small audiences can be broadcast or videotaped for later distribution to a wider audience.  In any event, the number of people at Lot 8 never exceeded 50 people.  Plaintiffs' quibbling about the technicalities of permit paperwork has no causal connection to the injuries suffered by the Plaintiffs at the hands of unidentified protestors who entered the Capitol.

Plaintiffs further complain and ascribe legal liability to Alexander for later releasing *"a video proclaiming, "Stopthesteal.us is gonna be the home of the rebellion against an illegitimate government."* Am. Compl. para. 142.  Alexander's use of the term "rebellion" is common political parlance.  The American Left used a similar contextual reference when they went under the moniker "resist" or "resistance" in their attacks on the duly-elected Trump administration. Alexander believes Joseph R. Biden was seated under controversy regarding voter irregularity. He has every right to call the administration he opposes "illegitimate" just as several civil rights leaders have called past administrations "illegitimate" if they believed the election was somehow flawed.  In any event, this subsequent statement by Alexander has no causal connection to the injuries previously suffered by the Plaintiffs.

Finally, in yet another example of the Plaintiffs' shamelessly taking Alexander's words out of context to suit their false narrative, they allege that, *"On January 6, as the Capitol Attack was underway, ALEXANDER shared a video overlooking the Capitol and said, "I don't disavow this. I do not denounce this."* Am. Compl. para. 155.  In the first place, Alexander does not say

that he affirmatively approves "this."  But what Plaintiffs' counsel conveniently omit is that in the video, the "this" Alexander was expressly referring to was the thousands of "completely peaceful" protestors he was looking down upon from atop a nearby office building after he had left the East side of the Capitol.  Indeed, in the same breath, Alexander specifically denounced those "agitators" who breached the Capitol Building.[13]

In sum, Plaintiff's allegations against Alexander are bereft of factual and legal substance to make out any kind of conspiracy with Donald Trump and the other defendants to cause injury to the plaintiffs and should be dismissed.

## ARGUMENT AND NOTICE OF ADOPTION

In the interest of judicial economy and to avoid a duplication of briefs, Alexander hereby adopts by reference the applicable legal arguments submitted by the other Defendants in their respective Motions to Dismiss the Amended Complaint filed on December 3, 2021. In particular, Alexander adopts the First Motion to Dismiss the Amended Complaint by Ethan Nordean (ECF 95) and the Motion to Dismiss the Amended Complaint by Roger J. Stone, Jr. (ECF 100), including the following arguments summarized below:

### I.       Plaintiffs fail to state a claim upon which relief can be granted. (Rule 12(b)(6)).

A complaint must be dismissed if it consists only of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell v. D.C.,* 82 F. Supp. 3d 151, 154 (D.D.C. 2015) (Mehta, J.,); *Pena v. A. Anderson Scott Mortg. Group, Inc.,* 692 F. Supp. 2d 102, 106 (D.D.C. 2010).

---

[13] See https://twitter.com/k2doe/status/1346957709900455937

"Although 'detailed factual allegations' are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the 'grounds' of 'entitle[ment] to relief,' a plaintiff must furnish 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Gerlich v. United States Dep't of Justice,* 659 F.Supp.2d 1, 4 (D.D.C.2009) (quoting *Twombly,* 550 U.S. at 555– 56)). The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678. Thus, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. Following *Iqbal*, this District Court has applied the *Iqbal* standard strictly in cases ranging from racketeering to age discrimination, and other civil rights cases.[5] Invoking terms like "conspiracy" and "agreement" is insufficient. *Twombly,* 550 U.S. at 556. "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 37 (D.D.C. 2019), *aff'd,* 816 Fed. Appx. 497 (D.C. Cir. 2020), *cert. denied,* 141 S.Ct. 2466 (2021) (citing *id.* at 556-57)).

As demonstrated in the Facts section of this brief, Plaintiffs' claims are based on the sheer speculation that Alexander's First Amendment statements and conduct are actionable and proximately caused Plaintiffs' injuries.

II.      **Counts I-III should be dismissed insofar as Plaintiff officers seek redress for the alleged injuries of nonparty members of Congress, "Congressional staff," President Biden and Vice President Harris**

Plaintiffs do not have "third-party" standing to sue on behalf of those nonparties because they have not shown they have a "close relationship" to those third parties and, in

any case, there is no "hindrance to the third part[ies'] ability to protect [their] own interest[s]." *Powers*, 499 U.S. at 411; *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (A plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229-30 (11th Cir. 2000) ("Absent exceptional circumstances, a third party does not have standing to challenge injury to another party.").

