**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CONRAD SMITH, *et al.*, | |
| *Plaintiffs*, | |
| v. | Case No. 1:21-cv-2265-APM |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

**BRIEF OF *AMICI CURIAE* RECONSTRUCTION ERA SCHOLARS**
**IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS**

Roy D. Prather III
BEVERIDGE & DIAMOND, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
410-230-1300 • 202-789-6190 (fax)

Jessica H. Maloney
Anthony G. Papetti
BEVERIDGE & DIAMOND, P.C.
477 Madison Avenue, 15th Floor
New York, NY 10022-5835
212-702-5400 • 202-789-6190 (fax)

Zachary B. Pilchen
Eric L. Klein (Bar No. 993268)
Nessa Horewitch Coppinger (Bar No. 477467)
Julius M. Redd
Alan J. Sachs
Dacia T. Meng
Jack B. Zietman
BEVERIDGE & DIAMOND, P.C.
1900 N Street NW, Suite 100
Washington, DC 20036
202-789-6000 • 202-789-6190 (fax)

Counsel for *Amici Curiae*
Reconstruction Era Scholars

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ...................................................................1

SUMMARY OF ARGUMENT .......................................................................1

ARGUMENT .................................................................................................3

I.   Congress enacted the Civil Rights Act of 1871 to prevent conspiracies to violently interfere with federal officials discharging their duties, and to remedy those injured. .......3

   A.   Political violence against federal and state officials—including legislators— threatened the functioning of government at all levels during Reconstruction. ......3

   B.   A Senate Select Committee investigation into widespread anti-government violence prompted passage of the Act. ..................................................7

   C.   Congress drafted the Act broadly, to safeguard the federal government's operations from violent conspiracies targeting federal actors. ...............................9

      1.   Congress based Section 2 of the Act (now Section 1985) on a Civil War-era statute that broadly protected federal officials. ...............................10

      2.   Congress intended Section 6 of the Act (now Section 1986) to require people with knowledge of a Section 2 conspiracy to reasonably act. ............13

II.   Congress intentionally used broad terms in Sections 1985 and 1986 to discourage violent conspiracies that would disrupt the functioning of government. .........................15

   A.   Section 1985 provides a cause of action for "any person" injured by an act in furtherance of a conspiracy to interfere with federal officers' discharge of duties. ..................................................................................16

      1.   U.S. Capitol Police officers hold an "office, trust, or place of confidence under the United States," as do the officials they protect. ............17

      2.   There is no Section 1985 loophole for violent conspiracies to interfere with duties related to elections or the peaceful transfer of power. .................21

      3.   The plaintiff in a Section 1985 case can be "any person" injured, not merely the federal official targeted. ...........................................22

   B.   Congress intended Section 1986 to apply to any individual with knowledge of, and the ability to help prevent, a Section 1985 conspiracy. ............................24

CONCLUSION .............................................................................................25

# TABLE OF AUTHORITIES

## Federal Court Cases

*Bostock v. Clayton Cnty., Georgia,*
    140 S. Ct. 1731 (2020) ................................................................................................16, 19

*Griffin v. Breckenridge,*
    403 U.S. 88 (1971) ..............................................................................................15, 19, 23

*Huey v. Barloga,*
    277 F. Supp. 864 (N.D. Ill. 1967) .............................................................................25

*Hurd v. D.C., Gov't,*
    864 F.3d 671 (D.C. Cir. 2017) ..................................................................................16

*Kush v. Rutledge,*
    460 U.S. 719 (1983) ...............................................................................................4, 10, 24

*Lamar v. United States,*
    240 U.S. 60 (1916) ......................................................................................................18

*Lawrence v. Acree,*
    665 F.2d 1319 (D.C. Cir. 1981) ................................................................................16

*Leo Sheep Co. v. United States,*
    440 U.S. 668 (1979) ...................................................................................................15

*McCord v. Bailey,*
    636 F.2d 606 (D.C. Cir. 1980) ...............................................................................3, 4, 9

*Monell v. Dep't of Soc. Servs. of City of New York,*
    436 U.S. 658 (1978) ..............................................................................................21, 25

*Park v. City of Atlanta,*
    120 F.3d 1157 (11th Cir. 1997) ................................................................................24

*Pott v. Arthur,*
    104 U.S. 735 (1881) ...................................................................................................24

*Spagnola v. Mathis,*
    809 F.2d 16 (D.C. Cir. 1986) ................................................................................11, 17

*Steele v. United States,*
    267 U.S. 505 (1925) ...................................................................................................20

*Stern v. U.S. Gypsum*,
   547 F.2d 1329 (7th Cir. 1977) ............................................................................passim

*United States v. Mosley*,
   238 U. S. 383 (1915).............................................................................................15

*United States v. Price*,
   383 U.S. 787 (1966)..............................................................................................15

*United States v. Union Pac. R.R. Co.*,
   91 U.S. 72 (1875)..................................................................................................15

*Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*,
   518 F. Supp. 993 (S.D. Tex. 1981) .......................................................................25

*Windsor v. The Tennessean*,
   719 F.2d 155 (6th Cir. 1983) ................................................................................22

## Federal Statutory Authorities

1 U.S.C. § 1 ................................................................................................................19

2 U.S.C. ch. 9, subch. II............................................................................................19

2 U.S.C. § 1961 .........................................................................................................22

3 U.S.C. § 15 .........................................................................................................2, 22

18 U.S.C. § 372...................................................................................................passim

42 U.S.C. § 1985 ................................................................................................passim

42 U.S.C. § 1986 ................................................................................................passim

Act of July 31, 1861, c. 33, 12 Stat. 284 .................................................................11

Act of Feb. 25, 1871, § 2, 16 Stat. 431 (Dictionary Act) ........................................18

Act of Apr. 20, 1871, ch. 22, 17 Stat. 13 (Civil Rights Act of 1871)...............passim

## Constitutional Provisions

U.S. Const. art I, § 3, cl. 7 ......................................................................................20

## Legislative Materials

Cong. Globe, 37th Cong., 1st Sess. (1861) ............................................................................11, 12

Cong. Globe. 41st Cong., 3d Sess. (1871).......................................................................................8

Cong. Globe, 42d Cong., 1st Sess. (1871)...........................................................................passim

Select Comm. on the New Orleans Riots, 39th Cong., 2d Sess., H.R. Rep. No. 16 (1867)........4, 5

Select Comm. on the Memphis Riots, 39th Cong., 1st Sess., H.R. Rep. No. 101 (1866)............15

Select Comm. of the Senate to Investigate Alleged Outrages in the Southern States,
    S. Rep. No. 1, 42d Cong., 1st Sess. (1871)...................................................................7, 8, 9, 23

## Additional Authorities

Abraham Lincoln, *Proclamation on State Militia* (Apr. 15, 1861) ...............................................11

*An American Dictionary of the English Language* at 908 (N. Webster et al., eds., 1865)............19

*Conspiracy to Impede or Injure an Officer of the United States,*
    *18 U.S.C. § 372,* 1 Op. O.L.C. 274 (1977) .............................................................11, 12, 17, 18

Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863–1877* (1988).................4, 14

