IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONRAD SMITH, *et al.*,

               Plaintiffs,

   v.

DONALD J. TRUMP, *et al.*,

               Defendants.

Civil Action No. 1:21-CV-02265-APM

PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION
TO THE MOTIONS TO DISMISS BY DEFENDANTS
MELE AND ALEXANDER

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.      Defendant Mele's Motion Should Be Denied as Untimely ................................. 2

II.     Standard of Review ................................................................................ 4

III.    Plaintiffs State Claims under the Ku Klux Klan Act ........................................ 5

        A.      Plaintiffs State Valid Claims for Mele's and Alexander's
                Violations of Section 1985 ..................................................... 5

        B.      Plaintiffs Sufficiently Allege that Alexander and Mele Violated
                Section 1986 ..................................................................... 17

IV.     Plaintiffs Sufficiently Allege Claims under D.C. Law ...................................... 20

        A.      Plaintiffs Sufficiently Allege that Alexander and Mele Violated the
                D.C. Bias-Related Crimes Act, and Plaintiffs Have Standing to
                Pursue those Claims ............................................................. 20

        B.      Plaintiffs State Valid Claims for Battery and Assault against Mele
                and Alexander .................................................................... 22

        C.      Plaintiffs State Valid Claims for Negligence ...................................... 27

V.      The First Amendment Does Not Shield the Defendants from Liability for
        Their Unlawful Conduct ......................................................................... 30

        A.      The First Amendment Is No Defense because the Defendants'
                Speech Was Integral to Their Unlawful Conspiracies ............................. 31

        B.      Defendants' Speech Serves as Evidence Supporting the Claims
                against Them, Consistent with the First Amendment .............................. 33

        C.      The First Amendment Does Not Protect Incitement or Threats ................... 35

        D.      The *Noerr-Pennington* Doctrine Does Not Immunize Defendants ........ 38

VI.     Plaintiffs Have Standing to Pursue Their Claims against Mele and
        Alexander ......................................................................................... 40

        A.      Plaintiffs' Injuries Are "Fairly Traceable" to Mele's Conduct .................. 40

        B.      Plaintiffs Seek Redress for Their Own Injuries, Not Those of
                Others ............................................................................. 43

CONCLUSION.................................................................................................................. 44

## INTRODUCTION

This case seeks accountability for those, like Defendants Alexander and Mele, responsible for the violent Attack on the U.S. Capitol and Capitol Police on January 6, 2021. Defendants' arguments for why they should escape liability for their actions all fail.

Defendant Mele's motion should be rejected in its entirety as untimely, filed with no regard to the Court's order setting the briefing schedule. Regardless, the allegations in the Amended Complaint firmly establish each of the claims against Mele and Alexander under the governing legal standards. When all of the allegations are taken as true and considered together, as the law requires, including the allegations pertaining to each Defendant's coconspirators, the allegations more than meet the requirement to state plausible claims against the Defendants.

The allegations in the Amended Complaint allow the Court to draw reasonable inferences that each of the Defendants agreed with at least one other person to objectives that are unlawful under 42 U.S.C. § 1985(1), that Defendants carried out acts in furtherance of their conspiracies, and that Plaintiffs were injured as a result.

The allegations also establish plausible claims that each Defendant violated 42 U.S.C. § 1986 by failing to act to help prevent the harms of the § 1985(1) conspiracies. Defendants Mele and Alexander each had it within his power to help avoid the violent Attack on the Capitol and the harms caused to Plaintiffs, but neither Defendant made any effort to do so.

The Amended Complaint firmly establishes plausible claims against each Defendant under the D.C. Bias Related Crimes Act. It properly alleges that each Defendant committed an underlying criminal act, such as a violation of D.C.'s Anti-Terrorism Act, rioting, or destruction of property; that they were motivated to do so by prejudice against certain members of Congress and the Vice President based on their actual or perceived political affiliations; and that their actions resulted in

1

injuries to the Plaintiffs. Likewise, the allegations establish plausible claims that each Defendant is liable for battery and assault of the Plaintiffs based on their own conduct and on their aiding and abetting of the primary tortfeasors, or on their conspiracy with others whose acts in furtherance of the conspiracy injured the Plaintiffs. Further, the Amended Complaint establishes Defendants' liability to Plaintiffs in negligence for having injured Plaintiffs as a result of Defendants' violations of their duties of reasonable care in facilitating the Attack, and their duties to abide by criminal statutes prohibiting rioting and violence at the Capitol.

The First Amendment does not shield Defendants from liability for their unlawful and abhorrent conduct. Conspirators to unlawful ends cannot acquire immunity by seeking refuge under the umbrella of "political expression" or petitioning. The First Amendment protects neither violence nor agreements to commit it.

Defendant Mele's and Alexander's remaining arguments are meritless.

## ARGUMENT

## I.   Defendant Mele's Motion Should Be Denied as Untimely

The Court should deny Mele's Motion to Dismiss in its entirety as untimely in light of the Court's December 7, 2021 Order setting the briefing schedule for motions to dismiss. In the absence of any motion under Rule 6(b) for an extension of time to file Mele's motion to dismiss, there is no basis on which the late filing may be permitted. *See Smith v. D.C.*, 430 F.3d 450, 457 (D.C. Cir. 2005).

Federal Rule of Civil Procedure 6(b) governs extensions of time for filings with the trial court. *See* Fed. R. Civ. P. 6(b); *Smith*, 430 F.3d at 456. As the Supreme Court emphasized in *Lujan v. National Wildlife Federation*: "First, any extension of a time limitation must be 'for cause shown.' Second, although extensions before expiration of the time period may be 'with or without motion or notice,' any *post*deadline extension must be 'upon motion made,' and is permissible

2

only where the failure to meet the deadline 'was the result of excusable neglect.'" 497 U.S. 871, 896 (1990) (emphasis in original; quoting Rule 6(b)); *see Smith*, 430 F.3d at 456 ("[P]ost-deadline extensions may be granted only 'for cause shown' and 'upon motion.'"*)*. In *Smith*, the Court of Appeals held that, in the absence of any motion for an extension of time to file a motion for summary judgment, the trial court had no basis on which to exercise its discretion to permit the late filing. *See* 430 F.3d at 457. Under such circumstances, the court held that the district court abused its discretion in entertaining the late motion for summary judgment. *See id.*

Here, Mele failed to make a motion for extension of time to file, and he filed his motions over three weeks late. Under these circumstances, as in *Smith*, there is no basis to permit the late filing, and the Court should reject the motion in its entirety. In setting the briefing schedule, the Court ordered that "by December 23, 2021, Defendants shall file responses to the Amended Complaint, including any answer or Rule 12 motions," and that Plaintiffs were to file a consolidated response by January 17, 2022. Minute Order (Dec. 7, 2021). Mele was served on October 5, 2021, well before the Court's December 7 order and the October 25, 2021 Order initially granting a consolidated briefing schedule. *See* ECF 41 (Return of Service executed on Defendant Mele); Minute Order (Oct. 25, 2021). All defendants were required to file any Rule 12 motions in response to the Amended Complaint by December 23, 2021. *See* Minute Order (Dec. 7, 2021). Without explanation or motion for an extension of time, Defendant Mele filed his Rule 12 motion over three weeks later on January 16, 2022. *See* ECF 117, Defendant Ronald Mele's Motion to Dismiss the Amended Complaint (Jan. 16, 2022).

In light of Rule 6(b) and the D.C. Court of Appeals holding in *Smith v. D.C.*, the Court should deny Mele's Motion to Dismiss the Amended Complaint in its entirety.

## II.      Standard of Review

Defendants Mele and Alexander each bring motions challenging the sufficiency of the allegations in the Amended Complaint, *see* Fed. R. Civ. P. 12(b)(6), and challenging the Court's subject matter jurisdiction on the contention that Plaintiffs lack standing to pursue their claims, *see* R. 12(b)(1). For both sets of motions, the Court must accept the allegations in the Amended Complaint as true. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("As it must on motions to dismiss for failure to state a claim, a district court considering a motion to dismiss for lack of subject matter jurisdiction accepts the allegations of the complaint as true.").[1]

Further, in considering motions to dismiss pursuant to both Rule 12(b)(1) and Rule 12(b)(6), courts must "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged,' and upon such facts determine jurisdictional questions." *Am. Nat. Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (on 12(b)(1) motion; quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)); *see Hurd v. D.C., Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017) (on 12(b)(6) motion). Thus, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Further, the complaint must be viewed as a whole, considering all of the allegations in their totality, rather than parsing the allegations to assess the strength of each. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009).

---

[1]     Neither Defendant challenges the accuracy of the Amended Complaint's allegations relevant to the jurisdictional arguments they make. *See* ECF 117, Mele Motion to Dismiss ("MTD"), at 6 (arguing that "Plaintiffs have not alleged facts that, even if true, would show their injuries are 'fairly traceable' to Mr. Mele"); ECF 120, Alexander MTD, at 14-15 (arguing that "Plaintiffs do not have 'third-party' standing" to sue on behalf of others).

Read as a whole, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Respecting conspiracy claims in particular, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable, and that a recovery is very remote and unlikely." *Id.* (internal quotation marks omitted). "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible. The choice between or among plausible inferences or scenarios is one for the factfinder." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (internal citations omitted).

## III.   Plaintiffs State Claims under the Ku Klux Klan Act

### A.   Plaintiffs State Valid Claims for Mele's and Alexander's Violations of Section 1985

Defendants Mele and Alexander move to dismiss Plaintiffs' section 1985 claims under Rule 12(b)(6) for failure to state a claim. ECF 117 at 11; ECF 120 at 18. However, the Amended Complaint sufficiently alleges that each Defendant conspired to use force, intimidation, and threats in violation of section 1985(1), and that overt acts taken in furtherance of those conspiracies—the support, planning, and attack on the Capitol—caused Plaintiffs' injuries.

#### 1.   Conspiracy Law Supports Defendants' Liability

To violate section 1985(1), a plaintiff must allege a conspiracy:

to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any . . . place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof . . . .

42 U.S.C. § 1985(1). In this Circuit, civil conspiracies require a plaintiff to show "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

A conspiratorial agreement exists wherever two or more persons share a commitment to a "general objective or common plan." *Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 80-81 (D.D.C. 2004). Such agreements do not need to be explicit—proof of a tacit understanding is sufficient to show agreement, since "conspiracies are rarely evidenced by explicit agreements and nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (internal quotations and citations omitted).

