IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONRAD SMITH, et. al.,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀*Plaintiffs*,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀Civil Case No. 21-2265
DONALD J. TRUMP, et al.,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀*Defendants*.⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

**DEFENDANTS DONALD J. TRUMP, DONALD J. TRUMP FOR PRESIDENT INC., AND MAKE AMERICA GREAT AGAIN PAC'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
*Attorney for Donald J. Trump, Donald J. Trump for President, Inc., and Make America Great Again*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................II

TABLE OF AUTHORITIES.........................................................................III

BACKGROUND ..........................................................................................2

ARGUMENT    .............................................................................................3

    I.    The Constitution forecloses Plaintiffs' claims. ....................................3

        a.   Absolute Immunity bars Plaintiffs' claims. ...................................3
        b.   President Trump's political speech is protected by the First Amendment. ....................................................................................9

    II.   Plaintiffs Fail to State a Claim for Which Relief May be Granted. .16

        a.   Plaintiffs fail to adequately allege a violation of 42 U.S.C. § 1985. ................................................................................................16
        b.   Plaintiffs have failed to adequately plead any state law claim. 22

CONCLUSION   .........................................................................................25

CERTIFICATE OF SERVICE......................................................................26

# TABLE OF AUTHORITIES

## Cases

*3M Co. v. Boulter*,

　　842 F. Supp. 2d 85, 119 (D.D.C. 2012) ................................................................. 23

*Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*,

　　1 F.4th 180, 187–88 (4th Cir. 2021) .......................................................................... 5

*Baker v. Henderson*,

　　150 F. Supp. 2d 17, 19 n.1 (D.D.C. 2001) ................................................................. 3

*Bell Atlantic Corp. v. Twombly*,

　　550 U.S. 544, 556 (2007) .......................................................................................... 21

*Cal. Motor Transp. Co. v. Trucking Unlimited*,

　　404 U.S. 508 (1972) ................................................................................................... 11

*Canlis v. San Joaquin Sheriff's Posse Comitatus*,

　　641 F.2d 711, 717–718 (9th Cir. 1981) ..................................................................... 19

*Couch v. Verizon Commc'ns, Inc.*,

　　2021 WL 4476698, at *6 n.10 (D.D.C. Sept. 30, 2021) ...................................... 23, 24

*Diulus v. Churchill Valley Country Club*,

　　601 F. Supp 677, 681 (W.D. Pa. 1985) ..................................................................... 19

*Flax v. Schertler*,

　　935 A.2d 1091, 1108 n.15 (D.C. 2007) ..................................................................... 23

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,

    561 U.S. 477, 497–98 (2010) ................................................................. 19, 21

*Griffin v. Breckenridge*,

    403 U.S. 88, 97 (1971) ................................................................................. 17

*Halberstam v. Welch*,

    705 F.2d 472, 489 (D.C. Cir. 1983) ...................................................... 23, 24

*Halperin v. Kissinger*,

    578 F. Supp. 231, 233 (D.D.C. 1984) ........................................................... 7

*Haynesworth v. D.H. Stevens Co.*,

    645 A.2d 1095, 1098 (D.C. Cir. 1994) ....................................................... 25

*Hemphill v. Kimberly-Clark Corp.*,

    605 F. Supp. 2d 183, 186 (D.D.C. 2009) ..................................................... 3

*Jankovic v. Int'l Crisis Grp.*,

    494 F.3d 1080, 1088 (D.C. Cir. 2007) ......................................................... 3

*Jin v. Ministry of State Sec.*,

    335 F. Supp. 2d 72, 80-81 (D.D.C. 2004) .................................................. 21

*Kush v. Rutledge*,

    460 U.S. 719, 724 (1983) ........................................................................... 18

*Lobosco v. Falsetti*,

    2010 WL 4366209, at *3 (D.N.J. Oct. 28, 2010)........................................ 19

*Lynch v. President of the U.S.*,

    2009 WL 2949776, at *1 (N.D. Tex. Sept. 14, 2009)................................... 8

iv

*Marshall Cty. Health Care Auth. v. Shalala*,

    988 F.2d 1221, 1222 (D.C. Cir. 1993) ........................................................................ 3

*Miller v. Indiana Hosp.*,

    562 F. Supp. 1259, 1281 (3d Cir. 1983) ................................................................... 18

*Morse v. Frederick*,

    551 U.S. 393, 442 (2007) ......................................................................................... 15

*Myers v. United States*,

    272 U.S. 52, 122 (1926) ............................................................................................. 7

*NAACP v. Claiborne Hardware*,

    458 U.S. 886 (1982) ................................................................................................. 12

*Nixon v. Fitzgerald*,

    457 U.S. 731 (1982) ............................................................................................. 1, 4

*Palsgraf v. Long Island R.R. Co.*,

    248 N.Y. 339 (1928) ................................................................................................ 25

*Snyder v. Phelps*,

    562 U.S. 443, 453 (2011) ........................................................................................... 7

*Thomas v. Collins*,

    323 U.S. 516, 535 (1945) ......................................................................................... 15

*United States v. Mouat*,

    124 U.S. 303, 307 (1888) ......................................................................................... 19

## Statutes

18 U.S.C § 372 .................................................................................................... 20

42 U.S.C. § 1985 ........................................................................................ 17, 18, 20

42 U.S.C. § 1985(1) ..................................................................................... passim

42 U.S.C. § 1985(2) ............................................................................................. 20

42 U.S.C. § 1985(3) .................................................................................... 17, 18, 20

42 U.S.C. § 1986 .................................................................................................. 22

## Other Authorities

Alton L. Lightsey, *Constitutional Law: The Independent Counsel and the Supreme Court's Separation of Powers Jurisprudence*, 40 Univ. Fl. L. Rev. 563, 573 (1988) 7

