**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CONRAD SMITH, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 1:21-cv-2265-APM |
| | ) |
| DONALD J. TRUMP, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT NORDEAN'S REPLY TO PLAINTIFFS' OPPOSITION TO HIS FIRST
MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FED. R. CIV.
P. 12(b)(1) AND (b)(6)**

An American wit once characterized the European nineteenth-century novel as a "large, loose, baggy monster." As the Court wades through Plaintiffs' 79-page complaint and 88-page motion-to-dismiss opposition in search of a well-pleaded claim, similar adjectives may suggest themselves. Along the way, even the most politically sympathetic reader will be taxed by such practical questions as:

- Did the random jumble of Defendants who do not know one another "conspire" against Plaintiff police officers, or against someone else?

- If the latter, why did "someone else" not bring these claims against the impecunious Defendants? (Or is it that others have already brought identical claims, many times, and this case was added to the pile of duplicative matters more to advance the aims of counsel?)

- Do Plaintiffs plead one conspiracy or a mix of mini conspiracies—perhaps circling around a grand conspiracy like planetary rings?

- How were Plaintiffs actually injured and by whom? By members of the "conspiracy" or by others? Should that not matter when assessing whether Defendants are liable to Plaintiffs?

1

- There were over 2,000 protesters at the Capitol on January 6. How does Defendants' alleged conspiracy somehow bear causal responsibility for Plaintiffs' injuries greater than that borne by hundreds or thousands of nonparty protesters not involved in the "conspiracy" uncovered by Plaintiffs' counsel through mixing allegations recycled from unrelated criminal cases?

- If Plaintiffs' Ku Klux Klan Act counts do not require a showing of racial animus, as they claim, why does the complaint plead such things as the ethnic backgrounds of the parties and racial voting statistics plucked from, among other places, Milwaukee, Wisconsin?

- Is Plaintiffs' repeated misuse of the word "attack" to describe even acts of nonviolent protest appropriate?

The Court will find no answers to these questions in Plaintiffs' filings.  The truth is their counsel wager that the words "attack" and "January 6" are open sesames to the doors of the Court, no matter the law, the claim, or the facts.  Labeled a Ku Klux Klan Act conspiracy here, it might as well have been called an antitrust conspiracy, a labor law conspiracy, or perhaps an obstruction-of-justice conspiracy.  The wager may be right.  But when spotting the complaint's flaws demands nothing more than a nonlegal understanding of cause and effect, and of collective versus individual responsibility, such politicization of the legal system would be an unhappy outcome for the rule of law.

**Argument**

**I.    Counts I-III should be dismissed insofar as Plaintiff officers seek redress for the alleged injuries of nonparty members of Congress, "Congressional staff," President Biden and Vice President Harris**

Plaintiffs' opposition stretches over 88 pages.  ECF No. 118.  Only three of them, however, address their complaint's most pressing flaw: Plaintiff police officers do not have

standing to bring claims on behalf of nonparty targets of Defendants' alleged conspiracy, such as members of Congress and the former vice president.  *Id*., pp. 25, 75-76.

Plaintiffs' essential pleading dilemma is straightforward.  Their claims are wholly lifted from allegations the federal government has made in parallel criminal cases.  Those allegations are that Defendant Nordean and others conspired to delay or stop Congress's electoral certificate count on January 6.  But unlike the Department of Justice, private Plaintiffs lack standing to bring claims to redress harm to general government processes.  Hence the hedging-all-bets, bifurcated nature of Plaintiffs' Ku Klux Klan Act claims.  The primary set of officeholders whom Defendants allegedly "prevent[ed], by force, intimidation, or threat. . . from discharging any duties. . .," § 1985(1), were members of Congress, congressional staff, President Biden and Vice President Harris.  Am. Compl., ¶ 168.  Recognizing they do not have standing to bring those nonparty claims, Plaintiffs plead alternatively that Defendants' conspiracy was actually aimed at preventing them, U.S. Capitol Police officers, from discharging *their* duties.  *Id.*

Plaintiffs' allegations end up falling between two stools.

They first mount a halfhearted defense of their right to bring a § 1985(1) claim on behalf of nonparty members of Congress, the vice president, etc.  ECF No. 118, p. 25.  They have standing, they say, because § 1985 states, "'[I]n any case of conspiracy set forth in this section . . .the party so injured or deprived may have an action . . .against any one or more of the conspirators.'" *Id.* (quoting § 1985(3)).  Notice, first, that Plaintiffs cite no authority holding that a party who is not the § 1985(1) officeholder "prevent[ed], by force, intimidation, or threat. . . from discharging [his] duties. . ." may bring a claim on behalf of such an officeholder merely because the plaintiff suffered an injury causally related in any way to the relevant officeholder's. There is none.  The parties "so injured" by a § 1985(1) conspiracy are the only parties referenced

in that section: the conspired-against officeholders of the United States.  In the remedial section, § 1985(3)'s phrase "injur[y] in [the party's] person or property" is plainly a reference to identical antecedent language in § 1985(1) which prohibits conspiring to "injure [any officer of the United States] in *his person or property* on account of *his* lawful discharge of the duties of *his* office, or while engaged in the lawful discharge thereof, or to injure *his property* so as to molest, interrupt, hinder or impede *him* in the discharge of *his* official duties." § 1985(1) (emphasis added). Plaintiffs' novel decoupling of the tort in § 1985(1) and the remedy in § 1985(3) would create vagueness and absurdity.  One example suffices.  The friend of a § 1985(1) "officer of the United States" could bring a claim against a defendant for conspiring to induce the officer-friend to leave a "place," thereby depriving plaintiff of choice concert tickets.  That hardly seems to be the injury the Reconstruction Era Congress had in mind.

