# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CONRAD SMITH *et al.*,

              Plaintiffs,

       v.

DONALD J. TRUMP *et al.*,

           Defendants.

Civil Action No. 1:21-cv-02265-APM

## DONALD J. TRUMP FOR PRESIDENT, INC. AND MAKE AMERICA GREAT AGAIN PAC'S BRIEF IN SUPPORT OF ASSERTED PRIVILEGES

Jesse R. Binnall, VA022
jesse@binnall.com

Jason C. Greaves, DC Bar No. 1033617
jason@binnall.com

Gerald A. Urbanek, Jr., VA191
gerald@binnall.com

Jared J. Roberts, *pro hac vice*
jared@binnall.com

BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
Tel:  (703) 888-1943
Fax: (703) 888-1930

*Counsel for Donald J. Trump for President, Inc., and
Make America Great Again PAC*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ..................................................................................................................1

ARGUMENT ...................................................................................................................... 3

I.    Communications between Campaign attorneys and the Senior Officials are
      protected by the attorney-client privilege and the work-product privilege. ........ 3

      a.    The use of senior White House officials as intermediaries between
            President Trump and the Campaign attorneys does not invalidate the
            attorney-client privilege or the work-product privilege. ............................. 3

      b.    The Freedom of Information Act does not lessen the expectation of
            privacy as it relates to privileged materials shared with White House
            staff. 8

II.   Communications between the Campaign and the RNC are protected by the
      common interest privilege as an extension of the work-product privilege and
      the attorney-client privilege. ................................................................................ 9

III.  A *de facto* attorney-client relationship existed between the Campaign and
      RNC attorneys and both entities. ........................................................................ 12

IV.   The documents at issue are so far afield of any relevant issue that Plaintiffs'
      untimely pursuit of them is a disproportional burden to the Campaign
      Defendants. ........................................................................................................ 14

CONCLUSION ................................................................................................................. 15

CERTIFICATE OF SERVICE .......................................................................................... 16

## TABLE OF AUTHORITIES

### Cases

*Animal Welfare Inst. v. Nat'l Oceanic & Atmospheric Admin.,*
  370 F. Supp. 3d 116, 133 (D.D.C. 2019) ....................................................................... 10

*Baylor v. Mitchell Rubenstein & Assocs., P.C.,*
  130 F. Supp. 3d 326, 330 (D.D.C. 2015), *aff'd*, 857 F.3d 939 (D.C. Cir. 2017) ............. 4

*Bowles v. Nat'l Ass'n of Home Builders,*
  224 F.R.D. 246, 252 n.7 (D.D.C. 2004) ........................................................................... 9

*Colorado Republican Fed. Campaign Comm. v. Fed. Election Comm'n,*
  518 U.S. 604, 630, 116 S (1996)...................................................................................... 10

*Council on Am.-Islamic Rels. - Connecticut v. U.S. Citizenship & Immigr. Servs.,*
  669 F. Supp. 3d 64, 76 (D. Conn. 2023) ......................................................................... 8

*Director, Office of Thrift Supervision v. Vinson & Elkins LLP et al.,*
  124 F.3d 1304, 1307 (D.C. Cir. 1997)............................................................................... 4

*Donovan v. Teamsters Union Loc. 25, Int'l Bhd. of Teamsters, Chauffeurs,
  Warehousemen & Helpers of Am.,*
  103 F.R.D. 550, 551 (D. Mass. 1984)............................................................................. 12

*Georgia v. United States Dep't of Just.,*
  657 F. Supp. 3d 1, 18 (D.D.C. 2023) ............................................................................... 9

*Holland v. Island Creek Corp.,*
  885 F. Supp. 4, 6 (D.D.C. 1995) ...................................................................................... 9

*In re Lindsey,*
  158 F.3d 1263, 1279 (D.C. Cir. 1998)........................................................................... 4, 6

*In re Sealed Case,*
  121 F.3d 729, 752 (D.C. Cir. 1997) .............................................................................. 8, 9

*In re Sealed Case,*
  146 F.3d 881, 884 (D.C.Cir.1998) .................................................................................... 5

*In re Sealed Case,*
  676 F.2d 793, 807 (D.C. Cir. 1982) ................................................................................. 5

