**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CONRAD SMITH *et al.*,<br><br>     Plaintiffs,<br><br>   v.<br><br>DONALD J. TRUMP *et al.*,<br><br>     Defendants. | Civil Action No. 1:21-cv-02265-APM |

**JOINT STATUS REPORT**

Defendants Donald J. Trump for President Inc. and Make America Great Again PAC (collectively, the "Campaign"), believe that the parties are at an impasse regarding several outstanding discovery issues, summarized below.

Plaintiffs Conrad Smith, Danny McElroy, Governor Latson, Melissa Marshall, Michael Fortune, Jason DeRoche, and Reginald Cleveland ("Plaintiffs") have provided responses below. All of the Campaign's bevy of deficiency assertions are unfounded; for some, the Campaign has failed to meaningfully confer with Plaintiffs; and for one—AEO designations—the Campaign has attempted to circumvent procedures outlined in the Protective Order.

## I.  AEO Designations

*Campaign Defendants' position:*

After multiple rounds of attempting to resolve this issue, Plaintiffs continue to abuse and over-designate material as AEO, and then demand that the Campaign provide justifications on why their improperly designated material needs to be seen by our clients, who they chose to sue. Plaintiffs get this exactly backwards. The designating party, who is

required to have a reasonable and good faith belief in asserting the designation (ECF No. 223, ¶ 1)—bears the burden of justifying their AEO designations. *See In re ULLICO Inc. Litigation*, 237 F.R.D. 314, 318 (D.D.D. 2006).

The Campaign's obligation under the protective order is to assert its objections through notices of objection, which it has done, in detailed fashion. In large part, Plaintiff's designations are entirely outside the bounds of the Protective Order (ECF No. 223), and wouldn't even qualify as Confidential. To the extent that some of the designated material might qualify as Confidential under the Protective Order, the Campaign has specifically noted where Plaintiffs have no reasonable or good faith belief that Confidential designation is inadequate. In response, Plaintiffs continue to demand explanations and justifications for why the Campaign would need to see their designated AEO information and makes outlandish accusations about the potential for retaliation by President Donald J. Trump if they are redesignated as merely Confidential. Again, this is an improper attempt to flip the burden for justifying Plaintiffs' AEO designations.

And while it is not the Campaign's obligation to justify why Plaintiff should not be abusing AEO designations, at a general level, AEO and confidentiality designations increase the costs of litigation. They require special procedures for filing material as exhibits with the court and create problems when material is needed in a summary judgment motion. They require special procedures to prevent violations of the protective order. And they hamper counsel's ability to effectively communicate with their clients about the status of the case and the strengths or weaknesses of claims or defenses.

At a more specific level, just to highlight one of the most egregious examples, Plaintiffs have improperly designated *pages* of their own deposition testimony as AEO

with the listed justification of "[d]escription of mental health injuries." The Plaintiffs' mental health and treatment is a *central* issue in this case, placed into issue by the Plaintiffs who are claiming mental health injuries. The attempt to designate this kind of evidence as AEO is blatant abuse of the protective order and the discovery process. Other ridiculous AEO designations include descriptions of injuries, treatment plans, medical conditions, and mental health treatment, names of medical provider and medications, "[s]ensitive medical information," names of *witnesses*,[1] social media handles used by Plaintiffs, and financial information including income and employment. This is not an exhaustive list. The Campaign cannot be properly counseled in this case if it is not even permitted to know the nature of the Plaintiffs' injuries, their treatment, or even the names of potential witnesses.

And Plaintiffs' rampant abuse of the AEO designation continues. Just 12 days ago, in response to interrogatories sent by Defendant Rehl, asking who referred Plaintiffs to the Lawyers Committee for Civil Rights Under Law, the date they were retained, and whether Plaintiffs communicated with Open Society Foundations, the Plaintiffs designated their answers as AEO. These answers would not even qualify as Confidential. This is inexcusable, and it must end.

---

[1] This is a particularly troublesome sleight of hand. Plaintiffs repeatedly describe potential witnesses identified in deposition as "third parties" as if they are protecting some unrelated person's privacy. These so-called third parties include Capitol Police officers who gave orders during and were present for the events of January 6, as well as the person who "connected [Plaintiff Smith] to attorneys."

_Plaintiffs' Position:_

Plaintiffs have spent significant time and resources responding to the Campaign's designation concerns, including providing multiple rounds of designations and re-designations, even though the Campaign has yet to explain why it needs to provide information like the names of Plaintiffs' medical providers and Plaintiffs' social media handles to its clients, and even though Plaintiffs have expressed significant and valid reasons why designated material should remain AEO. Apparently dissatisfied with this agreed-upon process, the Campaign has attempted to create its own shortcut through a direct appeal to the Court—such that it would not have to provide Notices of Objection, note specifically which discovery it believes should not be designated material, or confer with Plaintiffs to attempt to resolve this issue without judicial intervention. The Court should reject the Campaign's attempted end run around the Stipulated Protective Order.