As to Count III, alleging a violation of the D.C. Bias-Related Crimes Act of 1989 (BRCA), Plaintiffs plainly lack standing. The BRCA provides a civil cause of action for

> any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived . . . political affiliation of a victim of the subject designated act. . .

D.C. Code § 22-3704.

The Complaint explicitly alleges that "The intended victims of Defendants' [BRCA violations] were *Democratic members of Congress, some Republican members of Congress, and Vice President Pence*, whom Defendants perceived to be endorsing Democrats Joe Biden and Kamala Harris by announcing the election results"— not Plaintiff police officers. Compl., ¶ 188 (emphasis added). As previously asserted, Plaintiffs did not allege that they held any particular political beliefs or that their attackers singled them out because of their political beliefs.

## III.    Counts I and II fail to state claims under §§ 1985(1), 1986

Counts I and II must be also dismissed because (1) "officers of the United States" in §§ 1985(1) and 1986 are Executive branch officers, whereas Plaintiffs are members of a congressional entity controlled by the U.S. Capitol Police Board, which does not belong to

the Executive branch; (2) Washington, D.C., is neither a "State" nor a "Territory" under §
1985(1); interference with federal voting rights is covered by § 1985(3), which Plaintiffs
eschew in a transparent attempt to avoid its requirement that the defendant act with racial,
invidiously discriminatory animus, an element not pleaded here, and (4) the Complaint fails
to plead any facts showing an agreement between Nordean and anyone else to violate §
1985(1), an essential element of that claim. Because Counts I and II are the only counts
creating original jurisdiction in this Court, the Court should dismiss the remaining pendant
Counts under 28 U.S.C. § 1367(c).

> **A.** **"Officers of the United States" are Executive officers under Article
> II of the Constitution, not congressional employees such as Plaintiffs.**

Section 1985(1) prohibits conspiring to induce by force, intimidation, or threat "any
officer of the United States" to leave the place where his duties as an officer are required to be
performed or "to injure him in his person or property on account of his lawful discharge of the
duties of his office, or while engaged in the lawful discharge thereof, or to injure his property
so as to molest, interrupt, hinder, or impede him in the discharge of his official duties." §
1985(1). Counts I and II are premised on the claim that Plaintiffs, U.S. Capitol Police officers,
are "officers of the United States" under § 1985(1). They are not. They are part of the
Legislative branch.

Under the Appointments Clause of Article II, Sec. 2, cl. 2 of the Constitution,
"officers of the United States" are either principal officers nominated by the President and
confirmed by the Senate or inferior officers where Congress may vest their appointment "in
the President alone, in the Courts of Law, or in the Heads of Departments." Clearly, officers
in the Legislative Branch are not subject to appointment or removal by the President, Courts

of Law, or Heads of Department in the Executive Branch. Hence, the Plaintiffs, being employed within the Legislative Branch, are not "officers of the United States."

**B.    D.C. is not a "State or Territory" under § 1985(1)**

Section 1985(1) creates a right of action against those who conspire to commit the acts covered in that statute—"in any State or Territory." § 1985(1). The Complaint alleges that the overt acts on which Counts I and II rest were committed in Washington, D.C. Compl., ¶¶ 6, 81, 82, 91, 100. Because Washington, D.C., is not a "State" or "Territory," Counts I and II must be dismissed.

**C.    Section 1985(3), not § 1985(1), prohibits conspiracies to interfere with the federal voting process**

Section 1985(3) explicitly prohibits conspiracies to interfere with the federal voting process. 42 U.S.C. § 1985(3). Here, the entire Complaint is focused on Defendants' alleged "unlawful effort to use force, intimidation, and threats to prevent Congress from certifying the results of the 2020 Presidential election." Compl., ¶ 1. Why, then, do Plaintiffs plead Count I under the wrong subpart of § 1985? Because they are attempting to avoid the requirement under § 1985(3) that there must be racial, invidious discriminatory animus for the conspiracy. Plaintiffs do not, and cannot, plead such animus.