*The Papers of Ulysses S. Grant, Volume 21: Nov. 1, 1870–May 31, 1871*
    (John Y. Simon ed. 1998) ........................................................................................................9

Linda E. Fisher, *Anatomy of an Affirmative Duty to Protect: 42 U.S.C. Section 1986*, 56
    Wash. & Lee L. Rev. 461, 474 (1999)......................................................................14, 24, 25

Maj. T. W. Gilbreth, *Report of an investigation of the cause, origin, and results of the
    late riots in the city of Memphis* (May 22, 1866)......................................................................15

U.S. Senate, *A Dramatic Session – July 4, 1861, available at*
    https://www.senate.gov/artandhistory/history/minute/Dramatic_Session.htm.........................12

William B. Darrow, *The Killing of Congressman James Hinds*, 74 Ark. Hist. Q. 18–55
    (2015), *available at* http://www.jstor.org/stable/24477498..................................................6

## INTEREST OF *AMICI CURIAE*

Reconstruction Era Scholars ("*Amici*") are leading scholars of the post-Civil War era and Reconstruction, the purpose and development of the Reconstruction-era civil rights statutes, and those statutes' application over time.[1] They have devoted their careers to understanding the complex issues central to this litigation and believe their perspective will assist the Court in deciding certain pending motions to dismiss Counts I and II of Plaintiffs' First Amended Complaint ("Complaint"). *Amici* bring unique insight into the legal, political, and social histories relevant to Plaintiffs' claims.

*Amici* do not address the full merits of the motions to dismiss. Rather, they proffer specialized knowledge of the historical context and legislative intent of the statutes at issue.

## SUMMARY OF ARGUMENT

The historical context and legislative history make clear that in 1871, the 42nd Congress enacted the protections now codified as 42 U.S.C. §§ 1985 and 1986 to give a cause of action to people injured as a consequence of conspiracies to violently disrupt official government functions, just like the conspiracies alleged in this case.  Counts I and II of Plaintiffs' Complaint allege causes of action under these provisions.  These causes of action include claims regarding Defendants' politically-motivated conspiracies to violently induce Members of Congress, Vice President Mike Pence, U.S. Capitol Police officers and others to leave the places (*e.g.*, the House and Senate floors, the perimeter of the U.S. Capitol) where their duties required them to be—and to injure those officials in the discharge of their duties.  Causes of action under Sections 1985(1) and 1986 also properly include Plaintiffs' claims that Defendants' objective was to forcibly

---

[1] A listing of the *Amici* is included in Reconstruction Era Scholars' Motion for Leave to File Brief as *Amici Curiae*.

prevent Joe Biden and Kamala Harris from being formally declared the "elected President and Vice President of the United States," 3 U.S.C. § 15, and assuming those offices. The historical context, legislative history, contemporaneous public meaning, and case law confirm that Counts I and II adequately state claims upon which this Court can grant relief.

Congress enacted Sections 1985(1) and 1986 amidst waves of politically-motivated mob violence that targeted the functioning of democratic government at the local, state, and federal levels.  The drafters of Sections 1985(1) and 1986 were unquestionably familiar with the threats to democratic self-governance posed by politically-motivated conspiracies to violently disrupt government functions.  After witnessing the violence of the Civil War—and then organized campaigns of violence against voters, candidates for office, and elected and appointed government officials—the 42nd Congress enacted a broad remedial statute to compensate people injured as a result of such conspiracies.  Congress hoped civil liability would remedy and deter these harmful conspiracies, thereby helping to protect the operation of the federal government itself, along with the constitutional structures designed to safeguard liberty and the rule of law.

Congress chose sweeping language to accomplish these goals, applying the law's protections to "any person" holding, accepting, or discharging the duties of "any office, trust, or place of confidence under the United States."  On its face, this language is broad enough to include multiple categories of people targeted in the January 6 attack on the U.S. Capitol. Congress authorized the civil remedies of Section 1985 for any person injured by acts furthering the conspiracy, not merely the individuals targeted. And the conspiracies under Section 1985 are so serious that Section 1986 imposes an affirmative duty on all citizens with advance knowledge of such conspiracies to do what they reasonably can to help prevent them—a rarity in American law, compelled by the extraordinary historical context in which the laws were adopted.

**ARGUMENT**

I.     **Congress enacted the Civil Rights Act of 1871 to prevent conspiracies to violently interfere with federal officials discharging their duties, and to remedy those injured.**

Plaintiffs bring conspiracy-related claims under 42 U.S.C. §§ 1985 and 1986.  *See Amended Compl.* ¶¶ 166–81 (Counts I & II).  Those provisions originated as Section 2 and Section 6 of the Civil Rights Act of 1871, also known as the "Third Enforcement Act" or "Ku Klux Klan Act" ("the Act").  Signed into law by President Ulysses S. Grant on April 20, 1871, the Act was a response to violent interference with governmental functions in southern states, including against "many federal officials."[2]  By creating private civil actions for damages against those who conspire to violently prevent or disrupt official government functions—and even those who fail to help stop such conspiracies—Congress sought to protect the direct interests of the federal government, and to compensate victims injured by such dangerous conspiracies.

A.     **Political violence against federal and state officials—including legislators— threatened the functioning of government at all levels during Reconstruction.**

Violence was rampant in the South after Confederate surrender.  As the conflict between the two armies died down, many white southerners turned to racially- and politically-motivated mob violence to undermine federal authority and the federal policies collectively known as Reconstruction.  Those policies sought, among other things, to protect the civil and political rights of Black people and white Unionists.  Within the states of the former Confederacy, opponents of Reconstruction "launched a campaign of violence…and confronted Reconstruction

---

[2] *See McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980) ("Restoration of civil authority...was a major concern," particularly after "increasing numbers of attacks, often fatal, against blacks and Union sympathizers, including many federal officials"); *Stern v. U.S. Gypsum*, 547 F.2d 1329, 1334 (7th Cir. 1977) ("Congress [was] acutely aware of the massive and frequently violent resistance in the southern states to federal Reconstruction after the Civil War").

governments with the most basic of challenges—a threat to their very physical survival."[3]  The purveyors of this political violence realized that if they could not change the trajectory of federal law through peaceful, democratic means, they could threaten or attack the government officials who carried out the law, forcing them to flee or otherwise surrender their duties.  Their tactics included intimidation, assault, and murder.  Congress robustly legislated against this violence, first passing the original Civil Rights Act of 1866, and then—after ratification of the 14th and 15th Amendments—three "Enforcement Acts" from 1870 to 1871 to address the continuing violence and lawlessness and to protect civil and political rights.  These Enforcement Acts were critical parts of Congress's efforts to expand access to federal courts, and to quell the political and racial violence still boiling after the Civil War. *See McCord v. Bailey*, 636 F.2d 606, 615–617 (D.C. Cir. 1980) (discussion of legislative history cited approvingly in *Kush v. Rutledge*, 460 U.S. 719, 724 n.10 (1983)).