On a motion to dismiss, Plaintiffs need not show that each participant knew "the exact limits of the illegal plan or the identity of all participants therein." *Hobson v. Wilson*, 737 F.2d 1, 51 (D.C. Cir. 1984) (citations omitted). Nor must Plaintiffs "definitively show an agreement" to overcome a motion to dismiss. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 426 (4th Cir. 2015). Instead, Plaintiffs must only "raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." *Twombly*, 550 U.S. at 556; *see also Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157 (1970) (conspiracy could be established where "the sequence of events

6

created a substantial enough possibility of a conspiracy . . . especially given the fact that the noncircumstantial evidence of the conspiracy could only come from adverse witnesses.").

In most cases, "the court will have to infer a conspiracy from indirect evidence."[2] *Halberstam*, 705 F.2d at 481. For example, conspiratorial agreements can be demonstrated through allegations of "communications and meetings among conspirators" that "support an inference of agreement because they provide the means and opportunity to conspire." *See SD3*, 801 F.3d at 432. They can also be demonstrated through "parallel conduct" by the Defendants coupled with other circumstances that "point[] toward a meeting of the minds," *Twombly*, 550 U.S. at 557. A "unity of purpose or common design and understanding" to accomplish the objects of the conspiracy and "the relationship among co-defendants" likewise may give rise to an inference of agreement. *United States v. Dowlin*, 408 F.3d 647, 657 (10th Cir. 2005).

A defendant's participation in a conspiracy can be "inferred from an invitation, followed by responsive assurances and conduct." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008). Later ratification of the overt acts in furtherance of a conspiracy can also evidence a defendant's participation in the conspiracy. *See, e.g.*, *Sines v. Kessler*, 324 F. Supp. 3d 765, 796-97 (W.D. Va. 2018); *Braver v. Ameriquest Mortg. Co.*, 2006 WL 8436631, at *4 (W.D. Okla. Oct. 13, 2006). "Motive or intent may be proved by the acts or declarations of some of the conspirators in furtherance of the common objective." *Pinkerton*, 328 U.S. at 647. In addition, communications evidencing a conspiracy do not need to be made in private or made surreptitiously—public statements by defendants can be construed as "invitations to agree." *In re California Bail Bond Antitrust Litig.*, 2020 WL 3041316, at *13 (N.D. Cal. Apr. 13, 2020). Even

---

[2]    Thus, "dismissals prior to giving the plaintiffs ample opportunity for discovery should be granted with caution and very sparingly." *In re Consumer Credit Counseling Services Antitrust Litig.*, 1997 WL 755019, at *4  (D.D.C. Dec. 4, 1997).

without any communication, an agreement may be inferred from circumstances suggesting purposeful action in concert. *See United States v. Scott*, 979 F.3d 986, 990-91 (2d Cir. 2020) (affirming conviction of correctional officers for conspiring to beat plaintiff even without communication; though initiation of beating "may have been spontaneous, the evidence at trial revealed that the other officers acted in concert and purposefully joined the assault").

Each Defendant is liable for the reasonably foreseeable acts of their coconspirators. *See Pinkerton*, 328 U.S. at 647-48; *Sines*, 324 F. Supp. 3d at 795 (applying *Pinkerton* liability to conspiracy under § 1985). Significantly, under the plain text of § 1985, coconspirators are liable if they "do, or cause to be done" any injurious act in furtherance of the conspiracy. 42 U.S.C. § 1985. "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, *but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury*." *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978) (emphasis added) (interpreting similar language—"subjects, or causes to be subjected" to a deprivation of civil rights—in 42 U.S.C. § 1983).

### 2.     The Amended Complaint's Allegations Establish Mele's and Alexander's Liability for Conspiracy under Section 1985(1)

The Amended Complaint sufficiently alleges that Mele and Alexander participated in a conspiracy to use force, intimidation, and threats to violate section 1985(1), and that the overt acts of Defendants and their coconspirators caused Plaintiffs' injuries. As demonstrated below, the Amended Complaint includes allegations evidencing either an explicit agreement by each moving Defendant to participate in a conspiracy or sufficient facts from which the Court may reasonably infer such agreement or have a "a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." *Twombly*, 550 U.S. at 556.  Mele's and Alexander's agreement in the

conspiracy is demonstrated by their public and private communications with others, pre-existing relationships with other Defendants, shared goals of preventing election certification, numerous opportunities to conspire with other Defendants, and participation in similar and coordinated actions at events and rallies preceding the January 6 Capitol Attack. Moreover, Mele and Alexander expressly and repeatedly ratified the conduct of the attackers, further demonstrating that the January 6 Attack was the intended result of their actions.

### a. Ronald Mele

According to the Amended Complaint, Mele coordinated with others to plan for and execute the Attack on the Capitol. In preparation for the Attack, he joined a Telegram chat called "The California Patriots-DC Brigade" ("DC Brigade"), the purpose of which, according to its founder, codefendant Russell Taylor, was "for able bodied individuals that are going to DC on Jan 6" who are "ready and willing to fight," and "to organize a group of fighters to have each other's backs and ensure that no one will trample on our rights." ECF 89, Amended Complaint, ¶ 99(a). Communicating via the DC Brigade chat, Mele worked with other Defendants to arm themselves and other attendees of the January 6 rally in anticipation of a violent confrontation at the Capitol. *Id.* ¶ 101. Defendant Taylor told others in the "DC Brigade" Telegram chat that he was "assuming that you have some type of weaponry that you are bringing with you and plates as well." *Id.* In response, Defendant Kinnison, said in the chat that he, Mele, and Defendant Warner were bringing "medical kits, radios, multiple cans of bear spray, knives, flags, plates[,] goggles, [and] helmets." *Id.*

Mele then posted on social media that he was renting a large SUV for the trip to Washington, D.C., because he needed "room for the 'gear,'" and he communicated by text with coconspirators about what weapons to bring for January 6. *Id.* Kinnison asked whether they wanted

to bring a "shotty" (shotgun) and "another long iron" (rifle), and Mele responded, "Shorter the better. Mine will be able to be stashed under the seat. I'll bring it. 18" barrel." *Id.* In response, Kinnison confirmed he would come with shotgun ammunition. *Id.*

Mele further confirmed his purposes in conspiring with others to come to Washington, D.C., for January 6 in support of Defendant Trump, messaging that he was "arriving January 5 [in Washington, D.C.,] to support our President on the 6th and days to follow just in case." *Id.* ¶ 142. And Mele followed through on his planning and coordination, actually joining with his coconspirators in the physical attack on the Capitol, engaging in rioting by joining with hundreds of attackers on Capitol grounds and violently breaching barricaded areas there. *See id.* ¶¶ 45, 134, 140(e), 195, 213(a), 215. In a contemporaneous video shot at the steps next to the Upper West Terrace of the Capitol on January 6, Mele stated: "We stormed the Capitol." *Id.* ¶ 140(e).

The Amended Complaint therefore certainly includes "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" as to Mele's participation in the alleged section 1985(1) conspiracy. *Twombly*, 550 U.S. at 556. Further, as noted above, section 1985 plainly provides for liability for those who "do, or cause to be done" any injurious act in furtherance of the conspiracy, 42 U.S.C. § 1985, and causation "can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Duffy*, 588 F.2d at 743-44. Mele's acts in furtherance of the conspiracy—including his plans to bring weaponry and other items to assist in physical combat with police at the Capitol, and his actual participation in the attack—helped set in motion, and keep in motion, the Capitol Attack. Further, Mele reasonably should have known that the Attack would cause others to inflict injuries on the Plaintiffs. The Plaintiffs' injuries were exactly the type

10

to be anticipated during a mass attack on police, including harm from physically being struck by attackers, sustaining bodily injury from being forced over barricades, and exposure to chemical irritants. *See* ECF 89, Amended Complaint, ¶¶ 156-65. Mele's discussion with his coconspirators of the materials to bring to the Attack shows not just that such injuries were foreseeable, but that he foresaw and intended to inflict them. *See* ECF 89, ¶ 101 (discussing the need for "medical kits, radios, multiple cans of bear spray, knives, flags, plates[,] goggles, [and] helmets"); *see Sines*, 324 F. Supp. 3d at 796-97 (holding defendants liable for coconspirator's car attack on demonstrators in part because defendants' plans to bring deadly weaponry to the demonstration showed that it was foreseeable that a deadly attack could occur); *see also Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003) (proximate cause exists where "'the injury is the natural and probable consequence of the negligent or wrongful act and ought to be foreseen in light of the circumstances.'" (quoting *Murphy v. United States,* 653 F.2d 637, 648 n.48 (D.C. Cir. 1981)). Further, the Amended Complaint specifically alleges that Mele conspired at least with Trump, Hostetter, Taylor, Warner, Martinez, and Kinnison. *Id.* ¶ 170. The acts by coconspirators in furtherance of the conspiracy are set forth in the Amended Complaint and summarized in Plaintiffs' Omnibus Response to motions to dismiss, and Mele is liable for them. *See* ECF 118, at 8-21. By fomenting, preparing for, supplying, and carrying out the Attack on the Capitol, Mele's own acts, and those of his coconspirators, facilitated and caused the Attack, and each of the Plaintiffs suffered physical and emotional injuries as a direct result. *See* ECF 89, ¶¶ 157-165.

### b.     Ali Alexander

The detailed allegations in the Amended Complaint likewise establish that Defendant Alexander agreed with others to the use of force, intimidation, and threats to stop Congress from certifying the results of the 2020 election and for the other purposes prohibited by

section 1985(1), and that overt acts taken in furtherance of that conspiracy caused Plaintiffs' injuries. The Amended Complaint specifically alleges that Alexander agreed to the purposes of the 1985 conspiracy with Defendants Trump, Trump for President, Make America Great Again PAC, Straka, Stone, Proud Boys, Proud Boys International, Tarrio, Nordean, Rhodes, Meggs, Oath Keepers, Hostetter, and Taylor. ECF 89, ¶ 170. The acts in furtherance of the conspiracy are set forth in the Amended Complaint and summarized in Plaintiffs' Omnibus Response, and Alexander is liable for them. *See* ECF 118, at ¶¶ 157-65.