Andrew Johnson proposing constitutional amendment to remove electoral college (July 18, 1868: Message Proposing Constitutional Amendments) .......................... 8

Andrew M. Wright, *The Take Care Clause, Justice Department Independence, and White House Control*, 121 W. Va. L. Rev. 353, 385 (2018) ...................................... 7

Annie Gowen, *Handful of protestors arrested during 'Occupy Congress'*, WA. POST (Jan. 17, 2012) ................................................................................................. 13

Camila Domonoske, *Anti-Trump Protest in Portland, Ore., Turns Destructive, Declared a Riot*, NPR (Nov. 11, 2016, 8:11 AM) .................................................... 14

Cheyenne Haslett, *Dreamers protest on Capitol Hill on DACA deadline day*, ABC NEWS (Mar. 5, 2018) ........................................................................................... 13

vi

Dep't of Def., Review of the DOD's Role, Responsibilities, and Actions to Prepare for and Respond to the Protest and Its Aftermath at the U.S. Capitol Campus on January 6, 2021, DODIG-2022-039 ............................................................................ 2

Gary Fineout, *Biden tells DeSantis to 'get out of the way' amid Covid surge*, POLITICO (Aug. 3, 2021, 6:03 PM) ................................................................................. 8

Kalhan Rosenblatt, *Protestors pound the doors of the Supreme Court following Kavanaugh confirmation*, NBC NEWS (Oct. 6, 2018) ............................................... 13

Patricia Zengerle, *Congress rejects Obama veto, Saudi September 11 bill becomes law*, REUTERS (Sept. 28, 2016) ..................................................................... 8

Remarks by the President on the Supreme Court Decision on U.S. Versus Texas (June 23, 2016, 11:53 AM) ...................................................................................... 8

*Schumer Threatens the Court*, WSJ (Mar. 4, 2020, 7:34 PM) .................................... 14

SE Cupp, *Republicans, resist the temptation to blame liberals for this tragedy*, CNN (June 15, 2017, at 9:54 PM) ....................................................................... 15

Staff of S. Comm. on Homeland Sec. & Gov't Affs., 117th Cong. Rep. on Examining The U.S. Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6, 5 ("HSGA Report") ............................................................. 22

Susan Cornwell, *U.S. lawmaker spends night outside Capitol to protest return of evictions*, REUTERS (July 31, 2021, 5:58 PM) .......................................................... 13

Yamiche Alcindor, *Attack Tests Movement Sanders Founded*, NEW YORK TIMES, (June 14, 2017) .................................................................................... 15

**Rules**

Fed. R. Evid. 201(b) ............................................................................... 3

**Regulations**

11 C.F.R. § 100.29 ................................................................................. 6

**U.S. Constitution**

U.S. Const. Art. II, § 3. .......................................................................... 6

U.S. Cont. Art. II, § 2, cl. 2 .................................................................... 19

Plaintiffs can state neither a legal nor a factual basis for their spurious allegations against President Trump and his political entities. Even after amending their complaint, they are constrained by stubborn facts. Indeed, public documents show it was President Trump who acted to protect Washington, D.C. in the lead-up to January 6, 2021, by authorizing the National Guard to protect the Capitol complex. Both congressional officials answering to Speaker Pelosi and Washington, D.C. Mayor Muriel Bowser, however, rejected that offer. They both may wish to blame their misfeasance on President Trump, but they need look farther then themselves and the rioters for casting blame for any harm suffered by Plaintiffs. Moreover, the Amended Complaint is premised upon flawed logic that would severely undermine key constitutional protections unique to the American form of government.

Plaintiffs grasp at straws to allege a conspiracy including President Trump or his campaign through innuendo based on *public* tweets and speeches (not a single instance of one-on-one communication is even alleged). Such political communication is at the heart of the First Amendment. President Trump spoke through his Twitter account and from the podium about congressional action. Further, Plaintiffs seek to cast absolute immunity as something the President has the burden to earn, yet, in contrast, it is something they must overcome by showing that he was not acting within the outer perimeter of his official responsibilities. *See Nixon v. Fitzgerald*, 457 U.S. 731 (1982). Presidents often speak to the American people on issues outside their explicit constitutional authority, including veto overrides, Senate approval of nominees, and ratification of treaties. Limiting protection to only those powers

specifically enumerated in Article II would open the floodgates of litigation and cause irreparable harm to the institution of the Presidency. The Amended Complaint should be dismissed, with prejudice.

## BACKGROUND

In trying to cast aspersion against President Trump, Plaintiffs ignore the clear and publicly available facts regarding January 6. From late December 2020 through January 6, 2021, ongoing discussions regarding the deployment of additional resources took place between District of Columbia Mayor Muriel Bowser's office, the Department of Defense, and other federal agencies. Through these negotiations, Mayor Bowser's office initially requested troops from the District of Columbia National Guard be deployed to assist with the events of January 6. President Trump and his advisers readily approved this request.

But the mayor and congressional officials apparently had second thoughts. Mayor Bowser and congressional leadership declined to make the required requests for troops, as is mandated by law to authorize additional federal troops to help maintain order. In fact, Mayor Bowser specifically rejected *any* additional involvement of *any* "federal law enforcement personnel", despite President Trump's insistence that any resources be available. Dep't of Def., Review of the DOD's Role, Responsibilities, and Actions to Prepare for and Respond to the Protest and Its Aftermath at the U.S. Capitol Campus on January 6, 2021, DODIG-2022-039 at 120, 16 (quoting a January 5 letter from Mayor Bowser and noting President Trump asked

about law enforcement preparedness on January 3 and told Defense Secretary Miller

on January 5 to "do what's required to protect the American people").[1]

The facts in this case are clear. President Trump acted promptly and

reasonably to prevent danger and damage on January 6, 2021. Other congressional

and D.C. leadership did not. Plaintiffs now seek to twist the facts in a blatant attempt

to hold the wrong parties liable for the damage they suffered.