Even if Plaintiffs' unprecedented construction of § 1985(3) were somehow correct, they still lack standing to bring a § 1985(1) claim alleging official injury to nonparty officeholders. Article III standing at least requires Plaintiffs to show that *their* injuries-in-fact are traceable to Defendants' alleged conspiracy against the nonparty officeholders.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Plaintiffs' traceability flaw here is simple: they do not allege who directly caused the injuries they complain of, so they have not alleged that the unidentified assailants injured them as a result of Defendant Nordean's alleged conspiracy to interfere with nonparty members of Congress, the vice president, etc.  Am. Compl., ¶¶ 156-164.  The Amended Complaint alleges no facts connecting Nordean and his actions to Plaintiffs' injuries, which were allegedly caused by one or more of over 2,000 unidentified protesters at the Capitol that day, any or all of whom may not be members of the "conspiracy" alleged here.  And the same traceability problem plagues their D.C. Bias-Related Crimes Act of 1989 (BRCA) claim that Plaintiffs

4

incurred injury "as a result of" Defendant Nordean's nonspecific alleged "prejudice based on the actual or perceived political affiliation of" nonparty victims.  Am. Compl., Count III, ¶¶ 183, 186, 188 ("The intended victims of Defendants' criminal acts were [nonparty] Democratic members of Congress, some Republican members of Congress, and Vice President Pence. . .").[1]

Plaintiffs' next theory—that *they* were the § 1985(1) officeholder-objects of Defendants' conspiracy—fares even worse.  Plaintiffs cite only three paragraphs of their complaint in support of this theory—in contrast with the prior claim that Defendants conspired to prevent nonparty officeholders from performing *their* duties.  ECF No. 118, p. 26 (citing Am. Compl., ¶¶ 1, 5, 7). None of these paragraphs contains a single factual allegation that Nordean conspired to prevent Capitol Police officers from performing police duties on January 6.  None of the factual allegations Plaintiffs lift from the parallel criminal case suggests Nordean conspired to prevent Capitol Police officers from fulfilling law enforcement duties.  ECF No. 118, pp. 10-12.  Indeed, these bland allegations do not reference the Capitol Police at all.  *Id.*

Counts I-III rest on an ill-conceived attempt to dodge the rules of Article III standing.

## II.   Counts I and II fail to state claims under §§ 1985(1), 1986

### A.   "Officers of the United States" are Executive officers, not congressional employees

Plaintiffs conflate Nordean's next argument with one made by other Defendants in this case and related ones.  ECF No. 118, pp. 22-24.  Unlike other Defendants, Nordean does not contend that "President-elect Biden [and] Vice President-elect Harris . . . are not the types of federal officials that § 1985 protects from the conspiracies described therein." *Id.*, p. 22.  Instead,

---

[1] Plaintiffs cite no authority for their just-for-this-case argument that "the plaintiff need not be the targeted victim" of a BRCA violation.  ECF No. 118, p. 35.  That no such authority exists in the statute's over-30-year history points to how meritless their position is.

he argues that the U.S. Capitol Police are not "officer[s] of the United States," § 1985(1), and therefore Counts I and II must be dismissed to the extent they rely on Defendants' alleged conspiracy to prevent Plaintiffs, as opposed to nonparties, from discharging their duties.

The key distinction, which Plaintiffs nowhere address, is between Executive department officers and members of Congress and its employees.  The president and vice president are of course officers of the Executive branch.  Plaintiffs do not deny, however, that U.S. Capitol Police officers are not Executive officers but are rather controlled and managed by the U.S. Capitol Police Board, which is a congressional entity. 5 U.S.C. § 101 (listing Executive departments); 2 U.S.C. § 1970 (providing that Executive departments and agencies may aid the USCP, which is therefore not the same thing); United States Capitol Police, Capitol Police Board, https://www.uscp.gov/the-department/oversight/capitol-police-board.

The Fourteenth Amendment repeatedly draws a distinction between "representatives" of Congress, on the one hand, and "*executive* officers," on the other; between "members of Congress" and "officers of the United States." U.S. Const. amend. XIV, §§ 2, 3 (emphasis added).  Section 1985 was codified after enactment of the Civil Rights Act of 1871, which was a means of effectuating the Fourteenth Amendment.  Section 1985's reference to "officers of the United States" is therefore construed in light of the Fourteenth Amendment's understanding of its identical terms.  *D.C. v. Carter*, 409 U.S. 418, 423 (1973).  Similarly, unless a party makes a fairly powerful showing otherwise based on the text of the statute at issue, the default textual presumption is that the related phrase "department or agency of the United States" refers exclusively to Executive branch, not congressional, entities.  *Hubbard v. United States*, 514 U.S. 695, 115 S. Ct. 1754 (1995); *United States v. Oakar*, 111 F.3d 146, 151 (D.C. Cir. 1997)

(congressional entities not "departments" or "agencies" "of the United States"); *United States v. Dean*, 44 F.3d 640, 658-59 (D.C. Cir. 1995) (same).