*Intex Recreation Corp. v. Team Worldwide Corp.*,
   471 F. Supp. 2d 11, 16 (D.D.C. 2007)................................................................ 10

*Jones v. United States*,
   828 A.2d 169, 175 (D.C. 2003) ......................................................................12

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*,
   736 F. Supp. 2d 202, 209 (D.D.C. 2010)............................................................ 5

*Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*,
   5 F.3d 1508, 1514 (D.C. Cir. 1993)................................................................... 4

*Martin v. Off. of Special Couns., Merit Sys. Prot. Bd.*,
   819 F.2d 1181, 1185 (D.C. Cir. 1987)............................................................... 8

*Minebea Co. v. Papst*,
   228 F.R.D. 13, 16 (D.D.C. 2005) ................................................................... 10

*N.L.R.B. v. Jackson Hosp. Corp.*,
   257 F.R.D. 302, 312 (D.D.C. 2009) ..............................................................9, 12

*Trs. of Elec. Workers Loc. No. 26 Pension Tr. Fund v. Tr. Fund Advisors, Inc.*,
   266 F.R.D. 1, 14–15 (D.D.C. 2010) ................................................................. 5

*United States ex rel. Barko v. Halliburton Co.*,
   74 F. Supp. 3d 183, 187 (D.D.C. 2014) ............................................................. 4

*United States v. Adlman*,
   134 F.3d 1194, 1195 (2d Cir. 1998) ................................................................. 5

*United States v. Am. Tel. & Tel. Co.*,
   642 F.2d 1285, 1299 (D.C. Cir. 1980)............................................................. 10

*United States v. Deloitte LLP*,
   610 F.3d 129, 137 (D.C. Cir. 2010) .................................................................. 5

*United States v. ISS Marine Servs., Inc.*,
   905 F. Supp. 2d 121, 133 (D.D.C. 2012) ........................................................ 4, 5

*Upjohn Co. v. United States*,
   449 U.S. 383, 390 (1981)................................................................................ 4

**Statutes**

5 U.S.C. § 2105(a)(1)(A) ................................................................................. 6

iii

5 U.S.C. § 552(b)(5) ................................................................................................................. 8

5 U.S.C. § 7323(a) ................................................................................................................... 6

**Rules**

Fed. R. Civ. P. 26(b)(3) ........................................................................................................... 5

Fed. Rules Evid. 502 ............................................................................................................... 5

**BACKGROUND**

On July 28, 2025, this Court heard arguments related to a privilege dispute between Donald J. Trump for President, Inc. and Make America Great Again PAC (collectively the "Campaign") and Plaintiffs. Ultimately, the Court requested briefing on the legal issues raised.

On March 14, 2023, the Campaign served Plaintiffs with objections to document requests and supplemented those objections and responses on April 20, 2023. Ex. 1. After extensive searches and *significant expenses* incurred by the Campaign to review roughly 400,000 documents, the Campaign produced 84,424 documents.

On March 6, 2025, the Campaign served Plaintiffs with their privilege log. On April 16, 2025, Plaintiffs contested several categories of withheld documents, including: (1) communications between attorneys for the Campaign and senior members of White House staff, in addition to their immediate subordinates—amounting to 79 withheld documents—and (2) communications between attorneys for the Campaign, attorneys for the Republican National Committee ("RNC"), and non-attorney employees of both entities—254 withheld documents. Ex. 2.

On May 7, 2025, the Campaign responded to Plaintiffs' letter explaining the legal basis for withholding these categories of documents and agreeing to conduct an additional review for any documents which could reasonably be produced. Ex. 3. On July 18, 2025, the Campaign provided their updated privilege log (Ex. 4), finding only one document to be non-privileged, and confirming the parties had reached an impasse as to the remainder.

As to the first contested category, those senior White House officials included: Eric Herschmann (Senior Advisor to the President and Executive Assistant to the President),

Mark Meadows (Chief of Staff to the President), Molly A. Michael (Deputy Assistant to the President and Executive Assistant to the President), Jared Kushner (Senior Advisor to the President), Brian T. Jack (White House Director of Political Affairs), Hope Hicks (Counselor to the President), Stephen Miller (Senior Advisor to the President), and Marc Short (Chief of Staff to the Vice President) (collectively the "Senior Officials"). Each of these individuals, as members of the President's immediate staff, served as commissioned officers and were permitted under the Hatch Act to engage in the political affairs of the President, in addition to their official duties as members of White House Staff. For example, Brian Jack served as the White House Director of *Political Affairs*. Indeed, not only were the Senior Officials permitted to engage in political activities related to the President, but they worked directly for the Campaign from time to time in various roles.