The Stipulated Protective Order states that the parties may designate any Discovery Material as AEO "that the Designating Party reasonably and in good faith believes constitutes or discloses information that is of such a sensitive nature that its dissemination cannot adequately be protected by the Confidential Material designation." ¶ 1(b). This Court endorsed the use of AEO designations at the June 6, 2025 Discovery Hearing, stating that if there are privacy concerns, "you can always designate it as attorneys' eyes only." June 6, 2025 Discovery Hearing Tr. at 14:2–7; _see also id._ at 18:15–25 ("And if something is particularly sensitive, it needs attorneys' eyes only designation. . . . I assume there is some provision in [the Stipulated Protective Order] to that effect, and you can rely on it."). Pursuant to the Protective Order, the Producing Party may designate discovery material as AEO by affixing the phrase "ATTORNEYS' EYES ONLY" on each designated page. Protective Order ¶ 2(a). Another party may then challenge that

4

designation "by serving the Designating Party with a captioned notice of objection (a 'Notice of Objection'), which must identify with particularity the Discovery Material as to which the designation is challenged and state the basis for each challenge."  Protective Order ¶ 7(a).

The Campaign initially availed itself of this procedure after taking the depositions of four Plaintiffs in February and April 2025. Even though the Campaign agreed on the record at each deposition that each deposition transcript would be marked AEO or Confidential, the Campaign nonetheless subsequently requested specific AEO designations, and Plaintiffs agreed to provide them. Plaintiffs spent significant time and resources reviewing the deposition transcripts and making designations. In response, the Campaign served Notices of Objection, and after conferring with the Campaign, Plaintiffs again spent significant time and resources in another round of reviewing the same deposition transcripts to de-designate non-Confidential and non-AEO information.

The Campaign has not served any Notices of Objection since then. Instead, in this Joint Status Report, the Campaign raises blanket assertions regarding Plaintiffs' AEO designations in only general terms. If the Campaign has legitimate qualms about any of Plaintiffs' remaining AEO designations, it could have (and should have) provided Plaintiffs with additional Notices of Objection that identify, with specificity, the challenged portions and the reasons for its challenge, as required under the Stipulated Protective Order negotiated by the parties.  Indeed, the parties heavily negotiated the Stipulated Protective Order and the Campaign agreed to be bound by that procedure when it stipulated to it years ago. But the Campaign's latest attempt to run to the Court to raise a catch-all "over designation" grievance is neither supported by the Stipulated Protective Order, nor is it an efficient use of the Court's, or the parties', time and resources.

Moreover, the Campaign twists *its* obligation to "state the basis for each challenge" on its head. Protective Order ¶ 7(a). The Campaign has not provided a single valid reason to remove Plaintiffs' AEO designations, despite repeated requests from Plaintiffs for the Campaign to do so. It is not AEO designations that increase the cost of litigation, but rather the fight over them and the re-designations that the Campaign itself is perpetuating. The Campaign's protestations ring even more senseless in light of the fact that the Protective Order designates *all* material provided by President Trump in immunity proceedings as AEO. Conversely, the Campaign ignores Plaintiffs' legitimate, reasonable reasons for these designations—that there is a significant risk of harm to Plaintiffs if their sensitive documents are not designated AEO, as the history of this case has already demonstrated.

For example, a former defendant in this case posted the names, photographs, or contact information of Plaintiffs and their counsel to his nearly one million followers on the social media platform X, calling on his followers to "never forget who these people are and what they tried to do," and showing his followers excerpts of non-designated interrogatory responses.[2] Luckily, that individual defendant did not have access to Plaintiffs' private information—precisely because Plaintiffs have been taking these precautions by properly designating information pursuant to the Stipulated Protective Order.

This is not the only example. Another defendant in this case harassed Capitol Police officers for defending the Capitol and sharing their experiences with the public. *Enrique Tarrio follows and insults officers who defended US Capitol on January 6*, The

---

[2] https://x.com/BrandonStraka/status/1740107537201193005.

Guardian (Feb. 22, 2025).[3]  Moreover, there are examples of parties to this litigation improperly targeting individuals associated with cases were targeted for intimidation or retaliation.  *See, e.g.*, Feb. 25, 2020 Tweet from @realDonaldTrump (targeting juror)[4]; Matthew Loh, *A judge warned Trump about comments that could 'jeopardize the safety or well-being' of others. 6 hours later, he attacked the judge, the judge's wife, and the judge's daughter*, Business Insider (Apr. 4, 2023).[5]

Plaintiffs' concern about their safety is reasonable and tangible, and their AEO designations have been thoughtfully tailored to protect their legitimate privacy interests while providing the Campaign with the relevant information to which they are entitled. In contrast, the Campaign cannot articulate any legitimate reason why its client needs to see the material designated AEO, nor why Plaintiffs' designations are improper, and its attempt to end-run the Stipulated Protective Order should be rejected.