**D. Plaintiffs do not plead failure to Prevent Conspiracy to Interfere with Civil Rights, under §1986. Alternatively, Alexander did not Violate It.**

Section 1986 states in pertinent part:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having <u>power to prevent or aid</u> in preventing the commission of the same, neglects or refuses

17

> so to do, if such wrongful act be committed, shall be liable to
> the party injured, or his legal representatives, for all damages
> caused by such wrongful act, which such person by reasonable
> diligence could have prevented * * * *

(emphasis added).

Plaintiffs fail to state a claim under section 1986 for two reasons: 1) the statute

requires *actual* power over others and *knowledge* of actual power over others; and, 2) if

there is no section 1985(1) claim, then no section 1986 claim can remain. In any event, as

demonstrated in the Facts section of this brief, Alexander used whatever power he could

muster, along with radio personality Alex Jones, to de-escalate the situation and urge the

protestors *not* to breach the Capitol. That they were not fully successful, but were partially,

should not be cause for imposing liability but one deserving gratitude for their making the

effort.

**E.  Counts I and II must be dismissed, as the Complaint alleges no facts showing an actual agreement to commit the "conspiracy's" overt acts**

Sections 1985(1) and 1986 prohibit conspiracies to commit the acts described in those

sections. An essential element of any civil conspiracy is "an agreement between two or more

persons" to commit the prohibited activity. *Findlay v. Citimortgage, Inc.*, 813 F. Supp. 2d 108,

122 (D.D.C. 2011). Counts I and II must be dismissed as the Complaint does not allege any

facts showing an agreement between Alexander and any other Defendant to commit the acts

prohibited by §§ 1985(1), 1986. The only agreement between Alexander and some of the other

Defendants was to commit acts of protected political speech at permitted rallies.

**IV.     Counts III, IV, V and VI fail to state claims**

    **A.  The BRCA Count fails to state a claim**

Count III alleges that Plaintiffs "incur[red] injury to [their] person or property as a result of an intentional act [of Alexander] that demonstrates [his] prejudice based on the actual or perceived . . . political affiliation of a victim of the subject designated act. . . ." Compl., ¶ 183 (citing D.C. Code § 22-3704(a)). This claim fails for several reasons.

First, the Complaint pleads no facts showing how any of Alexander's "intentional acts" affected any of the alleged victims except in a conclusory fashion that his lawful Stop the Steal activities caused certain protestors to breach the Capitol and injure Plaintiffs.

Second, the Complaint fails to plead facts satisfying the elements of the three D.C. Code offenses allegedly predicating the BRCA Count, namely, that Alexander (1) engaged in acts of terrorism in violation of the D.C. Anti-Terrorism Act of 2002, D.C. Code § 22-3153; (2) engaged in rioting or incited a riot, in violation of D.C. Code § 22-1322; or (3) engaged in destruction of property in violation of D.C. Code § 22-303. All of Alexander's acts were well protected First Amendment activity and clearly could not be considered rioting or inciting a riot, terrorist acts or the destruction of property.  *See Brandenburg v. Ohio,* 395 U.S. 444 (1969).

    **B.  The battery, assault and negligence Counts fail to state claims**

Counts IV and V concede that Plaintiffs have not identified the individuals who allegedly committed assault and battery against them. Compl., ¶¶ 200, 206. The Complaint's conclusory allegations that Alexander "aided and abetted" the unknown assailants and "conspired" to cause those offenses therefore fail. Again, Alexander's conduct consisted of fundamental First Amendment activity in the political arena.

1.   **Plaintiffs fail to state a claim for battery – Count IV.**

"A battery is an intentional act that causes a harmful or offensive bodily contact." *Etheredge v. D.C.*, 635 A.2d 908, 916 (D.C. 1993) (citation omitted) (quoting Restatement (Second) of Torts, *supra,* § 18)). Alexander did not batter anyone. He also did not tell anyone to batter anyone on January 6 or any other day. There is no allegation that the John Doe defendants who did batter the Plaintiffs or even hear Alexander's comments at his peaceful Stop the Steal rallies before January 6 in other cities or his remarks at the rally on Freedom Plaza on January 5. In any event, Alexander took steps to prevent protestors from entering the Capitol and Plaintiffs did not allege that Alexander entered a conspiracy to batter the Plaintiffs. Plaintiffs' theories of tort liability do not withstand the First Amendment.