Throughout this period, Americans witnessed conspiracies by organized groups and political leaders to use mob violence to prevent officials from discharging their duties, by interfering with constitutional conventions and democratically-elected local and state governments that had been formed under federal authority.  In 1866, Louisiana Republicans had organized a constitutional convention in New Orleans to amend the state constitution and extend civil rights to Black people.  New Orleans' elected mayor and sheriff opposed these goals, and conspired to use mob violence to prevent the delegates from discharging their duties. Select Comm. on the New Orleans Riots, 39th Cong., 2d Sess., H.R. Rep. No. 16, at 17–18 (1867) ("New Orleans Comm. Report").  On the day of the convention, as the delegates began to debate

---

[3] Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863–1877*, at 425 (1988) (hereinafter "Foner").

these new constitutional protections, a mob of white policemen arrived at the convention hall.

*Id.* at 5.  They began firing into a crowd of Black supporters, then burst into the building to

attack the delegates themselves in an attempt to prevent the outcome of the proceedings. *Id.* at 5–

6.  Historian Ron Chernow described the harrowing scene:

> The whites stomped, kicked, and clubbed the black marchers
> mercilessly. Policemen smashed the institute's windows and fired
> into it indiscriminately until the floor grew slick with blood. When
> blacks inside shook a white flag from a window, the white
> policemen ignored it and invaded the building. They emptied their
> revolvers on the convention delegates, who desperately sought to
> escape. Some leapt from windows and were shot dead when they
> landed. Those lying wounded on the ground were stabbed
> repeatedly, their skulls bashed in with brickbats.

Ron Chernow, *Grant*, 574–75 (2017); *see also* New Orleans Comm. Report at 6–8, 10

(describing same).  Although federal troops eventually restored order, for the day the mob and

the elected officials behind it had succeeded—they had "br[oken] up this convention by armed

forces," and prevented the delegates from discharging their duties. *See* New Orleans Comm.

Report at 16.

Five years later, while debating the 1871 Civil Rights Act, members of Congress

repeatedly invoked the 1866 assault on the constitutional convention in New Orleans.  *See, e.g.*,

Cong. Globe, 42d Cong., 1st Sess. 517 (1871) (bill sponsor and manager Rep. Shellabarger

discussing the events "in 1866, when a Republican State convention, engaged in the formation of

a free constitution, was murdered or dispersed"); *id.* at 442 (Rep. Butler describing how, "in the

New Orleans riot... a peaceful convention was attacked for political reasons only").  These

members were acutely aware of the risk that violent mobs —including elected officials—would

interrupt and prevent the assemblies of government officials from discharging their lawful duties.

Across the states of the former Confederacy, organized violent mobs prevented federal

officers from discharging the duties of their federal positions, thus frustrating the functioning of

government.  Some of the more common examples included conspiracies to violently prevent federal marshals' discharge of their law enforcement duties, postal officials' distribution of the U.S. mail, and revenue agents' collection of federal taxes.  *See, e.g.*, Cong. Globe, 42d Cong., 1st Sess. 449 (federal marshal fired upon, arrested, and "obligated at the jeopardy of his life to renounce the service of other process"); *id.* at 413 (mail agent "butchered in Kentucky"); *id.* at 446 (mail agent "shot in the mail-car" by disguised men); *id.* at 457 (postmaster in Georgia attacked by "the Ku Klux Klan, [who] infest that State… while in the discharge of his duty as a revenue assessor"); *id.* at 446 (tax assessor in Alabama assaulted by a gang of 125 men, and "driven from his home, simply because he was a United States officer in discharge of his duty").

But Congress in 1870 to 1871 was not concerned only with federal marshals, mail agents, and revenue assessors.  Congress's own members were also vulnerable to mob violence.  Two congressmen had recently been assassinated in their home districts, including Arkansas Congressman James Hinds in October 1868, who was "foully murdered by a Ku Klux assassin, for the sole crime of devotion to his Government."  Cong. Globe 42d Cong., 1st Sess., App. 200 (Rep. Oliver P. Snyder).[4]  Members of the 42nd Congress were even threatened with violence for voting upon the Act itself: Rep. Jeremiah Wilson described how "a member of this House" had been urged "not to vote for this bill, for the reason that he could not safely return to his home if he did."  Cong. Globe, 42d Cong., 1st Sess. 484.  In Rep. Wilson's words, these threats were efforts "to overthrow by force and violence political opinion; it is to destroy by violence the freedom of the ballot-box, and therefore it is the most dangerous form of domestic violence and rebellion against the laws."  *Id.*

---

[4] *See generally* William B. Darrow, *The Killing of Congressman James Hinds*, 74 Ark. Hist. Q. 18–55 (2015), *available at* http://www.jstor.org/stable/24477498.

Congress also took considerable notice of vigilantes' assaults against and murders of elected officials at the local and state levels, where federal policies had been instrumental not only in protecting civil and political rights, but also in laying the foundation for democratically elected governments.  In particular, members discussed the 1870 murders in North Carolina of Wyatt Outlaw (a Black local official) and John W. Stephens (a white state senator and former agent of the U.S. Freedman's Bureau) at the hands of paramilitary organizations.  *See* Cong. Globe, 42d Cong., 1st Sess. 320, 437, 443–44, 504, 517.  In acts emblematic of the mobs' disdain for the rule of law, both officials had been killed in or outside of courthouses.  The murders and other widespread violence were so severe that the Governor of North Carolina declared martial law later in 1870 in a failed attempt to quell the uprising.

**B.      A Senate Select Committee investigation into widespread anti-government violence prompted passage of the Act.**

Although anti-government violence was common in the years following the Civil War, in the year before passage of the Act, North Carolina stood out.  Organized mobs used violence to prevent the normal functioning of elections and government, and to instead further their white supremacist agenda.[5] An investigation into the insurgency of North Carolina was the most immediate catalyst for the passage of the Act, and members referred to North Carolina frequently and at great length in the congressional debates.[6]

---

[5] *See* Select Comm. of the Senate to Investigate Alleged Outrages in the Southern States, S. Rep. No. 1, 42d Cong., 1st Sess., XIX–XXI, XXVI–XXXI (1871) [hereinafter "Select Senate Comm. Report"]; *id.* at XXXI (referring to "an army of criminals at large, with no power in the State tribunals to bring them to justice... [and] with the consciousness that they number enough to turn the scale of political power in favor of the party with which they act, so long as their violence and intimidation are successful against those whom they oppose…").

[6] *See, e.g.*, Cong. Globe, 42d Cong., 1st Sess. 443 (Rep. Benjamin Butler describing North Carolina's Ku Klux organization of forty thousand men, "controlling the election, murdering a State senator in the jury-room of a court-house on the day when a Democratic convention was

On December 16, 1870, the Senate requested information from President Grant about "murders and outrages for political purpose" committed by "organized bodies of disloyal and evil-disposed persons in the State of North Carolina," who "threaten resistance to the execution of the laws of the United States[.]"[7] In January 1871, President Grant provided such information to Congress.[8]

In response to the reports from North Carolina and other states, the Senate created a "Select Committee To Investigate Alleged Outrages in the Southern States," with the goal of investigating vigilante violence and recommending legislation to "punish such organized violence, and secure to all citizens the rights so garantied [sic] to them." Cong. Globe, 42d Cong., 1st Sess. 122 (resolution of Sen. Sherman). The committee would investigate the "organized bands of desperate and lawless men" who had "by force, terror, and violence subverted all civil authority in large parts of the late insurrectionary States, thus utterly overthrowing the safety of persons and property, and all those rights which are the primary basis and object of all civil government[.]" *Id.*

The Senate Select Committee held hearings from January to March of 1871, interviewing 52 witnesses from across North Carolina. On March 10, 1871, the Select Committee published a "voluminous report" of nearly 600 pages.[9] This report laid bare how the KKK and other

---

sitting in the court-room overhead; able to put at defiance the courts; requiring martial law to be proclaimed by the Governor; [and] strong enough to resist even that….").