In concert with them and others, Defendant Alexander worked to recruit persons willing to attack Congress by propagating the false claims that election fraud denied codefendant Trump a second term as president, he promoted efforts to stop by force Congress's certification of the election results on January 6, he coordinated with coconspirators to plan events to stoke anger amongst Defendant Trump's supporters to help generate the violent Attack, and he facilitated the participation of coconspirators in the violent Attack.[3]

Soon after the election in November 2020, Alexander allied with coconspirators for the purpose of blocking Congress from discharging its duty to certify the result of the election.

- On November 18, 2020, he appeared with Proud Boys at a Stop the Steal really outside the state capitol in Georgia, speaking with Defendant Tarrio to promote false claims of election fraud. *Id.* ¶ 78. Alexander asked the crowd, "Who is going to be ready to storm the capitol with us in a few minutes?" after which they led the crowd inside the state capitol. *Id.* At that rally, Alexander explicitly told supporters of codefendant Trump, "we're going to stop the steal. But first we're going to stop the certification." *Id.*

- At December 19, 2020 rally in Phoenix, Alexander told the crowd: "One of our organizers in one state said, 'We're nice patriots, we don't throw bricks.' I leaned over and I said, 'Not yet. Not yet!' Haven't you read about a little tar-and-feathering? Those

---

[3]   Alexander argues that Plaintiffs' claims are based only on speculation, "[a]s demonstrated in the Facts section of [his] brief . . . ." ECF 120, at 14. The "facts" Alexander asserts in his brief are entirely unsupported by any citation to record evidence, affidavits, or otherwise, and it is the facts as pled in the Amended Complaint that control on a motion to dismiss. *See Graham*, 798 F.3d at 1129.

were second-degree burns! . . . We're going to convince them to not certify the vote on January 6 by marching hundreds of thousands, if not millions of patriots, to sit their butts in D.C. and close that city down, right? And if we have to explore options after that . . . 'yet.' Yet!'" *Id.*

- His intent to prevent Congress from certifying the election is further evidenced by his procurement of a permit to rally on Capitol grounds on January 6 and his use of subterfuge to obtain it. *See id.* ¶ 106. Aware that Stop the Steal was considered an extremist group, he applied for the permit under a different name, misrepresented the number of people likely to attend (only 50), indicated that the planners had no other events planned in Washington that day, and stated that no march was planned. *See id.*

Along with other Defendants, Alexander promoted the use of force, intimidation, and threats to prevent the election certification and Biden and Harris from taking office. *See id.* ¶ 72.

- In his December 19 speech in Phoenix, he called for the use of violence "to convince them to not certify the vote on January 6," as noted above. *Id.* ¶ 106.

- On December 7, 2020, for example, Alexander tweeted, "I am willing to give my life for this fight." *Id.* ¶ 72(c).

- In broadcast interviews on November 14 and December 23, 2020, Alexander told viewers that they had to "put bodies in the streets and make the American oligarchs scared of what we'll do." *Id.*

- He also called for "fighters," telling viewers that "you teach a bully to stop hitting you by punching him in the nose. We've got to punch the left in the nose and we've got to stop being nice about it." *Id.*

In furtherance of the alleged conspiracy, Alexander also participated in the intimidation of members of Congress to prevent them from discharging their duties to certify the results of the 2020 election.

- On December 30, 2020, for example, Alexander tweeted, in reference to the Congressional count of electoral votes and announcement of the election of Biden and Harris on January 6, "If they do this, everyone can guess what me and 500,000 others will do to that building." *Id.* ¶ 72(c).

In so doing, Alexander promoted exactly the kind of violence that he and his coconspirators intended and that actually transpired on January 6.

Defendant Alexander worked with others to recruit individuals willing to attack Congress, including by propagating false claims about a stolen election.

- As a national organizer for, and leader of, Stop the Steal, LLC, *see* ECF 89, ¶ 23, Alexander popularized the slogan "stop the steal" in promotion of his and his coconspirators' false election fraud claims to stoke anger among Trump supporters, *see id.* ¶ 62.

- Alexander helped propagate the false election fraud claims by, for example, soliciting people to sign up for an email listserv at StoptheSteal.us, *id.* ¶ 72(c), and promoting the false claims at several rallies, *see, e.g.*, *id.* ¶¶ 78, 79, 108.

- Alexander did not do this alone, but joined with other Defendants and coconspirators in such acts in furtherance of their conspiracy. *See id.* ¶ 78. Alexander organized a "stop the steal" rally for December 12, 2021, which was promoted by codefendants Stone, Tarrio, and Nordean, among others. *Id.* ¶ 79. Katrina Pierson, advisor for codefendant Trump for President, spoke at the rally, and explicitly called for lawless action and promoted the use of force, intimidation, and threats to keep Defendant Trump in power. *Id.*

As the date for Congress's certification of the election results approached—the certification that Alexander stated that the wanted to stop by violent means—Alexander worked with coconspirators to recruit crowds of angry supporters to come to Washington and to incite them to violently attack Congress.

- Trump and Trump for President organized a rally for January 5, 2021, in Washington, D.C., for Alexander and others to speak. *Id.* ¶ 84.

- Alexander worked with Trump, Trump for President, and Stone to publicize the January 6 rally widely among Trump's supporters, encouraging as many people as possible to attend despite widespread reports that many had already resorted to violence and threats of violence in response to Trump's election loss. *Id.* ¶ 95.

- Alexander and Stop the Steal advertised and encouraged attendance at the rally and the "march" on the Capitol on both the Stop the Steal website and other websites it controlled, where they called on supporters to march to the Capitol at 1 p.m. on January 6 and to "Take a stand with President Trump and the #StopTheSteal coalition." *Id.* ¶ 95.

- Alexander worked with Trump and other coconspirators to promote and prepare for the January 6 rally and unlawful march to the Capitol, continued spreading false claims of election fraud, and continued trying to intimidate and threaten government officials

into stopping the electoral vote count and announcement of the election of Biden and Harris. *Id.* ¶¶ 85, 107.

- Alexander himself acknowledged that in working to "stop the steal," he had worked with codefendant Trump's lawyers and coordinated with "people from the White House." *Id.* ¶ 85.

- He communicated with a senior Trump campaign official on January 5 and, on the morning of January 6, shortly before the Capitol Attack, Alexander stated, "The president's mood is he's in fighter mode and today will determine which Republicans are going to suffer his wrath going forward. That's the mood that he's in. In fact, I got a call last night from Kimberly Guilfoyle and none of us are stopping." *Id.* Guilfoyle was the fundraising chair of the Trump Victory Committee, a joint fundraising representative of codefendant Trump for President. *Id.*

- On January 5, Alexander spoke at the rally in Freedom Plaza in Washington, D.C., that Trump and Trump for President helped to organize, appearing with Taylor, Stone, and Straka. *Id.* ¶ 108. Alexander told the crowd that the government should be "afraid of the people" and led the crowd in chants of "Victory or Death." *Id.* Alexander further told the crowd that "1776 is always an option. These degenerates in the deep state are going to give us what we want, or we are going to shut this country down." The term "1776" has commonly been used by Defendants and their supporters as a code for violent revolution. *Id.*

- Both Stone and Alexander explicitly acknowledged working together and with others to prevent Biden and Harris from taking office. At the January 5 Freedom Plaza event, Stone acknowledged Alexander for driving the Stop the Steal movement, and Alexander recognized that Stone had offered "wise counsel to Trump's legal team and this movement" and that it "couldn't be done without Stone." *Id.* ¶ 109.

Alexander also helped to facilitate the Attack itself.

- Alexander facilitated the presence of Proud Boys and their members at the Capitol on January 6, speaking with them about accommodations in Washington, D.C. *See id.* ¶ 103(d).

- He used the Stop the Steal website to post a detailed map of Washington, D.C., with instructions on where to meet, and he urged followers to "take to the Capitol lawn and steps," *id.*, which he knew or reasonably should have known would be restricted from public access by the U.S. Capitol Police.

Following the January 6 attack on the Capitol, Alexander ratified the violent attack, confirming his intent to support it as part of the conspiracy to use force, intimidation, or threats against Congress and the Capitol police. *See* ¶ 141.

15

- As the Attack was underway, Alexander posted a video overlooking the Capitol in which he proclaimed, "I don't disavow this. I do not denounce this." *Id.* ¶ 155.[4]

- He also released a video proclaiming, "Stopthesteal.us is gonna be the home of the rebellion against an illegitimate government." *Id.*

Considering all of these allegations together with the Amended Complaint as a whole, and drawing all reasonable inferences in favor of Plaintiffs, the Amended Complaint manifestly includes "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" as to Alexander's participation in the alleged section 1985(1) conspiracy. *Twombly*, 550 U.S. at 556.

_____

Based on the foregoing, it is clear that Defendants Mele and Alexander and their coconspirators committed overt acts to explicitly support, encourage, and direct their coconspirators to use the violent Attack on the Capitol and the Capitol Police to stop the electoral count and certification, and that each of the Plaintiffs suffered physical and emotional injuries as a direct and foreseeable result of such acts in furtherance of the conspiracies. *See id.* ¶¶ 157-165 (injuries); *Sines*, 324 F. Supp. 3d at 795-97 (§ 1985 defendants caused plaintiffs' injuries where unknown participants in a violent demonstration "pepper sprayed and otherwise assaulted" plaintiffs at the location where defendants had led the demonstrators and defendants shouted "[t]he heat here is nothing compared to what you're going to get in the ovens!"); *Marsh v. Barry*, 824 F.2d 1139, 1143-45 (D.C. Cir. 1987) (holding that defendant officials could have caused plaintiffs' injuries resulting from jail riot because officials had created the circumstances (overcrowding) that

---

[4]    In his motion to dismiss, Alexander offers a strained interpretation of this statement, suggesting that he meant it only as to "peaceful" protestors, ECF 120, at 12-13, and not the violent confrontation that was evident and being broadcast widely on news networks and social media. *See* ECF 89, ¶ 145. Even if this interpretation was not implausible, reasonable inferences must be drawn in favor of Plaintiffs. *See Graham*, 798 F.3d at 1129.

foreseeably led to the riot); *Burnett*, 274 F. Supp. 2d at 105 (plaintiffs injured in the September 11 terrorist attacks properly alleged that defendants caused their injuries because the attacks could fairly be seen as the "natural and probable consequence" of defendants' knowing financial support to the terrorist group). Indeed the Attack on the Capitol and Capitol Police was not just the foreseeable consequence of their actions (and the actions of their coconspirators), but the intended one, as demonstrated by Defendants' statements ratifying the violence. *See Sines*, 324 F. Supp. 3d at 785, 791, 797 (defendants' post-attack comments ratifying other attackers' acts supported defendants' liability under *Pinkerton*). In sum, Plaintiffs have more than met the pleading standard to defeat Defendants' motions to dismiss the § 1985(1) claims.