## ARGUMENT

### I.     The Constitution forecloses Plaintiffs' claims.

#### a.     Absolute Immunity bars Plaintiffs' claims.

##### 1.     *The Court should reject Plaintiffs' invitation to make content-based value determinations on a Presidential address in making its "outer perimeter" determination as to immunity.*

Plaintiffs wish to limit the President's absolute immunity from civil litigation

by allowing courts to make content-based value determinations on the presidential

activities and the motives behind those activities. Pls.' Resp. in Opp'n to Mot. To

---

[1] The Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). "[C]ourt[s] may take judicial notice of matters of a general public nature . . . without converting [a] motion to dismiss into one for summary judgment." *Baker v. Henderson*, 150 F. Supp. 2d 17, 19 n.1 (D.D.C. 2001). *See also Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1088 (D.C. Cir. 2007) (holding that public record information "may properly be considered on a motion to dismiss"). This exception allows the Court on a Rule 12(b)(6) motion to take judicial notice of its own files and records, public records from other proceedings, as well as facts which are matters of public record. *See Hemphill v. Kimberly-Clark Corp.*, 605 F. Supp. 2d 183, 186 (D.D.C. 2009); *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222 (D.C. Cir. 1993). The IG Report is a public record released by the United States Department of Defense, readily available to Plaintiffs or anyone else.

Dismiss ("Pls.' Opp'n"), ECF No. 118, at 53-54. The Supreme Court squarely rejected this focus on the motives rather than the nature of the presidential act at issue. *See Nixon v. Fitzgerald*, 457 U.S. at 756 ("[A]n inquiry into the President's motives could not be avoided under the kind of "functional" theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive."). Indeed, Plaintiffs largely regurgitate many of the same arguments made by the *Fitzgerald* respondents, who claimed that President Nixon lacked a legitimate presidential purpose for dismissing a federal employee in violation of federal law. *Id.* at 756. But the Court rejected that argument, just as should this Court because such a "construction would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose. Adoption of this construction thus would deprive absolute immunity of its intended effect." *Id.* at 756.[2]

The limit of the inquiry is that President Donald J. Trump ("President Trump") spoke on January 6 to address forthcoming congressional action. It is of no moment as to whether he was directly involved in that action or whether Plaintiffs, or even this Court, agreed with arguments made in that Presidential address. It is enough that the nature of the activity, a speech by the President, is the type of activity normal

---

[2] The *Fitzgerald* standard for absolute immunity of the President is broader than the qualified immunity standard that covers other federal and state officials and is necessarily broader than the ordinary speech immunity guaranteed by the First Amendment as discussed in *Brandenberg v. Ohio*, 395 U.S. 444 (1969).

and customary to the presidency. Indeed, it is not at the outer perimeter of the President's duties; it is dead center.

2. *President Trump's speech was in his official capacity.*

Contrary to the musings of Plaintiffs, President Trump was not engaged in some elaborate conspiracy, and Plaintiffs have failed to point to any plausibly pled facts to the contrary nor could President Trump have appeared at the event in any capacity other than President of the United States. Instead, as is much more plausible, President Trump was discussing matters of public concern as President of the United States. The sitting President of the United States is entitled to absolute immunity when speaking on matters of public concern, especially here where the speech involved Congressional action.

Plaintiffs suggest that President Trump's speech at the Ellipse was a campaign event. The speech, however, came well after the election, not before. As the Fourth Circuit held, after the end of the election, "President Trump was no longer a candidate for public office," and he was not engaged in electioneering. *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 187–88 (4th Cir. 2021).

Further, the Federal Elections Commission has laid out a detailed definition of electioneering (or what Plaintiffs refer to as campaign speech). The FEC definition requires four things for a communication to be considered electioneering: (1) it must be a broadcast, cable, or satellite communication; (2) it must refer to a clearly identified candidate for federal office; (3) must be publicly distributed prior to an election; and (4) must be targeted to the relevant electorate. *See* 11 C.F.R. § 100.29.

5

President Trump was not urging voters to support a candidate for political office; he was communicating his position on congressional action. The only capacity in which he made that address was as the sitting President of the United States. Accordingly, when President Trump made this speech, he was acting in his official capacity and was not engaged in electioneering. Thus, the speech at and leading up to the Ellipse rally—the basis of Plaintiffs' claims—is speech that President Trump made in his official capacity as the President of the United States. Indeed, it could not have been in any other capacity.

In a bizarre attempt to limit the scope of absolute immunity, Plaintiffs argue that a President must point to a constitutional provision that grants him authority to take the action that he took. Pls.' Opp'n at 56. Their argument would undermine the very purpose of absolute immunity. A President need not identify a constitutional duty to prove that an activity is absolutely immune from civil suit. Nevertheless, Plaintiffs' allegations support the conclusion that President Trump was executing his duties under the Constitution to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 3.

The Framers specifically sought to ensure that it was the President's duty to execute the laws faithfully. Initially, the Framers directed the President to "carry into execution" the laws; however, at the Convention, the Framers replaced that language and assigned the President an affirmative duty to take care that the country's laws be faithfully executed. Andrew M. Wright, *The Take Care Clause, Justice Department Independence, and White House Control*, 121 W. Va. L. Rev. 353,

385 (2018). As one scholar wrote, "enforcing election laws . . . struck at the core of the executive branch's duty to faithfully execute the law." Alton L. Lightsey, *Constitutional Law: The Independent Counsel and the Supreme Court's Separation of Powers Jurisprudence*, 40 Univ. Fl. L. Rev. 563, 573 (1988).