Plaintiffs make no showing that § 1985's text was intended to include congressional employees within the definition of "officers of the United States." ECF No. 118, pp. 22-24. Counts I and II must therefore be dismissed.

**B.      D.C. is not a "State or Territory" under § 1985(1)**

Section 1985(1) creates a right of action against those who conspire to commit the acts covered in that statute—"in any State or Territory." § 1985(1). The Amended Complaint alleges that the overt acts on which Counts I and II rest were committed in Washington, D.C. Contrary to Plaintiffs' claims, the Supreme Court's holding in *Carter* that D.C. is not a "State or Territory" binds this Court. *Carter*, 409 U.S. at 423.

Plaintiffs say the "D.C. Circuit has expressly ruled that section 1985 includes section 1985 conspiracies within the District of Columbia." ECF No. 118, p. 29 (citing *McCord v. Bailey*, 636 F.2d 606, 617 n. 15 (D.C. Cir. 1980)). That is quite wrong. The footnote in *McCord* to which Plaintiffs allude was non-binding dicta. 636 F.2d at 617 n. 15. In any case, the *McCord* court's dicta, in 1980, that "[w]e cannot presume Congress intended to attack conspiracies throughout the nation except for the District of Columbia" does not apply modern principles of statutory interpretation. Now, the first step in contemporary statutory interpretation is to examine the plain meaning of the text, not to begin with "presum[ptions]" about congressional purposes not explicitly embodied in the text. *E.g.*, *U.S. v. Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *19 (D.D.C. Dec. 20, 2021) (courts should not concern themselves with what Congress and courts meant by a Chapter 73 "proceeding" for a century before January 6, but only with what certain dictionary definitions say).

Because the Supreme Court has held that the plain meaning of "State or Territory" excludes the District of Columbia, Counts I and II must be dismissed. *Carter*, 409 U.S. at 423.

### C.     Section 1985(3), not § 1985(1), prohibits conspiracies to interfere with the federal voting process

Plaintiffs do not deny that, unlike in § 1985(1) on which their claim is based, § 1985(3) expressly prohibits conspiracies to interfere with the federal voting process. ECF No. 118, p. 30. They do not bring a claim under § 1985(3), however, because that section requires that Plaintiffs plead and prove that racial, invidiously discriminatory animus lay behind the conspirators' actions. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993). Accepting the textual contortions Plaintiffs offer to end-run § 1985(3)'s requirements would render that section superfluous.

Section 1985(3) prohibits two or more people from conspiring "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President. . ." Plaintiffs claim that is not what they are alleging in this case. ECF No. 118, p. 30. That is quite disingenuous. The very beginning of their 79-page complaint alleges that "racism and white supremacy" "pervaded" Defendants' efforts to conspire to "intimidate and threaten officials from . . .states with significant Black populations . . . into overturning *the will of the voters*." Am. Compl., ¶ 4 (emphasis added). The complaint alleges that this conspiracy involved force, intimidation and threats. *Id*. ¶ 5. Thus, Plaintiffs do allege that Defendants conspired to "prevent by force, intimidation, or threat, any citizen . . .from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President . . ." § 1985(3). Except that, apart from a boilerplate allegation at the start of their complaint, Plaintiffs do not allege any facts showing

that racial, invidiously discriminatory animus lay behind Nordean's alleged actions.  *Bray*, 506 U.S. at 268.

Plaintiffs say they can have their cake and eat it under § 1985(1): they can lodge a § 1985(3) voting interference claim but without having to comply with the racial, invidiously discriminatory animus element.  ECF No. 118, p. 30.  Not so.  If § 1985(1) covered conspiracies to interfere with the federal election process, the express provision covering identical conduct in § 1985(3) would impermissibly be rendered superfluous.  *Marx v. General Rev. Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

Plaintiffs' only response is to argue that § 1985(1) is distinct because it concerns conspiracies "to interfere with federal officials by force, intimidation, or threat" whereas § 1985(3) addresses conspiracies to prevent "any citizen who is lawfully entitled to vote, from giving his support or advocacy" to any federal candidate.  ECF No. 118, p. 30.  But notwithstanding Plaintiffs' misleadingly selective quotations, both sections prohibit conspiracies "by force, intimidation, or threat." §§1985(1), (3).  And Plaintiffs' very complaint shows that a conspiracy to interfere with federal officials counting electoral certificates will also prevent "citizen[s] from giving [their] support or advocacy" to a presidential candidate in the same election—that is precisely what Plaintiffs allege, albeit without any specific factual allegations.  Am. Compl., ¶ 4.  Accordingly, Count I should be dismissed because Plaintiffs are transparently attempting to end-run the pleading requirements of § 1985(3).

### D.   Counts I and II must be dismissed, as the Complaint alleges no facts showing any agreement to commit the "conspiracy's" overt acts

As discussed, Counts I and II require Plaintiffs to allege facts showing that Defendant Nordean and others made an agreement to use force, intimidation or threats to prevent (1)

members of Congress and the vice president from performing their official duties on January 6; and/or (2) Plaintiff police officers from performing theirs.