As to the second category, the RNC was intimately involved in the business of the Campaign and assisted in the election efforts of President Trump as the Republican nominee. Indeed, the election of the Republican presidential nominee is the RNC's raison d'être. Over the course of the 2020 presidential election, RNC attorneys worked with Campaign attorneys to review fundraising mailers for FEC compliance, assist in the drafting, review, and filing of post-election lawsuits, and generate work product in consideration of ongoing and anticipated litigation. Exs. 7 and 8. For this, the Campaign and the RNC entered into joint-representation agreements with multiple law firms, in addition to an explicit common interest agreement amongst themselves to advance the reelection prospects of President Trump to a second term and to cooperate in resolving ongoing or anticipated legal challenges against those efforts. Exs. 5 and 6. Additionally, in many instances, the RNC and the state-level Republican party did not just share a common interest with the Campaign but were effectively jointly represented by the

Campaign's lawyers as co-parties or substitute parties in litigation. Therefore, RNC employees were in a *de facto* attorney-client relationship when communicating with Campaign counsel regarding these matters.

## ARGUMENT

### I.    Communications between Campaign attorneys and the Senior Officials are protected by the attorney-client privilege and the work-product privilege.

Plaintiffs contend that neither the attorney-client privilege nor the work-product privilege apply to communications between Campaign attorneys and the Senior Officials under two theories. First, Plaintiffs argue Senior Officials were legally prohibited from engaging in campaign activity, were not employees or agents of the Campaign, and did not share a common legal interest with the Campaign sufficient to benefit from an extension of the attorney-client privilege. Second, Plaintiffs contend that because the Senior Officials were subject to the Freedom of Information Act that no reasonable expectation of privacy existed, and therefore any disclosure to these officials constituted a waiver. Plaintiffs are incorrect on both accounts, and their arguments fundamentally misstate both the relevant law and the relevant facts.

#### a.    The use of senior White House officials as intermediaries between President Trump and the Campaign attorneys does not invalidate the attorney-client privilege or the work-product privilege.

It is well established that the attorney-client privilege is not invalidated when disclosed to agents of the client, agents of the attorney, or both. "Maryland and the District of Columbia recognize that the attorney-client privilege protects communications not only between a client and an attorney, but also between their agents." *Baylor v. Mitchell*

*Rubenstein & Assocs., P.C.*, 130 F. Supp. 3d 326, 330 (D.D.C. 2015), *aff'd*, 857 F.3d 939 (D.C. Cir. 2017). "In general, the attorney-client privilege shelters confidential communications between an attorney and client, including their agents, made with a primary purpose of seeking or providing legal advice." *United States ex rel. Barko v. Halliburton Co.*, 74 F. Supp. 3d 183, 187 (D.D.C. 2014). "A 'primary purpose' is defined as 'one of the significant purposes' of the communication." *Id.*

"In considering whether a client's communication with his or her lawyer through an agent is privileged under the intermediary doctrine, the 'critical factor' is 'that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.'" *Baylor*, 130 F. Supp. 330 (citing *In re Lindsey*, 158 F.3d 1263, 1279 (D.C. Cir. 1998), quoting *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993)). The attorney-client "privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981). And "[a] lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system." *Id.* at 391.

As for the work-product privilege, that privilege protects materials prepared in consideration of ongoing or anticipated litigation which "contains an attorney's opinions, mental impressions, or legal theories prepared in anticipation of litigation" and is "virtually undiscoverable." *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 133 (D.D.C. 2012) (quoting *Director, Office of Thrift Supervision v. Vinson & Elkins LLP et al.*, 124 F.3d 1304, 1307 (D.C. Cir. 1997)). A lesser, although equally valid protection extends to materials which merely contain "relevant and nonprivileged facts," and an

adverse party can only obtain such work product "upon a showing of substantial need for the materials and an undue hardship." *ISS Marine Servs., Inc.*, 905 F. Supp. 2d at 133 (quoting *Director, Office of Thrift Supervision*, 124 F.3d at 1307). In determining whether the work-product privilege is applicable, the D.C. Circuit applies the "because of" test, asking "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* at 133–34 (citing *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C.Cir.1998)).