## II.  **Interrogatory No. 1, description of injuries.**

*Campaign Defendants' position:*

In response to one of the Campaign's most fundamental discovery requests— "Identify and describe all injuries, physical, psychological, or otherwise, that you allege to have suffered as a result of January 6, 2021, including whether you continue to suffer from that injury or when it resolved"—all seven Plaintiffs have asserted a bevy of boilerplate objections, none of which are remotely applicable. Subject to those improper objections—and an additional "objection" that this information "will not be known in full

---

[3] https://www.theguardian.com/us-news/2025/feb/22/enrique-tarrio-capitol-police.
[4] https://x.com/realDonaldTrump/status/1232395209125707776.
[5]        https://www.businessinsider.com/donald-trump-attack-judge-family-warned-jeopardize-safety-indictment-2023-4.

until after additional discovery is completed"—they have provided extremely similar, boilerplate, and *open-ended* answers, asserting mostly generic, unspecified injuries.

While there is some variation among the Plaintiffs' answers on which generic, unspecified injuries they recite, they all claim a subset of the following:

- "physical injury," from exposure to pollutants, or from "assault" by rioters

- "exhaustion and soreness"

- "emotional injuries"

- "heightened stress and anxiety"

- "post-traumatic stress"

- "economic injuries"

- "lost income"

- "lost and reduced economic opportunity"

Many of these answers include no details on the extent of these injuries. For example, none make any attempt to quantify their lost income. All Plaintiffs include an open-ended statement that "[t]he full and continuing effects of the harm caused by the Defendants will be the subject of further evidence in this case."

The Campaign is entitled to know the specific nature and detailed descriptions of each injury claimed by each Plaintiff, without having to wonder or speculate as to what is meant by a physical, emotional, or economic injury, or whether Plaintiffs require "additional discovery" to understand the "full and continuing effects" of their own supposed injuries. Plaintiffs thus far refuse to supplement these answers.

*Plaintiffs' position:*

Plaintiffs have provided complete, detailed answers to the Campaign's Interrogatory 1. Tellingly, the Campaign fails to identify any aspect of the interrogatory to which Plaintiffs have not responded. Indeed, the Campaign accuses Plaintiffs of failing to provide information that is not called for in the interrogatory, including information that the Campaign can ask about—and has asked about—in Plaintiffs' depositions.

The Campaign's First Interrogatory states, "Identify and describe all injuries, physical, psychological, or otherwise, that you allege to have suffered as a result of January 6, 2021, including whether you continue to suffer from that injury or when it resolved."

Plaintiffs provided complete, detailed answers in response. As just one example, Plaintiff Jason DeRoche's response states:

> I suffered physical injury when I was assaulted by attackers and from exposure to noxious pepper spray, bear spray, fire extinguishers, and other pollutants sprayed by attackers, and emotional injuries including, but not limited to, post-traumatic stress and heightened stress and anxiety. My left forearm and thumb were sprained in the course of the attack. Those injuries healed within a week after January 6, 2021. In addition, my entire body was sore and exhausted from trying to fend off the attack over the course of several hours. That soreness was resolved within two to three days. The exhaustion took months to resolve. My skin burned from the pepper spray that an attacker sprayed on my face and from bear spray that an attacker dowsed my body with from my chest to my knees. This burning sensation lasted for three to four days following the January 6, 2021 attack. My eyes were severely irritated and my vision compromised from the pepper spray, bear spray and other pollutants sprayed by attackers both inside and outside of the building. The irritation to my eyes and compromised vision resolved within a day following the January 6, 2021 attack. My emotional injuries, including posttraumatic stress, last to this day and

> continue to affect my life and my ability to work. I also suffered economic injuries from health care and other costs imposed on me as a result of the Defendants' conduct and the other injuries I experienced, as well as lost and reduced economic opportunity. The full and continuing effects of the harm caused by the Defendants will be the subject of further evidence in this case.

The Campaign fails to offer a coherent explanation as to how this response is deficient. Rather, the Campaign's alleged deficiencies are no more than an attempt to obtain information it did not ask for in its interrogatory. For example, the Campaign has claimed Plaintiffs were deficient for failing to provide details like who sprayed chemical irritants against Plaintiffs; how Plaintiffs' injuries occurred; and how Defendants were responsible for those injuries. It has also claimed that this interrogatory calls for Plaintiffs to provide "a total sum of damages" and to "quantify their lost income." None of these requests are in the interrogatory itself. The request does not even mention the word "damages."[6]

Finally, the Campaign's assertions that it is unaware of Plaintiffs' injuries are disingenuous. The Campaign already deposed four Plaintiffs and questioned them extensively regarding their injuries, as it will surely do with the remaining three Plaintiffs.