2. **Unlawful violence mixed with constitutionally protected assemblies**

Plaintiffs' claim that assemblies mixed with violence lose constitutional protection has been unanimously rejected by the Supreme Court. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 889 (1982). *See also Jeannette Rankin Brigade*, 342 F. Supp. at 585 (finding unconstitutional U.S. Capitol Police's refusal to allow 5,000 protesters on the steps of the Capitol in protest of the Vietnam War),

V.   **The First Amendment is an absolute defense to plaintiffs' claims.**
    **A. Speech and Assembly clauses.**

Under the First Amendment, the government has no power to restrict expression "because of the content of the message." *Texas v. Johnson*, 491 U.S. 397, 412 (1989). "Content- based regulations are presumptively invalid." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (citations omitted). In particular, it may not prohibit speech simply because society or the Plaintiffs finds the speech "offensive or disagreeable." *Id.* at 414. In

short, it does not matter if plaintiffs and their counsel think Alexander and others are lying about election fraud. Correctness of political speech is not the test for First Amendment protection. *See, e.g., United States v. Alvarez*, 567 U.S. 709, 717 (2012) ("Absent from those few categories where the law allows content-based regulation of speech is any general exception the First Amendment for false statements").

All of Alexander's statements and conduct cited by the Plaintiffs in their Complaint represent core political speech and activities protected fully by the First Amendment.

**B. Petitioning clause.**

Another protection afforded by the First Amendment is petitioning for a redress of grievances. Alexander's protest rallies at the federal, state, and local government levels constitute petitioning for a redress grievances. This occurs every day in the District. Plaintiffs must allege more than speech, assembly, and communicating grievances to Congress. Section 1985(1) does not permit a cause of action that falls squarely under the First Amendment. *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1342 (7th Cir. 1977). "For the right to petition for redress of grievances is 'among the most precious of the liberties safeguarded by the Bill of Rights.'" *Id.* (citing *United Mine Workers of America, District 12 v. Illinois State Bar Association,* 389 U.S. 217, 222 (1967)). "The public criticism of governmental policy and those responsible for government operations is at the very core of the constitutionality protected free speech area. *Id.* (citations omitted). Alexander's speech could not be more political or squarely classified as a petition for the redress of grievances based upon content and location.

### C. *Noerr-Pennington* **doctrine immunity.**

> The right to petition for the redress of grievances has an ancient history and is not limited to writing a letter or sending a telegram to a congressman; it is not confined to appearing before the local city council, or writing letters to the President or Governor or Mayor. *See NAACP v. Button*, 371 U.S. 415, 429—431, 83 S. Ct. 328, 335—336, 9 L.Ed.2d 405. Conventional methods of petitioning may be, and often have been, shut off to large groups of our citizens. Legislators may turn deaf ears; formal complaints may be routed endlessly through a bureaucratic maze; courts may let the wheels of justice grind very slowly. Those who do not control television and radio, those who cannot afford to advertise in newspapers or circulate elaborate pamphlets may have only a more limited type of access to public officials. Their methods should not be condemned as tactics of obstruction and harassment as long as the assembly and petition are peaceable . . .

*Adderley v. State of Fla.*, 385 U.S. 39, 49–51 (1966) (Douglas, J.,) (dissenting in part).

Alexander's organizing and speaking at political rallies, and encouraging people to gather and assemble at the seat of the federal government in the District of Columbia is quintessential First Amendment conduct. On the flip side, petitioning the government for a redress of grievances is provided immunity under the *Noerr-Pennington* doctrine. "The *Noerr– Pennington* doctrine holds that defendants who petition the government for redress of grievances, 'whether by efforts to influence legislative or executive action or by seeking redress in court,' are immune from liability for such activity under the First Amendment." *Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C.Cir.1995).

**CONCLUSION**

For all of the foregoing reasons, Ali Alexander moves this Court to dismiss Counts I-VI of Plaintiffs' Complaint.

Dated: January 18, 2022                    Respectfully submitted,

*/s/ Paul D. Kamenar*
Paul D. Kamenar
D.C. Bar 914200
1629 K Street, N.W., Suite 300
Washington, D.C. 20006
(301) 257-9435
pul.kamenar@gmail.com

*Counsel to Ali Alexander*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of January, 2022, I filed the foregoing motion and Proposed Order with the Clerk of Court using the CM/ECF system, which will send a notification of such electronic filing (NEF) to all registered users in this case.

/s/*Paul D. Kamenar*

*Counsel for Ali Alexander*