[7] Select Senate Comm. Report, *supra* n.5, at I.

[8] *See* Cong. Globe. 41st Cong., 3d Sess. 479 (1871) (one of President Grant's transmittals to the 41st Congress, of "abstracts of reports and other papers on file with the War Department relative to outrages in North Carolina").

[9] *See* Select Senate Comm. Report, *supra* n.5; Cong. Globe, 42d Cong., 1st Sess. 374 (describing the "evidence… contained in the voluminous report of the Senate committee elicited from a crowd of witnesses").

paramilitary organizations used violence to interfere with the functioning of political and governmental processes.  In North Carolina, the report charged "numerous" offenses by these groups, including rashes of murders and shootings conducted for political purposes.[10]

On March 23, 1871, President Grant called for Congress to pass new legislation to "control the apparent chaos." *See McCord*, 636 F.2d at 615.  He explained that the evidence "now before the Senate" showed a need to protect the functioning of the federal government: "I urgently recommend, such legislation, as in the judgment of Congress, shall effectually secure life liberty and property, and the enforcement of law, in all parts of the United States."[11]

Congress debated and adopted the Act against this backdrop.  "Throughout the deliberations" over the Act in Congress, "a recurring theme was that the need to preserve orderly government mandated enactment of [the] bill." *McCord*, 636 F.2d at 615. "The operation of government, especially the federal government, was threatened.  Civil survival was at stake." *Id.* (citing Cong. Globe, 42d Cong., 1st Sess. 830).  Senator William Stewart explained that the law was needed to preserve basic federal operations, as "[w]e must either have a Constitution that protects American citizens everywhere, *that protects the Government and its officers everywhere*, we must have obedience to law, or we have no Government."  Cong. Globe, 42d Cong., 1st Sess. 831 (emphasis added).

### C.   Congress drafted the Act broadly, to safeguard the federal government's operations from violent conspiracies targeting federal actors.

The legislative history of Section 2 sheds lights on Counts I and II in this case.  The historical record shows that, in drafting, debating, and passing the Act, Congress intended it both

---

[10] Select Senate Comm. Report, *supra* n.5, at XVIII.

[11] *The Papers of Ulysses S. Grant, Volume 21: November 1, 1870–May 31, 1871*, at 246 (John Y. Simon ed. 1998) (adding that "[t]here is no other subject, on which I would recommend, legislation during the present session" of Congress).

to protect federal officials—including themselves—from violent conspiracies to interfere with their duties, and to impose liability on individuals who failed to take reasonable steps to thwart those conspiracies.

### 1.     Congress based Section 2 of the Act (now Section 1985) on a Civil War-era statute that broadly protected federal officials.

The history of Section 2 of the Act—now largely codified at 42 U.S.C. § 1985—helps illuminate its broad scope.  Reflecting the ongoing organized violence across the former Confederate states, Section 2 "outlawed five broad classes of conspiratorial activity," mostly "relate[d] to institutions and processes of the federal government."  *Kush*, 460 U.S. at 724.  The opening lines of Section 2 concerned conspiracies to interfere with "the performance of official duties by federal officers."  *Id.*  Other parts of Section 2 concerned conspiracies "relate[d] to institutions and processes of the federal government" (federal officers, federal judicial proceedings, and federal elections).  *Id.*

Section 2 was a single paragraph comprised of two long sentences.[12]  The first sentence (678 words) criminalized numerous violent conspiracies, including those targeting "any person" who holds "any office or trust or place of confidence under the United States."  17 Stat. 13 (1871).  The second sentence provided a civil remedy for "any person" injured by "any act in furtherance of the object of such conspiracy."  *Id.*

The 42nd Congress copied key portions of Section 2 from "virtually identical language" in a criminal statute enacted in 1861, less than three months into the Civil War.  *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1339 (7th Cir. 1977) (citing Act of July 31, 1861, ch. 33, now largely codified as 18 U.S.C. § 372); *see also* Cong. Globe, 42d Cong., 1st Sess. 478 (Rep.

---

[12] The full text of Section 2 can be found in *Kush v. Rutledge*, 460 U.S. 719, 727–29 (1983)  (1871 Civil Rights Act, § 2, 17 Stat. 13).

Shellabarger noting that "the first part of [Section 2]" was already "now the law of the United

States, having been enacted in 1861," with "the same powers conferred by this bill").  President

Lincoln had called an emergency session of the 37th Congress in response to the attack on Fort

Sumter, telling the nation that the "existence of our National Union and the perpetuity of popular

government" were on the line.[13]  The criminal conspiracy law passed by the 37th Congress was

written broadly to criminalize the use of force to interfere with the federal government:

> *if two or more persons within any State or Territory of the United*
> *States shall conspire together* to overthrow, or to put down, or to
> destroy by force, the Government of the United States, or to levy
> war against the United States, or to oppose by force the authority of
> the Government of the United States; or by force to prevent, hinder,
> or delay the execution of any law of the United States; or by force
> to seize, take, or possess any property of the United States against
> the will or contrary to the authority of the United States; or *by force,*
> *or intimidation, or threat to prevent any person from accepting or*
> *holding any office, or trust, or place of confidence, under the United*
> *States*; each and every person so offending shall be guilty of a high
> crime ....

Act of July 31, 1861, c. 33, 12 Stat. 284 (emphasis added).  Because of the historical relationship

between the "any office, trust, or place of confidence under the United States" language in the

Civil War statute (now at 18 U.S.C. § 372) and Section 2 of the Act (now 42 U.S.C. § 1985),

courts and the U.S. Department of Justice construe the statutes *in pari materia*.  *See Conspiracy*

*to Impede or Injure an Officer of the United States, 18 U.S.C. § 372*, 1 U.S. Op. Off. Legal

Counsel 274, 275 (1977) (citing 42 U.S.C. § 1985(1)); *Stern*, 547 F.2d at 1339 (citing decisions

under 18 U.S.C. § 372).  The provision originated as a wartime measure "to protect federal

officials from external coercion in a hostile environment," *Spagnola v. Mathis*, 809 F.2d 16, 34

(D.C. Cir. 1986) (Silberman, J., concurring in part, dissenting in part), and thus illuminates the

---

[13] Abraham Lincoln, *Proclamation on State Militia* (Apr. 15, 1861), http://www.senate.gov/
artandhistory/history/common/civil_war/LincolnExtraordinarySession_Transcript.htm.

broad scope of federal officials protected by that language when it was carried over to Section 2 of the Act.[14]

In 1871, the 42nd Congress did not substantially debate whether the Act should include language deterring conspiracies to violently interfere with federal officials.  The need to further protect the operation of the federal government was self-evident, and Congress hoped that the deterrent effect of civil liability would help protect the rule of law.  Rep. Charles Buckley lamented that mob violence "sets at naught the laws of the country…. The United States mails are stopped; route agents are shot dead while assorting the mails, and others are driven from their routes.  Your revenue officers are resisted and scourged and driven from their homes and families and out of the country." Cong. Globe, 42d Cong., 1st Sess., App. 190 (Rep. Buckley); *see id.* at 519 (Rep. Shellabarger emphasizing that federal officers were being violently prevented from collecting "the revenues of the Republic," and delivering "the mails of this Government").  At stake was no less than "peace and safety" in a democratic republic.  *See, e.g.*, Cong. Globe, 42d Cong., 1st Sess. 376 (Rep. David Lowe); *id.* at 508 (Rep. John Edwards).