### 3. Alexander's other Challenges to Plaintiffs' Section 1985 Claims Fail

Echoing the Defendants who timely filed their motions to dismiss pursuant to the Court's December 7, 2021 Minute Order, Alexander argues that Plaintiffs fail to state a claim under section 1985(1) because they are not officers of the United States for purposes of the statute, *see* ECF 120, at16-17, because Washington, D.C., is not a state or territory, *see id.* at 17, and because their conspiracy claims should have been brought under section 1985(3), *see id.* These arguments are meritless and should be rejected for the reasons discussed in Plaintiffs' Omnibus Response to the other motions to dismiss. *See* ECF 118, Omnibus Response, at 22-25 (federal officials protected by 1985(1)), 29-30 (Washington, D.C. is covered by § 1985(1)), 30-31 (1985(1) claims distinct from 1985(3)).

### B. Plaintiffs Sufficiently Allege that Alexander and Mele Violated Section 1986

Contrary to Mele's and Alexander's contentions, Plaintiffs sufficiently allege each element of a claim against them under 42 U.S.C. § 1986. In the interests of judicial economy, Plaintiffs incorporate here the legal arguments made in their Omnibus Response. *See* ECF 118 at 31-34. As discussed there, the elements of a section 1986 claim are (1) the defendant had actual knowledge

of a section 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of the wrongs conspired to be done, (3) the defendant neglected or refused to prevent such action, and (4) a wrongful act was committed. *See* 42 U.S.C. § 1986; *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d. Cir. 1994).

Defendants' arguments fail for three reasons. *First*, as discussed above and in Plaintiffs' Omnibus Response, Plaintiffs sufficiently allege the existence of a section 1985 conspiracy of which Alexander and Mele each knew. *See supra* III.A; ECF 118 at 4-22. Contrary to Mele's suggestion, *see* ECF 117, at 14, section 1986 does not require a Defendant to be a party to the section 1985 conspiracy or even share the same motives. *See Park v. City of Atlanta*, 120 F.3d 1157, 1160-61 (11th Cir. 1997).

*Second,* each defendant certainly had the power to prevent or help prevent the commission of the wrongs conspired to be done. Such power to help prevent the wrongs of a section 1985 conspiracy need not derive from any kind of official position, as Alexander argues, *see* ECF 120 at 18. Rather, the plain and unambiguous language of the statute imposes a duty on "*Every person*." 42 U.S.C. § 1986 (emphasis added). Courts have not required a section 1986 defendant to hold any kind of formal position of authority over those participating in the conspiracy or otherwise. *See, e.g.*, *Vietnamese Fishermen's Ass'n*, 518 F. Supp. at 1001, 1006-07 (non-leader Klan member and non-members held liable under section 1986 for failure to prevent wrongs by other Klansmen pursuant to § 1985 conspiracy). And the legislative history says the opposite. *See* Cong. Globe 42nd Cong., 1st Sess. 824 (Senator Edmunds: the provision creates "individual responsibility on the part of every man who should have failed to exert his full duty as a citizen to prevent an outrage upon his fellow-citizen."). Alexander argues that a section 1986 defendant must have knowledge of one's ability to prevent or aid in preventing the section 1985 violation. *See* ECF 120, at 18. The

plain text requires actual knowledge only of the existence of the section 1985 conspiracy, however, and applies a negligence standard to a defendant's duty of care and obligation to intervene. *See* 42 U.S.C. § 1986; *Clark*, 20 F.3d at 1295; *Park*, 120 F.3d at 1160; ECF 118 at 31-34.

Plaintiffs' sufficiently allege that Alexander and Mele each had the ability to prevent or aid in preventing the section 1985 conspiracy, that they did not exercise it and that injuries resulted. *See* ECF 89 ¶¶ 176, 178. As alleged in the Amended Complaint, Alexander could have, among other things, refused to raise funds to disseminate false claims of election fraud or to hold Stop the Steal rallies; instructed the attackers—including Straka and Proud Boys—not to attack the Capitol and to comply with all police directives concerning access to Capitol grounds; reported the unlawful conspiracy to law enforcement; tried to persuade conspirators to change course and behave lawfully; and, generally, not taken the actions he took to cause, aid, and encourage the attack. *See* ECF 89 ¶ 178. He did not do these things. Rather, as discussed above, *see supra* III.A.2, Alexander actively participated in and furthered the aims of the section 1985 conspiracy, and his actions and failures to act resulted in the Plaintiffs' injuries. *See id.*; ECF 89, ¶¶ 157-65.

Mele similarly had the ability to prevent or aid in preventing the conspiracy and failed to do so. ECF 89 ¶¶ 176, 179. Mele could have refused to attack the Capitol; tried to persuade fellow attackers and others not to attack the Capitol; or notified law enforcement of the unlawful conspiracy, but he did not do these things. ECF 89 ¶ 179. Instead, Mele actively participated in the conspiracy and worked to further its aims, and his actions and failures to act resulted in the Plaintiffs' injuries. *See supra* III.A.2; ECF 89, ¶¶ 157-65.

*Third*, insofar as Alexander argues that he made reasonable efforts to try to mitigate the Attack, his argument fails because it is based on facts that are not in the record and that are not proper for the Court to consider on a motion to dismiss. *See Graham*, 798 F.3d at 1129. Alexander

will have the opportunity later in the case to make such arguments to a factfinder. The allegations in the Amended Complaint—with all inferences interpreted in the light most favorable to Plaintiffs, as is required on a motion to dismiss—do not support a conclusion that Alexander exercised reasonable care.

## IV.    Plaintiffs Sufficiently Allege Claims under D.C. Law

### A.    Plaintiffs Sufficiently Allege that Alexander and Mele Violated the D.C. Bias-Related Crimes Act, and Plaintiffs Have Standing to Pursue those Claims

Plaintiffs sufficiently allege that Alexander and Mele violated the D.C. Bias-Related Crimes Act ("BRCA"). In the interests of judicial economy, Plaintiffs incorporate here their BRCA and vicarious liability arguments from their Omnibus Response to the other motions to dismiss. *See* ECF 118, at 35-46. To make out a civil claim under BRCA, a plaintiff must show (1) the defendant committed a crime under D.C. law; (2) an intentional act of the defendant demonstrates their prejudice against a protected characteristic of an intended victim of such crime; and (3) as a result of such intentional act, the plaintiff was injured. *See* D.C. Code § 22-3704(a). Plaintiffs sufficiently alleged three underlying crimes: acts of terrorism in violation of the D.C. Anti-Terrorism Act of 2002 ("ATA"), D.C. Code § 22-3153; rioting or inciting to riot in violation of D.C. Code § 22-1322; and destruction of property in violation of D.C. Code § 22-303. ECF 89 ¶¶ 184, 190-98; ECF 118 at 36-38. As discussed in the Omnibus Response, BRCA predicate offenses may be established by conspiracy or aiding and abetting. ECF 118 at 38-39.

Alexander and Mele's arguments against the BRCA allegations are meritless, largely for the same reasons alleged in the Omnibus Response. *See* ECF 120, Alexander MTD, at 19; ECF 117, Mele MTD, at 14-16; ECF 118, Omnibus Response, § III.A. Alexander makes cursory arguments, without citation to any authority or engagement with the allegations of the Amended Complaint, that Plaintiffs failed to plead the elements of the underlying crimes. He asserts that he

did not engage in any intentional acts, but fails to address the well-pled allegations that he conspired with others to engage in criminal acts and aided and abetted the criminal acts of others. *See supra* III.A.2 (liability for 1985 conspiracy), *infra* IV.B.1 (aiding and abetting). As discussed at length in the Amended Complaint and above, Alexander played a key role in planning, promoting, fundraising, coordinating logistics for, encouraging attendance at, and celebrating the Capitol Attack. *See* ECF 89 ¶¶ 62, 72c, 78, 85, 93, 95, 103d, 106-09, 141, 155, 182-98; *supra* III.A.2. In so doing, he violated BRCA through bias-motivated predicate crimes including acts of terrorism, rioting or inciting to riot, and property destruction. *See* ECF 118, Plaintiffs' Omnibus Response, at 35-44.

Mele raises a few cursory arguments and a thin challenge to the sufficiency of the allegations, none of which has merit. He argues, without any legal support, that his political affiliation bias is merely a "political disagreement" with both Democrats and Republicans. Mele at 15-16. This is merely a factual dispute, and in no way challenges the sufficiency of the pleading. *See also* ECF 118, Plaintiffs' Omnibus Response, at 39-43; D.C. Code § 22-3704(a) (BRCA covers actual and perceived political affiliation bias); *Blodgett v. Univ. Club*, 930 A.2d 210, 221 (D.C. 2007) (political affiliation includes "endorsing any political party"); *Kurd v. Rep. of Turkey*, 374 F. Supp. 3d 37, 58-59 (D.D.C. 2019) (opposition to Turkish President constitutes a political affiliation). Mele also argues that Plaintiffs failed to allege that he participated in or is responsible for the riot.[5] Mele at 15. This too is incorrect; Plaintiffs allege that Mele attempted to, conspired

---

[5] Mele does not argue that Plaintiffs failed to allege that he conspired with others to riot or incite a riot. Nor does he provide more than a cursory argument against Plaintiffs' allegations that he engaged in, conspired to engage in, and/or aided and abetted an act of terrorism and property destruction. As a result, those arguments are waived. *See Cement Kiln Recycling Coal. v. E.P.A.*, 255 F.3d 855, 869 (D.C. Cir. 2001) ("A litigant does not properly raise an issue by addressing it

to, aided and abetted, and did in fact engage in rioting or inciting to riot—including by engaging in the riot directly and helping to plan and execute the attack. *See* ECF 89 ¶¶ 45, 99a, 101, 134, 140e, 194-95, 197; *supra* III.A.2 (participation in 1985 conspiracy); *infra* IV.B.1 (aiding and abetting).[6]

Finally, Mele cursorily argues that none of his acts affected Plaintiffs and that any political affiliation bias was not directed at Plaintiffs. Mele at 7-8, 16. For the reasons discussed in the Omnibus Response, these arguments are meritless: (1) Defendants are liable vicariously for the acts of their co-conspirators or those they aided and abetted, and (2) a plaintiff need not be the intended victim of the bias-motivated crime so long as they were injured as a result of it. *See* ECF 118 at 35, 43-44.