As the Supreme Court held, the take care clause "are sweeping words." *Myers v. United States*, 272 U.S. 52, 122 (1926). President Trump's efforts to question congressional action was a discretionary act, not subject to second-guessing by the judiciary. *See Halperin v. Kissinger*, 578 F. Supp. 231, 233 (D.D.C. 1984), *aff'd in part, remanded in part*, 807 F.2d 180 (D.C. Cir. 1986) ("Judicial inquiries, however, into possible motives for discretionary actions are 'highly intrusive[]' . . . . If this were permitted, the doctrine of absolute immunity, which is based on the separation of powers, would lose its intended effect.").

The rally on January 6 and all other statements made by President Trump regarding the legality of changes to election laws and the validity of election results constitute speech on matters of public concern. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' . . . or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"). What falls within this category for the President can be quite broad; in one instance, a district court held that the "[t]elevised publication of the President's views on various topical items is within the outer perimeter of his official duties." *Lynch v. President of the U.S.*, 2009

7

WL 2949776, at *1 (N.D. Tex. Sept. 14, 2009) (finding that the President had immunity and dismissing the plaintiff's case). Presidents past, present, and future will speak, and should speak, on numerous issues where they do not have any textually identifiable constitutional duty. For instance, Presidents have pushed against a veto override,[3] commented on expectations for Supreme Court opinions,[4] supported Constitutional amendments,[5] and spoken against State actions.[6]

A President need not sift through the intentionally sparse text of Article II as a precondition of using his bully pulpit to support or oppose issues of public concern. Any assertion to the contrary is an ill-considered and impractical limitation on

---

[3] *See, e.g.*, Patricia Zengerle, *Congress rejects Obama veto, Saudi September 11 bill becomes law*, REUTERS (Sept. 28, 2016), https://www.reuters.com/article/us-usa-sept11-saudi/congress-rejects-obama-veto-saudi-september-11-bill-becomes-law-idUSKCN11Y2D1(describing that President Obama called and wrote a letter to Senate Minority Leader Harry Reid to explain his opposition to the bill, and Reid was the only senator that sided against the veto override).

[4] Remarks by the President on the Supreme Court Decision on U.S. Versus Texas (June 23, 2016, 11:53 AM), https://obamawhitehouse.archives.gov/the-press-office/2016/06/23/remarks-president-supreme-court-decision-us-versus-texas(commenting that the even split of justices was a consequence of partisan reluctance to confirm a ninth justice and the President's policies "can't go forward at this stage, until there is a ninth justice on the Court to break the tie.").

[5] Andrew Johnson proposing constitutional amendment to remove electoral college (July 18, 1868: Message Proposing Constitutional Amendments) https://millercenter.org/the-presidency/presidential-speeches/july-18-1868-message-proposing-constitutional-amendments.).

[6] *See, e.g.*, Gary Fineout, *Biden tells DeSantis to 'get out of the way' amid Covid surge*, POLITICO (Aug. 3, 2021, 6:03 PM), https://www.politico.com/states/florida/story/2021/08/03/desantis-blames-media-for-hysteria-over-covid-surge-1389404 (quoting President Biden, saying if the state governors are "not going to help, get out of the way of the people that are trying to do the right thing.").

presidential speech. Accordingly, when President Trump made this speech, he was acting within the outer perimeter of his official duties as the President of the United States and is thus protected by absolute immunity.

###### b.     President Trump's political speech is protected by the First Amendment.

Plaintiffs would like the Court to believe that President Trump is both not acting within the scope of his Office as President and not speaking on political matters despite the speech being from a public platform on matters of public concern. Instead, Plaintiffs claim that President Trump was acting under some mass conspiracy to invade the Capitol. Pls.' Opp'n at 57-58. Such a reading would destroy the heart of the First Amendment protections for political speech.

Plaintiffs' allegations of agreement concerning President Trump are based solely on his public, political speech, and the statements of outlier third parties who had no direct communication with President Trump. Pls.' Opp'n at 19-21. Plaintiffs cannot show that any agreement was entered, what the alleged agreement pertained to, or what the parties' respective roles or responsibilities were. Plaintiffs disingenuously argue that President Trump waived the argument that "Plaintiffs' allegations do not suffice to allege that he conspired with other Defendants." *Id.* at 19. Plaintiffs' waiver argument is wishful thinking and a far cry from the truth. In reality, President Trump made clear in his motion to dismiss that there was no agreement, thus; Plaintiffs failed to meet the pleading standard for conspiracy. Defs.' Memo. in Support of Mot. to Dismiss at 30-31.

Plaintiffs broadly allege several different conspiratorial goals: (1) injuring Capitol Police officers, (2) preventing Capitol Police officers from discharging their duties, (3) injuring Vice President Pence, (4) preventing Joe Biden and Kamala Harris from taking office, (5) attacking the Capitol, and (6) disrupting or stopping Congress from counting the electoral votes. *See, e.g.,* Pls.' Opp'n at 4, 21, 36, 37. That Plaintiffs cannot articulate a clear goal of the conspiracy supports the more plausible scenario—there was no agreement, and the individuals responsible for Plaintiffs' injuries acted on their own misinterpretation of President Trump's words. Plaintiffs seek to put the cart before the horse, claiming that allegations of a conspiracy involving only political speech automatically strip First Amendment protections.

### 1. *Plaintiffs' incredible allegations of a conspiracy cannot preclude First Amendment protections.*

Plaintiffs argue that President Trump is not entitled to First Amendment protections because of the alleged conspiracy in their Amended Complaint. Yet, the actions they allege against President Trump universally are comprised of political speech, often made to political supporters. Finding that President Trump's speech here was unprotected under a theory of conspiracy liability would create an exception that would swallow-whole the uniquely American protections for political discourse found in the First Amendment.