Plaintiffs' attempt to show that its complaint states §§ 1985(1), 1986 claims that are "plausible on their face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), is both deficient and inappropriate.  ECF No. 118, pp. 10-11.

Notice first that Plaintiffs represent that Nordean communicated with other Defendants "to organize and plan the attack on the Capitol." ECF No. 118, p. 10.  One would assume that Plaintiffs' counsel would then feel compelled, by the requirements of Rule 11 and professional ethics, to present evidence that, on January 6, Nordean either planned to or did "try to hurt or defeat [someone] using violence." *Attack*, Cambridge Online Dictionary, https://dictionary.cambridge.org/us/dictionary/english/attack.  One would be mistaken.[2] Although Plaintiffs do continue to use the word "attack" in connection with Nordean's alleged conduct, it is not with his own words or with the words of anyone associated with him.  ECF No. 118, p. 10.  Scour as they might through the lengthy docket of Nordean's parallel criminal case, Plaintiffs could not locate a single piece of evidence showing something of which the government has not even accused Nordean: that he planned to commit or committed any act of violence at the Capitol on January 6.  *U.S. v. Nordean*, 21-cr-175 (D.D.C. 2021).

Notice next that Plaintiffs' counsel represent that "Nordean advocated for the use of force to overturn the election results." ECF No. 118, p. 10.  However, for some strange reason, in the

_____

[2] Plaintiffs say Nordean is mistaken for pointing out the reality that their counsel are irresponsibly abusing the term "attack," since "Capitol Attack," Plaintiffs respond, is defined in the Amended Complaint.  ECF No. 118, p. 10 (citing Am. Compl., ¶ 2).  If and when the Court turns to that "definition" it will find that "Capitol Attack" means "the attack on the Capitol." Am. Compl., ¶ 2.  Oh.

bulleted examples that follow, the Court will not see Nordean advocating force.  *Id.*  Plaintiffs

evidently feel it is riskless to make such misrepresentation in Court filings.

But perhaps Plaintiffs' most egregious misstatement comes next.  Nordean, Plaintiffs

represent, led coconspirators in "the Capitol Attack" by "direct[ing] a group that assembled near

and attacked the Capitol, communicating through ear-pieces and walkie-talkie-style

communications devices." ECF No. 118, p. 11.  What is remarkable about this misrepresentation

in particular is that its falsehood is demonstrated not through "publicly inaccessible" records, *id.*

at 11 n. 4, but in a publicly available hearing transcript that Nordean pasted virtually verbatim

into his motion to dismiss.  Directly contrary to Plaintiffs' representations about communications

devices, which the government was forced to withdraw, the Chief Judge found:

> What the Government said in its original papers is that [Nordean] directed the Proud Boys
> with specific plans, telling them to split up into groups and to attempt to break into the
> Capitol building; that's a far cry from what I heard at the hearing today. And the Government
> has backtracked on saying that [Nordean] directly told them to split into different groups and
> had this kind of strategic plan.
>
> [W]hat I've heard at the hearing today is that the defendant, with this group, positioned
> himself at one of [the] pedestrian entrances to the Capitol and [] strutted right in front of the
> police barriers. That's also a far cry from threatening or assaulting the police officers who
> were barricading the entrance to the Capitol[.]
>
> There is no allegation that [Nordean] caused injury to any person or that he even personally
> caused damage to any particular property. . . He was a leader of a march down to the Capitol.
> Once they got there it's not clear what leadership role this defendant took at all []—even the
> evidence about [Nordean] directing people to break windows to get into the Capitol is weak,
> to say the least. . .

Hr'g Tr., 3/3/21, pp. 79-80.

None of the allegations Plaintiffs have lifted from 8-month-old filings in the parallel

criminal case without conducting any diligence makes out a plausible claim that Nordean

conspired to do something even the federal government does not accuse him of: using "force,

intimidation or threats" to prevent members of Congress, the vice president or Capitol Police officers from performing their official duties.

### E.      The intracorporate conspiracy doctrine bars Counts I and II

Nordean showed that, in a misguided attempt to collect assets the entity does not possess, Plaintiffs named "Proud Boys International L.L.C." (PBI) as a Defendant, of which Nordean was an alleged "agent and officer" on January 6, and thereby defeated their own claim that Nordean conspired with the other Proud Boys Defendants, pursuant to the intracorporate conspiracy doctrine.  Plaintiffs' two attempts to wriggle out from the self-inflicted pleading error fail.

First, Plaintiffs argue that the intracorporate conspiracy doctrine does not apply to § 1985(1) claims.  ECF No. 118, pp. 27-29.  That is easily refuted.  "Federal district courts in the District of Columbia . . . consistently have applied the intracorporate conspiracy doctrine to Section 1985." *Tabb v. District of Columbia*, 477 F. Supp. 2d 185, 190 (D.D.C. 2007) (citing agreement on this issue among seven circuits).  Plaintiffs have nothing to say about *Tabb*, except that they want the Court to change the law for their case alone.