In consideration of the more lenient "because of" test, "material generated in anticipation of litigation may also be used for ordinary business purposes without losing its protected status." *Id.* at 134 (citing *Deloitte*, 610 F.3d at 138; see also *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998)). This privilege is also not limited solely to materials generated by attorneys and "work product created by non-attorneys can also be protected if it is 'so intertwined with the legal analysis as to warrant protection.'" *Id.* (citing *Deloitte*, 610 F.3d at 139; see also *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 209 (D.D.C. 2010)). Finally, unlike the attorney-client privilege, the work-product privilege "is not forfeited by disclosure of the privileged information to a third-party," but is only forfeited when the disclosure is made "to a party who is an adversary or does not have a common interest with the party claiming the privilege." *Trs. of Elec. Workers Loc. No. 26 Pension Tr. Fund v. Tr. Fund Advisors, Inc.*, 266 F.R.D. 1, 14–15 (D.D.C. 2010) (citing *In re Sealed Case*, 676 F.2d 793, 807 (D.C. Cir. 1982); Fed. R. Civ. P. 26(b)(3); Fed. Rules Evid. 502)).

It is furthermore axiomatic that the President of the United States has many obligations, and this fact limits his ability to communicate directly with the multitude of

individuals that require his attention, including his own attorneys. In determining under what circumstances the President may use his staff as intermediaries between himself and his attorneys, this District has adopted a policy of deference:

> When the client is the President, the standard of "reasonable necessity" must accommodate the unavoidable, virtually full-time demands of the office. Moreover, the court would be remiss not to heed the Supreme Court's instructions in *Clinton v. Jones*, that "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding," and that there is a tradition of federal courts' affording "the utmost deference to Presidential responsibilities." In light of these considerations, we decline to second-guess the President's decision to use Lindsey as an intermediary in order to avoid undue disruptions to the President's ability to carry out his official responsibilities. So viewed, the designation of Lindsey as an intermediary was at least reasonably necessary and, thus, while acting in this capacity his communications came within the President's personal attorney-client privilege.

*In re Lindsey*, 158 F.3d 1263, 1280 (D.C. Cir. 1998) (cleaned up, internal citations removed).

Plaintiffs' first argument fails because their assertion that senior White House officials are prohibited from engaging in political activity under the Hatch Act is simply wrong. Rather, the Hatch Act, codified under 5 U.S.C. §§ 7321–26, explicitly authorizes "employees" to engage in political activities ("Subject to the provisions of subsection (b), an employee may take an active part in political management or in political campaigns." 5 U.S.C. § 7323(a)). An "employee" is defined, in part, as "an officer and an individual who is [] appointed in the civil service by . . . the President." 5 U.S.C. § 2105(a)(1)(A). As relevant to the present analysis, the Senior Officials were directly appointed by President Trump and were thus permitted to engage in overt political and campaign activities, which they frequently undertook, provided those activities were properly segregated from their official duties.

6

Plaintiffs' contention that none of the Senior Officials were employees or agents of the Campaign is equally misplaced, as President Trump was an actual client of the Campaign attorneys, in his capacity as a candidate, and the Senior Officials privy to these conversations were direct agents of the President who assisted him in both his official and political functions, including obtaining legal advice from his attorneys. Thus, the relevant inquiry is not whether the identified officials were agents of the Campaign, but rather whether disclosure of attorney-client information to intermediary agents of the client invalidates the attorney-client privilege. Finally, it is incorrect that the Senior Officials lacked a common interest with the Campaign attorneys, as both actively worked towards the goal of reelecting President Trump and ensuring that his campaign was successful in both legal and non-legal matters.

As it relates to documents shared between attorneys for the Campaign and the Senior Officials, the documents were withheld based on either the attorney-client privilege, the work-product privilege, or both, as those documents either directly sought legal advice or transmitted work-product among parties with a shared common interest in consideration of ongoing or anticipated litigation. Furthermore, at no point were any such documents shared with adverse parties or outside the zone of privilege.