---

[6] In addition, "'when the specific compensatory damages sought are intangible damages such as pain and suffering, mental anguish, or loss of consortium, no "monetary amount need be set forth." *Dickerson v. D.C.*, No. CV 09-2213 (PLF), 2019 WL 6910043, at *3 (D.D.C. Dec. 19, 2019) (quotations omitted); *see also, e.g., Williams v. Trader Publishing Co.*, 218 F.3d 481, 486 n.3 (5th Cir. 2000) ("Since compensatory damages for emotional distress are necessarily vague and are generally considered a fact issue for the jury, they may not be amenable to the kind of calculation disclosure contemplated by Rule 26(a)(1)(C)."); *Gray v. Florida Dept. of Juvenile Justice*, 2007 WL 295514, at *2 (M.D. Fla. 2007) (holding plaintiff "is not required to provide Defendant with a calculation of her suggested compensatory damages for emotional distress" where plaintiff does not intend to "suggest to the jury a suggested amount of compensatory damages for her emotional distress").

*See, e.g.*, *Klugel v. Clough*, 252 F.R.D. 53 (D.D.C. 2008) (noting defendants' assertion that they had "received no evidence pertaining to the nature and severity of plaintiff's alleged mental distress" was "disingenuous" because "Defendants deposed Plaintiff and asked her about her condition" (alterations and citations omitted)).

### III.    USCP devices and emails

*Campaign Defendants' position:*

Plaintiffs maintain the position that they are under no obligation to search or ensure the preservation of their communications on work phones and emails related to January 6. The Campaign has repeatedly asked for confirmation on whether such emails have been searched or preserved and what actions were taken to search or preserve those records. Plaintiffs respond with non-sequitur answers that they cannot *produce* USCP records, without addressing their obligations to search for or ensure preservations of responsive documents. Plaintiffs were under a duty to take reasonable steps to preserve potentially relevant ESI—such as by written litigation hold letter—the moment they anticipated litigation, or at the very least, the date they filed the lawsuit. *Borum v. Brentwood Village, LLC*, 332 F.R.D. 38, 45 (D.D.C. 2019).

And while Plaintiffs may not "control" USCP communications such that they can produce them in discovery without authorization, nothing prevents them from searching their own devices, and as agency employees, they are sufficiently in "control" of their own communications that they are responsible for taking reasonable steps to prevent their destruction. *See Landmark Legal Foundation v. Environmental Protection Agency*, 82 F. Supp. 3d 211, 223–24 (D.D.C. 2015). It appears that has not happened, but Plaintiffs continue to evade responding to direct questions about this.

11

At Plaintiff Smith's deposition, on February 27, 2025, it was revealed for the first time that some of the Plaintiffs possessed USCP-issued cell phones, which included text messaging capability, and provided access to their USCP email address. Plaintiff Smith testified that he still possessed his USCP phone, that he received emails and text messages on it from USCP, and used it to communicate with coworkers. He further testified that he had not performed any search on the phone for relevant texts or emails or even permitted his attorneys to conduct any search. And while he asserted that he did not send or receive any communications on his USCP phone related to January 6—one of the most consequential days in USCP history—that testimony is simply not credible, especially since he never even bothered to conduct a search.

In an off-the-record exchange at this deposition, Campaign counsel expressed deep concern about the apparent failure to preserve or search work devices and emails, including the potential for loss of information for Plaintiffs that had retired or changed jobs since filing of the lawsuit. Plaintiff's counsel stated that he would investigate the issue and provide an update to the Campaign. After several weeks, the Campaign reached out by letter, asking for a meeting to discuss the Plaintiff's work phones and emails and efforts to avoid spoliation. After this point, the Plaintiffs adopted the position that they were under no obligation to search for or *produce* evidence from their work phones or email accounts but have never provided any information on preserving it. By letter dated July 10, 2025, the Campaign specifically requested information about the appropriate steps the Plaintiffs took to preserve USCP device information, even if they are unable to produce it. Plaintiffs' subsequent refusal to provide any detail on reasonable steps taken to preserve these emails and phone records—such as litigation hold letters to USCP—and

12

their explicit denial of any such responsibility, strongly suggests that no such steps were taken.

*Plaintiffs' position:*

The Campaign has been aware since the filing of the original complaint, over four years ago, that Plaintiffs were employees of the U.S. Capitol Police. Yet, at no point until Officer Smith's deposition did the Campaign ask whether Plaintiffs were able to preserve, search, or collect Plaintiffs' USCP devices. Indeed, Officer Smith's deposition occurred months after Plaintiffs told the Campaign that Plaintiffs had substantially completed production of custodial documents, and even a cursory review of those documents would have revealed that Plaintiffs had not produced documents from USCP devices. Nevertheless, the Campaign now improperly seeks to hold Plaintiffs responsible for the preservation (or lack thereof) of those documents. The Campaign's deficiency allegations are meritless.