The 42nd Congress understood that the "office, trust, or place of confidence" language was broad enough to cover themselves as members of Congress, provided that a conspiracy

---

[14] The 37th Congress met in emergency session on July 4, 1861, with Confederate troops only a short distance from the U.S. Capitol.  On July 17, 1861, Rep. John Hickman presented H.R. 45, a bill "to define and punish certain conspiracies."  Cong. Globe, 37th Cong., 1st Sess. 129 (1861).  Sen. Trumbull explained that the law was intended to punish conspiracies "by force, or intimidation, or threat, to prevent any person from accepting or holding an office under the Government of the United States," and gave examples of interference with federal land officers, a postmaster, and railroad route agents. *Id.* at 277.  The bill passed the House and Senate by large majorities, with minor amendments and relatively little commentary.  *Id.* at 130, 232–33, 276–77, 287, 347; *see Conspiracy to Impede or Injure an Officer of the United States, 18 U.S.C. § 372,* 1 U.S. Op. Off. Legal Counsel 274, 276 (1977) (summarizing the floor debates); *see also* U.S. Senate, *A Dramatic Session – July 4, 1861,* https://www.senate.gov/artandhistory/history/minute/Dramatic_Session.htm.

targeted members' discharge of their congressional duties.  For example, even critics of the bill's

scope like Senator Trumbull argued that Section 2 should include conspiracies targeting "the

Senator who sits before me," provided he was targeted "on account of his lawful discharge of the

duties of his office…." Cong. Globe, 42d Cong., 1st Sess. 580 (expressing concern the Act might

reach conspiracies coincidental to the Senator's service, such as a robbery of his farm while he

was away on Senate business). Similarly, in discussing the Act, Rep. John Coburn stated that

contempt for "officers" of the "legislative branch" (among other officials) is "what we have to

deal with and legislate about…." *Id.* at 461.

> **2.   Congress intended Section 6 of the Act (now Section 1986) to require people with knowledge of a Section 2 conspiracy to reasonably act.**

Section 6 of the Act, now codified at 42 U.S.C. § 1986, emerged later in the debates as a

compromise to reach "every species of mischief covered by [Section 2]," by making liable "any

persons having knowledge that any of these are to be committed and having power to prevent…

or to aid in preventing" by "for instance, [giving] information [that] the mischief is

impending…."  Cong. Globe, 42d Cong., 1st Sess. 804 (Rep. Shellabarger). Section 6 broadly

provided:

> [A]ny person or persons, having knowledge that any of the wrongs
> [in Section 2, now 42 U.S.C. § 1985] are about to be committed, and
> having power to prevent or aid in preventing the same, shall neglect
> or refuse so to do, and such wrongful act shall be committed, such
> person or persons shall be liable to the person injured … for all
> damages caused by any such wrongful act which such first-named
> person or persons by reasonable diligence could have prevented ….

1871 Civil Rights Act, ch. 22, § 6, 17 Stat. 15 (now codified at 42 U.S.C. § 1986).

Members of Congress explained that Section 6 created a duty in all citizens who have

advance knowledge of a Section 2 conspiracy and possess the power to help prevent it (*e.g.*, by

reporting to law enforcement).  Cong. Globe, 42d Cong., 1st Sess. 804 (Rep. Poland explaining

that "any person who has knowledge" that "any of the conspiracies indicated in [Section 2] are about to be committed, it shall be his duty to use all reasonable diligence within his power to prevent it…."). The sponsor of the Section 6 amendment explained that it would establish an "individual responsibility on the part of every man who should have failed to exert his full duty as a citizen to prevent an outrage upon his fellow-citizen." Cong. Globe, 42d Cong., 1st Sess. 824 (Sen. Edmunds). Rep. James Garfield touted that Section 6 would make it "the duty of all citizens to aid in repressing these outrages; and any citizen knowing that an outrage is threatened, and not aiding to prevent it, is made liable for the wrong and damages done." *Id.* at 807.

When one congressman asked if a neighbor or sheriff who knew of a threat and refused to act "would be liable" under Section 6, Rep. Bingham said, "So they ought to be." *Id.* at 805. Rep. Shellabarger continued, "not only that, but everybody else who has learned anything about the way in which the mischief has been done… everybody having knowledge of that kind would be in danger of being made liable unless he communicates the same." *Id.* Simply put, with Section 6 Congress wanted "to compel protective action from local citizens and municipalities," to assist in the identification and prevention of violent conspiracies to interfere with federal officials and other conspiracies under Section 2 (now Section 1985).[15]

When developing Section 6, Congress was acutely aware that individuals with foreknowledge of violent conspiracies had failed to take steps to prevent the outrages. For example, in May of 1866, a *posse comitatus* of white citizens—riled up by a local government official—participated in "an organized and bloody massacre of the colored people of

---

[15] *See* Linda E. Fisher, *Anatomy of an Affirmative Duty to Protect: 42 U.S.C. Section 1986*, 56 Wash. & Lee L. Rev. 461, 474 (1999) (citing Foner*, supra* n.3, at 454–55).

Memphis."[16]  Select Comm. on the Memphis Riots, H.R. Rep. No. 101, at 5 (1866).  The mob set

fire to the homes, schools, and churches of Black people.  *Id.* at 35–36.  Local firefighters sat by,

making "no effort whatever to extinguish the fires of the burning churches and school-houses,"

except insofar as the fires threatened to spread to white-affiliated buildings.  *Id.* at 26.  This was

unacceptable to Congress.  "[W]e cannot, as legislators, afford to let Memphis... become old or

be 'by-gones,'" proclaimed Rep. Shellabarger during the Act debates.  Cong. Globe, 42d Cong.,

1st Sess. 516.

## II.    Congress intentionally used broad terms in Sections 1985 and 1986 to discourage violent conspiracies that would disrupt the functioning of government.