### B.    Plaintiffs State Valid Claims for Battery and Assault against Mele and Alexander

Defendants Mele and Alexander each argue that Plaintiffs have failed to state plausible claims of Battery and Assault. Their arguments fail. Plaintiffs' assault and battery claims are premised on two theories of liability—aiding and abetting and conspiracy. The Amended Complaint easily satisfies the pleading requirements for the assault and battery claims under each theory of liability.

An assault is "'an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the victim.'" *Hall v. District of Columbia*, 867 F.3d 138, 158 (D.C. Cir. 2017) (quoting *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007)). To state a claim, "a

---

in a cursory fashion with only bare-bones arguments."); *David v. Dist. of Columbia*, 436 F. Supp. 2d 83, 90 n.2 (D.D.C. 2006).

[6]    Mele argues the property destruction is not causally connected to Plaintiffs' injuries. *See* Mele at 8. But the allegations establish that the property destruction was accomplished via the Attack on the Capitol, and Plaintiffs have alleged that they were injured as a result it. *See* ECF 89, ¶¶ 156-65; *see supra* III.A.2 (liability for 1985 conspiracy).

plaintiff must show that he suffered apprehension of harmful or offensive contact and that a reasonable person in his position would have experienced such apprehension." *Collier v. D.C.*, 46 F. Supp. 3d 6, 14 (D.D.C. 2014). A plaintiff establishes a claim for battery "by proving an 'intentional act that causes harmful or offensive bodily contact.'" *D.C. v. Chinn*, 839 A.2d 701, 705 (D.C. 2003).

### 1.     Aiding and Abetting Liability

To support a claim for aiding and abetting battery or assault, a plaintiff must allege that (1) the party whom the defendant aided committed battery or assault on the plaintiffs, (2) the defendant was generally aware of the defendant's role in the tortious activity, and (3) the defendant knowingly and substantially assisted in the battery or assault. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983); *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 50 (D.D.C. 2019). "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance." *Halberstam*, 705 F.2d at 478. Significantly, a defendant's "'creation of a free-for-all, [that] was both dangerous and ultimately injurious' may be sufficient to impose liability on even a 'minimally involved participant.'" *Bassi v. Patten*, No. 07-cv-1277, 2008 WL 4876326, at *1 (D.D.C. Nov. 12, 2008) (quoting *Halberstam*, 705 F.2d at 484); *see also Halberstam*, 705 F.2d at 484 (observing that "defendant's war cry for more blood may well have contributed to the assaulter's hysteria, which was fueling his physical acts of violence").

First, the facts alleged in the Amended Complaint firmly establish that the Plaintiffs were subjected to assaults and batteries. "Plaintiffs were violently assaulted, spat on, tear-gassed, bear-sprayed, subjected to racial slurs and epithets, and put in fear for their lives." ECF 89, ¶ 1. "Defendants, their coconspirators, and the rest of the mob overwhelmed United States Capitol

Police officers, broke through the Capitol's outer barricades, and assaulted the officers, including Plaintiffs, in and outside the Capitol." *Id.* ¶ 128. Plaintiffs were forced to barricade doors against the attackers to protect their own lives and the lives the members of Congress, subjecting them to severe anxiety and mental stress. *Id.* ¶¶ 139, 157-65. They were injured from exposure to noxious pepper spray, bear spray, fire extinguishers, mace, and other pollutants sprayed by attackers. *Id.* Attackers violently confronted them inside and outside the Capitol, pushing, shoving, and physically striking and assaulting them. *Id.* ¶¶ 157-65.

The facts alleged in the Amended Complaint further establish that Defendants Mele and Alexander each were generally aware of their role in the tortious activity and knowingly instigated, encouraged, planned for, or participated in, the unlawful Attack on the Capitol, and that each Defendant thereby knowingly and substantially assisted the assaults and batteries on Plaintiffs. *See supra* III.A.2 (liability for 1985 conspiracy). Defendant Mele coordinated with others to plan for and execute the Attack on the Capitol. *See* ECF 89, ¶ 99(a). He planned with others to bring weapons and other equipment to aid in violent confrontation there. *See id.* (discussing the need to bring a shotgun, ammunition, and "medical kits, radios, multiple cans of bear spray, knives, flags, plates[,] goggles, [and] helmets") *Id.* He joined the physical attack on the Capitol, joining with hundreds of other attackers on Capitol grounds, helping to breach barricaded areas there, *see id.* ¶¶ 45, 134, 140(e), 195, 213(a), 215, thereby helping to create and sustain "a free-for-all, [that] was both dangerous and ultimately injurious' . . . ." *Bassi*, 2008 WL 4876326, at *1.

As described above, *see supra* III.A.2 (liability for 1985 conspiracy), Alexander helped propagate the false election fraud claims that clearly were intended as the fuel to fire the violent crowd at the Capitol. *See* ECF 89, ¶¶ 72(c), 78, 79, 84, 108. He promoted the use of force, intimidation, and threats, which he knew would be directed at the Capitol and Congress on January

6, as he explicitly acknowledged. *See, e.g.*, *id.* ¶¶ 72, 93, 108. He publicized and encouraged attendance at the January 6 rally, which he knew would generate a large, angry crowd and take place moments before and steps away from where Congress would carry out its duty to certify the election. *Id.* ¶¶ 85, 95, 107. He called on those there to "march" on the Capitol at 1 p.m. on January 6, the very time that Congress was convening to discharge its duty. *Id.* ¶ 95. He helped members of the Proud Boys, known to be violent, to find accommodations in Washington, D.C., for January 6. *Id.* ¶ 103(d). He used his Stop the Steal website to post a detailed map of Washington, D.C., with instructions on where to meet, and he urged followers to "take to the Capitol lawn and steps," *id.*, which he knew or reasonably should have known would be restricted from public access by the U.S. Capitol Police. Further, Alexander confirmed his knowledge of the violence that he had assisted when he ratified the Attack, saying, in a video of the attack as it was happening, "I don't disavow this. I do not denounce this." *Id.* ¶ 155. Such actions clearly establish his knowing and substantial assistance of the Attack on the Capitol and the inevitable assault and battery of Plaintiffs.

Alexander argues that he cannot be held liable unless Plaintiffs can identify the primary tortfeasors committing assault and battery. "[N]o court has required a specific perpetrator to be identified" to proceed on an aiding and abetting claim, as "such a requirement . . . would effectively preclude aiding and abetting liability in those cases in which it is unclear which of several persons involved in a crime was the perpetrator, but equally clear that those persons acted together in committing the crime," as is the case here. *People v. Quiroz*, 215 Cal. App. 4th 65, 72 (Cal. Ct. App. 2013); *see also Corbin v. U.S.*, 237 A.2d 466, 467 (D.C. 1968) (affirming conviction for aiding and abetting an assault where principal offender was not identified); *Hobson v. Wilson*, 737 F.2d 1, 51 (D.C. Cir. 1984) (On a motion to dismiss, Plaintiffs need not show that each

participant knew "the exact limits of the illegal plan or the identity of all participants therein." (citations omitted)). Moreover, Defendants need not have been physically present during the Attack to be held liable for aiding and abetting or conspiracy. *See Halberstam*, 705 F.2d at 482 (an "aiding-abetting action may also be more distant in time and location and still be substantial enough to create liability"); *id.* ("[T]o the extent that the acts of aiding-abetting occur further from the actual scene of the tortious injury, the cases become more readily treatable as either conspiracies or substantial assistance cases.").

### 2.      Conspiracy Liability for Assault and Battery

Plaintiffs also establish Defendants' liability for assault and battery based on conspiracy liability. Under D.C. law, a civil claim for conspiracy "is a means for establishing vicarious liability for the underlying tort." *Democracy Partners v. Project Veritas Action Fund*, 453 F. Supp. 3d 261, 290 (D.D.C. 2020). Establishing civil conspiracy liability requires an agreement between two or more persons to participate in an unlawful act, and injury caused by an overt act in furtherance of the conspiracy. *Id.*; *see Halberstam*, 705 F.2d at 479. As set out above, *see supra* III.A.2 (liability for 1985 conspiracy), the Amended Complaint sufficiently alleges that Mele and Alexander joined agreements prohibited by section 1985 and resulting in the Attack on the Capitol and U.S. Capitol Police, including Plaintiffs, *see* ECF 89, at ¶¶ 114, 170, 203, 209, and various overt acts by one or more Defendants in support of the conspiracies, which would foreseeably result in the assault and battery of the Capitol Police officers, *see supra* III.A.2 (liability for 1985 conspiracy); ECF 118 Omnibus Response, at § II.A.2 (acts of coconspirators); *see also* ECF 89, at ¶¶ 72, 77, 103, 124, 128, 133, 137 (breaching barriers, breaking windows, throwing explosives, spraying toxicants, defacing property, and encouraging and planning for the use of force, intimidation, and threats).

### C.    Plaintiffs State Valid Claims for Negligence

Mele moves to dismiss Plaintiffs' negligence claims under Rule 12(b)(6).[7] He argues only against his liability based on negligence *per se*, however, and does not contest Plaintiffs' claims of negligence based on the violation of his ordinary duty of reasonable care under the circumstances. *See* ECF 117, at 18-19. The Amended Complaint asserts negligence claims on both theories of liability. *See* ECF 89, ¶ 112 ("Each Defendant owed a duty to act reasonably *and* conform to the standards of conduct set out in criminal statutes." (emphasis added)), ¶ 220 ("Defendants' failure to act reasonably, *as well as* their violations of D.C. Code § 22-1322, D.C. Code § 10-503.16(b)(6), and 40 U.S.C. § 5104, directly and proximately caused Plaintiffs injuries." (emphasis added)); *see also* ECF 118, Omnibus Response, at 48 ("Each Defendant owed a duty of reasonable care *and* the duty of care defined by specific statutes intended to protect public safety and welfare." (citing ECF 89, ¶ 212) (emphasis added)). Because Mele does not contest Plaintiffs' negligence claim based on the violation of his ordinary duty of reasonable care, the Court should deny Mele's motion to dismiss Plaintiffs' negligence claims regardless of Mele's arguments concerning liability based on negligence *per se*. *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").