In support of their position, Plaintiffs chiefly rely on *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). *Cal. Motor* stands for the premise that because it was established as a fact that the sole purpose of the speech was to harass

and deter competitor's access to agencies and courts, in violation of antitrust laws, the speech was not protected. Here, not only did President Trump employ lawful means in directing his speech, the intended result of his speech was lawful in nature and did not involve storming the Capitol Building. Accordingly, *Cal. Motor* has no basis on determining the constitutionality of President Trump's speech.

2.    *Plaintiffs take President Trump's words out of context.*

Plaintiffs argue that President Trump's purely political speech, in which he used common political jargon and did not advocate for violence, infers a conspiracy to attack the Capitol building. Pls.' Opp'n at 61-62. Throughout their Opposition, Plaintiffs go so far as to suggest that social media posts from a supposed Proud Boy leader and other tortfeasors shows conspiracy simply because they were posted in response to President Trump's speech. *Id.* at 14. The First Amendment is not so fragile as to permit an individual, much less the President of the United States, to be hauled into court due to posts on social media from debate viewers or the actions of a few individuals that attended a large political rally. Political speech is never made in a vacuum; to be effective it must be made while engaging with others.

In *NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982), the Supreme Court contemplated (and rejected) a possible exception to the *Brandenburg* limitation on liability for speech. That case is readily distinguishable both factually and legally from the case at hand. In *Claiborne*, the Supreme Court opined in dicta "if that language had been followed by acts of violence, a substantial question would be

11

presented whether [defendant] could be held liable for the consequences of that unlawful conduct." *Claiborne*, 458 U.S. at 928.

That case was based upon a longstanding boycott among numerous *identified* defendants including multiple in person meetings admitted by both parties to the litigation. The defendant's speeches contained explicit calls for violence including threats to break the necks of those who do not follow the boycott. *Id.* at 902. Since there was no contemporaneous violence, however, the Supreme Court declined to carve an exception to the incitement standard.

In contrast to this case, Plaintiffs have not established any communication other than public tweets and speeches that supports their notion of a conspiracy. President Trump did not call for violence. Instead, he engaged in political discourse about a matter of public concern while using language that is used across the political spectrum. Indeed, Plaintiffs have not established anything beyond garden-variety political discourse asking supporters to fight for their beliefs. If the *Claiborne* dicta is utilized to hold President Trump liable for the speech at the Ellipse, it would subject an untold number of politicians to severe liability for similar rhetoric.[7] It would become the exception that would swallow the rule.

---

[7] *See* Video: https://www.youtube.com/watch?v=gcVlsq2x79g (quoting Rep. Maxine Waters "They've got a fight coming" at 1:02; Sen. Tim Kaine "What we've gotta do is . . . fight in the streets" at 1:06; Rep. Joaquin Castro "We'll also fight him and challenge him in every way that we can, in the Congress, in the courts, and in the streets" at 1:10).

Given the numerous protests over the years on Capitol Hill[8] and the necessity of protecting political speech—the very type of speech that the First Amendment was designed to protect—a holding that individuals can be liable for violence by random listeners if their words could be interpreted as a threat would be a striking rejection of well-established First Amendment law. For example, Senate Majority Leader Schumer directed statements at Supreme Court Justices Gorsuch and Kavanaugh, saying "[y]ou have released the whirlwind, and you will pay the price" and "[y]ou won't know what hit you if you go forward with these awful decisions."[9] While his words were undoubtedly irresponsible, they were not actionable, and would not have

---

[8] *See* Kalhan Rosenblatt, *Protestors pound the doors of the Supreme Court following Kavanaugh confirmation*, NBC NEWS (Oct. 6, 2018), https://www.nbcnews.com/politics/supreme-court/protests-build-capitol-hill-ahead-brett-kavanaugh-vote-n917351("[P]rotestors pushed past a police line, storming up steps to pound on the doors of the U.S. Supreme Court on Saturday after the Senate confirmation of Brett Kavanaugh."); Cheyenne Haslett, *Dreamers protest on Capitol Hill on DACA deadline day*, ABC NEWS (Mar. 5, 2018), https://abcnews.go.com/Politics/dreamers-protest-capitol-hill-daca-deadline-day/story?id=53539262 (describing the DACA protests in which protestors arrived at the Capitol and Senate office buildings to demand Congress pass legislation to renew DACA protections and quoting a protestor who claimed her conduct was "fighting for the people whose DACA expires soon."); Susan Cornwell, *U.S. lawmaker spends night outside Capitol to protest return of evictions*, REUTERS (July 31, 2021, 5:58 PM), https://www.reuters.com/world/us/us-lawmaker-spends-night-outside-capitol-protest-return-evictions-2021-07-31/ (describing how "progressive lawmakers" sat outside the Capitol all night to emphasize demand to extend the moratorium on evictions); Annie Gowen, *Handful of protestors arrested during 'Occupy Congress'*, WA. POST (Jan. 17, 2012), https://www.washingtonpost.com/local/handful-of-protesters-arrested-during-occupy-congress/2012/01/17/gIQAjGgO6P_story.html (describing a particularly large protest by the "Occupy" movement that involved entering Congressional buildings to make demands).

[9] *Schumer Threatens the Court*, WSJ (Mar. 4, 2020, 7:34 PM), https://www.wsj.com/articles/schumer-threatens-the-court-11583368462.

been even if any actual harm befell the Justices from those who claimed they were inspired by Schumer's words.