Second, Plaintiffs claim that the complaint alleges that Nordean conspired with "individuals and organizations *outside*" the Proud Boys Defendants.  ECF No. 118, p. 27 (emphasis original).  Only, that is a misrepresentation.  Every single "fact" alleged about Nordean and January 6 is in connection with members of PBI and not with "outside organizations and individuals." *Id.*, pp. 10-11.  Plaintiffs allege that Nordean and Defendant Stone attended the same rally on December 12, 2020.  Am. Compl., ¶ 79.  Of course, that is not an allegation that Nordean and Stone conspired to violate the Ku Klux Klan Act on January 6.[3]

---

[3] Plaintiffs add that the doctrine does not apply "to entities formed for the express purpose of violating the civil rights of certain individuals." ECF No. 118, p. 29.  It cites no authority.  It

Accordingly, the conspiracy counts (Counts I and II) and the conspiracy allegations of the remaining counts (Court III, ¶¶ 191, 194, 198; Count IV, ¶ 203; Count V, ¶ 209) should be dismissed because the complaint alleges no people or organizations with whom Nordean "conspired" beyond PBI in which he was an "agent and officer." Am. Compl., ¶ 26.

### F.      Plaintiffs' attempts to salvage a § 1986 claim are confused

Plaintiffs claim that although they have not properly pleaded a § 1985(1) conspiracy, they may still have pleaded a § 1986 claim.  ECF No. 118, pp. 31-34.  Their arguments are mistaken.

To establish Nordean's § 1986 liability, Plaintiffs say, they must show (1) he had actual knowledge of a § 1985 conspiracy, (2) he had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) he neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed.  ECF No. 118, p. 31 (citing *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994).  Even if Nordean did not commit a § 1985 conspiracy, Plaintiffs contend, "Defendants do not dispute that they had knowledge of the § 1985 conspiracy or . . .whether they neglected or refused to try to prevent the wrongs. Such arguments are now waived." *Id.*  That does not make sense.

As shown *supra*, Plaintiffs do not sufficiently allege a § 1985 conspiracy involving Nordean.  If it is not his "own" conspiracy, it is unclear which § 1985 conspiracy Nordean is alleged to have had "actual knowledge of." Certainly, Plaintiffs' opposition does not dispel the confusion. If they cannot articulate what they mean in an 88-page brief, suffice it to say they have not pleaded what Nordean had actual knowledge of and "neglected or refused to prevent"

---

cites no fact in the complaint alleging that PBI was an entity "formed for the express purpose of violating civil rights." It does not explain who the "certain individuals" are.

on January 6. Plaintiffs utterly fail to allege what Nordean should have done, and when, to "prevent" the unspecified conspiracy that did not involve him.

## III. Counts III, IV, V and VI fail to state claims

### A. The BRCA count fails to state a claim

Count III alleges that Plaintiffs "incur[red] injury to [their] person or property as a result of an intentional act [of Nordean's] that demonstrates [his] prejudice based on the actual or perceived . . . political affiliation of a victim of the subject designated act. . ." Am. Compl., ¶ 183 (citing D.C. Code § 22-3704(a)). Plaintiffs completely fail to show Count III is well-pleaded.

First, Plaintiffs point to no allegations in the complaint showing how any of *Nordean's* "intentional acts" affected any of the alleged victims: "Democratic members of Congress, some Republican members of Congress, and Vice President Pence." Compl., ¶ 188. The complaint does not plead a fact showing how, why, or whether they were victims of any act by Nordean specifically. Nor does the complaint plead facts showing Nordean's "prejudice" allegedly based on the "political affiliation" of any of those "victims." The one piece of "evidence" Plaintiffs cite in opposition is an alleged chat message from Nordean that has nothing to do with "political affiliation" or the "victims."[4]

Second, Plaintiffs show they misunderstand the "D.C. crimes" that allegedly predicate the BRCA count.

**"Act of terrorism."** Plaintiffs have cited a "D.C. crime" they call an "act of terrorism." ECF No. 118, p. 36. They are quite mistaken. The D.C. Code provision they cite does not set

---

[4] "Nordean wrote, 'now you will deal with the monster you created. . . Good luck to all you traitors. . . you're going to need it.'" ECF No. 118, p. 42. Scary. Plaintiffs do not identify the "you" in this statement or the "traitors." They do not allege to whom the message was sent. *Id.* They do not explain how this alleged message has any relevance to the "political affiliation" of the identified "victims" or relationship to the "intentional act."

out an offense but instead a definition that is used for sentencing enhancements and penalties. D.C. Code § 22-3152 ("Definitions—For the purposes of this chapter, the term (1) 'Act of terrorism' means an act or acts. . .").  Rather than simply admit an understandable mistake, their counsel continue to pretend they cite to a criminal offense and not an aggravating factor definition.  ECF No. 118, p. 37.  An "act of terrorism" must be a crime, they say, because "other statutes demonstrate that acts of terrorism are separate criminal offenses." *Id.*  In fact, the statutes Plaintiffs cite do not demonstrate that, as their counsel likely know.  Plaintiffs cite D.C. Code § 23-113(a)(1)(A)-(F).  These subsections do not create "separate criminal offenses" for terrorism but rather set a limitations period for the offense of murder that involves an "act of terrorism." *Id.*  Plaintiffs also cite D.C. Code § 42-3531.02(d).  That section in turn references § 22-3153, which clearly demonstrates that an "act of terrorism" is a sentencing enhancement that elevates the penalties for substantive offenses.  D.C. Code § 22-3153.  So Plaintiffs have not even pleaded an offense on which to predicate a BRCA claim.  In any case, as shown below, even if an "act of terrorism" were a D.C. offense, which it is not, Plaintiffs predicate the "act of terrorism" on "malicious property destruction" for which they plead no facts in connection with Nordean.  ECF No. 118, p. 36.