Plaintiffs have thus failed to demonstrate any fact or applicable authority which invalidates the privileges asserted. To wit: (1) President Trump was entitled to choose which of his agents to designate as intermediaries between himself and his Campaign attorneys for the purposes of obtaining legal advice; (2) the Senior Officials were legally engaging in political activities; (3) the Senior Officials shared a common interest with the Campaign in their mutual efforts to aid in President Trump's reelection, to ensure that those reelection efforts complied with applicable law, and in litigation furthering those

efforts; and (4) there is no evidence that any work product was disclosed in such a manner as to make it available to adverse parties or outside the zone of privilege.

> **b.    The Freedom of Information Act does not lessen the expectation of privacy as it relates to privileged materials shared with White House staff.**

Plaintiffs' second argument, relating to discoverability under FOIA, also fails because privileged materials are exempt from disclosure under FOIA. FOIA Exemption (b)(5) covers "agency communications with an outside consultant or other outside person" and includes "confidential communications between an attorney and the attorney's client where legal advice is sought or provided." 5 U.S.C. § 552(b)(5). Furthermore, the D.C. Circuit has interpreted FOIA Exemption (b)(5) to incorporate "all" "civil discovery rules," which necessarily prevents the discoverability of both attorney-client communications and work product documents. *Martin v. Off. of Special Couns., Merit Sys. Prot. Bd.*, 819 F.2d 1181, 1185 (D.C. Cir. 1987). Here, the communications involving attorneys from the Campaign are protected from disclosure under FOIA Exemption (b)(5) not only by the attorney-client privilege and the work-product privilege, as previously shown, but also pursuant to the presidential communications privilege.[1]

The presidential communications privilege extends to communications authored, solicited, and received by not only the President, but also his immediate advisors and

---

[1] Furthermore, the Presidential Records Act of 1978 codified under 44 U.S.C. Ch. 22 §§ 2201-2209, specifically restricts public access to "presidential records" for a period of 5 to 12 years, which prevents disclosure under FOIA. (44 U.S.C. Ch. 22 § 2204).

members of their staff "who have broad and significant responsibility for investigating and formulating the advice to be given to the President on the particular matter to which the communications relate." *Council on Am.-Islamic Rels. - Connecticut v. U.S. Citizenship & Immigr. Servs.*, 669 F. Supp. 3d 64, 76 (D. Conn. 2023) (quoting *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997)). Furthermore, "[g]iven the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (emphasis added).

Although the Campaign is not asserting in this litigation either the Executive Privilege, or its sub-privilege, the Presidential Communications Privilege, it is nevertheless undeniable that the subject communications would not be discoverable under FOIA. Because Plaintiffs' argument rests on the false assertion that the expectation of confidentiality was diminished due to FOIA, the fact that such communications were exempt from FOIA disclosure dooms the argument.

## II.    Communications between the Campaign and the RNC are protected by the common interest privilege as an extension of the work-product privilege and the attorney-client privilege.

"Under the common interest rule, individuals may share information without waiving the attorney-client privilege if: (1) the disclosure is made due to actual or anticipated litigation; (2) for the purpose of furthering a common interest; and (3) the disclosure is made in a manner not inconsistent with maintaining confidentiality against adverse parties." *N.L.R.B. v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 312 (D.D.C. 2009) (quoting *Holland v. Island Creek Corp.*, 885 F. Supp. 4, 6 (D.D.C. 1995)). For the doctrine

to apply, a party "must show that the withheld communications (1) satisfy the traditional requirements of the applicable privilege, and (2) were disclosed based upon a common legal interest and under an agreement to pursue a joint defense." *Georgia v. United States Dep't of Just.*, 657 F. Supp. 3d 1, 18 (D.D.C. 2023).

Though the common interest doctrine is not "limited to co-parties," it is stringent, and the doctrine requires "a strong identity of interests." *Id.* at 20 (quoting *Bowles v. Nat'l Ass'n of Home Builders*, 224 F.R.D. 246, 252 n.7 (D.D.C. 2004)). As explained by the court, "the parties must 'anticipate litigation against a common adversary on the same issue or issues.'" *Georgia*, 657 F. Supp. 3d at 20 (quoting *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980)). Additionally, the rule applies not only to communications subject to the attorney-client privilege, but also to communications and documents protected by the work product doctrine. *Intex Recreation Corp. v. Team Worldwide Corp.*, 471 F. Supp. 2d 11, 16 (D.D.C. 2007).