Importantly, the Campaign appears to concede that documents on USCP devices are outside of Plaintiffs' possession, custody, or control. For good reason. Plaintiffs have neither the obligation nor permission to collect or produce documents from their government-issued devices and email accounts. "Former employees of government agencies do not have 'possession, custody, or control' of documents held by their former employers," and current employees of the government "cannot on [their] own initiative remove government files and provide them to a third party." *Lowe v. District of Columbia*, 250 F.R.D. 36, 38–39 (D.D.C. 2008) (citing United States ex. rel. Touhy v. Ragen, 340 U.S. 462, 467 (1951)); *see also, e.g.*, *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951) ("When one considers the variety of information contained in the files of any

government department and the possibilities of harm from unrestricted disclosure in court, the usefulness, indeed the necessity, of centralizing determination as to whether subpoenas duces tecum will be willingly obeyed or challenged is obvious."). Despite sending several letters on this issue, and at one point threatening to move for sanctions, the Campaign cannot provide any contrary authority.

Yet, Defendants still "seek to blame Plaintiff[s]—and to have the court sanction [them]—for *their* failure to conduct routine third party discovery." *Ortiz v. City of Worcester*, No. 4:15-CV-40037-TSH, 2017 WL 2294285, at *5 (D. Mass. May 25, 2017). Plaintiffs have no duty to preserve documents that are outside their possession, custody, or control. *See, e.g.*, *id.* at *5; *Eacret v. Crunch, LLC*, No. 18CV04374JSTRMI, 2022 WL 4466718, at *2 (N.D. Cal. Sept. 26, 2022) ("[P]ossession, custody, or control is a necessary prerequisite to evidentiary spoliation."). The Campaign may desire these records to help "craft[] its defense," but that does not mean Plaintiffs then have a duty to seek out and preserve those records. *Ortiz*, No. 4:15-CV-40037-TSH, 2017 WL 2294285, at *4. "It is impossible to imagine where such a duty would end if it were recognized in circumstances where the records or items at issue are not a basis of a plaintiff's claim. It was the defendant's responsibility, in this adversary system, to conduct routine third party discovery." *Id.* at *5. To the extent the Campaign failed to do so, it is its own discovery failure, not Plaintiffs'.

## IV.    **Privacy Act Releases**

*Campaign Defendants' position:*

By letter on March 21, 2025, the Campaign informed Plaintiffs that the Department of Labor and the United States Capitol Police required Plaintiffs to sign

Privacy Act releases for the production of certain documents. The Campaign attached form Privacy Act releases that the Department of Labor provided to the Campaign. Plaintiffs did not object to signing Privacy Act releases, or the need for such releases, confirming their willingness to do so as recently as August 28, 2025, stating:

> As Plaintiffs stated in their June 18, 2025 letter, and the Campaign acknowledged in its August 20, 2025 letter, Plaintiffs are willing to sign Privacy Act releases. The Campaign states that there is no reason for Plaintiffs to redact PII when there is a protective order, but the Campaign still has not explained why it needs privacy-protected information like addresses and social security numbers. Plaintiffs specifically addressed this issue in their June 18, 2025 letter, but never received a response. Accordingly, Plaintiffs stand on their need to review records to determine whether and to what extent privacy and PII redactions are appropriate.

Plaintiffs, however, make the unreasonable demand that they will only sign the releases if documents are first produced to Plaintiffs for redaction of PII information. The Court has already expressed misgivings about Plaintiffs' practice of redacting such information from medical records at the June 6 discovery conference, particularly given the existence of the Protective Order. Ex. A at 10:10–12, 11:2–10.

Once again, the Plaintiffs attempt to flip the burden and simultaneously attack a strawman, demanding to know why the Campaign would need to see things like home addresses and social security numbers. First, redaction of this information is improper given the Protective Order. Second, this has nothing to do with exposing Plaintiffs' PII to *representatives* of the Campaign, as Plaintiffs have concealed this information even from the Campaign's *counsel*. At depositions, Plaintiffs' attorneys have consistently instructed their clients not to answer questions about their home address or social security numbers—even after offers from the Campaign to designate the answers as Confidential or AEO. This information is not subject to any privilege. It is also obviously relevant to the Campaign—which could use the information to gather evidence in this case—and is

utterly standard information exchanged in nearly every personal injury lawsuit ever litigated. Plaintiffs do not get to "pre-clear" or filter the documents produced in this case to prevent the Campaign from getting information to which it is entitled.

*Plaintiffs' position:*

The Campaign puts the cart before the horse. It still has not explained why, and to what extent, it needs Plaintiffs' Privacy Act releases, despite Plaintiffs' repeated entreaties for that information.