Congress wrote Section 1985(1), and the supplementary protections of Section 1986, to

protect American government from violent conspiracies.  They should be interpreted consistent

with that forceful intent.  "[C]ourts, in construing a statute, may with propriety recur to the

history of the times when it was passed[.]" *Leo Sheep Co. v. United States*, 440 U.S. 668, 669

(1979) (quoting *United States v. Union Pac. R.R. Co.*, 91 U.S. 72, 79 (1875)).  For the

Enforcement Acts, "the doings of the Ku Klux and the like," and "acts of violence [were]

obviously... in the mind of Congress." *See United States v. Mosley*, 238 U. S. 383, 387–88

(1915) (Holmes, J.) (interpreting Civil Rights Act of 1870).  This violent history illuminates why

Congress used sweeping words to address the problem.  *See United States v. Price*, 383 U.S. 787,

800–01 (1966) (interpreting Civil Rights Act of 1870); *Griffin v. Breckenridge*, 403 U.S. 88, 97

(1971) (interpreting 42 U.S.C. § 1985). History is also important because courts ordinarily

---

[16] *See* Maj. T. W. Gilbreth, *Report of an investigation of the cause, origin, and results of the late riots in the city of Memphis* (May 22, 1866) (recounting that the "effect of [the incendiary speech] delivered by" someone "so high in authority, to a promiscuous and excited assemblage can be easily perceived. From that time they seemed to act as though vested with full authority to kill, burn and plunder at will"), *available at* http://freedmensbureau.com/tennessee/outrages/memphisriot.htm.

interpret federal civil rights statutes "in accord with the ordinary public meaning of [their] terms at the time of [their] enactment."  *See Bostock v. Clayton Cnty., Georgia,* 140 S. Ct. 1731, 1738 (2020) (interpreting Civil Rights Act of 1964).

The historical context shows that Congress intended to broadly protect against violent conspiracies targeting federal officials in the discharge of their duties, and those who fail to take reasonable steps to prevent such violence.  Accepting as true the factual allegations in the Complaint, *Hurd v. D.C., Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017), Plaintiffs have adequately alleged claims under Sections 1985 and 1986 regarding the January 6 attack on the U.S. Capitol.

### A.   Section 1985 provides a cause of action for "any person" injured by an act in furtherance of a conspiracy to interfere with federal officers' duties.

In response to the politically motivated mob violence of the Reconstruction Era, Congress enacted a durable statute in Section 1985(1), "cast in general language of broad applicability." *See Stern*, 547 F.2d at 1335; Cong. Globe, 42d Cong., 1st Sess., App. 68 (Rep. Shellabarger stating that laws protecting constitutional rights should be given "the largest latitude consistent with the words employed").  Congress recognized and sought to prevent the inherent power imbalance when a mob or gang targets federal officials in the discharge of their official duties. *See, e.g.*, Cong. Globe, 42d Cong, 1st Sess. 446 (discussing mob assault on federal tax assessor to prevent him from discharging his duties).

The substantive purpose of Section 1985(1) is highly applicable to the facts of the present case.  On its face, Section 1985(1) addresses conspiracies to violently prevent individuals from accepting, holding, or discharging the duties of federal positions, and creates a cause of action for any person injured by "an act in furtherance of the object of the conspiracy." 42 U.S.C. §§ 1985(1), (3); *see Lawrence v. Acree*, 665 F.2d 1319, 1329 (D.C. Cir. 1981) (Wald, J., concurring) ("the terms and legislative intent of [Section 1985(1) are] directed against efforts to

16

impede governmental operations by interfering with officials in the discharge of their duties").

Plaintiffs have adequately alleged a violent trifecta of conspiracies covered by Section 1985(1):

- a conspiracy to prevent Plaintiffs from discharging their duties as federal law enforcement officers to protect the Capitol, the literal seat of Article I;

- in so doing, to effectuate a conspiracy to violently prevent the federal officeholders within the Capitol (the Vice President and members of Congress) from discharging their official duties under the Twelfth Amendment and federal Electoral Count Act; and

- in so doing, to effectuate a conspiracy to prevent Joe Biden and Kamala Harris from accepting or holding an "office, trust, or place of confidence under the United States," so that the defeated incumbent might remain in office.

These overlapping conspiracies were ultimately aimed at subverting the peaceful transfer of power at the heart of the democratic process, for the highest federal offices in the United States. The historical record leaves little doubt that the 42nd Congress in 1871 would have viewed conspiracies directed at federal officials as plainly implicating the federal operational interests protected by Section 1985(1).  Plaintiffs properly rely on Section 1985(1).

> ### 1.   U.S. Capitol Police officers hold an "office, trust, or place of confidence under the United States," as did the officials they protect.

The phrase "any office, trust, or place of confidence under the United States" is intentionally broad and captures a wide variety of elected officials and federal employees entrusted with carrying out operations of the federal government.  As discussed above in Part I.C.1, the phrase originated in a Civil War statute (now 18 U.S.C. § 372) to protect the broad functioning of a government under attack, and Congress incorporated it into the Act without material change in 1871, under "virtually insurrectional" conditions when officials at all levels of government were being subjected to attempted intimidation and control by political mob violence.  *See Spagnola*, 809 F.2d at 34 (Silberman J., concurring in part, dissenting in part).

In both 1861 and 1871, Congress used that phrase for the "broad purpose of protecting the Federal presence as fully as possible."  *See Conspiracy to Impede or Injure an Officer of the*

*United States, 18 U.S.C. § 372*, 1 U.S. Op. Off. Legal Counsel at 276 (concluding that the key phrase protects the duties of "permanent and temporary, full- and part-time officers and employees of the United States"); *see also Stern*, 547 F.2d at 1338 (Section 1985(1) is "akin to the inherent 'power of self-protection'… and it advances the important federal interest in the effective operation of government"). The purpose and ordinary public meaning of that phrase would have been broad enough to include—at minimum—law enforcement officers charged with protecting the U.S. Capitol, in addition to critical officeholders like members of Congress, the incumbent U.S. vice president, and the duly-elected incoming president and vice president.

Some defendants offer an illogical reading of "officer" that would carve out of Section 1985(1) any conspiracies to violently prevent the holders of those offices from discharging their official duties under federal law.  They rely not on the contemporary public meaning, statutory context, purpose, or legislative history of the Act, but instead cherry-pick a few isolated, unrelated uses of "office" and "officer" in parts of the Constitution.  *See, e.g.*, Trump Mot. to Dismiss at 35–37 (also citing English statute nearly 200 years old at the relevant time). Defendant Nordean thus concludes that the officers of the United States Capitol Police force hold no office under the United States. Nordean Mot. to Dismiss at 11–13.

Interpreting "officer" in a statute is a question of statutory interpretation, not rote constitutional importation.  *See, e.g.*, *Lamar v. United States*, 240 U.S. 60, 65 (1916) (Holmes, J.).  Less than two months before passing the Act, Congress enacted the original Dictionary Act. As today, that interpretive statute provides that the word "officer" in federal statutes is contextual, and depends on the "office" at issue.[17]

---

[17] "[I]n all acts hereafter passed…the reference to an officer shall include *any person authorized by law to perform the duties of such office*, unless the context shows that such words were intended to be used in a more limited sense…." 16 Stat. 431, ch. 71, § 2 (Feb. 25, 1871). The

There is no indication in the legislative history that Congress intended to use "office" and "officer" in the artificially narrow sense proposed by Defendant Trump—not in the Act, and not in the Civil War predecessor statute using the same terminology.  In 1871, the ordinary public meaning of the key word "office"—not to mention "trust," or place of "confidence"—was broad enough to include all of the alleged targets of the violent conspiracy alleged by Plaintiffs. Contemporaneous dictionaries show that these terms would have protected from violent conspiracies essentially any individual occupying a position under federal law (*i.e.*, "under the United States"), entrusted with responsibilities and privileges distinct from ordinary citizens, including those in legislative positions. [18]

An officer of the United States Capitol Police force plainly holds an "office, trust, or place of confidence under the United States."  They have many duties under federal law. *See generally* 2 U.S.C. ch. 29, subch. II ("Powers and Duties of Capitol Police").  There is simply no evidence that when the Act spoke of "any" office, trust, or place of confidence under the United States, it would have been understood at the time to mean only *some* federal offices.  "[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule." *Bostock*, 140 S. Ct. at 1747; *Griffin*, 403 U.S. at 97 (courts should give Reconstruction civil rights statutes "a sweep as broad as [their] language").  If it were otherwise, violent KKK

---

Dictionary Act's definition of "officer" has remained essentially unchanged for over 150 years. *See* 1 U.S.C. § 1 ("any person authorized by law to perform the duties of the office").