---

[7]    Defendant Alexander does not move to dismiss Plaintiffs' negligence claims. Although he mentions the word "negligence" in the subheading of his memorandum concerning his arguments against the assault and battery claims, he does not include any argument challenging Plaintiffs negligence claims. *See* ECF 120, at 19-20. He has therefore waived any such argument. *See* *Cement Kiln Recycling Coal.*, 255 F.3d at 869; *David*, 436 F. Supp. 2d at 90 n.2.

Even if Mele's motion can be read to challenge Plaintiffs' negligence claim, as based on the violation of Mele's ordinary duty of reasonable care, the Amended Complaint states valid claims of negligence. Mele had a duty to act reasonably—to not help carry out a violent attack on the U.S. Capitol and Capitol Police. Certainly his actions on January 6, as discussed above, *see supra* III.A.2 (liability for 1985 conspiracy), were a breach of that duty, and Mele's actions were proximate causes of Plaintiffs' injuries, as discussed above. *See id.* "Proximate cause is defined as 'a test of whether the injury is the natural and probable consequence of the negligent or wrongful act and ought to be foreseen in light of the circumstances.'" *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 105 (D.D.C. 2003) (quoting *Murphy v. United States,* 653 F.2d 637, 648 n.48 (D.C. Cir. 1981)). There can be no doubt that the injuries sustained in the Capitol Attack by Plaintiffs, all U.S. Capitol Police officers, were the "natural and probable consequences" of Mele's negligence in facilitating and participating in the Attack on the Capitol. They included harm from physically being struck by attackers, sustaining bodily injury from being forced over barricades, and exposure to chemical irritants. *See* ECF 89, ¶¶ 157-65. Mele's discussion with his coconspirators of the materials to bring to the attack shows not just that such injuries were foreseeable, but that he foresaw them. *See* ECF 89, ¶ 101 (discussing the need for "medical kits, radios, multiple cans of bear spray, knives, flags, plates[,] goggles, [and] helmets").

Concerning negligence *per se*, Mele argues that Plaintiffs do not state a valid negligence claim because the criminal statutes on which Plaintiffs rely do not impose specific duties on Mele, but on the general public. *See* ECF 117, at 18-19. Mele's overly narrow description of negligence *per se* liability is unsupported by law. The statute relied on "must promote public safety and have been 'enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred,'" *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 579 (D.C. 1996), and it must "impose

specific duties on the defendant," *id.* Mele cites *McCracken v. Walls-Kaufman*, for the requirement

that the statute impose "specific duties on the defendant," 717 A.2d 346, 354 (D.C. 1998), but

*McCracken* does not hold that the statute must apply only to a narrow class of persons to which

the defendant belongs, *see id.*, nor does *Hawkins*, cited above, or *Marusa v. District of Columbia*,

484 F.2d 828 (1973), which is the case on which *McCracken* relies. Indeed, D.C. law supports

negligence *per se* liability based on statutes of wide applicability, such as traffic laws. *See, e.g.*,

*Rong Yao Zhou v. Jennifer Mall Rest., Inc.*, 534 A.2d 1268, 1274 (D.C. 1987) (noting that violation

of traffic regulations constitutes negligence *per se*; collecting cases); *Sibert-Dean v. Washington*

*Metro. Area Transit Auth.*, 826 F. Supp. 2d 266, 273 (D.D.C. 2011) ("D.C. courts have repeatedly

held that 'the unexplained violation of a traffic regulation enacted . . . to . . . prevent the type of

accident that occurred constitutes negligence *per se*."); *Ross v. Hartman*, 139 F.2d 14, 16 (D.C.

Cir. 1943) (holding that the violation of an ordinance prohibiting vehicle owners from leaving their

automobiles unattended with the key in the ignition constituted negligence *per se* in a personal

injury action against the car owner by a third party injured by the stolen vehicle following its theft).

*See also Andrews v. Wilkins*, No. 88-cv-1326, 1990 WL 102777, at *5 (D.D.C. July 11, 1990)

(noting that fleeing a law enforcement officer, being intoxicated to the point of self-endangerment

in violation of D.C. law, and attempting to swim in the Potomac River in violation of federal

regulations, constituted contributory negligence *per se*).

      Like traffic laws, the statutes on which Plaintiffs rely are of wide application, but not

unlimited. Indeed, the prohibitions against engaging in violence at the Capitol are much narrower

than traffic laws, as they would apply only to persons causing violence on Capitol grounds. *See*

D.C. Code § 10-503.16(b)(6) (prohibiting "willfully and knowingly . . . engag[ing] in any act of

physical violence upon the United States Capitol grounds or within any of the Capitol buildings");

40 U.S.C. § 5104(e)(2)(F) (prohibiting "willfully and knowingly . . . engag[ing] in an act of physical violence in the Grounds or any of the Capitol Buildings"). Likewise, the D.C. statute prohibiting rioting or incitement to riot would apply only to those individuals gathering publicly in "an assemblage of 5 or more persons," and to those that may incite them to violence. D.C. Code § 22-1322(a) & (c). In sum, Plaintiffs' claims based on negligence *per se* do not fail because of the scope of the applicability of the statutes on which Plaintiffs rely, and Mele's motion to dismiss those claims should be denied.

## V.   The First Amendment Does Not Shield the Defendants from Liability for Their Unlawful Conduct

Defendants Mele's and Alexander's invocation of the First Amendment is unavailing. Plaintiffs do not assert claims against Defendants because of their speech, but because of their conspiracies to attack Congress and the Capitol Police, ECF 89, ¶¶ 166-72, failing to prevent such harms, *id.* ¶¶ 173-81, knowingly and intentionally subjecting Plaintiffs to battery and assault, *id.* ¶¶ 199-210, and injuring Plaintiffs through intentional acts amounting to terrorism, rioting, and destruction of property, *id.* ¶¶ 182-98, and as a result of their planning, executing, and participating in a violent mass attack on the Capitol, *id.* ¶¶ 211-20. The First Amendment provides no safe harbor for such unlawful and abhorrent conduct, nor does it prevent the consideration of Defendants' statements as evidence of such a conspiracy.

"[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed . . . ." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)); *see United States v. Williams*, 553 U.S. 285, 298 (2008) ("Many long-established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize

speech . . . that is intended to induce or commence illegal activities." (citation omitted)). Rather, "[i]t is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute." *Cal. Motor Transp.*, 404 U.S. at 514. This applies with equal force to Plaintiffs' conspiracy claims and state-law claims premised on aiding and abetting liability. *See Rice v. Paladin Enter., Inc.*, 128 F.3d 233, 244-45 (4th Cir. 1997) ("*[E]very* court that has addressed the issue, including this court, has held that the First Amendment does not necessarily pose a bar to liability for aiding and abetting a crime, even when such aiding and abetting takes the form of the spoken or written word.") (emphasis in original).

### A.     The First Amendment Is No Defense because the Defendants' Speech Was Integral to Their Unlawful Conspiracies

The First Amendment does not protect speech used as an integral part of civil conspiracies. *See Cal. Motor Transp.*, 404 U.S. at 511-13, 515 (upholding civil antitrust conspiracy claim and rejecting defense argument that their conduct involved advocacy protected by the First Amendment). Courts may hold defendants liable when they agree "to engage[] in a conspiracy against the public peace and order," such as when they "authorize[], direct[], or ratif[y] specific tortious activity," "incite lawless action," or "g[i]ve other specific instructions to carry out violent acts or threats." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 908-09, 926-27 (1982); *see also Sines v. Kessler*, 324 F. Supp. 3d 765, 802 (W.D. Va. 2018). Critically, "[i]f the end result [of a conspiracy] is unlawful, it matters not that the means used in violation may be lawful." *Cal. Motor Transp. Co.*, 404 U.S. at 515. Conspirators to unlawful ends "cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'" *Id.* at 513. "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' which the legislature has the power to control." *Id.* at 515 (quoting *NAACP v. Button*, 371 U.S. 415, 444 (1963)).

The statements cited in the Amended Complaint were not benign expressions of political opinion, but integral parts of Defendants' unlawful conspiracy. Defendants Alexander and Mele assert that the First Amendment bars the claims against them because their speech on and leading up to January 6 amounted to constitutionally protected petitioning of the government and other expressive conduct. *See* ECF 117, Mele MTD, at 20; ECF 120, Alexander MTD, at 21. However, the Supreme Court rejected this same argument in *California Motor Transport*, where the defendants sought to characterize their allegedly unlawful anticompetitive conspiracy as "a concerted effort to influence public officials." *Cal. Motor Transp. Co.*, 404 U.S. at 511. The Court held that the allegations stated a claim for an unlawful conspiracy and that, although the defendants did have rights to petition under the First Amendment, such rights did not immunize the defendants from liability when the rights were used as an integral part of an unlawful conspiracy. *Id.* at 513-14. Likewise, statements by Defendants Alexander and Mele were integral to the alleged unlawful conspiracy, as set out above, *see supra* III.A.2 (liability for § 1985 conspiracy), and just because they may have been lawful actions on their own, their lawfulness under the First Amendment does not insulate Defendants from liability for the unlawful conspiracy they served. *See Cal. Motor Transp. Co.*, 404 U.S. at 515 ("If the end result is unlawful, it matters not that the means used in violation may be lawful.").

Plaintiffs do not argue that Defendants should be held liable for what they said, but for the violent conspiracies and other unlawful conduct in which they engaged and of which their statements were an integral part. For this reason, the First Amendment does not shield them from liability. *See United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (holding that the First Amendment is no defense where "the speech is not 'itself the proscribed conduct,'" but instead is used to establish the defendant's participation in an unlawful enterprise (citation omitted)).