If every individual had to police his speech to ensure it could never be perceived as a threat in light of later events, nearly all political discussion would be off the table. For example, on November 11, 2016, Sen. Elizabeth Warren stated on MSNBC "[w]e are going to fight back, we are not turning this country over."[10] This was said while destructive protests turned riots were ongoing in Portland, Oregon.[11] Similarly, after Sen. Bernie Sanders passionately addressed his supporters and said "today in the White House we have perhaps the worst and most dangerous President in the history of our country . . . [and] extreme right-wing [congressional] leadership,"[12] a Bernie Sanders supporter with a known hatred for conservatives and Republicans was found to be the culprit for the shooting of a Republican representative, a Capitol Police officer, and others at an Alexandria baseball field.[13]  Neither of these instances

---

[10] *See supra* note 6 at 3:25.

[11] Camila Domonoske, *Anti-Trump Protest in Portland, Ore., Turns Destructive, Declared a Riot*, NPR (Nov. 11, 2016, 8:11 AM), https://www.npr.org/sections/thetwo-way/2016/11/11/501685976/anti-trump-protest-in-portland-ore-turns-destructive-declared-a-riot.

[12] *See* video: https://youtu.be/7-nR_5UBIPU; Yamiche Alcindor, *Attack Tests Movement Sanders Founded*, NEW YORK TIMES, (June 14, 2017), https://www.nytimes.com/2017/06/14/us/politics/bernie-sanders-supporters.html.

[13] *See, e.g.,* SE Cupp, *Republicans, resist the temptation to blame liberals for this tragedy*, CNN (June 15, 2017, at 9:54 PM), https://www.cnn.com/2017/06/15/opinions/republicans-dont-blame-liberals-cupp-opinion/index.html.

warrant blaming the politician for speech that may have inspired violence and destruction.

### 3.   Plaintiffs mistakenly rely on the effect upon listeners to argue that President Trump incited violence at the Capitol.

Plaintiffs' insistence that the way others interpret speech is somehow enough, or even relevant, to establish a conspiracy or incitement goes against well-established First Amendment law. *See Thomas v. Collins*, 323 U.S. 516, 535 (1945) (rejecting liability based on how others interpret one's speech because that "would 'pu[t] the speaker . . . wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning."); *Morse v. Frederick*, 551 U.S. 393, 442 (2007) (Stevens, J., dissenting) (describing that liability based on others' understanding would blur "the distinction between advocacy and incitement."). In any event, quoting President Trump's language and leaving out key phrases that indicate a desire for peaceful protest does not amount to factual support for an allegation of conspiracy or incitement. Plaintiffs have cherry-picked their allegations from thousands of tweets, speeches, rallies, and public statements in order to create an out-of-context narrative.

Taken in context, with the totality of only President Trump's actual language considered, Plaintiffs cannot plausibly state a claim. The bulk of their allegations consist of general political bombast, interpreted by others to be calls to violence. But effect on others is not what is relevant under the First Amendment. Rather, it is President Trump's actual words—which included clear direction for peaceful and

patriotic protest. Plaintiffs cannot plausibly allege that President Trump sought to incite violence.

## II.     Plaintiffs Fail to State a Claim for Which Relief May be Granted.

### a.  Plaintiffs fail to adequately allege a violation of 42 U.S.C. § 1985.

Plaintiffs claim there are five bases for the actions alleged as conspiracy under § 1985(1). None of these, however, are even remotely persuasive or within the parameters of § 1985(1). Plaintiffs claim that the alleged conspiracy was: (1) to injure Capitol Police while they were carrying out their official duties, Pls.' Opp'n at 21; (2) to prevent Capitol Police officers from performing their official duties, *id.*; (3) to prevent President Biden and Vice President Harris from holding office, *id.*; (4) to prevent Vice President Pence from discharging his duties, *id.*; and, finally, (5) to injure Vice President Pence for discharging his official duties, *id.* at 21-22.

#### 1.  *Capitol Police Officers are not Federal Officers.*

Plaintiffs have broadly alleged that they are both the harmed party and such persons holding an office, trust, or place of confidence under the United States. Plaintiffs have not, however, plausibly alleged that they are officers contemplated by 42 U.S.C. § 1985. Plaintiffs cite a single case in support of their argument that Capitol Police officers are either federal officers or hold an office, trust, or place of confidence under the United States. *See* Pls.' Opp'n at 22-23 (citing *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971)). In *Griffin*, the Supreme Court held that Reconstruction Era statutes such as § 1985 should be accorded a sweep as broad as their language.

16

*Griffin*, 403 U.S. at 97. While it is generally true that remedial statutes are construed broadly, Plaintiffs left out that the Court made this statement in the context of § 1985(3) to address whether the prohibition of conspiracies to deny equal protection applied to the actions of private individuals or solely the state. *Id.* at 97–98. The Court ultimately held that § 1985(3) should be read broadly enough to encompass the actions of private individuals, not just actions from the state in their official capacity, and this intent is evidenced from the inclusion of legislative history indicating that the act was meant to cover conspiracies by private individuals. *Id.* at 98, 101.

Because § 1985(1) and § 1985(3) confer standing in different ways (and involve pleading different elements), it is misleading to use *Griffin*, a case that specifically involved the construction of § 1985(3), to argue that Plaintiffs have standing under § 1985(1), which requires a particular type of threat against enumerated parties. Plaintiffs do not cite any statute, act, regulation, policy statement, or even statement that indicates that Capitol Police officers hold such a station. In piecing together their arguments, Plaintiffs wholly fail to address binding Supreme Court precedent that already decided this issue regarding the interpretation of § 1985.