**Property destruction.**  Plaintiffs allege Nordean violated the BRCA by virtue of engaging in property destruction, worth more than $1,000, in violation of D.C. Code § 22-303, and attempting to engage in, aiding and abetting the commission of, and conspiring to do, the same.  Am. Compl., ¶ 198.  Again, the Complaint pleads no facts showing how or whether Nordean destroyed property on January 6; the federal government *concedes* Nordean did not personally destroy property worth more than $1,000.  21-cr-175, ECF No. 122, p. 9.  Plaintiffs state that "No defendant disputes that unlawful destruction of property in excess of $1,000

occurred." ECF No. 118, p. 38.  That misleadingly suggests Nordean did not specifically dispute destroying property in excess of $1,000 on January 6.  He did.  ECF No. 95, pp. 22-23.

**Rioting**.  Plaintiffs allege Nordean violated the BRCA by virtue of rioting and attempting to commit, conspiring to commit, and aiding and abetting the commission of the same in violation of D.C. Code § 22-1322.  Nordean showed that the complaint failed to plead the requisite element that he "willfully" "engaged in a riot" or "incited or urged other persons to engage in a riot." ECF No. 95, p. 23.  The adverb "willfully" in a criminal statute means "with knowledge of illegality." *United States v. Quinn*, 401 F.Supp.2d 80, 101 (D.D.C. 2005).

Plaintiffs respond by tacitly conceding they failed to plead the "willfully" element.  ECF No. 118, p. 37.  But they claim that "under no circumstances does violently breaching police barricades constitute a non-willful act." *Id.* (citing Am. Compl., ¶¶ 44, 126).  Again, Plaintiffs' argument is strikingly misleading.  The complaint paragraphs cited by Plaintiffs do not allege facts showing Nordean engaged in a crime of violence.  Paragraph 126 alleges that Nordean "grabbed a metal barricade" and "along with others in the crowd" he "knocked the barricade down." Am. Compl., ¶ 126.  In fact, it is publicly available information that the barricade allegation Plaintiffs lifted from the criminal case is demonstrably false.  Long after the government made the stale allegation on which Plaintiffs rely, it produced additional footage depicting a man other than Nordean "knock[ing] the barricade down." *U.S. v. Nordean*, 21-cr-175, ECF No. 197, p. 2 (D.D.C. 2021).  Thus, the Court is not required to, and should not, accept as true allegations contradicted by public records.[5]

---

[5] *Clark v. Stone*, 998 F.3d 287, 298 (6th Cir. 2021); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998); *Soo Line R.R. v. St. Louis Southwestern Ry.*, Co., 125 F.3d 481, 483 (7th Cir. 1997).

Third, Plaintiffs have not somehow properly pleaded that Nordean committed these "D.C. crimes" by virtue of aiding and abetting and conspiracy law.  ECF No. 118, p. 38.  Plaintiffs say that "by recruiting attendees, arranging logistics, arming themselves and others, and/or fundraising for the Attack" Nordean aided and abetted the "three" crimes.  *Id.*  Plaintiffs' understanding of aiding and abetting law is no better than their grasp of the D.C. Code.  A defendant does not aid and abet the crimes of property destruction and rioting by undertaking the acts in Plaintiffs' laundry list.  A person is liable for aiding and abetting a crime "if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014). "An intent to advance some different or lesser offense is not . . . sufficient: Instead, the intent must go to the specific and entire crime charged." *Id.* at 76.  "Recruiting attendees" to attend the rally in D.C. and the like neither constitutes an affirmative act in furtherance of property destruction or rioting, nor demonstrates the intent of facilitating those specific offenses.  No case Plaintiffs cite holds otherwise.

Nor does conspiracy law salvage Plaintiffs' poorly pleaded BRCA claim.  The complaint alleges no facts showing that Nordean agreed with anyone to destroy property or riot.  Again, even the government from whose allegations Plaintiffs borrow all their Nordean-related claims does not allege that the Nordean-involved conspiracy it charges had as its object the destruction of property.  *U.S. v. Nordean*, 21-cr-175, ECF No. 26, ¶ 27 (D.D.C. 2021) (criminal "objects" not including property destruction).  As for *Pinkerton* liability, Plaintiffs' complaint alleges no facts whatever showing that all property destruction of any kind on January 6, by any person, was "reasonably foreseeable" to Nordean.  Plaintiffs merely cite to legal formulas without alleging or pointing to any Defendant-specific facts.  ECF No. 118, p. 38.

17

Fourth, Plaintiffs fail to explain how their injuries were incurred "as a result of" an "intentional act [of Nordean's] that demonstrates [his] prejudice based on the actual or perceived . . . political affiliation of a victim." D.C. Code § 22-3704(a).  Plaintiffs claim that if they were injured "as a result of" a "bias-motivated crime," they have a well-pleaded BRCA cause of action.  ECF No. 118, p. 44.  But simply stating this legal conclusion is not to allege sufficient facts to plead the claim properly.  Even if Nordean committed a "bias-motivated crime" (he did not), that need not plausibly imply that the unidentified assailants of Plaintiffs committed their acts with any causal connection to Nordean's alleged conduct.  Because Plaintiffs have not pleaded any such facts, they have not stated a BRCA claim.