"A party which relies on the joint defense privilege or common interest doctrine must establish that 'the parties had agreed to pursue a joint defense strategy.'" *Id.* (quoting *Minebea Co. v. Papst*, 228 F.R.D. 13, 16 (D.D.C. 2005)). "A written agreement is the most effective method of establishing the existence of a common interest agreement, although an oral agreement whose existence, terms and scope are proved by the party asserting it, may provide a basis for the requisite showing." *Id.* (citing *Minebea*, 228 F.R.D. at 16). Furthermore, when two parties "have a substantial identity of legal interest in a particular matter," the attorneys for each party can be treated as representing both parties jointly. *Animal Welfare Inst. v. Nat'l Oceanic & Atmospheric Admin.*, 370 F. Supp. 3d 116, 133 (D.D.C. 2019).

A political party's form of organization and its fate in an election "is inextricably intertwined with that of its candidates." *Colorado Republican Fed. Campaign Comm. v. Fed. Election Comm'n,* 518 U.S. 604, 630, 116 S (1996). The RNC and state-level Republican Party Affiliates were acting with the common purpose of both the Campaign and of President Donald J. Trump: to reelect him as President. Toward this purpose, they often acted as surrogates, agents, consultants, and volunteers of the Campaign, and their officials were the functional equivalents of employees. Throughout the course of the 2020 presidential election, the Campaign and the RNC coordinated legal strategies, assisted each other in the drafting and filing of legal pleadings, maintained a strong identity of interests through their joint efforts to further the reelection of President Trump, adopted an explicit agreement to coordinate these efforts, and maintained the zone of privilege. Exs. 6, 7, and 8. Moreover, counsel has conferred with the RNC Chief Counsel from the 2020 election cycle, who confirmed that the Campaign and the RNC had an agreement to confidentially share privileged information based on their common interests.

The Campaign and the RNC also executed dozens of tripartite legal agreements with numerous law firms to pursue litigation related to the 2020 presidential election and shared in the legal expenses related to these firms. Exs. 5 and 6. Moreover, employees of the Campaign routinely sought and obtained legal advice from attorneys for the RNC, and vice versa. Exs. 7 and 8. Prior to election day, the Campaign and the RNC jointly identified areas of potential litigation and considered strategies to address these concerns. Exs. 7 and 8. After election day, the Campaign and the RNC jointly authored and reviewed legal work product and assisted each other in the filing of lawsuits. Exs. 7 and 8. The documents identified on the Campaign Defendant's privilege log consist of such materials. Ex. 4.

Applying the elements of the common interest privilege to the disputed documents, the elements necessary to assert the privilege are met. First, the Campaign was created for the sole purpose of reelecting President Trump, and Donald Trump was the RNC's presidential nominee. In this light, both the Campaign and the RNC shared the identical interest, *i.e.* the election of Donald Trump as President of the United States. Second, the documents on the Campaign's privilege log were created in consideration of anticipated or ongoing litigation, whether for the purpose of preventing potential lawsuits against the Campaign and the RNC or to file post-election lawsuits to challenge election irregularities and vote counts. Considering the nature of the post-election lawsuits, the Campaign and the RNC were adverse to the same parties in their efforts to serve President Trump's reelection efforts and in consideration of the single issue being pursued.

Third, at no point in time were the contested communications shared outside the zone of privilege and were not disclosed in a manner inconsistent with maintaining confidentiality against adverse parties. Fourth, the identified documents satisfied the traditional elements of both the attorney-client privilege and the work-product privilege and either sought direct legal advice from an attorney or, as previously identified, were drafted in consideration of anticipated or ongoing litigation. Finally, the documents were disclosed between the Campaign and the RNC pursuant to an explicit agreement to cooperate on the aforementioned legal matters.

### III.    A *de facto* attorney-client relationship existed between the Campaign and RNC attorneys and both entities.

"It is well settled that 'the relationship between attorney and client hinges on the client's intention to seek legal advice and his belief that he is consulting an attorney.'" *N.L.R.B. v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 312 (D.D.C. 2009) (citing *Jones v.*

*United States*, 828 A.2d 169, 175 (D.C. 2003)). "The de facto attorney-client privilege applies in situations where there is no actual attorney-client relationship, but one entity is acting like the other entity's attorney." *Id.* at 311. In one such case referenced by the court in *N.L.R.B.*, the United States District Court for the District of Massachusetts determined that a *de facto* attorney client relationship existed when considering both the actions of the client throughout his communications with the purported attorney as well as the client's acceptance of the purported attorney as his counsel. *Id.* (citing *Donovan v. Teamsters Union Loc. 25, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 103 F.R.D. 550, 551 (D. Mass. 1984)). Courts must also consider whether a client believed it was seeking advice and whether the client's belief about the confidentiality of the conversation was reasonable. *Id.* at 312.