The Campaign first sought Plaintiffs' Privacy Act releases in a March 21, 2025 letter, in which the Campaign claimed that the United States Capitol Police requested them. Since then, Plaintiffs have asked the Campaign—in four separate letters—for which of the Campaign's requests to the Capitol Police did the Capitol Police require Plaintiffs' Privacy Act releases. To date, the Campaign has not responded to Plaintiffs' single question, and it is still unclear whether and to what extent Plaintiffs' Privacy Act releases were requested by the Capitol Police.

This is no mere technicality. The Campaign is not entitled to all of Plaintiffs' Privacy Act information, but rather to relevant information that is proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Without understanding to what extent the Capitol Police require Plaintiffs' releases, Plaintiffs have no ability to discuss the breadth of the required releases. And yet, the Campaign has failed to meaningfully confer with Plaintiffs on this issue, let alone propose tailored Privacy Act releases.

Even if the Capitol Police have asked for Plaintiffs' Privacy Act releases, those releases can still be drafted to protect Plaintiffs' valid privacy interests, including their addresses and social security numbers. The Campaign uses hyperbolic language that it "is

utterly standard information exchanged in nearly every personal injury lawsuit ever litigated," but that is simply untrue. In cases with specific privacy interests such as this one, and especially where law enforcement officers are involved, courts are willing to grant protective orders to protect private information like addresses and social security numbers. *See, e.g.*, *Waters v. U.S. Capitol Police Bd.*, 216 F.R.D. 153, 164-65 (D.D.C. 2003); *Huthnance v. District of Columbia*, 255 F.R.D. 285, 293 (D.D.C. 2008).

Plaintiffs have raised their privacy interests, *see supra*, and the Campaign has flippantly dismissed them. But being a defendant in a lawsuit does not automatically entitle the Campaign to the full universe of information about the Plaintiffs, and there is no doubt that "privacy" is implicated in the "broad purpose and language of" Rule 26, and that the Court must take them into account. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35 n.21 (1984); *see also, e.g.*, *Smith v. Cafe Asia*, 246 F.R.D. 19, 21–22 (D.D.C. 2007) (court has "discretion under Rule 26 to balance defendant's need for [discovery] against plaintiff's valid privacy concerns" (collecting cases)).[7]

Plaintiffs have asked the Campaign why it requires Plaintiffs' addresses and social security numbers—beyond its general assertions that personal injury defendants are entitled to such information—and offered to meet and confer to address any issues if the Campaign needed Plaintiffs' addresses and social security numbers for a specific purpose.

---

[7] The Campaign's assertion that the protective order obviates any privacy concerns are similarly misguided. *See, e.g.*, *Bottomly v. Leucadia Nat.*, 163 F.R.D. 617, 619 (D. Utah 1995) (holding court must "exercise its discretion to assure that unnecessary invasion of the privacy interests of all parties and other persons does not occur" regardless of the existence of a confidentiality order.).

The Campaign never even responded to Plaintiffs' offer to confer, much less provide any specific reason as to why it needed the information.

## V.    **Medical Records**

*Campaign Defendants' position:*

As the Court previously noted to Plaintiffs, it is their obligation to produce relevant medical records. Ex. A at 6:10–13, 8:16–17, 9:5–11, 16:7–12. In response to the Campaign identifying three specific instances of records gaps, the Court instructed Plaintiffs' counsel, "you've got to go get those records." *Id.* at 9:5–11. Yesterday, September 8, 2025, Plaintiffs finally produced a batch of supplemental records for Plaintiffs Fortune, Latson, Marshall, and DeRoche—within which Plaintiffs are still redacting their client's PII. While the Campaign is in the process of reviewing these records, they do appear to address one of the three identified gaps in treatment—respecting Plaintiff Marshall's ongoing treatment—however, one of the gaps remains. Plaintiff Marshall still has not produced treatment notes for her most important medical provider for dates prior to July 2021, which should extend as far back as May 2019. Based on the records provided yesterday, the Campaign believes it has good cause to continue Plaintiff Marshall's deposition to question her on her ongoing treatment and diagnoses, however, it would not be able to do so without knowing if or when Plaintiff Marshall will produce the missing records from May 2019 to July 2021.[8]

---

[8] Campaign counsel left Defendant Marshall's deposition open, over objection of Plaintiffs' counsel, due to the disclosure by Marshall of significant treatment for which no records were produced. Plaintiffs incorrectly claim that this is a request for a re-deposition of Defendant Marshall. It is not. At this stage, the Campaign simply wants to receive the records to which it is entitled.