[18] The 1865 edition of Noah Webster's dictionary defined "office" as "[a] special duty, *trust*, or charge conferred by authority and for a public purpose; an employment undertaken by the commission and authority of the government, as civil, judicial, executive, *legislative*, diplomatic, and other office[.]" *An American Dictionary of the English Language* at 908 (N. Webster et al., eds., 1865) (emphasis added)*, available at* https://archive.org/ details/americandictiona00websuoft/page/908/mode/2up; *see id.* at 1421 (defining "trust" as a "responsible charge or office," or "that upon which confidence is reposed"); *id.* at 271 (defining "confidence" similarly as, "[t]hat in which faith is put; ground of trust or reliance").

conspiracies that had limited themselves to interfering with *deputy* U.S. marshals—as opposed to the presidentially-appointed lead U.S. marshal—would have been beyond the statute's reach. *Cf. Steele v. United States*, 267 U.S. 505, 507–08 (1925) (holding deputy U.S. marshal qualifies as an "officer" for purposes of the Espionage Act, even though "not in the constitutional sense").

To the extent the Constitution's use of "officer" is relevant at all, the text of the Constitution is far more ambiguous than Defendants suggest. The presidency and vice presidency are explicitly "offices" under the Constitution. *See, e.g.*, U.S. Const. art I, § 3, cl. 7 (subjecting the president and vice president to "removal from Office" and "disqualification to hold and enjoy any Office of honor, Trust, or Profit under the United States"). Accordingly, Section 1985(1) would reach any conspiracies to use force to prevent Joe Biden and Kamala Harris from "accepting or holding" the positions of president and vice president.[19]

Some defendants misleadingly assert that "officer" under Section 1985(1) must have the same meaning as under the Fourteenth Amendment, because Section 1985 was enacted "as a means of effectuating the Fourteenth Amendment[.]" Nordean Mot. to Dismiss at 12; Kinnison Mot. to Dismiss at 16. With respect to Section 1985(1), this argument is legally and historically incorrect. Congress did not enact Section 1985(1) pursuant to the Fourteenth Amendment. The Act's full title was, "An Act to enforce the Provisions of the Fourteenth Amendment, *and for other Purposes.*" 17 Stat. 13 (emphasis added). Section 1985(1) and its materially identical Civil War predecessor (which pre-dated the Fourteenth Amendment) were both enacted as exercises of Congress's broad powers to legislate under the Necessary and Proper Clause, not the Fourteenth Amendment. *See, e.g.*, *Stern*, 547 F.2d at 1338–39. Key members of Congress explained that

---

[19] For the same reason, it would reach any conspiracies to forcibly prevent Vice President Mike Pence from discharging the duties of his office regarding the electoral vote count.

the text of Section 1985(1) furthered one of these "other purposes," not directly related to enforcing the Fourteenth Amendment. *See id*. at 1339;  Cong. Globe, 42d Cong., 1st Sess. 478 (Rep. Shellaberger describing what would become Section 1985(1) as "clearly independent of the fourteenth amendment, referable to and sustainable by the old provisions of the Constitution"); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 665 (1978) (stating that Section 2 of the original bill "dealt primarily with the 'other purpose' [from the bill's title] of suppressing Ku Klux Klan violence in the Southern States").  The Necessary and Proper Clause is particularly relevant because it is the source of Congress's authority to establish the U.S. Capitol Police.  Regardless of whether Plaintiffs are formally officers in the executive versus legislative branch, they are federal law enforcement officers, and would have been paradigmatic examples of the types of federal officers Congress was concerned with protecting. *See, e.g.*, Cong. Globe, 42d Cong., 1st Sess. 445 (letter reporting "deputy marshals… fired upon" and asking "Congress for aid and protection"); *id.* at 449 (recounting marshal "engaged in his duty" who was subjected to "vengeance of armed men… aimed at his person").

> **2.** **There is no Section 1985 loophole for violent conspiracies to interfere with duties related to elections or the peaceful transfer of power.**

Some defendants claim that Plaintiffs must bring their claims pursuant to Section 1985(3), which among other things references the right of "any citizen who is lawfully entitled to vote…." *See* Nordean Mot. to Dismiss, at 15–17; Kinnison Mot. to Dismiss at 13–15.

That argument is unsupported by the statutory language, historical application of the statute, and the legislative history of Section 1985(1). Plaintiffs allege a conspiracy to use threats and force to prevent the counting of the Electoral College results of the 2020 presidential election. *See, e.g.*, *Amended Compl.* ¶¶ 5–9.  Regardless of whether the counting of electoral votes implicates individual voting rights, that process itself occurs long after citizens' votes have

been cast, with numerous individuals in federal positions holding key roles. *See* 3 U.S.C. § 15 (assigning duties to members of Congress, the vice president, and four appointed "tellers"). And Plaintiffs themselves had far-ranging duties to protect the Capitol itself, regardless of the nature of the proceedings inside. *See Amended Compl.* ¶ 156 (citing 2 U.S.C. § 1961). Plaintiffs have alleged a conspiracy to forcibly interfere with all these federal officials' discharging of duties.

If anything, the conspiracy Plaintiffs allege—an attack on the peaceful transfer of power at the heart of the democratic process—would have been one of the paramount federal operations that Congress would have plainly wanted to protect from violence under Section 1985(1). Given the text and historical context, it would be absurd for courts to interpret Section 1985(1)'s broad language as applying to conspiracies targeting officials who deliver mail, or certain conspiracies to defame government employees, *see, e.g.*, *Windsor v. The Tennessean*, 719 F.2d 155, 162 (6th Cir. 1983), but then leave exposed to a violent mob attack some of the most sensitive and important duties that federal officials can discharge in a democracy. There is no subject-matter exception to Section 1985(1), and certainly not one for interfering with officers protecting the Capitol or carrying out the electoral vote count, as alleged here.

### 3. The plaintiff in a Section 1985 case can be "any person" injured, not merely the federal official targeted.

Some defendants assert that the only plaintiffs capable of bringing a Section 1985(1) claim are the officials targeted. *See e.g.*, Nordean Mot. to Dismiss at 7–11; Kinnison Mot. to Dismiss at 5–8; Straka Mot. to Dismiss at 10–13. That is wrong as a matter of statutory history.