**B.     Defendants' Speech Serves as Evidence Supporting the Claims against Them, Consistent with the First Amendment**

Just as the First Amendment does not block claims where defendants' speech is integral to their otherwise unlawful conduct, the First Amendment does not "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *accord Claiborne Hardware*, 458 U.S. at 926-27 ("[S]peeches might be taken as evidence that [defendant] gave other specific instructions to carry out violent acts or threats."). Thus, even if Defendants engaged in political speech or expressive conduct, that speech and conduct is still admissible as evidence of their agreements and the purposes of, and participation in, their unlawful conspiracies to attack the Capitol. *See, e.g.*, *United States v. Hassan*, 742 F.3d 104, 127 (4th Cir. 2014) ("Forming an agreement to engage in criminal activities—in contrast with simply talking about religious or political beliefs—is not protected speech."); *United States v. Fullmer*, 584 F.3d 132, 158 (3d Cir. 2009) (political speeches provided circumstantial evidence of conspiracy); *United States v. Rahman*, 189 F.3d 88, 117 (2d Cir. 1999) (political speech can be used to prove conspiracy). Indeed, courts have applied this principle in the criminal cases of non-parties who attacked the Capitol on January 6 and in civil cases brought under section 1985.[8] For this same reason, Defendant Mele's argument that Plaintiffs are attempting to "punish[]" Mr. Mele for "being a part of the Three Percenters," in violation of his First Amendment rights fails. *See* ECF 117, Mele MTD, at 24. Mele's membership in the Three Percenters—and in particular his participation in chat messages planning for the Capitol Attack

---

[8]     *See United States v. DeGrave*, 539 F. Supp. 3d 184, 209 (D.D.C. 2021) (court may consider statements as evidence of motive or intent even if statements themselves were protected); *United States v. Chansley*, 525 F. Supp. 3d 151, 164 (D.D.C. 2021) ("[C]ourts *may* consider otherwise-protected speech to establish a defendant's motive or intent during the commission of some other unlawful conduct."); *Sines*, 324 F. Supp. 3d 804.

with other members of the group—provides evidence of his role in the unconstitutional conspiracy at the heart of this case.

None of Defendants' cases supports their sweeping proposition that they are immunized from liability because their conspiracies involved speech or because their speech provides evidence of their participation in the unlawful activity claimed. Indeed, Defendants rely almost entirely on cases in which speech or expressive conduct was the sole basis for liability, such as *Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329 (7th Cir. 1977), in which the complaint "allege[d] no more" than defendants' official complaints about an IRS agent's job performance. *See id.* at 1342, 1344. In contrast, the conspiracies and other claims in the Amended Complaint involve unprotected conduct, including violence, incitement, and threats.[9]

Mele and Alexander look for safe harbor in *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). *See* ECF 117, Mele MTD, at 20-22; ECF 120, Alexander MTD, at 2, 20. But *Claiborne Hardware* predicates First Amendment protection on the absence of violence, *see* 458 U.S. at 928, which is dramatically at odds with the facts asserted in the Amended Complaint. "The First Amendment does not protect violence." *Claiborne Hardware*, 458 U.S. at 916; *see Mitchell*, 508 U.S. at 484 ("[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment."). Nor does it protect agreements to commit violence. *See Rahman*, 189 F.3d at 115 (First Amendment does not protect "conspirac[ies] to take violent action"); *Sines*, 324 F. Supp. 3d at 802. The conspiracies alleged in the Amended Complaint caused a massive, violent attack in which Plaintiffs were "violently assaulted, spat on, tear-gassed, bear-

---

[9]   That much of Defendants' speech occurred in the open does not "immunize [their] agreement." *United States v. Spock*, 416 F.2d 165, 170 (1st Cir. 1969). "A group of vigilantes agreeing in the town square to solicit cohorts to call out a lynch mob would not be absolved because their agreement was open." *Id.*

sprayed, subjected to racial slurs and epithets, and put in fear for their lives." ECF 89, ¶ 1. Defendants' purposes were to accomplish unlawful ends. *Id.* ¶ 168. On numerous occasions, Defendant Alexander ratified, and incited the use of force, intimidation, and threats to accomplish those ends. ECF 89, ¶¶ 72, 78, 93, 103, 108; *See supra* III.A.2 (liability for § 1985 conspiracy). And Defendant Mele explicitly planned to bring arms to Washington D.C. for January 6 and participated in the attack on the Capitol. ECF 89, ¶¶ 10, 140, 142, 195.

### C.      The First Amendment Does Not Protect Incitement or Threats

Even if the First Amendment afforded some protection to Defendants' speech in furtherance of their conspiracies or violence (it does not), Defendants' statements nonetheless constitute unprotected speech. This is because the First Amendment draws a "line between permissible advocacy and impermissible incitation to crime or violence." *R.A.V. v. St. Paul*, 505 U.S. 377, 420 (1992) (Stevens, J., concurring) (quotation marks and citation omitted).

It is well established that the First Amendment does not protect speech that "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). Courts applying the *Brandenburg* standard consider (1) whether the speech "explicitly or implicitly encouraged the use of violence or lawless action," (2) whether the speaker "intends that his speech will result in the use of violence or lawless action," and (3) whether the "imminent use of violence or lawless action is the likely result of his speech," *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 246 (6th Cir. 2015), as well as other context-specific factors such as whether the speech is directed at a particular person or group of people. *See Hess v. Indiana*, 414 U.S. 105, 107-08 (1973). Critically, courts also consider the context in which the speech occurs to assess whether or not it is protected. *See R.A.V.*, 505 U.S. at 420 (Stevens, J., concurring); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761

(1985) (evaluating First Amendment protections "requires us to examine the 'content, form, and context' of that speech, 'as revealed by the whole record'" (citation omitted)).

As part of the conspiracies alleged, and in furtherance of them, Defendant Alexander made speeches and statements before and on January 6 that explicitly and implicitly encouraged violence and lawless action. These statements were intended to, and did, incite rally goers to violence. ECF 89, ¶¶ 107-109. There is no question that imminent violence was the likely result of these statements, as they *actually led to* violence and lawless action, with the Capitol Attack. *See Brandenburg*, 395 U.S. at 447.

At least the following statements leading up to and during the January 6 rally and attack were directed to inciting or producing imminent lawless action and likely to do so.

- Alexander told the crowd during the January 5 rally that the government should be "afraid of the people" and led the crowd in chants of "Victory or Death." ECF 89, ¶ 108.

- Alexander further told a crowd: "1776 is always an option. These degenerates in the deep state are going to give us what we want, or we are going to shut this country down." The term "1776" has commonly been used by Defendants and their supporters as a code for violent revolution. *Id.* ¶ 108.

Other statements, such as those below, celebrated the violent attack, encouraging the continuation of violence on January 6:

- During the Capitol Attack, Mele said in a video at the steps next to the Upper West Terrace, "We stormed the Capitol." *Id.* at ¶ 140-e, expressing pride in breaching police barricades, entering the Capitol, and in achieving their goal of halting the count of electoral votes.

- On January 6, as the Capitol Attack was underway, Alexander encouraged and celebrated the violence occurring at the Capitol by sharing a video saying, "I don't disavow this. I do not denounce this." *Id.* ¶¶ 155.

When considered in context, it is clear the statements called for imminent violent and lawless action. *See Hess*, 414 U.S. at 108; *Bible Believers*, 805 F.3d at 246; *Sines*, 324 F. Supp. 3d at 802-03 (*Brandenburg* exception to First Amendment privilege applied to defendant's statements

36

encouraging the throwing of torches at counter-protestors and ordering others to "charge!" where plaintiffs were physically assaulted during white supremacist rallies).[10] For example, statements made by Alexander in the weeks before the Capitol Attack demonstrate clearly his statements on January 5 and 6 were intended to incite violence and lawless action:

- In interviews on November 14 and December 23, 2020, Alexander told followers that they had to "put bodies in the streets and make the American oligarchs scared of what we'll do." He also called for "fighters," telling viewers that "you teach a bully to stop hitting you by punching him in the nose. We've got to punch the left in the nose and we've got to stop being nice about it." ECF 89, ¶ 72.

- At a December 19, 2020 rally in Phoenix, Alexander made clear that Defendants were expecting and planning for violence, using "yet" as a coded signal for violence: "One of our organizers in one state said, 'We're nice patriots, we don't throw bricks.' I leaned over and I said, 'Not yet. Not yet!' Haven't you read about a little tar-and-feathering? Those were second-degree burns! . . . We're going to convince them to not certify the vote on January 6 by marching hundreds of thousands, if not millions of patriots, to sit their butts in D.C. and close that city down, right? And if we have to explore options after that . . . 'yet.' Yet!'" ECF 89, ¶ 93.

- On December 30, 2020, Alexander tweeted, in reference to the Congressional count of electoral votes and announcement of the election of Biden and Harris one week later, "If they do this, everyone can guess what me and 500,000 others will do to that building." ECF 89, ¶ 72.

In making these statements, and through his statements imminently preceding the January 6 Attack, Alexander was not simply suggesting the possible need for violence or lawlessness if some hypothetical circumstance transpired in the future. Rather, Alexander was calling for violence on a date certain—January 6—in order to prevent an event certain to happen—Congress's certification of the presidential election results. *See id.* at 447–48 ("'[T]he mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.'" (quoting *Noto v. United*

---

[10]   It is irrelevant that the statements were made to many people, as the First Amendment does not insulate a speaker "from responsibility for his actions simply because he may have disseminated his message to a wide audience." *Rice*, 128 F.3d at 248.

*States*, 367 U.S. 290, 297-98 (1961))). Alexander's statements, including those on December 19 and 30, 2020, were therefore likely to provoke imminent violence on January 6, 2021. *See People v. Rubin*, 96 Cal. App. 3d 968, 978-79 (Cal. App. 2 1979) (calling for the assassinations of members of the American Nazi Party at a Nazi rally five weeks in the future constituted "incitement to imminent lawless action").

Additionally, such statements constitute "true threats," which the First Amendment does not protect. Alexander's statement on December 19, 2020—"We're going to convince them to not certify the vote on January 6 by marching hundreds of thousands, if not millions of patriots, to sit their butts in D.C. and close that city down, right? *And if we have to explore options after that . . . 'yet.' Yet!*'" ECF 89, ¶ 93 (emphasis added)—signals an intent to use violence against Congress for carrying out its duty to certify the election results on January 6. As does his statement on December 30, 2020, in reference to the Congressional count of electoral votes, "If they do this, everyone can guess what me and 500,000 others will do to that building." ECF 89, ¶ 72. Such statements represent intimidation that is unprotected by the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 360 (2003) ("Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.").