Reading § 1985(3) to cover deprivations of equal protection by private individuals is not the same as reading § 1985(1) to include conspiracies against Capitol Police officers who are not considered federal officers under binding Supreme Court precedent. The Supreme Court has laid out five specific conspiracies that § 1985 proscribes, which are those that interfere with: (a) the performance of official duties by federal officers; (b) the administration of justice in federal courts; (c) the

17

administration of justice in state courts; (d) the private enjoyment of 'equal protection of the laws' and 'equal privileges and immunities under the laws'; and (e) the right to support candidates in federal elections. *Kush v. Rutledge*, 460 U.S. 719, 724 (1983). The Court further explained that as currently codified, § 1985(1) applied to (a), § 1985(2) applied to (b) and (c), and § 1985(3) applied to (d) and (e). *Id.*

With this binding Supreme Court precedent, it is understandable that many courts, including the Third Circuit, merge the phrase "office, trust, or place of confidence under the United States" in § 1985(1) to mean that the person interfered with must be a federal officer. *Miller v. Indiana Hosp.*, 562 F. Supp. 1259, 1281 (3d Cir. 1983). The Third Circuit went as far as to say "subsection [§ 1985(1)] only protects federal officers." *Id.* The Ninth Circuit also held that § 1985(1) applies exclusively to federal officers. *Canlis v. San Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 717–718 (9th Cir. 1981). Other district courts have also come to the same conclusion. The District of New Jersey found that to bring a claim under § 1985(1), a plaintiff must show that they are a federal officer. *Lobosco v. Falsetti*, 2010 WL 4366209, at *3 (D.N.J. Oct. 28, 2010). In *Lobosco*, the court dismissed the plaintiff's claims under § 1985(1) as a matter of law because the plaintiff failed to plead sufficient facts to show that he was a federal officer. *Id. See also Diulus v. Churchill Valley Country Club*, 601 F. Supp 677, 681 (W.D. Pa. 1985) (dismissing a § 1985(1) claim because the complaint did not indicate any action of a federal officer). According to the foregoing precedent from the Supreme Court, circuit courts, and district courts,

18

"office, trust, or place of confidence under the United States" in § 1985(1) is all merged to mean federal officer.

The scope of an officer of the United States is clear. "Unless a person in the service of the government, therefore, holds his place by virtue of an appointment by the president, or of one of the courts of justice or heads of departments authorized by law to make such an appointment, he is not, strictly speaking, an officer of the United States." *United States v. Mouat*, 124 U.S. 303, 307 (1888). Additionally, the Supreme Court explained in 2010, "[t]he people do not vote for the 'Officers of the United States.' U.S. Cont. Art. II, § 2, cl. 2. They instead look to the President to guide the 'assistants or deputies . . . subject to his superintendence.'" *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 497–98 (2010). Accordingly, Capitol Police officers are not federal officers, nor do they hold an office, trust, or place of confidence under the United States for purposes of § 1985(1).

Plaintiffs' claims do not fall within § 1985(1); it is also clear that their claims do not fall within either of the other two sections in § 1985, as § 1985(2) deals with the obstruction of justice and § 1985(3) deals with depriving individuals of equal protection of the laws. Plaintiffs further attempt to piece together statutory standing by citing one example where a criminal counterpart statute, 18 U.S.C § 372, applied to U.S. Marshals. Pls.' Opp'n at 23. Further, Plaintiffs cite to an Attorney General's memo from 1977 to allege that because Capitol Police officers can be victims under a criminal conspiracy statute, the same must apply to § 1985(1). This directly contradicts the Supreme Court's own interpretation of § 1985. Not surprisingly,

19

Plaintiffs fail to cite a single case where a court has held that a member of the Capitol Police had standing under § 1985(1). This is because members of the Capitol Police are not federal officials, but rather employees of the Legislative branch. Accordingly, Plaintiffs lack standing under § 1985.

### 2. *The President and Vice President are not Federal Officers.*

Plaintiffs argue that a statute's words may be interpreted differently than in the Constitution. *See* Pls.' Opp'n at 24. Secondarily, Plaintiffs argue that the President and Vice President fall within the statute because of the aforementioned 1977 DOJ memo. *Id.* Plaintiffs are again incorrect. First, the words in this statute specifically refer to officer *under* the United States. The implication that they are under the United States is inherently constitutional unless otherwise defined. Further, as noted above, the Supreme Court, in interpreting this statute, has found that the entirety of the language condenses into "federal officer" and the President and Vice President are not federal officers. The Supreme Court explained in 2010 that officers of the United States are not elected but rather are subject to the superintendence of the President. *Free Enter. Fund*, 561 U.S. at 497–98. Because the President and Vice President are elected, they are not officers of the United States. Therefore, it is irrelevant what other constitutional provisions contain similar language—the Supreme Court has foreclosed this statute's applicability to the Presidency and Vice-Presidency.

### 3. *Plaintiffs fail to even allege any form of an agreement.*

As Plaintiffs note, a conspiratorial agreement requires a "general objective or common plan." Pls.' Opp'n at 5 (quoting *Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 80-81 (D.D.C. 2004)). Further, Plaintiffs state that they must only "raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement." *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Plaintiffs cannot even meet this minimal "reasonable expectation" pleading standard. Plaintiffs only allegation of an agreement is based on President Trump's public, political speech, which he addressed to millions of Americans. Plaintiffs cannot point to anything further.

Both the FBI and the Department of Homeland Security and Government Affairs ("HGSA") did not find any threats of violence to be credible.[14] Further, President Trump made a point to ask the Acting Secretary of Defense, "whether they were prepared," and the President "concurred in the activation of DCNG to support law enforcement."[15] This interaction, contained in an official report written after President Trump left office, severely cuts against Plaintiffs' baseless notions of conspiracy. Plaintiffs try to turn President Trump's common political phrasing, phrases often employed by Democratic politicians, into a conspiracy not supported by

---

[14] Staff of S. Comm. on Homeland Sec. & Gov't Affs., 117th Cong. Rep.  on Examining The U.S. Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6, 5 ("HSGA Report").