### B.       The battery, assault and negligence counts fail to state claims

Plaintiffs say the Amended Complaint "easily satisfies the pleading requirements for [their] assault and battery claims." ECF No. 118, p. 44.  To the contrary, with these claims Plaintiffs' counsel "easily" skirt the boundary of court filings made in violation of Rule 11, assuming they have not clearly transgressed those rules outright.

Though Plaintiffs allege Nordean aided and abetted assault and battery of Plaintiffs, and conspired to commit those offenses, the Amended Complaint does not allege a single fact in support of those claims with respect to Nordean.  Am. Compl., ¶¶ 199-210.  Plaintiffs' attempts at justifying these claims are absurd.  Before January 6, Nordean and others "made widespread public statements instigating and encouraging violent obstruction of the democratic process." ECF No. 118, p. 46.  In fact, no alleged statement of Nordean's comes close to the definition of incitement, as he showed in his motion to dismiss.  *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (forbidding the proscription of advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite

or produce such action). If Nordean's pre-January 6 statements about "the spirit of 1776 . . . resurface[ing]" constitute aiding and abetting of *assault and battery*, by *unknown assailants, weeks and months after his comments were made*, Plaintiffs are proposing to make millions, or perhaps tens of millions, of Americans liable to them for their protected speech.  Similarly, "promoting the January 6 rally" is neither (1) an affirmative act in furtherance of assault and battery, nor (2) evidence of specific intent to facilitate the crimes of assault and battery. *Rosemond*, 572 U.S. at 71.

 The problem is not merely that Plaintiffs have failed to "identify the primary tortfeasors," as they suggest.  ECF No. 118, p. 46.  It is that, unlike in the assault and battery case on which they rely, the Amended Complaint does not even allege facts showing that Nordean and the unidentified "primary tortfeasors" had "'acted together in committing the crime.'" *Id.* (quoting *People v. Quiroz*, 215 Cal. App. 4th 65, 72 (Cal. Ct. App. 2013)).  The situation here is not that Plaintiffs have identified the right group of "several persons" involved in the crime, some of whom have not been identified. *Id.*   The problem is Plaintiffs have pleaded no facts showing any temporal, spatial or relationship-based connection between the "primary tortfeasors" and Nordean.

 Likewise, Plaintiffs point to no allegations at all showing that Nordean entered into a conspiratorial agreement to commit assault and battery of them.  ECF No. 118, p. 47.  Again, Plaintiffs misleadingly repeat the by-now-meaningless refrain that Nordean and others made agreements "related to the Attack on the Capitol and U.S. Capitol Police." *Id.*  They do this despite not citing a single fact showing that Nordean committed an act of violence or planned to commit such an act on January 6, directed toward the U.S. Capitol Police or anyone else.

 Finally, Plaintiffs do nothing to rescue Count VI's faulty claim that Nordean breached a

a duty to act reasonably and conform to the standards of conduct set out in various criminal statutes. ECF No. 118, pp. 48-51.

**D.C. riot statute.**  Plaintiffs cite no authority holding that the D.C. riot statute, D.C. Code § 22-1322, "establishes a duty of care for the purposes of negligence *per se*."  The very fact that the argument has never been successfully made with respect to a very old criminal statute shows that it is baseless.  In any case, as explained above, the complaint does not even conclusorily allege that Nordean engaged in, or incited or urged others to engage in, a "riot" "willfully," much less facts substantiating that he undertook any alleged riotous acts with knowledge of their illegality.  Thus, it has not even alleged that Nordean has satisfied the elements of the offense.

**Violence on Capitol grounds**.  Two statutes prohibit "willfully and knowingly . . . engag[ing] in any act of physical violence" on U.S. Capitol grounds.  D.C. Code § 10-503.16(b)(6); 40 U.S.C. § 5104(e)(2)(F).  Plaintiffs point to no facts in the complaint showing that Nordean committed any act of physical violence on January 6, nor does the federal government accuse him of such conduct.  Again, the complaint conclusorily states that Nordean "attacked the police officers guarding the Capitol, including Plaintiffs." Am. Compl., ¶ 215.  No facts are pleaded in support of this reckless allegation.

Plaintiffs' argument that rioting and violence-at-the-Capitol offenses may be satisfied under a negligence standard is incomprehensible to any criminal practitioner: by definition the offenses involve intentional violent conduct, not negligence.

**IV.**     **Insofar as they depend on Nordean's protected speech, expressive conduct, freedom of association, and right to petition the government, Counts I-VI must be dismissed**

Plaintiffs argue they do not "assert claims against Defendants because of their speech, but because of their conspiracies to violently attack Congress and the Capitol Police, [for] failing to

prevent such harms, knowingly and intentionally subjecting them to battery and assault, injuring them through intentional acts amounting to terrorism, rioting, and destruction of property, and as a result of their planning, executing, and participating in a violent mass attack on the Capitol." ECF No. 118, pp. 57-58.

As Plaintiffs' counsel almost certainly did not know when they filed their claims without performing adequate diligence but are slowly learning as they plow ahead with a lawsuit based entirely on criminal allegations and charges they do not understand and on sloppy reporting that no longer presumes innocence, virtually every part of Plaintiffs' aforementioned sentence is recklessly false and misleading.