Even assuming the absence of an explicit agreement between the Campaign and the RNC to coordinate on ongoing or anticipated litigation, it is nevertheless evident that attorneys for the Campaign and attorneys for the RNC were engaged in an attorney client relationship with both entities. Exs. 7 and 8. As discussed above, employees for the Campaign and the RNC routinely communicated with Campaign and RNC attorneys to obtain legal advice, to generate legal work product, and to assist with the filing of pleadings, thus showing the existence of a *de facto* attorney client relationship through their course of conduct. Exs. 7 and 8. In return, those employees received both legal advice and legal work product from both Campaign and RNC attorneys in the furtherance of a common legal interest. Exs. 6, 7, and 8. To the extent a *de facto* attorney-client relationship existed, the attorney-client privilege would be applicable to all documents generated in accordance with that relationship and for the purpose of rendering legal advice.

13

**IV.    The documents at issue are so far afield of any relevant issue that Plaintiffs' untimely pursuit of them is a disproportional burden to the Campaign Defendants.**

While Plaintiffs asserted at the hearing that relevance should not be considered in this privilege dispute, the Campaign Defendants' timely objections to disproportionality and relevance—not to mention overbreadth and undue burden—are a critical backdrop. *See* Ex. 1 (objections to Document Request Nos. 12–16). Plaintiffs have alleged that the Campaign conspired with Stop the Steal and Ali Alexander to deprive them of their civil rights on January 6, 2021. The Campaign has reviewed hundreds of thousands of documents and has produced over 80,000. Not a single document produced to date has shown any evidence of such a conspiracy.

The withheld communications with the White House that are at issue are discussions between White House officials, many of whom were dual-hatted within the Campaign, and Campaign attorneys discussing litigation strategy or seeking legal advice and are not relevant to Plaintiffs' allegations of conspiracy found in their Amended Complaint. Similarly, the withheld communications with the RNC and state-level Republican Party officials all revolve around the legal challenges or prospective legal challenges to the election results in various states—utterly typical for the losing party in any national election—and also have *nothing* to do with the Plaintiffs' asserted allegations of conspiracy. Plaintiffs' motivation in this discovery dispute is not to obtain relevant documents to prove their case, but to continue their pretextual and politically motivated fishing expedition.

Moreover, to the extent that Plaintiffs seek to overcome the work product privilege for non-opinion work product based on a showing of substantial need, the fact that the disputed documents are irrelevant precludes any such showing.

## CONCLUSION

For the foregoing reasons, the Campaign Defendants believe that the work-product privilege, the attorney-client privilege, the common interest privilege extension, and the *de facto* attorney client privilege apply to the designated documents as stated on the privilege log (Ex. 4) and that Plaintiffs' insistence to review those documents as discoverable material should be denied.

Dated: August 12, 2025                          Respectfully submitted,

                                                /s/ Jesse R. Binnall
                                                Jesse R. Binnall, VA022
                                                Jason C. Greaves, DC Bar No. 1033617
                                                Gerald A Urbanek, Jr. VA191
                                                Jared J. Roberts, *pro hac vice*
                                                BINNALL LAW GROUP
                                                717 King Street, Suite 200
                                                Alexandria, Virginia 22314
                                                Tel:  (703) 888-1943
                                                Fax: (703) 888-1930
                                                jason@binnall.com
                                                jesse@binnall.com
                                                gerald@binnall.com
                                                jared@binnall.com

                                                *Counsel for Donald J. Trump for President, Inc., and Make America Great Again PAC*

**CERTIFICATE OF SERVICE**

I certify that on August 12, 2025, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ Jesse R. Binnall
Jesse R. Binnall, VA022
*Counsel for Donald J. Trump for*
*President, Inc., and Make America*
*Great Again PAC*