*Plaintiffs' position:*

On June 16, 2025, the Court ordered that "if Defendants do identify missing records, Plaintiffs shall promptly attempt to obtain them." Smith ECF No. 406. Plaintiffs sent the Campaign a letter on June 18, 2025, requesting the Campaign identify any medical records it believed were missing. The Campaign did not respond for more than a month, eventually identifying four providers for whom it believed records were missing. Plaintiffs promptly contacted all four providers, in accordance with the Court's June 16 order, and are providing records as they receive them. As for Plaintiff Marshall's "most important medical provider," Plaintiffs have contacted both the provider and their former practice, and while Plaintiffs anticipate potentially receiving additional billing records, neither the provider nor their former practice has treatment notes for the time period identified by the Campaign.

Regarding the Campaign's request to re-depose Plaintiff Marshall, the Campaign has not yet conferred with Plaintiffs on this issue—indeed, the Campaign first added this request into the joint status report at 6:30 p.m. the day it was due to be filed. In any event, the Campaign has not provided any basis for re-deposing Plaintiff Marshall beyond its amorphous "belie[f]" that it has good cause.

## VI.    **Request for Production No. 35, retainer agreement**

*Campaign Defendants' position:*

Plaintiffs are standing on attorney-client privilege objections—among others—to producing their retainer agreement, despite relying on numerous cases that state,

explicitly, that such agreements are *not privileged*.[9] While Plaintiffs might, in a run-of-the-mill employment discrimination case—like those cited by Plaintiffs[10]—have a colorable relevance objection, relevance in *this* case goes beyond fee shifting. Plaintiffs' retainer agreements are potential evidence of Plaintiffs' motives for pursuing this case against the Campaign—namely, that the lawsuit is not about any injury caused by the Campaign, but is instead driven by lawyers and outside interest groups. In *Banks*, one of the employment discrimination cases relied upon by Plaintiffs, the court found the idea of outside funding of the litigation be "too fanciful to justify compelling production of the fee agreement." *Banks*, 222 F.R.D. at 13. In this case, there is ample evidence to support this theory.

Plaintiffs are represented by openly partisan attorneys,[11] they have testified evasively and vaguely about their retainer agreements—some claiming not to know whether they ever signed one—they have virulently prosecuted this case, investing thousands of hours of attorney time against entities and individuals which they know to be uncollectable—including the financially defunct Campaign—and they have invoked the

---

[9] *Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 7, 13 (D.D.C. 2004); *Robinson v. Duncan*, 255 F.R.D. 300, 302 (D.D.C. 2009); *Barnett v. PA Consulting Group, Inc.*, No. 04-1245-RWR-AK, 2006 WL 8464884, *4 (D.D.C. Jun. 30, 2006) *set aside on other grounds.*

[10] *See supra* n.2. All three of these cases, relied upon by Plaintiffs, were ordinary employment discrimination cases, and while each found that retainer agreements were not *yet* relevant, they did so on the grounds that the only potential relevance was potential fee shifting.

[11] While the Lawyers' Committee for Civil Rights Under the Law proclaims itself to be non-partisan on its website, its politics are openly anti-Trump, as can be readily gleaned from the press releases put out by the Lawyers' Committee on a regular basis, as well as the cases—such as this one—that it chooses to pursue. There is, of course, nothing wrong with that, but for the purposes of this case and the Campaign's defense, it is relevant.

common interest doctrine on this document request, further suggesting the involvement of outside groups.

Moreover, the President of the United States and his presidential campaign are not ordinary defendants. They are not being sued for employment discrimination. They are being sued under a novel application of a 154-year-old civil rights statute for the actions of unnamed and unconnected rioters at one of the most politically significant events of the last century. It is therefore not a "fanciful" idea, as the Court found it to be in *Banks*, that outside groups are influencing and motivating the prosecution of this case.

It is also ironic that on this issue, Plaintiffs cite to authorities prohibiting the use of discovery as a fishing expedition, considering the vastly overbroad, disproportionate, and irrelevant discovery requests propounded by Plaintiffs on the Campaign.[12] As described above, the Campaign's theory—unlike Plaintiffs' entire case against the Campaign—is not mere speculation, but is plausibly grounded in facts. The Campaign is entitled to discovery on what outside groups may be involved in this litigation.

---

[12] *De Sousa v. Embassy of Republic of Angola*, 267 F. Supp. 3d 163, 174 (D.D.C. 2017). The Court, deciding a motion to dismiss, and responding to the plaintiff's argument that he should be able to amend the complaint to allege new claims "learned through the flexible discovery process," stated:

> The plaintiff misunderstands the purpose of discovery. His complaint must allege sufficient facts that, if proven true, would justify his claim for relief. The discovery process is meant to provide an opportunity for a plaintiff to find factual support for those allegations, not to give a plaintiff free reign to fish for evidence of other claims he may have against an opposing party. As the purported victim of intentional infliction of emotional distress, the plaintiff should already know a good amount of detail about the conduct that assertedly caused him distress.

*Id.* (internal citation omitted). This case, relied upon by Plaintiffs, has no application to the Campaign's attempt to develop evidence of Plaintiffs' motivations.