Congress contemplated that persons *injured by* private conspiracies under Section 1985 can seek redress under Section 1985 regardless of whether they are the object of the conspiracy. The last clause of Section 2, now found at the end of Section 1985(3), gives a cause of action to any person "injured in his person or property" by "any act in furtherance of the object of a

22

conspiracy" in violation of Section 1985.  That individual need not be the federal official covered by Section 1985(1).  *See* Cong. Globe, 42d Cong., 1st Sess. 568 (Sen. Edmunds explaining that Section 2 "gives a civil action to anybody who shall be injured by the conspiracy"); *Griffin*, 403 U.S. at 103 (finding Section 1985 satisfied where plaintiffs allege "personal injury resulting from" acts of "detention, threats, and battery… done in furtherance of the conspiracy," regardless of whether one mistakenly targeted victim was the "main or only target of the conspiracy").

As originally drafted, Section 2 of the Act made clear that "any person" injured by "*any act in furtherance of* the object of such conspiracy... may have and maintain an action for the recovery of damages occasioned by such injury":

> And if any one or more persons engaged in any such conspiracy [under Section 2] shall do, or cause to be done, *any act in furtherance of the object of such conspiracy*, whereby *any person* shall be injured in his person or property … *the person so injured* … may have and maintain an action for the recovery of damages occasioned by such injury … against any one or more of the persons engaged in such conspiracy.

1871 Civil Rights Act, § 2, 17 Stat. 13 (1871) (emphasis added). There is no requirement that the "person so injured" be the *target* of the Section 1985 conspiracy (e.g., the federal official, juror, or voter assault)—only that they be injured by *any act in furtherance* of the conspiracy.

That broader reading makes sense in historical context. Congress was aware that these vigilante attacks frequently involved sustained harassment on an official, or courtroom witness, or voter, and included violence perpetrated against the target's family members at their homes.[20] Under Defendants' view, a conspiracy to induce officers of the United States to flee their duty

---

[20] *See, e.g.*, Select Senate Comm. Report, *supra* n.5, at XLII (describing 1868 murder of state official Solomon Dill in his home, "by a party of five to nine men, who also mortally wounded Dill's wife…."); *id.* at XXVIII (prosecutor describing the "abusing and maltreatment" of the wife of a man named Brooks, who had been threatened at gunpoint to stop voting Republican).

stations by injuring their spouses would not be actionable under Section 1985, because the spouses hold no office.[21]  There is no indication in the legislative history that Congress intended to create such a loophole when it provided for recovery by "the person so injured" by the act in furtherance of the conspiracy.[22]

### B.  Congress intended Section 1986 to apply to any individual with knowledge of, and the ability to help prevent, a Section 1985 conspiracy.

Section 1986 imposes "perhaps the strongest affirmative duty of any piece of legislation arising from the Civil War." *See* Linda E. Fisher, *Anatomy of an Affirmative Duty to Protect: 42 U.S.C. Section 1986*, 56 Wash. & Lee L. Rev. 461, 463 (1999) (hereinafter "Fisher").  The law applies to any individual who knew of a Section 1985 conspiracy, and neglected to take steps within their power to help "prevent or aid in preventing" it. *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997).  Section 1986 thus reaches more broadly than Section 1985, to include even individuals who are not affirmatively members of the conspiracy. *Id.*  These robust protections arose in response to government officials and local community members who had prior knowledge of violent conspiracies but failed to speak up or otherwise help stop them.

Contrary to Defendant Stone, there is no requirement that a Section 1986 defendant have a "position of authority" over Section 1985 conspirators.  Stone Mot. to Dismiss at 18.  Section

---

[21] By the same logic, people who "conspire to deter" a witness from testifying in federal court by injuring the witness's spouse or child could escape liability under 42 U.S.C. § 1985(2) because the "party so injured" was not the witness.

[22] The text of Section 1985 uses slightly different terms today, like "the party so injured," rather than "the person so injured."  That is because in 1874, Congress passed legislation to consolidate and collect all federal statutes in the Revised Statutes.  Congress made minor changes during that process that were "not intended to change the substantive meaning of the 1871 Act." *See Kush*, 460 U.S. at 724 & n.6 (citing 18 Stat. 113); *Pott v. Arthur*, 104 U.S. 735, 736 (1881) ("In transferring the language [to the Revised Statutes], it is to be presumed that it was intended to transfer the sense.").  For example, Congress also broke apart Section 2's first sentence into three subsections ("First," "Second," "Third"), now Section 1985(1)–(3).

1986 effectively creates a "Good Samaritan" responsibility for all people who have knowledge of a Section 1985 conspiracy, and the ability to help aid in its prevention. *See* Fisher at 463–64; *supra* Part I.C.2 (legislative history discussing Section 1986 as creating a "duty" for all citizens); *Monell*, 436 U.S. at 668–69 & n.20 (citing 42 U.S.C. § 1986).  Accordingly, Section 1986 imposes this duty on "[e]very person," using language broad enough to apply to government officials, *see, e.g.*, *Huey v. Barloga*, 277 F. Supp. 864, 870 (N.D. Ill. 1967), or private actors, *see, e.g.*, *Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*, 518 F. Supp. 993, 1007 (S.D. Tex. 1981), with a relatively low standard that the person neglect to reasonably "aid in preventing" the violent conspiracies they have foreknowledge of.  Congress expected in 1871 that even someone without direct power to stop the violence could help prevent it by, for example, alerting the authorities. *See supra* Part I.C.2 (discussing legislative history).  While the affirmative duty imposed by Section 1986 is unusual in American law, it is the "unusual and extreme nature of the underlying harm [that] justifies the statute's reach." *See* Fisher at 475.

## CONCLUSION

During the Civil War and through Reconstruction, Americans endured a crescendo of mob violence that targeted federal officials and sought to violently subvert democratically elected governments at all levels.  In many ways, the 2021 U.S. Capitol attack was an event unprecedented in American history.  But on a more fundamental level, the violent mob tactics of anti-democratic conspirators—and the shameful delinquency of their associates—have been familiar in American life for over 150 years.  With the 1871 Civil Rights Act, the United States enacted statutes that would durably guard against such evils by imposing financial liability on the conspirators, and on those who would sit idly by as such conspiracies unfold.  Plaintiffs have adequately pled claims under that statute as it is codified today at 42 U.S.C. §§ 1985 and 1986.

Dated: January 24, 2022

Respectfully submitted,

/s/  *Eric L. Klein*

Roy D. Prather III
BEVERIDGE & DIAMOND, P.C.
201 North Charles Street, Suite 2210
Baltimore, MD 21201-4150
410-230-1300 • 202-789-6190 (fax)

Zachary B. Pilchen
Eric L. Klein (Bar No. 993268)
Nessa Horewitch Coppinger (Bar No. 477467)
Julius M. Redd
Alan J. Sachs
Dacia T. Meng

Jessica H. Maloney
Anthony G. Papetti
BEVERIDGE & DIAMOND, P.C.
477 Madison Avenue, 15th Floor
New York, NY 10022-5835
212-702-5400 • 202-789-6190 (fax)

Jack B. Zietman
BEVERIDGE & DIAMOND, P.C.
1900 N Street NW, Suite 100
Washington, DC 20036
202-789-6000 • 202-789-6190 (fax)
eklein@bdlaw.com

Counsel for *Amici Curiae*
Reconstruction Era Scholars