### D. The *Noerr-Pennington* Doctrine Does Not Immunize Defendants

Alexander contends that the *Noerr-Pennington* doctrine immunizes him from liability. *See* ECF 120, at 22. He misconstrues the doctrine, however, and his argument fails.

The *Noerr-Pennington* doctrine is an antitrust doctrine that does not apply here. It holds that, with important and relevant exceptions, "petitioning the Government for redress of grievances, whether by efforts to influence legislative or executive action or by seeking redress in

court, is immune from liability under the antitrust laws." *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005) (applying the doctrine in anti-trust suit). The D.C. Circuit, however, has not applied the doctrine outside the anti-trust context, *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1137 n.8 (D.C. Cir. 2015), and it would be inappropriate to do so here. The doctrine is based both on the Supreme Court's statutory interpretation of the Sherman Act and on its application of the First Amendment. *See Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995);[11] *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 888-89 (10th Cir. 2000) (abrogated on other grounds as recognized by CSMN Invs., LLC v. Cordillera Metro. Dist., 956 F.3d 1276, 1284 (10th Cir. 2020)). Outside the anti-trust context, only the First Amendment underpinnings of the doctrine apply. *See Cardtoons*, 208 F.3d at 879-91.

In attempting to recast his conduct as "petitioning" activity, Alexander misleadingly focuses only on his words and speeches and ignores his actions in conspiring with other defendants to prevent by force, intimidation and threats the President- and Vice President-elect from taking office, Congress from certifying the election, and the Capitol Police from protecting the lawful occupants of the Capitol. *See supra* III.A.2 (liability for 1985 conspiracy). Furthermore, as discussed above, the First Amendment affords no protection to the speech Alexander used to further such actions because it was integral to an unlawful conspiracy and incited imminent violence and lawlessness. *See supra* V.A-C.

Even if the *Noerr-Pennington* doctrine applied, "using threats and other coercive measures" to influence officials is "beyond the protection of *Noerr*." *Fed. Prescription Servs., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 263 & n.7 (D.C. Cir. 1981) (citing *Sacramento Coca-Cola*

---

[11]   *Whelan* assumed by did not decide that the doctrine applied to common law torts. *See* 48 F.3d at 1254.

*Bottling Co. v. Chauffeurs, Teamsters & Helpers Loc. No. 150, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 440 F.2d 1096, 1099 (9th Cir. 1971), *overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012)); *see Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*, 593 F. Supp. 2d 840, 844 (E.D. Va. 2008) (same). As are "deliberately false" petitions. *Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995). Given the violent and threatening nature of Alexander's speech and the falsity of the grievances he promoted, *see supra* III.A.2.b (liability for 1985 conspiracy), the *Noerr-Pennington* doctrine does not protect Alexander or any other defendant from liability.

## VI.   Plaintiffs Have Standing to Pursue Their Claims against Mele and Alexander

Defendant Mele argues that Plaintiffs lack standing to pursue each of their claims because they have not alleged facts showing that their injuries are "fairly traceable" to his conduct. *See* ECF 117, at 5-10.[12] For his part, Defendant Alexander argues that Plaintiffs lack standing because they seek redress for the injuries of others. ECF 120, at 14-15. Defendants' arguments all fail.

### A.   Plaintiffs' Injuries Are "Fairly Traceable" to Mele's Conduct

As Mele recognizes, to establish a plaintiff's standing, the allegations in the complaint must show, among other things, that the plaintiff suffered an "injury in fact" that is "'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Est. of Boyland v. United States Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). As to Plaintiffs claims under Count I (§ 1985(1) conspiracy), Count II (§ 1986), Count IV (Battery), Count V

---

[12]   Mele further argues that Plaintiffs lack standing to pursue their claim under BRCA, and those arguments fail for the reasons discussed above. *See supra* IV.A (BRCA).

(assault), and Count VI (negligence), Mele argues only that Plaintiffs' injuries are not "fairly traceable" to Mele. *See* ECF 117, at 5-10.

The requirement that a plaintiff's injury be "fairly traceable" to a defendant's actions "'requires no more than de facto causality,'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019), which need not be proved "with absolute certainty." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 113 (D.C. Cir. 1990). A plaintiff's burden to establish causation is "relatively modest" at the motion to dismiss stage. *Bennett v. Spear*, 520 U.S. 154, 170-71 (1997). "[P]roximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). Where a plaintiff suffers injury due to the actions of a third party, the plaintiff must show that the third party "likely react[ed] in predictable ways" to the defendant's actions. *Dep't of Com. v. New York*, 139 S. Ct. at 2565-66. A defendant's actions need not be "the very last step in the chain of causation," *Bennett*, 520 U.S. at 169, and the "existence of . . . an equally important player in the story" does not necessarily negate the causal relationship to support standing, *Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017).

Regarding the claims under sections 1985 and 1986, Mele argues that Plaintiffs' injuries are not "fairly traceable" to his conduct only because "the Plaintiffs do not describe any actual meetings or discussions Mr. Mele attended, or any other facts that suggest he participated in or knew about the alleged conspiracy." ECF 117 at 6. His standing argument, then, is identical to his argument under Rule 12(b)(6) that Plaintiffs have failed to state a claim under section 1985(1). As fully set out above, the allegations in the Amended Complaint firmly establish that Mele participated in and knew about the alleged conspiracy.  *See supra* III.A.2 (liability for 1985 conspiracy).

Concerning the battery and assault claims, Mele argues that Plaintiffs' allegations do not show that their injuries "were 'fairly traceable' to Mr. Mele" because they were the result of a third party's action. ECF 117 at 9. As fully discussed above, however, the allegations in the Amended Complaint firmly establish that Plaintiffs' injuries are fairly traceable to Mele's conduct because he participated in a conspiracy and Plaintiffs' injuries are due to overt acts in furtherance of that conspiracy. *See supra* III.A.2 (liability for 1985 conspiracy); *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946); *Sines v. Kessler*, 324 F. Supp. 3d 765, 795 (W.D. Va. 2018) (applying *Pinkerton* liability to conspiracy under § 1985). Mele's participation in the Attack also caused Plaintiffs injuries, and he aided and abetted the batteries and assaults of Plaintiffs, which caused Plaintiffs' injuries. *See supra* III.A.2 (liability for 1985 conspiracy), IV.B.1 (aiding and abetting).

Defendant Mele also argues that Plaintiffs lack standing for their negligence claims because the Amended Complaint does not "show their injuries were 'fairly traceable' to Mr. Mele when Plaintiffs describe actions of physical violence, riots, and attacks wholly 'hypothetical and conjectural' by Mr. Mele's alleged mere presence 'at the steps next to the Upper West Terrace[.]'" ECF 117 at 10 (quoting *Lujan*, 504 U.S. at 560). For the reasons discussed above, *see supra* IV.C (negligence), the allegations in the Amended Complaint establish that Plaintiffs' injuries are "fairly traceable" to Mele's actions.

It is unclear whether Mele intends to assert an additional standing argument that Plaintiffs' injuries were "hypothetical and conjectural," *id.*, but clearly such an argument would fail. As noted in *Lujan*, standing requires that a plaintiffs' asserted injuries be "actual" and "not 'conjectural' or 'hypothetical[.]'" *Lujan*, 504 U.S. at 560. As Mele acknowledges, "The Plaintiffs each allege exposure to pepper spray and other noxious gasses as harmful or offensive contacts, each allege apprehension of imminent harmful or offensive contacts, and some allege additional harmful or

offensive contacts." ECF 117, Mele MTDC, at 9; *see also* ECF 89, Amended Complaint, ¶¶ 157-165 (describing Plaintiffs' injuries). These alleged injuries are actual, not conjectural, injuries.

**B.     Plaintiffs Seek Redress for Their Own Injuries, Not Those of Others**

Defendant Alexander argues that Plaintiffs lack standing because they seek redress for the injuries of non-parties, including members of Congress and then President- and Vice President-elect Biden and Harris. *See* ECF 120, Alexander MTD, at 14-15. First, Plaintiffs clearly allege that Alexander and his codefendants violated section 1985(1) by conspiring against U.S. Capitol Police officers. *See* ECF 89, ¶ 168 (alleging conspiracy to "to prevent, by force, intimidation, and threats . . . United States Capitol Police officers from discharging their lawful duties," ECF 89, ¶ 168(a), "to injure . . . a United States Capitol Police officer on account of their lawful discharge of their duties," *id.* ¶ 168(b), and "to induce by force, intimidation, or threat . . . United States Capitol Police officers to leave a place, where their duties as officers were required to be performed," *id.* ¶ 168(c)). Alexander's standing argument should be denied for this reason alone.

Regardless, section 1985 unmistakably permits Plaintiffs to seek redress for their own injuries as a result of acts in furtherance of a prohibited conspiracy against others. *See* 42 U.S.C. § 1985(3) ("[I]n any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property . . . , the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."); *see Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1332 n.2 (7th Cir. 1977) ("Section 1985(1) defines conspiracies, for which Section 1985(3) establishes a private right of action . . . ."). Interpreting section 1985 to allow redress only for those federal officials who were the targets of a prohibited conspiracy would ignore its plain text and contravene bedrock principles

43

of statutory construction. *See Sebelius v. Cloer*, 569 U.S. 369, (2013) (statutory construction "start[s] . . . with the statutory text."); *Kay v. F.C.C.*, 525 F.3d 1277, 1279 (D.C. Cir. 2008) ("[A]s the Supreme Court has emphasized time and again, courts have no authority to rewrite the plain text of a statute.").

## <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' motions to dismiss the Amended Complaint should be denied.

Dated: January 31, 2022                          Respectfully submitted,

                                          */s/ Edward G. Caspar*
                                          Jon Greenbaum, D.C. Bar No. 489887
                                          Edward G. Caspar, D.C. Bar No. 1644168
                                          David Brody, D.C. Bar No. 1021476
                                          Arusha Gordon, D.C. Bar No. 1035129
                                          Adonne Washington, *pro hac vice*
                                          Lawyers' Committee for Civil Rights Under Law
                                          1500 K Street N.W., Suite 900
                                          Washington, D.C. 20005
                                          Tel: (202) 662-8390
                                          jgreenbaum@lawyerscommittee.org
                                          ecaspar@lawyerscommittee.org
                                          dbrody@lawyerscommittee.org
                                          agordon@lawyerscommittee.org
                                          awashington@lawyerscommittee.org

                                          ***Counsel for Plaintiffs***