[15] *Id.* at 77.

the evidence. Therefore, Plaintiffs' claims under 42 U.S.C. § 1985 and 1986 must fail, and President Trump respectfully requests this Court dismiss them with prejudice.

b. **Plaintiffs have failed to adequately plead any state law claim.**

1. *Plaintiffs have failed to state a claim under D.C. bias-related crimes act.*

Plaintiffs' claims under the D.C. Bias-Related Crimes Act ("BRCA") must fail due to the fact that Plaintiffs' conspiracy claim fails. Plaintiffs cite three different crimes that President Trump allegedly engaged in a conspiracy to commit. As discussed above, President Trump was not engaged in any conspiracy, thus Plaintiffs fail to plead any facts to support that President Trump engaged in these crimes. Further, President Trump was already acquitted regarding incitement to riot. Even still, calling someone a radical left Democrat does not amount to prejudice. Accordingly, because President Trump did not commit any crimes under D.C. law nor acted with any prejudice, he cannot be held liable under BRCA.

2. *Aiding and abetting is not recognized in this District.*

Aiding and abetting liability has never been accepted as a cause of action in the District of Columbia. While the D.C. Circuit indicated in dicta that it may develop over time, *Halberstam v. Welch*, 705 F.2d 472, 489 (D.C. Cir. 1983), no current controlling or persuasive authority in this jurisdiction recognizes aiding and abetting as a cause of action. *See 3M Co. v. Boulter*, 842 F. Supp. 2d 85, 119 (D.D.C. 2012); *Flax v. Schertler*, 935 A.2d 1091, 1108 n.15 (D.C. 2007) ("[a]lthough the *Halberstam* court predicted that this court would recognize a tort of aiding and abetting tortious conduct, we have not done so to date"). This Court bolstered that notion just a few

months ago, holding that there are no independent torts for aiding and abetting and conspiracy because "no such torts are recognized under D.C. law." *Couch v. Verizon Commc'ns, Inc.*, 2021 WL 4476698, at *6 n.10 (D.D.C. Sept. 30, 2021). Therefore, Plaintiffs' claim for aiding and abetting must be dismissed because it is not recognized in this Circuit. Even if it were, President Trump did not provide substantial assistance to the alleged main tortfeasors. Taking the factors from the Restatement and the additional factor from *Halberstam*, it becomes clear that President Trump did not aid and abet any action at the United States Capitol on January 6, 2021.

Here, President Trump spoke at the rally, admonishing the crowd to be peaceful, well before any violence was conducted by anyone listening to his speech. There is little temporal connection compared to aiding and abetting cases commonly cited based on speech when a person acts during or immediately after the speech. Plaintiffs admit that President Trump was physically absent from the Capitol on January 6 and fail to allege that President Trump gave any assistance to those that were at the Capitol. Plaintiffs also admit that President Trump has no relationship with the tortfeasors in this case. They may be supporters of President Trump, but they are not persons known to him.

Plaintiffs allege that President Trump took pleasure in the news coverage of the events on January 6, 2021. But Plaintiffs even admit that President Trump took several actions to try to stop the actions on January 6. *See* Am. Compl. ¶117 (noting that President Trump asked people to act "peacefully"), ¶150 (explaining that President Trump made statements in the late afternoon telling people to return

23

home). They do not otherwise allege anything as to state of mind. As *Halberstam* clearly stated, taking pleasure in something does not constitute aiding and abetting. *See Halberstam*, 705 F.2d at 483.

Here, President Trump's supposed assistance was brief and consisted of sporadic tweets and speeches.[16] President Trump's relationship to the true damages in this case is tangential and tenuous at best. Further, as Senior Judge Leon noted in *Couch*, conspiracy liability is not recognized as an independent tort in this Circuit either. As such, President Trump is not liable for conspiracy liability for assault and battery. Therefore, President Trump did not aid or abet or conspire to commit any act under D.C. law, and Plaintiffs' claims should be dismissed with prejudice.

### 3.   *Plaintiffs fail to state a claim of negligence.*

Plaintiffs have failed to allege any duty of care as required to bring a negligence cause of action. *See Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095, 1098 (D.C. Cir. 1994) (citing *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339 (1928)). Plaintiffs claim President Trump and the Campaign are liable under this cause of action because they broke criminal laws (they did not) solely through their speech and the actions of others based on that speech.

---

[16] Elmer Rhodes, leader of the Oath Keepers, was quoted in the indictment in the District of Columbia as saying "All I see Trump doing is complaining. I see no intent by him to do anything. So the patriots are taking it into their own hands." *United States v. Rhodes, III, et al.*, No. 1:22-cr-00015 (D.D.C. Jan. 12, 2022), ECF No. 1 at 22.

Plaintiffs' claim is woefully insufficient, even at the pleading stage. Speakers at political rallies do not owe a duty of care to members of Congress or Capitol Police officers not at the rally. By bringing their negligence claims, Plaintiffs advocate for another boundless rule with severe ramifications. Since the dawn of the Republic and before, politicians have expressed their passions in political speeches. The important First Amendment protections for those speeches have been discussed in detail. But claiming political speech can give rise to negligence liability is also troubling.

## CONCLUSION

For the foregoing reasons, President Trump's Motion to Dismiss should be granted. This matter should be dismissed, with prejudice.

Dated: January 31, 2022                    Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel:  (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
*Attorney for President Donald J. Trump, Donald J. Trump for President, Inc., and Make America Great Again PAC.*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.


Dated: January 31, 2022

/s/ Jesse R. Binnall
Jesse R. Binnall
*Attorney for Donald J. Trump,*
*Donald J. Trump for President,*
*Inc., and Make America Great*
*Again PAC.*