As shown above and in Nordean's motion to dismiss, Plaintiffs do not possess a single piece of evidence showing that he violently attacked anyone on January 6, that he had a plan to do so, that he assaulted or battered anyone, or that destroyed a single piece of property.  Had Plaintiffs' counsel performed diligence before filing their claims, they would have learned that Nordean's conduct on January 6 is indistinguishable from that of hundreds of misdemeanants who entered the Capitol, walked around, and exited—and who have been mostly sentenced to probation.  Plaintiffs assumed they could safely rely on media reports alone to come to Court and allege that a person committed "intentional acts amounting to terrorism."  They are mistaken.

Counts I-VI do rest on Nordean's protected speech and assembly rights because the "facts" alleged in the complaint do not show "intentional acts amounting to terrorism" or "assault and battery" but instead political commentary and attendance at political assemblies, whether or not it meets the approval of Plaintiffs.  "Promoting rallies," Am. Compl., ¶ 79; posting political videos saying, "Democracy is dead? Well, then no peace for you. No democracy, no peace," *id.*, ¶ 93; creating an online crowdfunding campaign for "protective gear and communications," *id.*, ¶

98; marching toward the Capitol, calling out "1776," *id.*, ¶ 125.  These are unequivocally constitutionally protected activities.

Plaintiffs offer two responses: (1) the Supreme Court must not have meant what it said in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 889 (1982); and (2) the First Amendment does not "'prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent.'" ECF No. 118, p. 61 (quoting *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)).  Both are wrong.

Plaintiffs contend that "*Claiborne Hardware* predicates First Amendment protection on the absence of violence." ECF No. 118, p. 62.  As they know, that is precisely the opposite of the decision's meaning.  *Claiborne Hardware* held that assemblies mixed with violence do not lose constitutional protection simply because some portion of the assembled engaged in violence. 458 U.S. at 889.  Here, the heart of Plaintiffs' case rests on an inverted principle: they were "violently assaulted, spat on, tear-gassed, bear-sprayed, subjected to racial slurs, and epithets, and put in fear of their lives." ECF No. 118, p. 63.  Therefore, because Nordean was also present at the Capitol, his speech and assembly transformed from protected rights to criminal conspiracy. We know this is Plaintiffs' argument precisely because they allege no facts connecting the alleged assaults on them by members of a crowd of over 2,000 protesters to anything Nordean himself did or incited.  But even those who, perhaps like Nordean, make "threats of vilification," even those who go further and warn of "broken necks," do not lose constitutional protection for their speech simply because those with them in the assembly commit acts of violence.  *Claiborne Hardware*, 458 U.S. at 927.

Second, Nordean does not argue that he is "immunized from liability because [the alleged] conspiracies involved speech or because [his] speech provides evidence of [his]

participation in the unlawful activity claimed." ECF No. 118, p. 62.  To show that Plaintiffs are not merely proposing to make evidentiary use of speech to establish the elements of a crime or to prove motive or intent, consider *Mitchell*.  There, the defendant's sentence for aggravated battery was enhanced because he intentionally selected his victim on account of the victim's race.  508 U.S. at 479.  Mitchell argued that the statute was overbroad, as evidence of his prior speech or associations could be used to prove that he intentionally selected his victim on account of the victim's protected status.  *Id.* at 489.  The Court rejected this, finding that "evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials" to establish the elements of a crime or to prove motive or intent.  *Id.*

The differences here are several.  First, Plaintiffs' case is not "criminal." Second, Plaintiffs do not propose to make Nordean's protected speech and assembly evidence of some other tort—the Amended Complaint purports to make those things the torts themselves.  This the First Amendment does not allow, as the Court demonstrated in *Claiborne Hardware* with respect to NAAP member Charles Evers.  During a period of violent protest, Evers had made "threats of vilification" to the assembled group and intimated that "necks would be broken." 458 U.S. at 927.  The Court observed that multiple theories might have justified holding him liable for "the unlawful conduct of others," including incitement and giving "specific instructions to carry out violent acts or threats." *Id.*  But because Evers' speech did not constitute incitement under *Brandenburg*, it could not be used as the basis for holding him liable under any of the theories of liability. *Id.* at 929.

Here, Plaintiffs do not even argue that any part of Nordean's relevant speech constituted incitement under *Brandenburg*.  ECF No. 118, pp. 63-68 (arguing that Defendants Trump, Stone, and Straka committed incitement).  Accordingly, to the extent that Plaintiffs have properly

pleaded claims in Counts I-VI, they should be dismissed for resting wholly on Nordean's

protected speech, assembly and freedom of association rights.

**Conclusion**

For all of the foregoing reasons, Nordean requests that the Court dismiss Counts I – VI.

Dated: January 31, 2022                    Respectfully submitted,

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Ethan Nordean*

**<u>Certificate of Service</u>**

I hereby certify that on the 31st day of January 2022, I filed the foregoing motion with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following CM/ECF user(s):

Edward G. Caspar
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street, NW
Suite 900
Washington, DC 20005
202-662-8390
Email: ecaspar@lawyerscommittee.org

And I hereby certify that I have mailed the document by United States mail, first class

postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ Nicholas D. Smith
Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com