<u>*Plaintiffs' position:*</u>

Plaintiffs have not produced Plaintiffs' retainer agreements because they are not relevant to any issue in this case.  *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . .").  As Plaintiffs have previously explained to the Campaign, it is well established that retainer agreements showing fee arrangements only "become relevant, at best, when plaintiff prevails and seeks a fee." *Banks v. Office of the Senate Sergeant-at-Arms and Doorkeeper*, 222 F.R.D. 7 (D.D.C. 2004); *see also Robinson v. Duncan*, 255 F.R.D. 300, 303 (D.D.C. 2009) (denying motion to compel production of retainer agreement before plaintiff succeeded on the merits, despite plaintiff's claim for attorney's fees, because the agreement was "not currently relevant"); *Barnett v. PA Consulting Grp.*, 2006 WL 8464884, at *1 n.1, *4 (D.D.C. June 30, 2006) (denying motion to compel a response to an interrogatory that "inquir[ed] as to whether Plaintiff has retained her counsel on a contingency basis, otherwise what the hourly fee rate is," because "the attorney fee information that Defendant seeks is not relevant to a claim or defense, but rather relates to the issue of fee shifting, which becomes applicable only if Plaintiff prevails and is entitled to reasonable attorney's fees"), *set aside on other grounds*.  As the court noted in *Banks* (which the Campaign cites), parties are only entitled to use discovery mechanisms for a "legitimate use"; thus, obtaining information about a counterparty's fee arrangement with counsel is not discoverable until the merits have resolved in part because of the likelihood of use for improper purposes (in *Banks*, "assessing one's settlement posture by knowing what one's opponent is paying counsel," for example).  Therefore, the position articulated by the Campaign is not only

insufficient to compel the production of the retainers at this stage of the case, but a legally improper use of the discovery process.

The Campaign asserts that the "relevance" of the retainer agreements goes to Plaintiffs' motives. Even if that were true (which is purely speculative), the Campaign has not provided any explanation or authority that Plaintiffs' motives would be relevant to any claim or defense in this case.

Regardless, the Campaign has no support for its unfounded contention that the retainer agreements are relevant even to Plaintiffs' motives. Indeed, the Campaign cites to a case that expressly rejects this kind of "fanciful" claim. *See Banks for Office of Senate Sergeant at Arms*, 222 F.R.D. 7, 13 (D.D.C. 2004). The Campaign provides no basis for its assertion that "Plaintiffs are represented by openly partisan attorneys," nor does it indicate why the speculated personal political leanings of a party's counsel—which is not supported by *any* evidence—are at all relevant to discovery in this litigation. In addition, that Plaintiffs did not recall the specifics of their retainer agreements with their lawyers during deposition says nothing about their "motivations" for bringing this lawsuit, nor can the Campaign articulate any rationale for how it would. Finally, the Campaign's reference to Plaintiffs' invocation of the common interest doctrine seems to refer to their request for discovery regarding whether "outside parties" have been involved in this case, to which Plaintiffs responded.

Dated: September 9, 2025                    Respectfully submitted,

                                            /s/ Jason C. Greaves
                                            Jesse R. Binnall, VA022
                                            Jason C. Greaves, DC Bar No. 1033617
                                            Gerald A Urbanek, Jr. VA191
                                            Jared J. Roberts, *pro hac vice*
                                            BINNALL LAW GROUP
                                            717 King Street, Suite 200

Alexandria, Virginia 22314
Tel:  (703) 888-1943
Fax: (703) 888-1930
jason@binnall.com
jesse@binnall.com
gerald@binnall.com
jared@binnall.com

*Counsel for Donald J. Trump for
President, Inc., and Make America
Great Again PAC*

  /s/   Marc P. Epstein
Edward G. Caspar, D.C. Bar No. 1644168
Marc P. Epstein, D.C. Bar No. 90003967
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street N.W. Suite 900
Washington, DC  20005
Tel: 202-662-8390
ecaspar@lawyerscommittee.org
mepstein@lawyerscommittee.org

Faith E. Gay, *pro hac vice*
Joshua S. Margolin, *pro hac vice*
Babak Ghafarzade, *pro hac vice*
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
fgay@selendygay.com
jmargolin@selendygay.com
bghafarzade@selendygay.com

William J. Blechman, *pro hac vice*
Elizabeth B. Honkonen, *pro hac vice*
SPERLING KENNY NACHWALTER
Four Seasons Tower – Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Tel: 305-373-1000
wblechman@sperlingkenny.com
ebh@sperlingkenny.com

*Counsel for Plaintiffs Smith et al.*

24

## CERTIFICATE OF SERVICE

I certify that on September 9, 2025, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

*/s/* Jason C. Greaves
Jason C. Greaves
*Counsel for Donald J. Trump for*
*President, Inc., and Make America*
*Great Again PAC*
